**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| DANIEL ANDERSEN | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE CITY OF CHICAGO, JAMES | ) |
| BEDNARKIEWICZ #6793, RICHARD | ) |
| BEDRAN #2812, CRAIG CEGIELSKI | ) |
| #14238, DAN FITZGERALD #9342, | ) |
| JOHN HERMAN #12088, JAMES | ) |
| HIGGINS #3094, DANIEL MCWEENY | ) |
| #14367, TED MELKO #11558, PAUL | ) |
| NIELSEN #8060, JOHN OLSON | ) |
| #3357, L. PAWLOWSKI #2525, N. | ) |
| RAJEWSKI #12601, MICHAEL RILEY | ) |
| [STAR # UNK], RICHARD | ) |
| ROCHOWICZ #2812, and UNKNOWN | ) |
| EMPLOYEES OF THE CITY OF | ) **JURY TRIAL DEMANDED** |
| CHICAGO, | ) |
| | ) |
| Defendants. | |

## <u>COMPLAINT</u>

NOW COMES Plaintiff, DANIEL ANDERSEN, by his attorneys
LOEVY & LOEVY, and complaining of Defendants THE CITY OF
CHICAGO, JAMES BEDNARKIEWICZ #6793, RICHARD BEDRAN #2812, CRAIG
CEGIELSKI #14238, DAN FITZGERALD #9342, JOHN HERMAN #12088,
JAMES HIGGINS #3094, DANIEL MCWEENY #14367, TED MELKO #11558,
PAUL NIELSEN #8060, JOHN OLSON #3357, L. PAWLOWSKI #2525, N.
RAJEWSKI #12601, MICHAEL RILEY [STAR # UNK], RICHARD ROCHOWICZ
#2812, and UNKNOWN EMPLOYEES OF THE CITY OF CHICAGO
(collectively, "Defendants" or "Defendant Officers"), states as
follows:

## Introduction

1.    In 1982, Plaintiff Daniel Andersen was wrongfully convicted of a heinous crime: the murder and attempted rape of a young woman near her home in Chicago's Back of the Yards neighborhood.

2.    Plaintiff had nothing to do with the crime for which he was wrongfully convicted.  He is completely innocent.

3.    It took thirty-four years for Plaintiff to clear his name and secure his exoneration. In 2014, DNA testing conclusively excluded Mr. Andersen as the assailant.

4.    After the DNA results were obtained, Plaintiff's conviction was vacated, and the Cook County State's Attorney's Office dismissed the charges on August 13, 2015.

5.    Plaintiff was granted a Certificate of Innocence by the Circuit Court of Cook County on December 18, 2015, which the State's Attorney did not oppose.

6.    A teenager when he was arrested, Mr. Andersen's wrongful conviction forced him to endure nearly three decades in in Illinois' most dangerous prisons, and his life has been forever damaged.

7.    Plaintiff now seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and the terrible hardship that Plaintiff has endured and continues to suffer as a result of the Defendants' misconduct.

## Jurisdiction and venue

8.   This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

9.   This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

10.   Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district, the majority of the Defendants reside in this judicial district, and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

## Parties

11.   Plaintiff Daniel Andersen is an Illinois resident who spent more than 27 years in prison for a crime he did not commit.

12.   Defendants Bednarkiewicz, Bedran, Cegielski, Fitzgerald, Herman, Higgins, McWeeny, Melko, Nielsen, Olson, Pawlowski, Rajewski, Riley, and Rochowicz (hereinafter "Defendant Officers") are current or former officers of the Chicago Police Department. All are sued in their individual

3

capacities and were at all relevant times acting within the scope of their employment and under color of law.

13.  Defendant unknown employees of the City of Chicago are officers of the Chicago Police Department, at all times acting within the scope of their employment and under color of law.

14.  Defendant City of Chicago is an Illinois municipal corporation that is or was the employer of the Defendant Officers.

**FACTS**

**The Crime**

15.  On January 19, 1980, at approximately 10:15 pm, 20-year old Cathy Trunko was found dead on the sidewalk in front of 4938 South Paulina in Chicago.  That address was less than one block away from her home, in the Back of the Yards neighborhood.

16.  The victim had three stab wounds to her chest: two on her left breast and one on her right breast.

17.  There were no signs of strangulation. Her clothes were not in disarray. Her purse was still secured around her shoulder but had no money in it.

