IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| DANIEL ANDERSEN, | ) ) ) | No. 16 C 1963 |
| Plaintiff, | ) ) | Judge Virginia M. Kendall |
| v. | ) ) ) |  |
| THE CITY OF CHICAGO, *et al.*, | ) ) ) |  |
| Defendants. | ) |  |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Daniel Andersen filed this civil rights action pursuant to 42 U.S.C. § 1983 against Defendants City of Chicago ("City") and a number of Defendant Officers[1] arising out of his wrongful conviction and incarceration. Specifically, Andersen sues the Defendant Officers for violating his constitutional rights by allegedly coercing his false confession, fabricating false evidence, and concealing exculpatory evidence. He also sues the City alleging that its police department's policies and practices render it liable for his wrongful conviction and injuries pursuant to *Monell v. New York Department of Social Services*, 436 U.S. 658 (1978). The City now moves to bifurcate and stay discovery on Andersen's *Monell* claim. For the reasons set forth below, the Motion to Bifurcate and Stay Discovery on Plaintiff's *Monell* Claim [74] is granted.

---

[1] The Defendant Officers are James Bernarkiewicz, Richard Bedran, Craig Cegielski, Dan Fitzgerald, John Herman, James Higgins, Daniel McWeeny, Ted Melko, Paul Nielsen, John Olson, L. Pawlowski, N. Rajewski, Michael Riley, Richard Rochowicz, and any unknown employees of the City. (Dkt. No. 1 at 1.)

1

**BACKGROUND**

In 1982, Andersen was wrongfully convicted for the murder and attempted rape of Cathy Trunko in Chicago. (Dkt. No. 1 at ¶ 1.) In 2014, Andersen was exonerated through DNA evidence that conclusively excluded him as the assailant. (*Id.* at ¶ 3.)

The relevant facts of the crime and subsequent investigation and conviction are that on January 19, 1980, Trunko was found dead – she was stabbed three times – in front of 4938 South Paulina Street in Chicago. (*Id.* at ¶¶ 15-16.) A few days after the crime, the Defendant Officers recovered a knife and an Old Style beer bottle that was found near the location of the murder. (*Id.* at ¶¶ 19-24.) Andersen, who was nineteen years old at the time, was aware of the crime because he knew Trunko from the neighborhood, but was not involved in any aspect of the crime. (*Id.* at ¶¶ 24, 26.) On January 24, five days after the murder, Andersen went out drinking to celebrate his friend Norman Venegas's birthday. (*Id.* at ¶ 29.) Andersen was sleep-deprived that night because he had not gotten enough sleep and was also taking Activid, a prescription drug that, when combined with alcohol, could cause cognitive impairments. (*Id.* at ¶ 30.) Andersen and Venegas went to the Red Mist Tavern and drank beer and shots until Venegas left, driving Andersen's car to Andersen's home because Andersen was too drunk to drive himself. (*Id.* at ¶ 31.) Andersen stayed at the tavern, eventually getting a ride home from another friend. (*Id.*) Andersen's mother, who was concerned that he was out drinking, called Defendant Riley, the neighborhood police officer, to bring Andersen home. (*Id.* at ¶ 32.)

Shortly after the phone call, Defendant Officers Bednarkiewicz and Nielsen pulled Venegas over, who was driving Andersen's car, and began to question him about the Trunko murder. After speaking with Venegas, who stated that he knew nothing about the murder, Bednarkiewicz, Nielsen, and Venegas went to Andersen's home, arriving there at the same time

as Andersen. (*Id*. at ¶¶ 33-35.) Upon seeing Andersen, Bednarkiewicz and Nielsen grabbed Andersen and began to search him. (*Id*. at ¶ 35.) Venegas allegedly heard one of the officers say something to the effect of "[t]hat's the guy. Let's get him." (*Id*.) Nielsen allegedly twisted Andersen's arm and pressed him against the hood of the car for several minutes while he and Bednarkiewicz questioned Andersen about the murder. (*Id*. at ¶¶ 36-37.) Bednarkiewicz pressured and eventually succeeded in having Andersen's mother sign a disorderly conduct complaint against Andersen. Andersen's mother allegedly heard one of the officers say "[y]ou're the guy that did it," to Andersen after they arrested him. (*Id*. at ¶ 38.)

