**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DANIEL ANDERSEN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) No.: 16 CV 1963 | |
| | ) | |
| CITY OF CHICAGO, ET AL., | ) | JUDGE KENDALL |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION TO BAR RICHARD BRZECZEK**

NOW COME the Defendant Chicago Police Officers, JAMES BEDNARKIEWICZ, RICHARD BEDRAN, JAMES HIGGINS, DANIEL MCWEENY, PAUL NIELSEN, JOHN OLSON, LARRY PAWLOWSKI, NORBERT RAJEWSKI, and MICHAEL RILEY, (collectively "Defendant Officers"), by and through their attorneys, Steve Borkan, Timothy P. Scahill, Misha Itchhaporia, and Emily E. Schnidt of BORKAN & SCAHILL LTD., and moving to bar Plaintiff's expert Richard Brzeczek under the principles of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)[1] state as follows:

**INTRODUCTION**

Plaintiff has named Richard Brzeczek ("Brzeczek") as a police practices expert. *See* Ex. A. Brzeczek's Report attempts to "double up" on some of the exact same issues as Plaintiff's other police practices expert, Dennis Waller ("Waller"). Specifically, Brzeczek's report focuses on the purported obligation on the defendant officers to document and disclose the interview and polygraphing of an individual named Robert LaGace in connection with the underlying criminal investigation arising from the murder of Cathy Trunko. *See* Ex. A at 1-7 (discussing polygraph issues); *compare* Mot. Bar. Waller at

---

[1] The foregoing motion pertains to bases for exclusion premised upon the standards of *Daubert*, Defendant reserves the right to file additional motions in limine relating to the testimony of the foregoing proferred expert based on any other available grounds.

1

Ex. A p. 20 ("All investigative leads, such as those documented in the LaGrace polygraph reports should have been investigated and documented."). In addition to this testimony being improperly cumulative, Brzeczek is woefully unqualified to render any such opinions in this case, applies a wholly unreliable and subjective methodology, and attempts to render opinions that are simply irrelevant to any permissible issue in this case. As set forth below, Brzeczek must be barred from testifying at trial in this matter.

## PROPOSED OPINIONS AND TESTIMONY OF RICHARD BRZECZEK

As noted above, Brzeczek was disclosed as an expert to opine on matters relating to the documentation and disclosure of the polygraphing of an individual named Robert LaGace in connection with the underlying criminal investigation. *See* Ex. A. Brzeczek was employed by the Chicago Police Department between 1964 and 1983. *See* Ex. B at 23:18-24:18; 55:19-56:8; Ex. C. Brzeczek's assigments included a patrol officer, driver to the police superintendent, youth officer, sergeant in the detective division, internal affairs, organized crime, and a short stint as police superintendent. Ex. B at 23:18-56:8; Ex. C. Brzeczek's duties in the detective division encompassed two years and largely involved adminstrative functions. Ex. B at 36:19-37:14. Brzeczek was never assigned to investigations in this position. Ex. B at 44:12-45:11. Brzeczek never at any time had any direct experience as a working detective or supervisor of detectives in the field. Ex. B at 47:10-47:13 ("Q. And you never had direct experience as a working detective or supervisor of detectives in the field; is that correct? A. That's correct."). Brzeczek has never investigated a homicide at any time as either a lead detective or even an assisting detective. Ex. B at 47:16-48:2 ("Q. Have you ever investigated a homicide as a lead detective? A. Based upon the statement that I just agreed to, never having been a detective I could not be a lead detective in any homicide. Q. I am sorry, I assume that you also never investigated a homicide as an assisting detective then?...[A.] Never having been a detective, I never was assigned as assistant detective."); Ex. D at 79:19-79:23. During his time with the Chicago Police department, Brzeczek never administered a polygraph and was never trained in adminstering polygraphs. Ex. B at 170:13-170:17. Brzeczek elected to resign his position as police superintendent in April 1983 because the incoming mayor publicly stated that Brzeczek would be fired once he took office. Ex. B at 56:3-56:8.

2

It is undisputed in this case that this polygraphing and the information regarding LaGace was, in fact, documented in a police report and an interview of LaGace was documented in another police report as well. Ex. B at 114:19-115:7; 143:10-144:2 ("Q But you say that information is not found in any of the police reports related to the Trunko homicide investigation; right? A. That's correct. Q. Mr. Stout's Polygraph Case Report is a police report; correct? A. Yes. What I am talking about are the Area 3 detectives' reports. Because this document right here, what you are showing me, Exhibit No. 6 that was not part of the investigative file at Area 3. Q. But here in your report when you are saying it is not found in any of the police reports it is, in fact, in the Polygraph Case Report of Mr. Stout which is related to the Trunko homicide investigation? A. It is. It is.").

It is also undisputed that the results of the polygraph of LaGace were deemed to be inconclusive and that LaGace specifically denied any involvement in the murder of Cathy Trunko. *See* Ex. A at 2; Ex. E. In this regard, Brzeczek ultimately conceded that LaGace should not even have been considered to have been polygraphed in the first place. Ex. D at 68:22-70:13; 71:11-71:23. Notably, this conclusion is consistent with the standards provided by Plaintiff's other police policies expert, Waller, who provided police training keys regarding polygraph results which specifically indicate that "[t]he investigator should treat the suspect who yields inconclusive results as if the examination had never been given." *See* Ex. F (Waller Sub Resp 0010).

