**Report of Richard J. Brzeczek prepared at the request of the Plaintiff in the Matter of *Daniel Anderson v. The City of Chicago, et. al., 16 C 1963***

I reviewed the following documents reviewed by the undersigned:

- the complaint filed in the aforementioned cause of action;
- police reports known as case and supplementary reports,
- court attendance reports;
- the deposition and written notes of then polygraph examiner John Stout;
- select portions of the deposition of former detective James Higgins
- the depositions of then prosecutors Erickson and Cohen
- the deposition of Diane Diaz-Grabowski
- my testimony from *Palmer v. City of Chicago.*

## FACTS

1. Cathy Trunko was found fatally stabbed on 19 Jan 1980 at about (2210-2219hrs – I cannot read the last digit on the Case Report) at 4936 South Paulina St. in Chicago, Illinois.
2. Prior to her being found stabbed, it was established that she was contacted by telephone by her best friend, Diane Diaz, who was at Dot's Tavern in the company of Robert LaGace.
3. The only thing mentioned about LaGace in any of the police reports (patrol & detective) is that LaGace was allegedly interviewed by detectives on 20 Jan 1980 and, according to detectives, he said the same thing as did Diane Diaz relative to the phone call. The detectives did not report as to whether or not they asked LaGace if he knew Trunko, which is especially problematic since LaGace was at Dot's Tavern with Trunko's best friend, Diane Diaz, and went to go visit the victim on the night of the murder.
4. While there is absolutely no mention whatsoever in the detectives' reports, Detectives Bedran and Rochowicz took LaGace to the CPD Criminalistics Division – Polygraph Unit for a polygraph exam on 21 January 1980 at 6:15 p.m., in connection with the Trunko homicide investigation.
   a. Before Stout administered the polygraph exam, he first met with Detectives Bedran and Rochowicz for the pre-test interview. The purpose of the pre-test interview is to learn the pertinent information related to the crime and the subject so that the examiner can effectively conduct a polygraph examination. In the pre-test interview with Bedran and Rochowicz, it appears those officers conveyed to Stout that on at least two prior occasions,

1


EXHIBIT
Brzeczek #3
11-2218 PW

> LaGace was known to have pulled knives on Trunko. *See* Stout
> Deposition at 45, 49-50, and RFC-Andersen 008107. That
> information, and the identification the individual who provided the
> information to the detectives, is not found in any of the police
> reports related to the Trunko homicide investigation.

5. Prior to the polygraph examination, Stout conducted a pre-test interview
   with LaGace. During the "pre-test" interview, LaGace provided the
   examiner with information that was nowhere to be found in any of the
   reports of the detectives in the Trunko homicide investigative file. Among
   this information was: while or shortly after Diaz was on the phone with
   Trunko and offering to pick Trunko up with a car, LaGace drove over to the
   area of Trunko's home (about ½ block from the murder scene) but was
   unable to find her. (Also missing from the detectives' reports is any attempt
   to confirm with LaGace's companion, Diane Diaz, that he did or did not
   leave Dot's Tavern to go pick up Trunko.) *See* RFC Andersen 8109 and
   Stout dep at 43-49 and compare it to the police reports, which do not contain
   this information, such as at RFC 7-8.

6. LaGace submitted to the polygraph exam but was deemed to be an unfit
   subject as the examiner could not establish standards for LaGace and was of
   the opinion that LaGace was not purposefully trying to defeat the purpose or
   objective of the polygraph exam. *See* Stout Deposition at 60-62.

7. LaGace knew that James Clark was Trunko's boyfriend. LaGace said that on
   Friday night in another bar Trunko showed/taught LaGace some card tricks
   and that she was pretty good at it. *See* Stout Deposition at 38, 42-43; RFC
   Andersen at 8109.