18.  There was no trail of blood that would indicate that her body had been moved.

**The Defendants Find A Knife**

19.  The Defendant Officers began an investigation of the Trunko murder.

4

20.   A few days after the murder, the Defendant Officers retrieved a knife apparently found on the front lawn of 5036 S. Hermitage.   The Defendant Officers immediately claimed the knife was Cathy Trunko's murder weapon, even though there were real questions about whether the knife could inflict the wounds she sustained, and even though the knife was found on a different street and a different block than where the crime occurred.

21.   The knife was photographed, tested, and inventoried as part of the Trunko investigation.

22.   Once tested, it was determined that the blood on the knife was Type A, which is shared by forty percent of the Caucasian population. Cathy Trunko, who was Caucasian, had Type A blood.

**The Beer Bottle**

23.   CPD investigators also recovered an Old Style beer bottle. The bottle was distinctive: a small, seven-ounce bottle that was only sold by one place in that neighborhood, Dot's Tavern.

24.   The Defendant Officers identified the bottle as evidence in the Trunko investigation and requested fingerprint testing of it.

**Daniel Andersen**

25.   In January of 1980, Daniel Andersen had just turned 19 years old and was living in the Back of the Yards neighborhood

5

with his mother, father, and siblings. After attending DeLaSalle High School, he began working at a construction company, where he was training to become a pipe fitter.

26. Mr. Andersen had nothing to do with the Trunko murder and is innocent of that crime.

27. Throughout the time period when the crime occurred, Plaintiff was with his friends and was seen by several people, including patrons of the Red Mist Tavern.

28. Plaintiff first learned that Cathy Trunko had been killed while he was at his friend's house, where several people were discussing it, as they all knew her from having lived in the same neighborhood for years.

### The Defendants Pursue Daniel Andersen

29. On January 24, five days after Trunko's death, Plaintiff went out drinking to celebrate his friend Norman Venegas's birthday. He had gotten very little sleep the night before and was in a sleep-deprived state.

30. In addition, Plaintiff had been taking a prescription drug called Activid, which his doctor prescribed for a sore throat. When combined with alcohol, Activid can cause cognitive impairments and lead to hallucinations.

31. Plaintiff went to the Red Mist Tavern with Venegas. The two were drinking beer and consuming shots. Eventually, Venegas left the tavern and drove Plaintiff's car toward

6

Plaintiff's home, because Plaintiff was too impaired to drive himself home. Plaintiff lingered at the tavern a short while longer, and then got a ride home from another friend who was at the tavern.

32.    Unbeknownst to Plaintiff, his mother, Mary Andersen, was concerned that Plaintiff was out drinking, so she contacted a neighborhood police officer she knew, Defendant Riley, and asked if he would bring her son home.

33.    Shortly thereafter, two of the Defendant Officers, Bednarkiewicz and Nielsen, spotted Plaintiff's car.  They pulled the car over, and inexplicably began asking the driver about a gun and about Cathy Trunko's murder. Venegas knew nothing about these subjects.

34.    Bednarkiewicz, Nielsen, and Venegas then proceeded to Mr. Andersen's house.

35.    Around the time they reached Plaintiff's house, Plaintiff arrived home.  Upon seeing the police car, Plaintiff approached to find out what was happening. Defendants Bednarkiewicz and Nielsen jumped out and began searching and violently grabbing Plaintiff.  Venegas heard one of the officers say, "That's the guy. Let's get him," or words to that effect.

36.    Defendants Bednarkiewicz and Nielsen began questioning Plaintiff about the Trunko murder and accusing him of knowing something.

37.    Defendant Nielsen twisted Plaintiff's arm for several minutes and pressed him against the hood of the car.  Plaintiff was crying out in pain.

38.    Meanwhile, Defendant Bednarkiewicz approached Plaintiff's mother and pressured her into signing a disorderly conduct complaint against Plaintiff.  Plaintiff's mother did not want to sign the complaint and did not believe her son needed to be arrested. Defendant Bednarkiewicz nonetheless continued pressuring her and assured her it was nothing serious, and she would be able to bond him out in the morning. Due to Bednarkiewicz's insistence, and so that they would stop hurting her son who was still screaming from pressed onto the car with his arm painfully twisted, she signed the complaint. At the time, she overheard one of the Defendant Officers saying to her son, "You're the guy that did it," but she did not understand the meaning of that statement until the following day.