At approximately 2 A.M. on January 24, Bednarkiewicz and Nielsen brought Andersen to the Ninth District Police Station. The Defendants knew that Andersen was heavily intoxicated, were allegedly physically violent with him, handcuffed him to a locker, and denied his requests for water. (*Id*. at ¶¶ 40-41.) Defendant Riley saw Andersen and observed that he was intoxicated, upset, and not talking rationally, but did not intervene even though Riley allegedly knew that officers were intending on interrogating Andersen. (*Id*. at ¶ 42.) Although Andersen did not make any inculpatory statements to them, Bednarkiewicz and Nielsen allegedly fabricated a statement stating that Andersen spontaneously and voluntarily confessed to stabbing Trunko three times (once in her right chest and twice in her left chest) and further confessed to throwing the knife away in the area that the Officers found it. (*Id*. at ¶ 43.) Following the fabrication of the statement, Bednarkiewicz and Nielsen transferred Andersen to Area 3 Homicide for further investigation. Upon arriving at Area 3, the Defendants began to threaten and beat Andersen, causing bruising on his face and a large cut on his forehead. (*Id*. at ¶ 46.) After an allegedly lengthy beating, the Defendant Officers began to feed Andersen facts that would implicate him in the Trunko murder. Andersen was in police custody for approximately

sixteen hours, during which time he was denied access to a bathroom, forced to urinate in a trashcan, and denied food and water before he agreed to give a confession. (*Id*. at ¶¶ 47-49.)

In coercing Andersen's false statement, the Defendants convinced Andersen that they were seeking his assistance in the murder investigation and that they needed him to get into the mindset of the killer. (*Id*. at ¶¶ 50-51.) The Defendants allegedly (1) had Andersen draw a map of the neighborhood marking specific locations, (2) had him write notes on the map such as "[h]ad to do what I had to do," and (3) fed him information regarding the knife and a pair of gloves. (*Id*. at ¶¶ 51-55.) They also created a narrative in which Andersen, as the attacker, wanted to have sex with Trunko and killed her when she refused. After fabricating the statement, Higgins forced Andersen to adopt the story by threatening to return him to the officers who had previously beaten him and offering to release him if he confessed. (*Id*. at ¶ 56.) Higgins also offered to get Andersen a job at Ford Motors, Andersen's previous employer, if Andersen confessed to the crime. By the end of the sixteen-hour period, Andersen was convinced that Defendant Higgins was his "friend," "buddy," and "attorney." (*Id*. at ¶¶ 60-61 (Andersen allegedly telling his parents that "Higgins is my friend, my buddy" and "Higgins told me I don't need an attorney. That he is my attorney.").)

In addition to fabricating Andersen's statement, the Defendants allegedly also destroyed exculpatory evidence. Specifically, on January 21, Defendants Melko and Rajewski lifted two fingerprints from the Old Style beer bottle that was connected the homicide. They communicated the results of the fingerprint analysis to Defendants Higgins and Cegielski at Area 3. (*Id*. at ¶¶ 69-71.) Andersen alleges, on information and belief, that the fingerprint contained "exculpatory or potentially exculpatory evidence" that could have corroborated the involvement of an alternate, viable suspect, and could have excluded him as the perpetrator. (*Id*. at ¶ 70.)

4

Andersen further alleges that instead of turning over the exculpatory evidence, as required by Chicago Police Department rules, the Defendants destroyed or caused the destruction of the evidence. (*Id.* at ¶¶ 72-73.) Finally, Andersen alleges that the City's policies and practice permits its officers to coerce false confessions, *see id.* at ¶¶ 74-86, and maintain "street files" – allegedly undisclosed files that are maintained by the police officers and that contain information about defendants but are not disclosed to the defense – that led to Andersen being denied access to exculpatory information. (*See id.* at ¶¶ 87-93.)

## LEGAL STANDARD

Under Rule 42(b), the Court has considerable discretion to decide claims or issues in separate trials "[f]or convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P. 42(b); *see Krocka v. City of Chicago*, 203 F.3d 507, 516 (7th Cir. 2000). Bifurcation may be appropriate if one or more of the Rule 42(b) criteria is met as long as bifurcation will not prejudice the non-moving party or violate the Seventh Amendment, "which guarantees a jury trial for civil cases in federal court." *See Treece v. Hochstetler*, 213 F.3d 360, 365 (7th Cir. 2000); *Chlopek v. Fed. Ins. Co.*, 499 F.3d 692, 700 (7th Cir. 2007).