Brzeczek admitted that he had no opinion on whether the content of the polygraphing information was exculpatory as to Plaintiff in the first place. Ex. B at 159:11-159:24. Brzeczek admitted that during the relevant time period, polygraph examinations were not admissible as evidence in court. Ex. B at 170:18-171:2.

Brzeczek's Report does not cite a single solitary authority, text, or source of any practices, policies or procedures for the Chicago Police department or any other law enforcement body. *See* Ex. A. Brzeczek relied on no authoritative text or journals or articles in forming his opinions in this case. *See* Ex. B at 89:17-89:21 ("Q. Did you rely on any authoritative text or journals or articles in forming your opinions in this case?... [A.] No."). Brzeczek also did not even review "any rules or regulations or

3

General Orders or special orders of the Chicago Police Department" in forming his opinions. Ex. B at 90:14-90:19. Brzeczek has published two articles on police work or police procedure (neither of which relate in any way to polygraph examinations or proper documenting of same). Ex. B at 68:18-69:11. Specifically, one was an article regarding police suicides and the other related to the establishment of a community assessement center. *Id.*

Brzeczek admitted that there was no general order or other police directive requiring that detectives document taking a person for a polygraph or the reasons therefor when a report has been made of such examination by the polygraph examiner. Ex. B at 122:24-124:1. Pressed further on whether there was "any law enforcement standard that [a person] could go look up that was in effect in 1980" requiring this to be done, Brzeczek first made vague references to weekly "training bulletins" as a possible source of this information. Ex. B at 124:2-128:3. These alleged "training bulletins" are not cited anywhere in Brzeczek's Report as a basis for his opinions. *See* Ex. A. Brzeczek admitted he did not have possession of any such materials and had not reviewed these materials for the purpose of his Report and had not seen them in nearly 40 years. Ex. B at 126:11-126:17; 131:2-131:4; Ex. D at 17:1-17:3, 46:1-46:13. Brzeczek instead attempted to provide Defendants with a "homework assigment" to attempt to locate what he might be referred to in the archives of the Chicago Police Department. Ex. B at 124:24-126:9; *see also* Ex. D at 14:6-14:16, 46:1-46:13.

Even taking his improper reference to these training bulletins in his deposition as a basis for his opinions, Brzeczek was unable to describe the substance of any particular training bulletin on the relevant topic. Ex. B at 124:2-128:3. Brzeczek ultimately conceded that he was aware of *no such specific training bulletin* or anything else regarding the required documentation of polygraph examination. *Id.*; *see also* Ex. B at 134:2-135:9 ("Q. So, again, sir, is it your testimony that when detectives were in detective school, that the syllabus indicated in writing that it was mandatory for them to document in a Supplementary Report that if they took someone to the polygraph unit to be polygraphed, that they had to write that down in a report?... [A.] I cannot say that... Q. And so it is accurate to say that you can't point to any instructional materials that would have been provided during detective school that would

have made that a requirement; true?...[A.] Again, yes, I cannot point to any document that says if it is mandatory, that you put in a report that someone was taken for a polygraph exam."); Ex. D at 25:8-25:20 ("Q. Did that document that we're talking about, whether it was called the Criminal Investigation or the Detective Division Standard Operating Manual, explicitly state that detectives were required to document in a police report the reasons why they took someone to get a polygraph test? A. I can tell you the answer to that question is "no". Q Did that document, whatever iteration it was under, Criminal Investigation or Detective Division Standard Operating Manual, explicitly state that police officers were required – or sorry -- detectives were required to document in a police report the reasons why they personally believed someone was a suspect? A Using that language, per se, the answer is, no."); Ex. D at 51:22-52:9 ("Q If you look further down on that Paragraph 5D, you state towards, like, the second sentence from the bottom, 'In addition, detectives were required to record information in their possession about witnesses they believed should be polygraphed and other information about those polygraph results as well as any other related information they had regardless of what was documented by the polygraph examiner.' What specific general order, or special order, or Department guideline addressed a detective's responsibilities and requirements as it relates to polygraphs? A I cannot give you a specific directive that relates to polygraph.").

Cornered into conceding the absence of any specific authority whatsoever requiring (or even discussing) the documentation of polygraph examinations by detectives, Brzeczek again backpeddled and simply stated that taking a person for a polygraph examination is "pertinent information" that "pertinent" information should generally be documented in police reports. Ex. B at 123:24-124:23; 148:16-151:19; 158:15-159:9; 185:21-190:6, 198:19-199:12; Ex. D at 10:17-11:12, 24:1-24:11. When asked to describe what encompassed "pertinent" information for the purposes of his opinions, Brzeczek stated that the definition of "pertinent information" for these purposes "were used with the objective that *most people at that time would understand the ordinary meaning of the words* 'pertinent information' in the context of a police investigation." Ex. B at 127:13-127:21. Brzeczek further conceded that the determination regarding what was pertinent information was a subjective determination by each officer.

Ex. D at 70:15-71:1 ("So my question to you is, pertinent information in investigation -- in a detective investigation is a subjective assessment by the detectives working the case at any specific period of time, correct, whether something is pertinent or not? A That's correct. I mean, at some point that determination is a subjective determination based upon the detective's training and experience.").