8. In addition, I reviewed select portions of Diane Diaz's deposition testimony
   (now Diane Grabowski). She says that on the night of Trunko's murder, she
   was with Bob LaGace; he was carrying knives on his belt; Diane was on the
   phone with Trunko when Bob LaGace grabbed the phone, told Trunko to get
   ready and that he was going to get her; that he left the bar and came back 30 ̶N̶A̶G̶A̶C̶E̶
   minutes later, without Trunko, and was sweaty and breathing heavy. ~~Trunko~~
   was apparently missing one of his knives. Diane Grabowski testified that she
   told the police all of this information before the Daniel Andersen criminal
   trial. I do not know what she told the police, but I have reviewed the police
   reports and see that none of the foregoing information appears in there. If
   Grabowski did actually tell the police any of this information, the officer
   receiving the information had to record it into an official police report and
   make this information part of the file. In addition, it had to be disclosed to

2

the prosecutors. This information is relevant to the investigation because it suggests that LaGace may have had something to do with the murder, and he was at least a possible suspect. In addition, LaGace is someone the police were looking into already. Therefore, based on existing CPD policies and procedures as well as the law, CPD officers and detectives who possessed this information were required to record and disclose it.

7. Daniel Andersen was arrested on 24 January 2018 on a complaint signed by his mother for disorderly conduct. This supposedly occurred after patrol officers received information that Andersen had a gun and was frequenting the area of 5100 South Hermitage. There is no reference in the officers' report as to how they received this information or from whom and when. According to the patrol officers who arrested him for disorderly conduct, on the way into the 9th District, he stated that he killed Trunko. The officers then took Andersen to Criminal Investigation Division Area 3.

8. At Area 3, Andersen told detectives that he did not kill Trunko but knew who did. He identified the offender as "Bob" with a scar on his face and neck. Andersen's arrest took place three (3) days after Robert LaGace was taken for a polygraph examination. The only mention of Robert LaGace in the detectives' reports is a couple of sentences attributed to him in which he confirms the story given to the detectives by Diane Diaz. Not only is there no mention of his being taken for a polygraph exam but there is also no mention of any visible scars on the face and/or neck of LaGace by the detectives.

9. Thereafter, detectives obtained a statement from Andersen that describes a somewhat complex and convoluted plot that he contrived to kill Trunko.

**OPINION** (Based on my education, training, and having been a Chicago police officer including a sergeant in the Detective/Criminal Investigation Division (name change took place sometime in 1970 or 1971 and again in 1980) and including having been appointed Superintendent of Police just 8 days prior to the occurrence of this murder.

1. It is a fundamental principle in American criminal jurisprudence that persons charged with the responsibility of criminal investigations and criminal prosecutions are to exonerate the innocent as well as pursue and prosecute the guilty. There is legal precedent and an inherent ethical obligation placed on law enforcement personnel to heed and develop

3

exculpatory information with the same vigor as applied to inculpatory information. Willfully concealing exculpatory information includes the failure to report the discovery of exculpatory information in routine police reports.

2. All police officers are taught in their respective academies that the polygraph is an investigative tool, albeit in many instances, an important investigative tool. Studying polygraph use even further, one learns that the "pre-exam" questioning and even "post-exam" questioning can be as important as the actual polygraph exam.

3. From my experience as a sergeant in the Detective/Criminal Investigation Division and as Superintendent of Police, I can affirmatively state that it was the clear and unequivocal policy of the Chicago Police Department that detectives were required to include relevant facts, inculpatory and exculpatory, learned from an investigation in their reports. At that time, detectives were selected as a result of a competitive examination that could be taken by police officers with a minimum of two (2) years' experience. Once selected, new detectives underwent a four (4) weeks pre-service training program. Methods of reporting was an integral component of the pre-service training program. Detectives were taught that all relevant facts and/or information must be included in their reports. Detectives were taught that exculpatory facts are relevant facts that must be included in reports.

4. The detectives' taking of a person, whether a suspect or a witness, to the Criminalistics Division for a polygraph examination is a relevant fact and must be included in the reports of the detectives. The results of the polygraph examination or anything learned in the process never justifies the failure to report the mere taking of a person for a polygraph examination.