### Plaintiff's Arrest

39.    Having obtained a false and pretextual disorderly conduct complaint from Mary Andersen, Defendants Bednarkiewicz and Nielsen arrested Plaintiff. The time was approximately 2:00 am on January 24, 1980. They placed Plaintiff into the back of their squad car and drove him to the Ninth District police station.

40. Though he was in custody, neither Defendant gave him a *Miranda* warning before proceeding to question him about the Trunko murder. The Defendants knew that Plaintiff was heavily intoxicated.

41. Plaintiff was detained at the Ninth District for approximately one hour. There, he saw Defendant Riley, who observed Plaintiff to be heavily intoxicated, upset, and not talking rationally. Defendants were physically violent with Plaintiff and handcuffed him to a locker. Despite repeated requests for water, Plaintiff was not given any.

42. Defendant Riley was aware that the Defendant Officers intended to question Plaintiff about the Trunko murder and planned to interrogate him without any cause to do so, but at no time did he intervene. Instead, he left Plaintiff alone at the station and placated Plaintiff's family by telling them not to worry because Plaintiff would be home soon.

43. Plaintiff never made any inculpatory statements to Defendants Bednarkiewicz and Nielsen. So the Defendant Officers fabricated a statement for him, claiming falsely that Plaintiff spontaneously and voluntarily confessed to stabbing "the Trunko girl" three times, once in her right chest and twice in her left chest. According to the Defendant Officers' concocted story, Plaintiff further confessed to throwing the knife in the area of 50th and Hermitage.

9

44.   Each of these facts – the presence of a knife at 5036 S. Hermitage, and the location of the stab wounds – was known to the Defendants, but not to Plaintiff, prior to his interrogation.  As it turns out, Defendants' fabricated link between the knife and the Trunko murder was totally false, and their decision to weave that knife into Plaintiff's coerced confession would eventually unravel the entire statement.

### Plaintiff's Lengthy Interrogation

45.   Having fabricated a false inculpatory statement from Plaintiff, Defendants Bednarkiewicz and Nielsen transferred Plaintiff to Area 3 Homicide for further interrogation. There, he was aggressively interrogated, confused, misled, and coerced from 3:00 am until approximately 6:00 pm the next day. Eventually, Plaintiff succumbed to Defendants' coercion, and adopted the story that Defendants had fabricated.

46.   Upon arriving at Area 3, Plaintiff said he did not know why anyone would want to kill Cathy Trunko, and he insisted that he was not responsible for the crime. The Defendant Officers responded by using physical violence against him.  They threatened to scar his face for life. Plaintiff sustained bruising on his face and a large cut on his forehead.

47.   Following the lengthy beating, the Defendant Officers began feeding Plaintiff facts and coercing him to implicate himself in the Trunko murder.

10

48.   Plaintiff was a vulnerable target: a teenager, alone at Area 3 homicide without a parent or attorney, heavily intoxicated, impaired from the prescription Activid, sleep deprived, and "not talking rationally" in the words of Defendant Riley himself. In addition, the coercive nature of the interrogation was exacerbated by the length of time he was in custody: all told, Plaintiff was in police custody interrogated about the Trunko case for sixteen hours before he gave an inculpatory statement.

49.   During those sixteen hours, Plaintiff was denied access to the bathroom, and he had to urinate in a trashcan. He was also denied food and water until he agreed to give a confession.

### The Coerced Confession

50.   The confession itself was a bizarre narrative filled with details that have since been proven objectively false, scripted entirely by the Defendant Officers.

51.   Defendant Higgins, an Area 3 homicide detective, convinced Plaintiff that they were seeking his help in solving the Trunko murder. Defendant Higgins told Plaintiff that they were frustrated that they had no leads. He asked Plaintiff to help him try to get into the mindset of the killer.

52.   Defendant Higgins asked Plaintiff to draw a map of the neighborhood. He instructed Plaintiff to make markings on the

11

map at various locations, and to write notes on the map, such as "Had to do what I had to do," and "dreams the night before." Whatever Higgins said, Plaintiff wrote.

53. At some point during the interrogation, one or more Defendants obtained Plaintiff's consent to search his home. The Defendants went to his home and grabbed knives and other objects, even though there was no connection between those items and the Trunko murder.