"Bifurcation may be appropriate if 'the separation would prevent prejudice to a party or promote judicial economy.'" *See, e.g.*, *Horton v. City of Chicago*, No. 13-CV-6865, 2016 WL 316878, at *2 (N.D. Ill. Jan. 26, 2016) (citing *Chlopek*, 499 F.3d at 700). Such motions are "now commonplace and '[c]ourts in our district have both granted and denied similar motions…[t]hus there is a going body of precedent in this district for both granting and denying bifurcation in § 1983 cases.'" *See, e.g., Allison v. Gallagher*, No. 10 C 6887, 2012 WL 4760863, at *1 (N.D. Ill. Oct. 5, 2012) (citations omitted). Finally, "*Monell* claims are most often bifurcated in this

district when a case is rooted in allegations of excessive force." *See, e.g.*, *Horton*, 2016 WL 316878, at *2 (quoting *Carr v. City of N. Chicago*, 908 F. Supp. 2d 926, 934 (N.D. Ill. 2012)).

## DISCUSSION

The City claims that bifurcation of the *Monell* claim[2] is warranted because: (1) before Andersen can prevail on his *Monell* claim, he must first succeed in his actions against the individual Defendants for violating his constitutional rights; (2) bifurcation best serves the interests of litigation and judicial economy; and (3) bifurcation will assist in eliminating the risk of unfair prejudice against the parties. (*See* Dkt. No. 67.)

### I.     Split or Inconsistent Verdicts

The City first argues that bifurcation is appropriate because Andersen must succeed in his action against the individual Defendants before he can obtain a judgment against the City pursuant his *Monell* claim. (*Id.* at 3.) As an initial point, to the extent that the City argues that that the individual officers must *always* be found liable before *Monell* liability can be established against a municipality, that argument is rejected because "a municipality can be held liable under *Monell,* even when its officers are not, unless such a finding would create an *inconsistent* verdict." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 798–99 (1986)) (emphasis in original). Rather, "to determine whether the [City]'s liability is dependent on its officers, we look to the nature of the constitutional violation, the theory of municipal liability, and the defenses set forth." *Id.*; *see also, e.g.*, *Horton*, 2016 WL 316878, at *4.

---

[2] Under *Monell*, to establish liability against the City, Andersen must show that: (1) he suffered a deprivation of a federal right; (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker; which (3) was the proximate cause of his injury. *See Ovadal v. City of Madison, Wisconsin*, 416 F.3d 531, 535 (7th Cir. 2005); *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 404 (1997) ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged.").

Andersen's *Monell* claim, made in paragraphs 74 to 93 of his Complaint, relate specifically to the City's policy and practice of coercing false confessions through psychological and physical torture, and police officers' use of "street files." The City argues that both theories of municipal liability – (1) that the City's policies caused the Defendant Officers to coerce a false confession from Andersen and (2) the City's policies were the moving force behind the Defendant Officers' keeping street files that were then not disclosed to the defense – first require a jury to find that the Officers did in fact violate Andersen's constitutional rights. Addressing first the *Monell* claim premised on the coercion of a false confession, it is clear that "fabricating a confession and coercing Plaintiff into making that confession, depends on the individual officers' actions." *See, e.g.*, *Harris v. City of Chicago*, No. 14-CV-4391, 2016 WL 3261522, at *3 (N.D. Ill. June 14, 2016) (citing *Taylor v. Kachiroubas*, 2013 WL 6050492, at *4 (N.D. Ill. Nov. 15, 2013) ("Here, however, the actions of the individual officers in collecting and fabricating evidence against [plaintiffs] are the source of the alleged harm to the plaintiffs, and any 'policy' exerted harm through those actions, not independently of them.")). Even if the City had a policy or practice of permitting its officers' to coerce false confessions through force, the harm caused by the policy could only manifest itself through the officers' actions. Although Andersen does assert that "[t]here are several ways that a jury could consistently find that the City is liable but its officers were not," *see* Dkt. No. 70 at 9, none of his specific arguments relate to the coerced confession claim. (*See* Dkt. No. 74 at 3 (City's Reply noting "[i]ndeed, Plaintiff's Response does not even try to make those arguments in relation to his practice based *Monell* claim about coercing false confessions.").)