Beyond the citation of vaguely applicable "pertinence" standard, the remainder of Brzeczek's Report consists of little more than Brzeczek's parroting of Plaintiff's factual theory of the case followed by the conclusion that "it was the clear and unequivocal policy of the Chicago Police Department that detectives were required to include relevant facts, inculpatory and exculpatory, learned from an investigation in their reports," that the above-described failure to essentially "double document" the information relating to the polygraph of Lagace "raise[s] serious concern about the integrity of the investigation and the reporting of investigative activity by the detectives," and "it is [his] opinion that periment information relevant to the Trunko homicide investigation was known to the detectives on or before January 21, 1980 that was not documented in any of the official reports that were produced in this case." *See* Ex. A at 1-7.

## LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) *citing Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006). The Federal Rules of Evidence permit expert opinion testimony only to the extent that the expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," and then only if the testimony is "based on sufficient facts or data" and "the product of reliable principles and methods" which the expert has "reliably applied." Fed. R. Evid. 702. The trial judge occupies "a gatekeeping role" and must scrutinize proffered expert testimony to ensure it satisfies each requirement of Rule 702. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 592-93, 597 (1993); *Ortiz v. City of Chicago*, 656 F.3d 523, 536 (7th Cir. 2011). "Rule 702 calls for a conjunctive test and thus expert testimony must meet all five requirements to be admissible; failure on any prong is fatal to

6

admissibility." *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 799 (N.D. Ill. 2013). In evaluating whether an expert's proposed testimony meets the Daubert standard, the Court is to "scrutinize proposed expert witness testimony to determine if it has 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field' so as to be deemed reliable enough to present to a jury." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012). The proponent of the expert evidence bears the burden of establishing, by a preponderance of the evidence, that the requirements set forth in Rule 702 and Daubert have been satisfied. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

District courts apply the Daubert framework described above using a three-part analysis. *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). First, the Court must determine whether the proposed witness is qualified as an expert by knowledge, skill, experience, training, or education. *Id.* If so, the Court must then decide whether the reasoning or methodology underlying the expert's testimony is reliable. *Id.* If these two requirements are met, the Court must assess whether the expert's proposed testimony will assist the trier of fact in understanding the evidence or to determine a factual issue. *See Myers*, 629 F.3d at 644 *citing Ervin v. Johnson & Johnson*, Inc., 492 F.3d 901, 904 (7th Cir. 2007)).

## ARGUMENT

## I. Brzeczek Is Not Qualified To Render Any Opinions In This Case.

Defendants have little doubt that there may be specific matters that Brzeczek would be qualified to render testimony upon regarding police practices. However, the subject matter at issue in this particular case is most certainly not among them. Plaintiff has "doubled up" on police practices experts in this case and Brzeczek's proposed opinions are very fact specific and limited. In essence, as noted above, Brzeczek attempts to impose a duty on homicide detectives to affirmatively document the bringing of an individual for a polygraph examination even when: (1) the polygraph examiner himself documents this exact same activity; and (2) even when the polygraph results themselves are entirely inconclusive. Even were such opinions otherwise proper (which they are not as set forth below), Brzeczek is not remotely qualified to render such opinions.

"[W]hether a witness is qualified as an expert can only be determined by comparing the area in

which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir.1990). In other words, the focus is not on whether the "expert is qualified in general, but whether his or her 'qualifications provide a foundation for [him or her] to answer a specific question.'" *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir.2010). More specifically, the court first "must look at each of the conclusions he draws individually to see if he has the adequate education, skill, and training to reach them." *Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016). "A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.* 395 F.3d 416,419 (7th Cir. 2005). A "court should not simply accept a proffered expert-even if he has been accepted as such before; the law requires an inquiry into whether an expert is an expert, and some degree of 'regulation of the subjects and theories about which an expert may testify.'" *In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321, *10 (N.D. Ill. 2015) *quoting IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 5815472, *1 (S.D.N.Y. 2013).

The expert's qualifications are not considered in the abstract; the court concerns itself "instead with his foundation for answering a specific question." *Hall*, 840 F.3d at 928. Thus, even if an expert is generally qualified to testify about a broad discipline (such as police practices), the failure to establish his or her qualifications in the specific subject matters at issue in the case precludes any such testimony under *Daubert. See United States v. Hirschberg*, 988 F.2d 1509, 1514 (7th Cir. 1993)(district court properly barred Illinois detective from opinion on police practices in Miami); *Rivera v. Guevara*, 2018 WL 3093339, *5–6 (N.D. Ill. 2018)(barring former prosecutor and criminal court judge from opining on matters relating to criminal defense strategy and discovery practices); *Davis v. Duran*, 277 F.R.D. 362, 368–69 (N.D. Ill. 2011)(barring Plaintiff's other police policies expert, Dennis Waller, from opining outside of matters in his specific area of expertise; "The plaintiff seems to suggest that Mr. Waller's opinion should be allowed because he has expertise in use of force and internal police procedures for investigation. He may well have. But an impressive resume is not a guarantor of relevancy. The expert's opinion must "fit" the case, and his ipse dixit that it does is never enough."); *Obrycka v. City of Chicago*, 792 F. Supp.

2d 1013, 1024 (N.D. Ill. 2011)(barring police policies expert witness because despite "impressive credentials and extensive research in many areas of policing, he lacks the requisite foundation for his CPD-specific opinions"); *Bird v. Jefferson Cty. Sheriff's Dep't*, 2009 WL 804058, *2–3 (E.D. Mo. 2009)(barring police policies expert who had never investigated police involved shooting from rendering opinions relating to police involved shooting and crime scene investigation); *Cooper v. City of Chicago Heights*, 2011 WL 2116394, *5 (N.D. Ill. 2011); *see also Moore v. P & G–Clairol, Inc.*, 781 F.Supp.2d 694, 704 (N.D.Ill.2011) (Kendall, J.)(expert who had "no background or training in psychology or any field related to the design of warnings" was not qualified to testify regarding adequacy of warnings).