5. In connection with the detectives' taking Robert LaGace to the CPD polygraph examiner a little more than two (2) days after the murder, the following issues raise serious concern about the integrity of the investigation and the reporting of investigative activity by the detectives. Among these are:

a. The detectives failed to report what prompted the detectives to ask Robert LaGace to submit to a polygraph exam.

b. The detectives failed to report the reason(s) why they regarded Robert LaGace as a suspect in the Trunko murder as they had to relate to the polygraph

4

examiner as the reason for bringing LaGace in for the exam. For example, was LaGace brought in for polygraph exam because he was a witness or a suspect?

c. The detectives failed to report what they did with the information provided by LaGace to the polygraph examiner as told to the detectives by the polygraph examiner. Some of this information was either unknown to the detectives or not consistent with what they already knew. For instance, did they follow up on it? Conduct any additional investigation? Disregard it as irrelevant for some reason?

d. None of this information was included by any detective in any report, nor in any detective notes, nor included in the "running" or "street" files maintained in each Area of the then Criminal Investigation Division. During my testimony in the *Palmer* case referenced in the materials I reviewed prior to the preparation of this report, I specifically stated that all documents prepared by any police officer, including detectives, containing information relative to any case *regardless of its nature, official or unofficial, formal or informal, piece of paper, notebook, back of a matchbook, or what have you, becomes part of the investigative file as a result of the TRO entered by this District Court and the order I caused to be issued as the Superintendent of Police.* I also testified that prior to the issuance of the TRO and the Department directive, all police officers notes were considered personal but police officers were required to preserve their notes for court testimony and incorporate their notes in official reports. As of the time of the Trunko homicide investigation, the Chicago Police Department made very clear to its detectives through training, policies, and supervision that *Brady v. Maryland* required detectives to record and disclose all material information relevant to guilt or innocence. Subsequent to the issuance of the TRO and the Department directive, all the writings referred to in italics above became part of the official file and were no longer considered personal. I also testified that the Criminal Investigation Division/Detective Division file should include reports received from other components of the Department such as "crime lab reports." The polygraph exam, the results thereof, the notes prepared in connection with the exam by the polygraph examiner are all "crime lab reports" as the Polygraph Unit was a component of the Criminalistics Division (aka, Crime Lab). In addition, detectives were required to record information in their possession about witnesses they believed should be polygraphed and other information about those polygraph results, as well as any other related information they had, regardless of what was documented by the polygraph examiner. The inclusion of reports from other components of the Department applied to the time periods both before and after

the issuance of the TRO and the Department directive as a result of the *Palmer* litigation. My testimony in *Palmer* recited the policy of the Chicago Police Department before and after the issuance of the TRO and the Department directive.

e. Without regard for the reasons for having LaGace submit to a polygraph exam and without regard for what transpired during that exam, no detective ever submitted a report that detectives took LaGace for a polygraph exam.

f. The detectives failed to create a record of the information regarding LaGace previously threatened Trunko with knives as well as the identity of the person from whom they learned the information.

g. The detectives failed to record whether or not they interviewed person named by Bob as possibly having information regarding the Trunko murder.

h. It appears that none of this was recorded by the area detectives assigned to this case or memorialized in any police report, such that it does not appear anywhere in the police files.

i. As noted above, the police also should have prepared a report documenting the information that Diane Diaz told them, and they were required to disclose that information to the prosecution.

j. Based on my experience and knowledge in the field of police practices and my specific knowledge of the CPD during the relevant time period, it is my opinion that pertinent information relevant to the Trunko homicide investigation was known to the detectives on or before January 21, 1980, that was not documented in any of the official reports that were produced in this case. Specifically, there was information in the possession of Detectives Bedran and Rochowicz that that implicated a suspect, LaGace, in violent conduct with the victim prior to her murder. That information and the individual that provided it should have been documented. In addition, the detectives should have documented that LaGace was taken to by polygraphed, even if the polygraph results were not provided to the prosecutors or criminal defendants. The fact of the polygraph examination should have been documented in an official CPD report. Finally, detectives should have prepared a report documenting their interviews with LaGace and the information that LaGace provided to them. All of this information

6

was pertinent and relevant investigatory information that detectives were expected to document in official reports. The information could reasonably be considered to be exculpatory to Mr. Andersen for his criminal defense and which he did not have for his trial.

Respectfully Submitted,

Richard J. Brzeczek
October 1, 2018