54. Defendant Higgins then fed Plaintiff information about the murder weapon. He said, "Dan, we found the murder weapon," and showed Plaintiff photographs of the knife that had been recovered at 5036 S. Hermitage. In addition, they displayed a pair of gloves. Plaintiff told Defendant Higgins that he was innocent and had no knowledge of the so-called murder weapon. The Defendants never produced the gloves or any photographs of the gloves to the prosecutor or Plaintiff's criminal defense attorney.

55. Over the course of several hours, Defendant Higgins created a narrative about Trunko's murder, in which her attacker wanted to have sex with her and then killed her because she refused. Defendant Higgins fed Plaintiff various imagined details about the crime, including that: (i) the knife recovered from 5036 S. Hermitage was the murder weapon; (ii) the assailant

hid the knife in his boot; (iii) the assailant and the victim struggled violently before she was stabbed.

56.  Defendant Higgins then forced Plaintiff to adopt the story as his own, alternating between threats to bring back the officers who had beaten Plaintiff earlier in the day, and promises to release Plaintiff if he just confessed to the crime. Defendant Higgins instructed Plaintiff to tell his "boss," the Assistant State's Attorney, that he had committed the murder. He told Plaintiff that sometimes people commit crimes but do not remember committing them.

57.  By the end of the interrogation, the Defendants succeeded in overcoming Plaintiff's will; Plaintiff was so confused and broken that he had no choice but to obey Defendant Higgins and confess to a crime he did not commit.

58.  The extent to which the Defendant Officers manipulated and distorted Plaintiff's sense of reality over the course of sixteen hours is startling.  Defendant Higgins promised Plaintiff that if he continued to help the police "get in the mind of the killer," Plaintiff may have a job at the police department. When Plaintiff expressed hesitation, Defendant Higgins offered to get Plaintiff a job at Ford Motors, where Plaintiff used to work.  Defendant Higgins even promised to take Plaintiff out on his boat.

59.   In his overly vulnerable state, Plaintiff began to believe that Defendant Higgins was his attorney, and his friend. Scribbled on the interrogation room wall in Plaintiff's handwriting was the phrase, "Need a friend, call a cop."

60.   When Plaintiff's parents arrived at the police station the next morning to look for their son, they found Mr. Andersen rocking from side to side, messy, edgy, and hyper. Plaintiff's father asked why he didn't call his parents, and Plaintiff explained that the police did not let him call.

61.   At the police station, Plaintiff told his parents, "Higgins is my friend, my buddy." He also stated: "Higgins told me I don't need an attorney. That he is my attorney." Then he told his parents, "It is all set. It is all fixed. Higgins and I are going to California."

### Plaintiff's False Statement

62.   With Defendant Higgins present, a Cook County Assistant State's Attorney brought a court reporter to the police station and obtained a "confession" from Plaintiff.

63.   The coerced statement contains facts that are demonstrably false and was the direct result of the Defendants' misconduct.

64.   Plaintiff was tried in March 1982 on charges of attempted rape and murder in the Circuit Court of Cook County. A jury convicted Plaintiff of both charges notwithstanding his

innocence. The fabricated confession and knife evidence were the centerpieces of the State's case and the only "evidence" upon which Plaintiff's conviction rested.

### DNA Results Exonerate Plaintiff

65.   Immediately after he was released from the Defendant Officers' control, Plaintiff recanted his confession. He maintained his innocence throughout his incarceration.

66.   Even after his release from prison, Plaintiff did not give up his fight to clear his name and uncover the truth. He obtained DNA testing in 2014. The results dismantled the state's case and exposed the Defendant officers' lies.

67.   DNA testing of blood found on various parts of the knife excluded both Plaintiff *and* the victim.  In other words, the knife at the heart of the prosecution's case had nothing to do with the Trunko murder. The DNA test results simultaneously eliminated the link between the knife and the murder that the Defendants had fabricated and exposed that Defendants had coerced Plaintiff into confessing--under their influence, Plaintiff confessed to using a knife that had nothing to do with the murder.

68.   Additionally, DNA testing of the victim's fingernail scrapings excluded the Plaintiff.

### Defendants Destroy Exculpatory Fingerprint Evidence

69.   In addition to fabricating evidence of guilt, the Defendants also destroyed evidence relevant to the investigation. On or about January 21, Defendants Melko and Rajewski lifted two fingerprints from a seven-ounce Old Style beer bottle, in connection with the homicide investigation. They communicated the results of their fingerprint analysis to Defendants Higgins and Cegielski of Area 3.