The same conclusion applies to the street files allegation because any harm caused by an alleged street files policy or practice could only manifest itself through the Defendant Officers

7

actually maintaining such files, and therefore a finding of municipal liability is predicated on a finding first that the Officers themselves were liable. *See, e.g.*, *Veal v. Kachiroubas*, No. 12 C 8342, 2014 WL 321708, at *4 (N.D. Ill. Jan. 29, 2014) ("It is true that a municipality can be held liable for failure to train and supervise its employees in the appropriate handling of exculpatory evidence, as Veal notes….But that does not mean that could occur without officer liability in Veal's case.") (citation omitted). In response, Andersen first contends that the Officers' alleged qualified immunity defense creates the possibility that the Officers could be found not liable while the City could be found liable. (*See* Dkt. No. 70 at 9.) However, whether the Officers can be found liable is beside the point; rather, the issue is "whether the individual defendants committed a constitutional violation that is a prerequisite for" the City's liability. *See, e.g.*, *Taylor*, 2013 WL 6050492, at *4. Moreover, the fact that the City has consented to entry of judgment against itself in the event that the Defendant Officers are found to have violated Andersen's constitutional rights undermines Andersen's position. *See, e.g., Horton*, 2016 WL 316878, at *4; (*see* Dkt. No. 67-4).

Second, Andersen seeks to distinguish *Veal* and *Taylor* on the ground that the Chicago Police Department's history of unconstitutional policies regarding custodial interrogations and street files distinguish it from the police departments in those cases. (Dkt. No. 70 at 9-10.) Yet, Andersen fails to explain how an alleged history of unconstitutional policies is in any way relevant to whether municipal liability is dependent upon officer liability here. Finally, Andersen contends that a jury could consistently find only the unknown individual defendants liable, which would then cause a new round of litigation on the *Monell* claim. Not only is this contention speculative at best, other courts in this district have granted motions to bifurcate

where such a possibility existed. *See, e.g., Castillo v. City of Chicago*, No. 11 C 7359, 2012 WL 1658350, at *1 (N.D. Ill. May 11, 2012); *Veal*, 2014 WL 321708, at *1.

As such, because there is no way that a jury could consistently find the City liable without first finding the Defendant Officers liable, this factor weighs heavily in favor of bifurcation.

## II.     Economy of Judicial Resources

The City next contends that bifurcation would best serve the interests of the litigation and judicial economy. Bifurcation can, especially in instances where municipal liability is dependent on individual liability as here, present a number of benefits including the bypassing of significant discovery (and associated discovery complications) related to the municipality's policies and practices and a shorter trial. *See, e.g.*, *Medina v. City of Chicago*, 100 F. Supp. 2d 893, 895 (N.D. Ill. 2000). The City argues that allowing the *Monell* claims to proceed will lead to both costly fact discovery – specifically, the City points to the fact that Andersen issued fifty-five discovery requests that are broadly worded and relate in part to all documents related to any training for officers, *see* Dkt. No. 67 at 8 – and expert discovery, reports, and subsequent depositions. (*Id*.) *Treece v. Hochstetler*, 213 F.3d 360 (7th Cir. 2000) proves instructive. In that case, the Seventh Circuit affirmed the district court's decision to bifurcate Treece's *Monell* claim from her Section 1983 claim alleging malicious prosecution in part because the City agreed to entry of judgment against itself if Defendant Hochstetler was found liable. *Id*. at 361. The Court held that bifurcation was proper given the City's agreement to enter judgment against itself, and because bifurcation would avoid "the needless costs and burdens of a second trial, as well as, but not limited to, the waste of valuable time and resources of the court, and the inconveniencing of the witnesses." *Id*. at 365. The Court further noted that bifurcation was appropriate because the

municipality's lability was a "derivate of Hochstetler's liability." *Id*. Those are the same circumstances before this Court. Here, the City has already agreed to "entry of judgment against it for the amount of damage assessed by the trier of fact if Plaintiff can establish a violation of his constitutional rights," *see* Dkt. No. 74 at 15, and, as discussed above, the City's liability is a derivative of the individual officers' liability.[3] *See also, e.g., Carr*, 908 F. Supp. 2d at 934 (granting bifurcation on similar grounds).