As noted above, while Brzeczek ascended to the ranks of police superintendent, he has no discernible experience relating in any way to polygraph examinations or the documentation of polygraph examinations (much less the obligation of police officers to document what another officer has already done). Brzeczek never worked as a detective (homicide or otherwise). Brzeczek is not trained in administering polygraphs and has never administered a polygraph at any point. While direct involvement in such aspect of an investigation may not necessarily be fatal to obtaining expertise in a particular area, Brzeczek neither set forth in his Report (as required by Fed. R. Civ. P. 26(a)(2)(B)) nor at his deposition any first hand (or even second hand or third hand) experience indicating that he ever in his career encountered or addressed any issue even remotely similar to that in the present case. In fact, Brzeczek repeatedly fumbled about at his deposition attempting to tether his specific opinions to some authority, experience, or other sound basis and was ultimately forced to concede that none existed beyond vague platitudes regarding the general requirement that "pertinent" information should be documented in police reports. Thus, Brzeczek's qualifications to opine on this specific issue appear to consist of little more than his "say so" untethered to any particular expertise in the area. This is precisely what *Daubert* does not permit.

This case is not unlike *Rivera v. Guevara*, 2018 WL 3093339 (N.D. Ill. 2018). In *Rivera*, the defendant disclosed a former prosecutor and state criminal court judge to discuss matters relating to reasonable diligence of a criminal defense attorney and *Brady* discovery issues. *Id.* Despite the fact that

the witness "supervised criminal discovery as a state trial judge and enforced discovery rules, tried criminal cases, decided habeas cases with *Brady* issues..., and enforced substantive rules in criminal cases," he had never directly addressed "strategic decisions peculiar to the practice of criminal defense in Cook County" from the perspective of a criminal defense attorney. In barring this testimony, the Court noted that such witness lacked qualifications because "his experience has limited utility in enlightening the jury on the issues that would be most helpful to the jury." *Id.* Similarly apropos is *Bird v. Jefferson Cty. Sheriff's Dep't*, 2009 WL 804058 (E.D. Mo. 2009) in which a court barred a highly experineced police officer from opining on matters relating to the investigation into a police involved shooting because he had no specific expertise in this area. *Id.*

While Brzeczek was found qualified to testify as to certain matters relating to the investigation of homicides in *Hill v. City of Chicago*, 2011 WL 2633823, at *3 (N.D. Ill. 2011), that case is a far cry from the present case. In addition to the fact that Brzeczek's opinions were largely barred in *Hill*, Brzeczek's testimony in *Hill* was essentially limited to matters relating to the temporal requirements of the submission of police reports and the use of non-standards methods of reporting in violation of established rules. *Id.* at *7-8. By contrast, Brzeczek, in the present case, essentially disavowed knowledge of any specific police requirements or standards governing the subject matter at issue. *Id.*

Frankly, permitting Brzeczek to render opinions in this area would be tantamount to setting a bar where any former police officer could testify as to any police practice by mere virtue of their former police service. As noted above, *Daubert* is not so easily avoided. Brzeczek cannot even satisfy the qualification requirements of *Daubert* and his testimony must be barred on these grounds alone.

## II.     Brzeczek's Methodology Is Not Only Unreliable; It Is Non-Existent.

Even were Brzeczek otherwise qualified to render opinions as an expert in this case, his methodology is not only unreliable but largely non-existent. As noted above, despite the absence of any methodology disclosed in his report (and various unsuccessful attempts at his depositions to tether his opinions to specific standards of policing), Brzeczek's methodology espoused at his deposition for the

first time fails in the most elementary of ways. Frankly, his "methodology" is not even close to being sufficiently reliable and is essentially non-existent, subjective, and appears made up solely for the purposes of this case. In the place of any methodology, Brzeczek attempts to render testimony essentially just on his "say so" without any regard for applicable standards or any method (scientific or otherwise).

To satisfy *Daubert*, the proffered testimony must have a reliable basis in the knowledge and experience of the relevant discipline, consisting of more than subjective belief or unsupported speculation. *Chapman v. Maytag Corp.*, 297 F.3d 682, 686-87 (7th Cir. 2002); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). By assessing reliability, the court ensures the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd* v. *Carmichael*, 526 U.S. 137, 152 (1999).

Among other things, the question of reliability can be assessed by looking at "(1) whether the expert's technique or theory can be or has been tested—that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community." *See* Fed. R. Evid. 702, comments citing *Daubert*.

11

An expert "cannot simply assert a 'bottom line.'" *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748,761 (7th Cir. 2010). Even a qualified expert must base his conclusions on sound reasoning, and the soundness of the analysis underlying the expert's conclusions is a factual question for the Court to resolve. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718-19 (7th Cir. 2000). An expert who fails to offer a sufficient rationale for his or her conclusions should be excluded from testifying because "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Hayes v. Raytheon Co.*, 23 F.3d 410, 1994 WL 143000, *4 (7th Cir. 1994). "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connecting to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

To that end, expert reports must be "detailed and complete" and explain "how and why the expert reached a particular result." *Salgado by Salgado v. General Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998) (internal quotation marks omitted). When a retained expert discloses his written report, that report must contain not only "a complete statement of all opinions the witness will express" but also "the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). In other words, an expert cannot just list his conclusions; he has to show his work. This is vital, because district courts are charged with policing the admissibility of expert opinions, and "experts' work is admissible only to the extent that it is reasoned, uses the methods of the discipline, and is founded on data." *Bourelle v. Crown Equip. Corp.*, 220 F.3d 532 539 (7th Cir. 2000).