70.   On information and belief, the fingerprint and the bottle contained exculpatory or potentially exculpatory evidence. Specifically, those fingerprints could have corroborated the involvement of an alternate, viable suspect, and they could have excluded Plaintiff.

71.   The potentially exculpatory value of the bottle and fingerprints were apparent. Their relevancy was obvious as well, and the Defendants Officers sought to have the bottle tested immediately in connection with the Trunko murder.

72.   Despite this obvious relevancy, the Defendant Officers destroyed, or caused to be destroyed, actually or potentially exculpatory evidence that could have linked evidence from the crime scene to the alternate suspect.  Had Plaintiff possessed this evidence, he may have been able to present evidence of an alternate suspect.

73.   In so doing, the Defendant Officers violated Chicago Police Department rules and regulations, including retention schedules that required this evidence to be preserved.

### Chicago's Pattern of Coercing False Confessions

74.   The constitutional violations that caused Plaintiff's wrongful conviction were not isolated events. To the contrary, they resulted from the City of Chicago's policies and practices of pursuing wrongful convictions through profoundly flawed investigations and coerced confessions.

75.   In particular, the Defendant Officers' coercion of false statements from Plaintiff was undertaken pursuant to, and proximately caused by, a policy and practice on the part of the Department.

76.   There is a well-documented history of torture and coercion by Chicago police detectives to obtain false confessions from murder suspects.  In the 1970s and 1980s, the practice of using physical and psychological coercion to gain false statements was pervasive, particularly in Area 2 and Area 3.  This department-wide misconduct has earned Chicago the dubious distinction of being the "False Confession Capital of America."

77.   The pattern of obtaining false confessions has persisted unabated well past the 1980s. In an article examining thousands of murder cases in Chicago from 1991 through 2000, *The*

17

*Chicago Tribune* found that Chicago police detectives had been involved in a wide range of cases that ultimately collapsed even though the detectives had obtained confessions.

78. The Chicago Police Department has a long history of using physically and psychologically coercive interrogation tactics in order to elicit statements from suspects in criminal cases, which has caused false confessions and led to wrongful convictions.

79. The wrongful convictions of innocent persons who gave coerced and false confessions include numerous cases in which Department detectives used the very same tactics that the Defendants employed against Plaintiff in this case. These tactics include: (a) physical abuse; (b) psychological intimidation and manipulation; (c) fabrication of confessions; (d) misleading of parents and denial of parents' access to their children during interrogations; (e) concealment of exculpatory information; (f) fabrication of supposed corroborating evidence; and (g) use of other unlawful tactics to secure the arrest, prosecution, and conviction of persons, including teenagers, without regard to their actual guilt.

80. At the time of the events leading to Plaintiff's coerced confession and wrongful conviction, members of the Department systematically promoted the improper prosecutions of individuals by using abusive and coercive interrogation tactics

to force them to confess to crimes they did not commit.

81. Consistent with the municipal policy and practice described in the preceding paragraph, members of the Department, including but not limited to the Defendant Officers, systematically suppressed evidence pertaining to these fabricated and coerced confessions, both from the Cook County State's Attorney's Office and from criminal defendants.

82. As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department. In accordance with this code, Department Detectives refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

83. As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct; failing to investigate cases in which the police are implicated in obtaining coerced and false confessions, as well as wrongful charges and convictions; failing to discipline officers accused of this unlawful conduct; and facilitating a code of silence within the Department, Chicago police officers (including the Defendant Officers here) have come to believe that they may violate the civil rights of members of the public and cause

innocent persons to be charged with serious crimes without fear of adverse consequences.

84. The City's failure to train, supervise, and discipline its officers effectively condones, ratifies, and sanctions the kind of misconduct that the Defendant Officers committed against Plaintiff in this case. Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* policies, as alleged above.

85. The City of Chicago and officials within the Department failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

86. The policies and practices described in the foregoing paragraphs were approved by City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

### Chicago's Street Files Problem

87. In addition to its widespread practice of coercing false confessions from vulnerable individuals, the Chicago Police Department had a widespread practice of withholding exculpatory and impeaching information from prosecutors and criminal defendants. As a result of that practice, the Defendant

Officers in this case were permitted to maintain undisclosed, material information about their investigation that was never made available for Plaintiff's defense.