Andersen counters that bifurcation is inappropriate because (1) the discovery essential to the case against the individual officers and against the City overlaps significantly such that bifurcation is unnecessary and (2) the amount of required discovery is much less than the City contends because a significant portion of the relevant discovery has already been done in other wrongful conviction cases. (Dkt. No. 70 at 6.) In terms of his overlap contention, Andersen argues that because he intends to show that the Defendant Officers maintained a street file that was not disclosed to the defense, he will "rely on much of the same evidence of a department-

---

[3] Andersen contends that the City's proffered "Limited Consent to Entry of Judgment" should be disregarded because it is both procedurally and substantively flawed. Procedurally, Andersen contends that the Consent is not a Rule 68 offer of judgment, a Rule 16 stipulation, or an otherwise permissible pleading. (Dkt. No. 70 at 13.) However, as the City points out in its briefing, the Consent is an agreement to accept judgment if the jury finds any individual defendant liable. (*See* Dkt. No. 74 at 15.) Such agreements have been considered and accepted by other courts. *See e.g.*, *Saunders v. City of Chicago*, 146 F. Supp. 3d 957, 970 (N.D. Ill. 2015). Substantively, Andersen first argues that the certification is insignificant because it provides that the City will indemnify the individual officers who are found guilty, something that the City is already required to do by law. *See* 745 Ill. Comp. Stat. Ann. 10/9-102 (West 2002). However, because the Consent, for example, states that the City will also pay for attorneys' fees and costs, the Consent "does go beyond what is required of the City under state law." *See, e.g., Saunders*, 146 F.Supp.3d at 971. Finally, Andersen contends that the Consent would limit his ability to hold the City accountable for its systemic practices that caused his constitutional harm. (Dkt. No. 70 at 11, 15.) While it is certainly the case that *Monell* claims are in part intended to serve as a deterrent against future constitutional deprivations, *see Owen v. City of Indep., Mo.*, 445 U.S. 622, 651 (1980), Andersen's argument itself is a false one because staying discovery on the *Monell* claims does not foreclose Andersen from pursuing his *Monell* claim if he is successful against the individual officers. *See, e.g., Ojeda-Beltran v. Lucio*, No. 07 C 6667, 2008 WL 2782815, at *4 (N.D. Ill. July 16, 2008) ("While the City's stipulation does remove the potential for any economic benefit to Plaintiffs through pursuit of their Monell claim, our inclination is to agree with Plaintiffs that there are non-economic benefits that can be obtained through suing the City that are unavailable through the suit of Defendant Officers. However, we decline to engage in this debate. A necessary premise of the City's and Plaintiffs' arguments on this topic is that bifurcation of Plaintiffs' Monell claim means that the claim cannot go forward. This is a premise that we do not accept. If Plaintiffs are successful in their claims against Defendant Officers, they are free to pursue their Monell claim against the City. In ordering the bifurcation and stay of Plaintiffs' Monell claim against the City, we have simply attempted to balance party convenience, judicial economy, prejudice against Defendant Officers, and prejudice against Plaintiffs. Bifurcation of the Monell claim is not dismissal of the Monell claim.").

wide street files practice that is relevant to the *Monell* claim."[4] (Dkt. No. 70 at 6.) However, Andersen fails to explain how discovery related to whether there was a street file in *this* case overlaps significantly with the much broader issue of whether the City had a policy or practice of allowing street files in all of its criminal investigations and prosecutions. Even assuming that a street file existed in this case – an assumption that the City denies throughout its briefing – the existence of that file would constitute only a small amount of the discovery that would underlie a department-wide *Monell* claim. The fact that the City has received fifty-five discovery requests related to officer training exemplifies the discrepancy in the discovery between the individual case and the case against the City as a whole. (*See* Dkt. No. 67 at 8; *see also* Dkt. No. 74 at 5 (City identifying litany of discovery requests related to the City's policy and practice.).)

Andersen's second contention, that much of the discovery necessary for the *Monell* claim here has already occurred in other cases, is also flawed because the two principal cases that Andersen points to, *Kluppelberg v. Burge*, No. 13 CV 3963, and *Rivera v. City of Chicago*, No. 12 CV 4428, took place after the police department changed its homicide investigation policies in late 1982, and after Andersen had already been convicted in this case. (*See* Dkt. No. 74 at 6-7.) As such, based on defense counsel's representations in its briefing here and the fact that counsel also represents the City in *Rivera*, much of the discovery done in those two cases is irrelevant to the *Monell* issues now before the Court. (*Id.* at 6.) Moreover, although Andersen does note that *Kluppelberg* and *Rivera* also had allegations and discovery regarding department policies about street files and coerced confessions, Andersen fails to provide any specific examples of discovery overlap that could lead the Court to infer that much of the discovery