An "indicator of unreliability is the unjustifiable extrapolation from an accepted premise to an unfounded conclusion." *See Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 530-31 (7th Cir.2005)(noting that one "indicator of unreliability is the unjustifiable extrapolation from an accepted premise to an unfounded

conclusion"); *Moore v. P & G-Clairol, Inc.*, 781 F. Supp. 2d 694, 702 (N.D. Ill. 2011)(barring expert testimony when expert extrapolated known methodology to reach a conclusion beyond the limits of the methodology's pataemeters) Fed.R.Evid. 702 advisory committee's note (2000 amends.) (listing "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion" as a relevant factor in determining reliability of expert testimony.

"The critical inquiry is whether there is a connection between the data employed and the opinion offered." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017)*quoting Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013). Said another way, there must be a "rational connection between the data and the opinion." *Id.* In this regard, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "Some greater methodology is required to bridge the analytical gap between general principles and particular conclusions, and to vest thereby the opinion with requisite reliability." *Fuesting*, 421 F.3d at 536.

Simply referring to basic standards does not suffice to make an expert's opinions admissible. Indeed, in *In re Zimmer Nexgen Knee Implant Products Liability Litigation*, the court barred opinions by an expert who did not "explain[ ] how he applied scientific principles to the underlying data to reach his conclusions." 2015 WL 3669933, at *23 (N.D. Ill. June 12, 2015)*; see also Fidelity Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 2001 WL 789218, at *3 (N.D. Ill. July 12, 2001)("The fact that Nielsen's report appends [22 pages of] supporting data does not justify the absence of supporting explanations or rationale for particular opinions. Rule 26(a) requires that the expert report contain the basis and reasons for each opinion...Nielsen's index of the materials he reviewed is not keyed to his various conclusions and, thus, provides insufficient support.").

As this Court succinctly stated in *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 808 (N.D. Ill. 2013):

The inquiry here requires the Court to assess the manner in which the expert has attempted to "bring it all together"; the question is whether the expert has "bridged the analytical gap" between the mere existence of his principles and methods in theory and his application of them to the specific facts of the case before the Court. Thus, "any step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Id.*

Even "[a] supremely qualified expert cannot waltz into the courtroom and render opinion unless those opinions are based upon some recognized scientific method." *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999); *Paramount Media Grp., Inc. v. Vill. of Bellwood*, 2015 WL 7008132, *7 (N.D. Ill. 2015)(barring expert's attempt to opine on novel methodology that was "untested and unused in the relevant industry."). Indeed, the possibility of hired experts simply rolling out novel methodologies for pay that are not otherwise used in the putative expert's professional work is exactly the type of "abuse" that Daubert was intended to protect against in the first place. *See Braun v. Lorillard Inc.*, 84 F.3d 230, 235 (7th Cir. 1996). As stated by the Seventh Circuit in *Braun*, "[t]hat abuse is the hiring of reputable scientists, impressively credentialed, to testify for a fee to propositions that they have not arrived at through the methods that they use when they are doing their regular professional work rather than being paid to give an opinion helpful to one side in a lawsuit." *Id.*

Expert testimony cannot "be based on subjective belief or speculation." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010); *see also Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014) ("Rule 703 requires the expert to rely on "facts or data," as opposed to subjective impressions."). In this regard, "[a] witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005); *Cummins v. Lyle Indus.*, 93 F.3d 362, 369 (7th Cir. 1996)(refusing to "'relax[ ] the usual first-hand knowledge requirement of the Federal Rules of Evidence on the ground that the expert's opinion has a reliable basis in knowledge and experience of his discipline'") *quoting Deimer v. Cincinnati Sub-Zero Prods., Inc.*, 58 F.3d 341, 345 (7th Cir. 1995)). Rather, an expert who bases his opinions on his experience must "explain how the application of his prior

14

experience to the facts of the case compels his conclusion." *Jordan v. City Chicago*, 2012 WL 254243, at *6 (N.D. Ill. 2012) (excluding opinion entirely based on "30+ years of experience as a firearms expert"); *see also* Fed. R. Evid. 702 advisory committee's note ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"); *Ammons v. Aramark Unif. Servs.*, 368 F.3d 809, 816 (7th Cir.2004) (under the reliability prong of the Daubert test, "a court is expected to reject any subjective belief or speculation").

Brzeczek's methodology can barely be even called one in the first place. Brzeczek repeatedly fumbled about attempting to find various sources of obligation for a police officer to affirmatively document matters relating to bringing a person to a polygraph when such matter was already documented by another police officer and the polygraph was inconclusive. He was unable to do so and instead simply relied on a subjective "pertinence" standard for which he cited nothing in his Report for its application. While Plaintiff's other police policies expert, Dennis Waller, at least makes a superficial attempt to cloak his Report with an air of reliability by tossing in a few cites to general standards from certifying police bodies and publications, Brzeczek cites exactly zero authorities in his Report to support his methodology in this case. Brzeczek also professed neither personal (nor even second or third hand) experience or knowledge relating to any remotely similar situation. Moreover, Brzeczek expressly conceded that this standard was itself inherently subjective and was simply an exercise of common sense.