88. At all times relevant hereto, members of the Chicago Police Department, including the Defendant Officers, maintained parallel files that contained investigative materials, memos, notes, and even photographs or other physical evidence, which were not part of the official police department file. Those parallel files were maintained informally by detectives, on clipboards or in lockers, briefcases, and cars. Referred to as "street files," these files were brought onto the street as detectives actively investigated a case, and they were considered the personal property of the detectives.

89. Because the information contained in the detectives' street files was not also preserved in the "official" police file of the Chicago Police Department, prosecutors and defense attorneys were routinely denied access to them. Furthermore, prosecutors and defense attorneys routinely did not know that this undisclosed investigative material even existed.

90. The practice of maintaining street files was deeply entrenched from 1980 through 1982, and well beyond, and it existed in every area homicide division, including Area 3.

91. As a matter of widespread custom and practice, these clandestine street files were routinely withheld from the Cook

21

County State's Attorney's Office and from criminal defendants, and some of these files may have been subsequently destroyed.

92.  Consistent with the municipal policy and practice described in the preceding paragraphs, Defendants in this case concealed exculpatory evidence, including evidence relating to Mr. Andersen, in street files, which were never disclosed to Plaintiff's criminal defense team.

93.  The street files practice described in the preceding paragraphs was consciously approved at the highest policy-making level for decisions involving the Department, and was a proximate cause of the injuries suffered here by Plaintiff.

### Plaintiff's Injuries

94.  Without the Defendants' misconduct, Plaintiff would never have been convicted.

95.  He was sentenced to forty years for murder and a concurrent thirty-year sentence for attempted rape, plus a fifteen-year enhancement for "exceptionally brutal or heinous behavior, indicative of wanton cruelty." At his sentencing, Plaintiff again declared his innocence, by telling the Court, "Your Honor, I am innocent. I didn't kill that girl, Cathy."

96.  Plaintiff's life was forever damaged. Plaintiff has lived more of his life in prison than in free society, though he committed no crime and was completely innocent.

22

97. During his 27-and-a-half years of incarceration, Plaintiff was detained in harsh and dangerous conditions in maximum security prisons.

98. Even after his release on parole, Plaintiff suffered the stigma of his wrongful conviction. He has had to register as a sex offender and has struggled to rebuild his life.

99. Plaintiff was taken away from his mother and father, from his siblings and other relatives, and from his friends. He has missed countless experiences and was deprived of the basic, everyday freedoms he deserved to enjoy.

100. Plaintiff was deprived of opportunities to gain an education, to engage in meaningful labor, to develop a career, and to pursue his interests and passions. Now in his fifties, Plaintiff has missed the opportunity to have children of his own.

101. In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, the Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and other physical and psychological effects.

102. To this day, the crime remains unsolved. By focusing exclusively on the wrong man, the Chicago Police Department has let the real killer remain at large for three decades.

**COUNT I**

**42 U.S.C. § 1983 – Coerced and False Confession
(Fifth and Fourteenth Amendments)**

103. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

104. In the manner described more fully above, the Defendants Officers, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his rights secured by the United States Constitution. The misconduct described in this Count was done using psychological coercion and torture and was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

105. As described more fully above, the Defendant Officers participated in, encouraged, advised, and ordered an unconstitutional, sixteen-hour interrogation of Plaintiff, which overcame his will, causing Plaintiff to make involuntary statements implicating himself in the murder and attempted rape of Cathy Trunko.

106. The false statements coerced by the Defendants and attributed to Plaintiff were used against Plaintiff to his

24

detriment in a criminal case. On the basis of these false statements, Plaintiff was convicted.

107. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

108. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT II**

**42 U.S.C. § 1983 - Due Process**

109. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

110. As described in detail above, the Defendant Officers, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

111. In the manner described more fully above, the Defendant Officers fabricated evidence of Plaintiff's guilt, including his false inculpatory statements and the fabricated knife evidence, obtained Plaintiff's conviction using that false

evidence, and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

112. In addition, the Defendant Officers deliberately withheld exculpatory evidence from Plaintiff, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

113. The Defendant Officers' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fifth and Fourteenth Amendments. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

114. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

115. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT III

### 42 U.S.C. 1983 - Destruction of Evidence

116. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

117. In the manner described more fully above, one or more of the Defendants destroyed evidence that Plaintiff could have used to further prove his innocence.

118. The exculpatory value of that evidence was apparent to the Defendants. In the alternative, the evidence was potentially exculpatory, and the Defendants knew that.