---

[4] This street files contention is the only example of the allegedly "significant overlap" that Andersen provides. Andersen entirely fails to assert, much less explain, an overlap of discovery for the coercive interrogation claim. (*See* Dkt. No. 74 at 6 (City noting that "Plaintiff has no response to the minimization of complexities, burdens of litigation and judicial economy with regard to his multifaceted coercive interrogation practice claim….The Court should therefore weigh this factor overwhelmingly in favor of bifurcation.").)

necessary for the present *Monell* claims has already been completed. Indeed, aside from facially referencing the Requests for Production from the *Kluppelberg* case, Andersen does not provide any analysis indicating that the discovery in those cases tracks the discovery necessary here. *See, e.g., Carr*, 908 F. Supp. 2d at 933 ("The Plaintiffs contend that, because much of the written discovery is already being kept by the City pursuant to an agreement between the City and the NAACP, the burden of producing the material should be nominal. The Plaintiffs do not provide any evidence, however, that their discovery requests actually track that agreement or what that agreement requires.").

Accordingly, because the *Monell* claims are reliant on the individual officers' liability and because the City has agreed to accept liability against itself if the individual officers are found liable, judicial economy counsels in favor of bifurcation.

### III. Prejudice to the Parties

Having found that the Rule 42(b) criteria are met, bifurcation is appropriate as long as it will not prejudice the non-moving party or violate the Seventh Amendment.[5] *Treece*, 213 F.3d at 365. The City argues that bifurcation would benefit, rather than prejudice, both parties because it would allow the parties to avoid costly discovery and receive a dispositive ruling more quickly. In addition, the City contends that Andersen will not be prejudiced without *Monell* discovery because the Limited Consent provides that the City will agree to judgment against itself if the jury finds any individual defendant liable or if, notwithstanding a finding of liability, an individual defendant's qualified immunity defense is successful.[6] (*See* Dkt. No. 67 at 7-10.)

---

[5] Because the parties do not raise any Seventh Amendment concerns in their briefing, the Court focuses on the prejudice dispute. *See Chlopek*, 499 F.3d at 700.

[6] The City also argues that it will suffer prejudice if the case is not bifurcated because a joint trial may cause the jury to find the individual defendants liable based on the evidence related to the City's conduct. (*See* Dkt. No. 67 at 11-12.) Although the Court recognizes that there is a possibility of such prejudice, concerns of prejudice at trial are premature at this stage. Moreover, "judicious use" of limiting instructions, motions *in limine*, and other tools can limit any such prejudice, and if such steps are inadequate, the Court could assess the propriety of bifurcating the trial

Based upon the above findings and the fact that numerous courts have found that bifurcation allows parties to bypass burdensome and potentially unnecessary litigation and related costs, bifurcation certainly presents benefits to both parties. *See, e.g.*, *Medina*, 100 F. Supp. 2d at 895; *Moore v. City of Chicago*, No. 02 C 5130, 2007 WL 3037121, at *9 (N.D. Ill. Oct. 15, 2007).

In opposition to this finding, Andersen contends bifurcation would prejudice him because it would merely delay the outcome of the litigation because the underlying claims overlap heavily with his *Monell* claims. However, as the Court already held above, Andersen has failed to show that the overlap is significant such that bifurcation would prejudice him. Similarly, although the Court acknowledges that Andersen, as the master of his Complaint, brought his *Monell* claim to hold the City accountable for its systemic practices, as discussed above, a stay of discovery of the *Monell* claim does not foreclose him from pursuing his *Monell* claim at a later date if he is successful against the individual officers. (*See supra* n. 3.)

Given that Andersen does not present any other arguments alleging prejudice and based on the Court's finding that bifurcation would expedite, rather than delay, a conclusion of this litigation, bifurcation is appropriate in this case.

## Conclusion

For the reasons stated above, the City's motion to bifurcate and stay discovery on Andersen's *Monell* claim [74] is granted.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: 12/14/2016

---

at a later time. As such, prejudice at trial does not militate in favor of bifurcation at this time. *See, e.g.*, *Cadle v. City of Chicago,* No. 15 C 4725, 2015 WL 6742070, at *3 (N.D. Ill. Nov. 2, 2015).