This analysis fails on every single relevant consideration under *Daubert*. Brzeczek expressly admitted this is a subjective inquiry. There is no way imaginable to objectively test whether something is "pertinent" or not. It is always inherently objective. There are no peer reviews or publications cited by Brzeczek. There is no cited error rate. Brzeczek was unable to cite even a single standard supporting his methodology. Brzeczek has also not cited to any acceptance in the scientific community.

Simply imposing a "pertinence" information standard and concluding that such applies to the present case is a bridge too far. As noted both by the United States Supreme Court and in the committee comments for Fed. R. Evid. 702, unjustifiable extrapolations from accepted premises to reach unfounded conclusions do not cut it for admissibility. *See* Fed. R. Evid. 702, comments citing Joiner, 522 U.S. at 146. This purported methodology is too general and far too subjective to pass muster under *Daubert*.

In order to be admissible, the methodology must provide "concrete information against which to measure abstract legal concepts." *United States v. Blount*, 502 F.3d 674, 680 (7th Cir. 2007). In *Wells v. City of Chicago*, Judge Kennelly barred the opinions of a police policies expert (Plaintiff's other expert Dennis Waller) to the extent that he relied upon generalized standards set forth in the Law Enforcement Code of Ethics regarding the general obligation of police officers "to safeguard lives, be mindful of the welfare of others, respect constitutional rights, and so on" because such standards were "far too general to be helpful to the jury." *Id.*, 2012 WL 116040, at *12 (N.D. Ill. 2012). Similarly, in *Davis v. Duran*, 277 F.R.D. 362, 372 (N.D. Ill. 2011), Brzeczek's co-police policies expert in this case was specifically admonished for simply "retreat[ing] behind the unhelpful and protective formulaic response that he was "relying on the totality of [his] training, education, and experience." as the methodological basis for his opinions because if this was sufficient under *Daubert,* it "would make all expert testimony essentially impervious to challenge and to meaningful cross-examination." *Id.*

Other cases where experts have attempted to fashion a methodology based on exceptionally broad and objectively meaningless standards have similarly been rejected under *Daubert. See Metavante Corp.*, 619 F.3d at 761 (holding that an expert's testimony was reliable because he did more than "simply testify that [the party]'s performance was commercially reasonable because he said so"); *Am. Family Mut. Ins. Co. v. Electrolux Home Prods., Inc.*, 2014 WL 2893179, *8 (W.D. Wis. 2014)(refusing to admit proffered expert opinion that Defendant behaved "unethically"); *Sanders v. City of Chicago Heights*, 2016 WL 1730608, *8 (N.D. Ill. 2016)("Because [the expert's] definition of deliberate indifference is not

necessarily the same as the Court's instruction on the legal definition of deliberate indifference, his testimony on this issue will only confuse the jury."); *Cook v. CTC Comms. Corp.*, No. 06-CV-58, 2007 WL 3028415, at *2-3 (D.N.H. 2007)(expert testimony relating to whether "an appropriate workplace investigation" was done was not reliable methodology); *Harper v. Capital One, N.A.,* 2013 WL 12250945, at *11–12 (N.D. Tex. 2013)(subjective best practices testimony was not admissible).

**III.    Brzeczek's Opinions Are Not Helpful To The Jury Under *Daubert*.**

Finally, even were Brzeczek qualified to render the specific opinions at issue and his methodology otherwise sound, the sum total of Brzeczek's opinions in this case are simply not helpful to the jury in this case. Brzeczek opines that the polygraphing of persons must be documented and disclosed in police reports *not only* by the polygraph examiner *but also* by the detectives bringing the person to be polygraphed and that such reports must be provided to a criminal defendant under *Brady.* As noted above, Brzeczek was unable to cite any actual standards providing as much or experience on this particular topics. Rather, Brzeczek attempts to shoehorn in such opinions by relying on the general obligation of police officers to document "pertinent" information in police reports. These opinions are not helpful for two separate and distinct reasons: (1) Brzeczek's theory that the polygraph information was required to be documented is in direct contravention of governing law; and (2) Brzeczek's methodology relies solely on an analysis that the jury is just as capable of applying as Brzeczek.

The Court must also assess whether proposed opinions will assist the jury in determining a factual issue. *See Myers*, 629 F.3d at 644; *Cage*, 979 F. Supp. 2d at 804. This is essentially a relevance inquiry. *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 613 (7th Cir.1993) ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."); *see also Roman v. Western Mfg., Inc.*, 691 F.3d 686, 694 (5th Cir.2012) ("To be 'helpful' under Rule 702, the evidence must possess validity when applied to the pertinent factual inquiry .... Principally this is a matter of relevance."); *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1184 (9th Cir.2002) ( "Whether testimony is helpful within the meaning of Rule 702 is in essence a relevancy inquiry."); *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir.1985) ("An additional consideration under Rule 702—and another aspect of relevancy—is whether

expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.").