119. Nonetheless, the Defendants negligently destroyed the evidence. In the alternative, Defendants acted in bad faith in destroying the evidence.

120. As a result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to emotional distress more fully alleged above.

121. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

### COUNT IV

### 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

122. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

123. After the murder of Cathy Trunko, the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

124. In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

125. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

126. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

127. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT V

### 42 U.S.C. § 1983 – Failure to Intervene

128. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

129. In the manner described above, during the constitutional violations described herein, one or more of the individual Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

130. As a result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress. These Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

131. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

132. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

29

## COUNT VI

### 42 U.S.C. 1983 – *Monell* claims against the City of Chicago

133. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

134. The actions of all the Defendant Officers were undertaken pursuant to policies and practices of the Department, described above, which were ratified by policymakers for the City of Chicago with final policymaking authority. These policies and practices included the failure to adequately train, supervise, and discipline officers who engaged in the alleged constitutional violations, as set forth in greater detail above.

135. The policies and practices described in this Count were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiff's constitutional rights.

136. As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

137. The City of Chicago is therefore liable for the misconduct committed by the Defendant Officers.

## COUNT VI

## 42 U.S.C. § 1983 – Federal Malicious Prosecution[1]

138. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

139. In the manner described above, the Defendant Officers, acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that there was no reasonable basis to suspect Plaintiff of the crime, in violation of his rights secured by the Fourth and Fourteenth Amendments.

140. In so doing, the Defendant Officers caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

141. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

---

[1] Plaintiff recognizes that this Circuit currently holds that malicious prosecution is not actionable under 42 U.S.C. § 1983. Other Courts of Appeals have taken the opposite position. Plaintiff pleads the claim here under the Fourth and Fourteenth Amendments to preserve the issue for reconsideration in the U.S. Court of Appeals for the Seventh Circuit or review in the Supreme Court of the United States.

142. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT VII**

**State Law Claim – Malicious Prosecution**

143. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

144. In the manner described above, the Defendant Officers, acting as investigators, individually, jointly, or in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

145. In so doing, these Defendant Officers caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

146. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with

reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

147. As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT VIII**

**State Law Claim – Intentional Infliction of Emotional Distress**

148. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

149. The actions, omissions, and conduct of the Defendant Officers as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

150. As a direct and proximate result of the Defendant Officers' actions, Plaintiff suffered and continues to suffer emotional distress and other grievous and continuing injuries and damages as set forth above.

## COUNT IX

### State Law Claim – Civil Conspiracy

151. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

152. As described more fully in the preceding paragraphs, the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

153. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

154. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

155. As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

34

**COUNT XI**

**State Law Claim – Respondeat Superior**

156. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

157. While committing the misconduct alleged in the preceding paragraphs, the Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

158. Defendant City of Chicago is liable as principal for all torts committed by its agents.

**COUNT XII**

**State Law Claim – Indemnification**

159. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

160. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

161. The Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

162. The City of Chicago is obligated by Illinois statute
to pay any judgment entered against the Defendant Officers in
his official capacity.


WHEREFORE, Plaintiff DANIEL ANDERSEN, respectfully requests
that this Court enter a judgment in his favor and against
Defendants THE CITY OF CHICAGO, JAMES BEDNARKIEWICZ #6793,
RICHARD BEDRAN #2812, CRAIG CEGIELSKI #14238, DAN FITZGERALD
#9342, JOHN HERMAN #12088, JAMES HIGGINS #3094, DANIEL MCWEENY
#14367, TED MELKO #11558, PAUL NIELSEN #8060, JOHN OLSON #3357,
L. PAWLOWSKI #2525, N. RAJEWSKI #12601, MICHAEL RILEY [STAR #
UNK], RICHARD ROCHOWICZ #2812, and UNKNOWN EMPLOYEES OF THE CITY
OF CHICAGO, awarding compensatory damages, attorneys' fees and
costs against each Defendant, punitive damages against each of
the individual Defendants, and any other relief this Court deems
just and appropriate.

**JURY DEMAND**

Plaintiff, DANIEL ANDERSEN, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.


Respectfully submitted,

DANIEL ANDERSEN


BY: /s/ Roshna Bala Keen
*One of Plaintiff's Attorneys*


Jon Loevy
Roshna Bala Keen
Joshua A. Tepfer
LOEVY & LOEVY
312 N. May St., Ste. 100
Chicago, IL 60607
(312) 243-5900