"It is a fundamental premise of our trial system that 'determining the weight and credibility of witness testimony ... belongs to the jury who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men.'" *Davis v. Duran*, 277 F.R.D. 362, 370 (N.D. Ill. 2011) *citing United States v. Scheffer*, 523 U.S. 303, 313, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998). "[A]n expert witness may not usurp the jury's function to weigh evidence and make credibility determinations." *United States v. Farrell*, 563 F.3d 364, 377 (8th Cir.2009). See also *United States v. Garcia*, 413 F.3d 201, 215 (2nd Cir.2005). "Expert testimony does not assist the trier of fact when the jury is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony." *See Taylor v. Illinois Cent. R.R. Co.*, 8 F.3d 584, 586 (7th Cir.1993); *Aponte*, 2011 WL 1838773 at * 2; *Matter of the Complaint of Ingram Barge Co.*, 2016 WL 3763450, at *10 (N.D. Ill. 2016) *citing Sullivan v. Alcatel-Lucent USA Inc.*, No. 12 C 7528, 2014 WL 3558690, *6 (N.D. Ill. 2014); *see also Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001)(expert must testify to something more than what is obvious to layperson).

"Expert testimony is permitted to assist the trier of fact with technical issues that laypeople would have difficulty resolving on their own. Expert testimony furthers this purpose only if the expert is in fact providing the jury with genuine expertise." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013). However, if a proffered expert opinion addresses matters that are "truly in the realm of common sense, then [an expert's] testimony is superfluous and will provide no benefit to the trier of fact." *See United States v. Palomino*, 2014 WL 2581347, at *3 (N.D. Ill. 2014); *Sullivan v. Alcatel-Lucent USA Inc.*, 2014 WL 3558690, at *6 (N.D. Ill. July 17, 2014)("Expert testimony does not assist the trier of fact when the jury is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony."); *Sommerfield v. City of Chi.*, 254 F.R.D. 317, 329 (N.D. Ill. 2008) ("[N]o expert testimony is needed when the subject matter of the testimony is clearly within the average person's grasp."); *Dean ex rel. Williams v. Watson*, 1995 WL 692020, at *6 (N.D.

Ill. 1995) ("Testimony of a witness is inadmissible if it 'consists of nothing more than drawing inferences from the evidence that [the alleged expert] was no more qualified than the jury to draw.' " (alteration in original)). Thus, expert testimony cannot "be based on subjective belief or speculation." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010); *see also Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014) ("Rule 703 requires the expert to rely on "facts or data," as opposed to subjective impressions."); *Timm v. Goodyear Dunlop Tires N. Am. Ltd.*, 2018 WL 1566827, *6 (N.D. Ind. 2018)("Woerhle's opinions appear to be based on nothing more than his subjective belief and unsupported speculation. It goes without saying that intuitive principles are not enough to satisfy the strictures of Rule 702 and Daubert.").

When police policies are at issue, the permissible topics for expert testimony typically are only permitted "when something peculiar about law enforcement (e.g., the tools they use or the circumstances they face) informs the issues to be decided by the finder of fact" rather than application of everyday experience and common sense concepts of relevance and reasonabless. *See Florek v. Vill. of Mundelein, Ill.*, 649 F.3d 594, 602 (7th Cir. 2011); *United States v. Brown*, 871 F.3d 532, 539 (7th Cir. 2017)(noting that expert testimony on police practices are not admissible when jurors are capable of applying same standard using common sense); Estate of *Loury by Hudson v. City of Chicago*, 2019 WL 1112260, at *5 (N.D. Ill. 2019)(barring police policies expert regarding reasonable suspicion; "Longo's testimony is devoid of any explanation why or how he concluded that certain police officers did not have reasonable suspicion, nor does he explain what facts typically support reasonable suspicion based on his experience."); *Sanders v. City of Chicago Heights,* 2016 WL 4417257, *6 (N.D. Ill. 2016)("Also, Ryan cannot testify to the legal standards of what constitutes probable cause, including the "totality of the circumstances" test"); *Potts v. Manos*, 2017 WL 4365948, *5 (N.D. Ill. 2017)(barring police policies expert because the "jury's inquiry is essentially a fact-bound one into the particular knowledge and intent of the defendants in taking or omitting to take particular actions" and that "defendants themselves or other appropriate fact witnesses will be able to provide the necessary context" to resolve such issues); *Burgs v. Pearson*, 2013 WL 12309672, *2–3 (N.D. Ill. 2013)(barring police policies expert and noting that

conclusions regarding whether officer actions "were 'appropriate,' whatever that term means" was not proper expert testimony because it was essentially the same as reasonableness which a jury was capable of applying without expert testimony). Indeed, the Seventh Circuit has noted that the problem with admitting such testimony is not just a lack of helpfulness to the jury but, additionally, the danger that the testimony may "induce[] the jurors to defer to [the expert's] conclusion rather than drawing their own." *Brown*, 871 F. 3d at 539.

Regardless of the validity of the underlying science, if the science does not actually address a disputed issue, testimony on such issue is simply not admissible. *See Owens v. Auxilium Pharm., Inc.*, 895 F.3d 971, 972–74 (7th Cir. 2018). Stated another way, "whether an expert's approach lines up with the basic facts of the case goes to the relevance and admissibility of the testimony itself. Gatekeeping of this sort is properly left to the court." *Owerns*, 895 F. 3d at 972-74; *State Farm Fire & Cas. Co. v. Electrolux Home Prod., Inc.*, 980 F. Supp. 2d 1031, 1049–50 (N.D. Ind. 2013)("To put it another way, care must be taken to be sure that the comparison is one between 'apples and apples' rather than one between 'apples and oranges.'").

First, Brzeczek's opinions regarding the alleged obligation of police detectives to document an inconclusive polygraph examination despite such information also being documented by another police officer in another report goes far beyond any relevant issue in this case. The Seventh Circuit has been pellucidly clear that polygraph examinations (and in particular inconclusive ones as here) are simply not *Brady* material in the first place because such evidence is not admissible in any underlying criminal prosecution. *See Beaman v. Freesmeyer*, 776 F.3d 500, 507 (7th Cir. 2015)(failure to disclose erratic polygraph examination of alleged alternate perpetrator was not a *Brady* violation because it was immaterial because it was inadmissible); *Snow v. Pfister*, 880 F.3d 857, 869 (7th Cir. 2018)(same); *Snow v. Pfister*, 240 F. Supp. 3d 854, 890 (N.D. Ill. 2016)("The [ ] Brady claim [based on the failure to disclose polygraph records] also fails because under Illinois law, polygraph evidence is inadmissible, and under Seventh Circuit law only admissible evidence is subject to Brady's disclosure requirements."). Indeed, even were this particular subset of a failure to "double document" not so specifically addressed by

Seventh Circuit precedent (and directly in contravention of Brzeczek's opinions), the case law is clear that police officers do not have an obligation to document in the first instance. *See Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir. 1988) ("*Brady v. Maryland* does not require the police to keep written records of all of their investigatory activities."); *Boyd v. City of Chicago*, 225 F. Supp. 3d 708, 719 (N.D. Ill. 2016)("Even if the defendant officers violated police procedures by failing to prepare reports after visiting Ricky—an allegation not made by plaintiff—42 U.S.C. § 1983 protects against constitutional violations, not violations of police practices, and any such violation would not rise to the level of a Brady violation."); *see also Kent v. Gantt*, 2013 WL 5424710, *3 (S.D. Ohio 2013); *Abella v. Simon*, 831 F.Supp.2d 1316 (S.D.Fla.2011)(Constitution is not violated by a police officer's failure to make a report).

Second, even were this not so, Brzeczek's testimony is not helpful to the jury in any respect because he admits that his testimony simply involves the application of common sense "pertinence" standard that is inherently subjective. As noted above, when asked to describe what encompassed "pertinent" information for the purposes of his opinions, Brzeczek stated that the definition of "pertinent information" for these purposes "were used with the objective that *most people at that time would understand the ordinary meaning of the words* 'pertinent information' in the context of a police investigation." Ex. B at 127:13-127:21. Brzeczek further conceded that the determination regarding what was pertinent information was a subjective determination by each officer. Ex. D at 70:15-71:1 ("So my question to you is, pertinent information in investigation -- in a detective investigation is a subjective assessment by the detectives working the case at any specific period of time, correct, whether something is pertinent or not? A That's correct. I mean, at some point that determination is a subjective determination based upon the detective's training and experience."). This type of subjective analysis not only is not helpful as expert testimony but would also run the improper risk of soliciting the jury to replace their own common sense with that of Brzeczek. This is not permitted.

As with Plaintiff's other police policies expert and false confessions expert, the true purpose behind their disclosure appears to be little more than a naked attempt to parrot Plaintiff's version of the facts through a paid expert and attempt to "backdoor" evidence that would never be admitted at trial

in this case. This tactic is common and routinely rejected. Although "an expert witness is not required to verify all the facts on which he relies," *Tilstra v. BouMatic LLC*, 791 F.3d 749, 753 (7th Cir. 2015), "[r]elaying the plaintiffs' likely testimony is not an example of expertise." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000). This limiting principle "is intended to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." *Von der Ruhr v. Immtech Int'l, Inc.*, 570 F.3d 858, 864 (7th Cir. 2009). "The entirety of an expert's testimony cannot be the mere repetition of the out-of-court statements of others, and … an expert witness may not simply summarize the out-of-court statements of others as his testimony. … An expert who parrots an out-of-court statement is not giving expert testimony; he is a ventriloquist's dummy." *United States v. Brownlee*, 744 F.3d 479, 482 (7th Cir. 2014); *Aponte v. City of Chicago*, 2011 WL 1838773, *2 (N.D. Ill. 2011)(excluding expert opinions that "essentially summarize deposition testimony of the Individual Defendants and leap to a conclusion that does not rely on specialized knowledge."); *Wells v. City of Chicago*, 2012 WL 116040, at *13 (N.D. Ill. 2012)("Based on Waller's report, it appears that he has done nothing more than summarize evidence that he has reviewed. The opinion does not appear to involve application of Waller's expertise."); *Rivera v. Heck*, 2018 WL 4354949, *4 (W.D. Wis. Sept. 12, 2018)("As previously discussed, Burwell's entire report does little more than summarize the evidence and offer an opinion about what the jury should ultimately decide, thereby impermissibly inviting the jurors to substitute their own independent judgment with that of an expert's conclusion.").

Moreover, while it does not expressly say so, Brzeczek's Report appears to be a roundabout way to suggest that the police should have taken additional steps to identify and document LaGace as an alternate perpetrator. This type of testimony is not admissible either and, indeed, this case would not be the first time that Brzeczek has attempted to offer such testimony and been denied. *See Hill v. City of Chicago*, 2011 WL 2633823, *7 (N.D. Ill. 2011).

## CONCLUSION

WHEREFORE Defendant prays this Court grant the relief specified above and for whatever

other relief this Court deems fit.

Timothy P. Scahill (6287296)                    Respectfully submitted,
BORKAN & SCAHILL, LTD.                          BORKAN & SCAHILL, LTD.
20 South Clark Street, Suite 1700
Chicago, Illinois 60603 (312) 580-1030          By:     s/ Timothy P. Scahill
                                                        Timothy P. Scahill