RICHARD J. BRZECZEK                                    November 29, 2018

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF ILLINOIS

3                        EASTERN DIVISION

4

5     DANIEL ANDERSEN,                    )
              Plaintiff,                  )
6        vs.                             ) No. 16-cv-1963
      CITY OF CHICAGO, JAMES             )
7     BEDNARKIEWICZ #6793, RICHARD       )
      BEDRAN #2812, CRAIG CEGIELSKI      )
8     #14238, DAN FITZGERALD #9342,      )
      JOHN HERMAN #12088, JAMES          )
9     HIGGINS #3094, DANIEL MCWEENY      )
      #14367, TED MELKO #11558, PAUL     )
10    NIELSEN #8060, JOHN OLSON          )
      #3357, L. PAWLOWSKI #2525,         )
11    M. RAJEWSKI #12601, MICHAEL        )
      RILEY [STAR # UNK], RICHARD        )
12    ROCHOWICZ #2812, and UNKNOWN       )
      EMPLOYEES OF THE CITY OF           )
13    CHICAGO,                           )
              Defendants.                )
14            The deposition of RICHARD J. BRZECZEK,

15    called for examination pursuant to the Rules of

16    Civil Procedure for the United States District

17    Courts pertaining to the taking of depositions,

18    taken before Patricia L. Wangler, Certified

19    Shorthand Reporter in the State of Illinois, at

20    20 South Clark Street, Chicago, Illinois, on

21    November 29, 2018, commenced at the hour of

22    10:08 a.m., and terminated at the hour of 3:27 p.m.

23    Reported By:  Patricia L. Wangler, CSR

24    License No.:  084-002417

RICHARD J. BRZECZEK                     November 29, 2018

---

Page 2

```
 1   APPEARANCES:
 2        LOEVY & LOEVY, by
 3        MS. ROSHNA BALA KEEN
 4        312 North May Street, Suite 100
 5        Chicago, Illinois  60607
 6        (312) 243-5900
 7        roshna@loevy.com
 8             Representing the Plaintiff,
 9
10        ROCK FUSCO & CONNELLY, LLC, by
11        MS. STACY A. BENJAMIN
12        321 North Clark Street, Suite 2200
13        Chicago, Illinois  60654
14        (312) 494-1000
15        sbenjamin@rfclaw.com
16             Representing the Defendant
17             City of Chicago,
18
19
20
21
22
23
24
```

Page 3

```
 1   APPEARANCES CONTINUED:
 2        BORKAN & SCAHILL, LTD., by
 3        MS. MISHA ITCHHAPORIA
 4        20 South Clark Street, Suite 1700
 5        Chicago, Illinois  60603
 6        (312) 580-1030
 7        mitchhaporia@borkanscahill.com
 8             Representing the individual Defendants.
 9
10   ALSO PRESENT:
11        MR. TIM KELLY, Videographer.
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1                  I N D E X
 2   WITNESS                         EXAMINATION
 3   RICHARD J. BRZECZEK
 4        By Ms. Itchhaporia              6
 5
 6
 7
 8
 9
10                E X H I B I T S
11   NUMBER                      MARKED FOR ID
12   Brzeczek Deposition
13        Exhibit No. 1               19
14        Exhibit No. 2               73
15        Exhibit No. 3               80
16        Exhibit No. 4              103
17        Exhibit No. 5              136
18        Exhibit No. 6              136
19        Exhibit No. 7              182
20
21
22
23
24
```

Page 5

```
 1        THE VIDEOGRAPHER:  Good morning.  We are on the
 2   record.  This is the videotaped deposition of
 3   Richard Brzeczek in the matter of Daniel Andersen
 4   versus City of Chicago, et al.  This deposition is
 5   taking place at 20 South Clark Street, Suite 1700,
 6   in Chicago, Illinois, on November 29th, 2018, at
 7   10:08 a.m.
 8        My name is Tim Kelly.  I am the
 9   videographer with U.S. Legal Support located at
10   200 West Jackson Boulevard in Chicago, Illinois.
11   Video and audio recording will be taking place
12   unless all counsel have agreed to go off the
13   record.
14        Will all present please identify
15   themselves beginning with the witness.
16        THE WITNESS:  Richard Brzeczek.
17        MS. KEEN:  Roshna Keen representing plaintiff.
18        MS. ITCHHAPORIA:  Misha Itchhaporia on behalf
19   of the individual defendants.
20        MS. BENJAMIN:  Stacy Benjamin for defendant
21   City of Chicago.
22        THE VIDEOGRAPHER:  The certified court reporter
23   is Patti Wangler.
24        Please swear in the witness.
```

RICHARD J. BRZECZEK                                November 29, 2018

1    THE COURT REPORTER:  Raise your right hand,
2  please.
3              (Witness sworn.)
4    MS. ITCHHAPORIA:  Let the record reflect this
5  is the deposition of Richard Brzeczek taken
6  pursuant to subpoena, agreement of the parties and
7  according to the Federal Rules of Civil Procedure
8  and all applicable local rules of the
9  Northern District of Illinois.
10            RICHARD J. BRZECZEK,
11  called as a witness herein, having been first duly
12  sworn, was examined and testified as follows:
13              EXAMINATION
14  BY MS. ITCHHAPORIA:
15    Q.   Mr. Brzeczek, have you given a deposition
16  before?
17    A.   Yes, I have.
18    Q.   And so I assume that you are familiar with
19  the rules that govern depositions?
20    A.   I think I am, yes.
21    Q.   Okay.  The only -- the only thing that I
22  will go over as far as the ground rules is that if
23  you can just make sure all of your responses are
24  out loud and that you wait until I get my entire

1  question out so that we have a clean record.  Is
2  that okay?
3    A.   Understood.
4    Q.   Did you receive a subpoena that requested
5  that you bring all the materials that you reviewed
6  in preparation?
7    A.   Yes, I did.
8    Q.   And you have those materials with you
9  today?
10    A.   I have them on a flash drive --
11    Q.   Okay.
12    A.   -- along with my notes in connection with
13  those materials.  I will tender those now if you
14  want those.
15    Q.   Okay.
16    MS. KEEN:  Yes.
17    MS. ITCHHAPORIA:  We will make a -- do you have
18  a copy?
19    MS. KEEN:  I didn't look at the -- I didn't
20  look -- plug this in.  But you put your -- all your
21  materials that you reviewed?
22    THE WITNESS:  All my materials on there
23  including --
24    MS. KEEN:  So this is for Misha I believe?

1    THE WITNESS:  Yes.  Yes.
2    MS. ITCHHAPORIA:  Yeah.  And it includes your
3  notes that I don't have.  We don't have your notes
4  yet.
5    THE WITNESS:  Right.  Just -- just so you
6  understand, my notes consist of highlighting
7  documents because they are PDF format and making
8  notes in the margin so you have all of those.
9  BY MS. ITCHHAPORIA:
10    Q.   Okay.  Perfect.
11    MS. KEEN:  What I could do, we probably should
12  Bates stamp everything just so that we have
13  identification.  So I could -- you can take that
14  flash drive if you want just so you have it now.
15  But we will also Bates stamp.
16    MS. ITCHHAPORIA:  Sure.  I can produce it Bates
17  stamped after the deposition.
18    MS. KEEN:  You could produce it or I can
19  reproduce all of that with Bates stamps.
20    MS. ITCHHAPORIA:  Okay.  We'll figure it out.
21       Let the record reflect that the witness
22  has tendered a flash drive with the documents
23  responsive to subpoena for the records.
24

1  BY MS. ITCHHAPORIA:
2    Q.   Mr. Brzeczek, what did you do in
3  preparation for your deposition today?
4    A.   Besides the initial task of the documents
5  that were provided to me which led to the writing
6  of my report?  Is that what you are saying, after
7  that?
8    Q.   Correct.
9    A.   I simply reviewed my report.  There may
10  have been one or two references in my report that I
11  double-checked.  I will tell you that on page 2 of
12  my report there is a mistake down toward the bottom
13  of the page on the right-hand margin.  It's -- I
14  used the word Trunko, T-R-U-N-K-O.  It is right
15  where your right thumb is.
16    Q.   Okay.
17    A.   And it should be LaGace.
18    THE COURT REPORTER:  And, I am sorry, what?
19    THE WITNESS:  It should be LaGace, L-A-G-A-C-E.
20  So those are things I did in preparation today --
21  for today.
22  BY MS. ITCHHAPORIA:
23    Q.   So you reviewed your report,
24  double-checked some references?

RICHARD J. BRZECZEK                                    November 29, 2018

Page 10

1    A.    Right.  Right.
2    Q.    Do you know which references you
3    double-checked?
4    A.    The ones that look like they are RFC.  And
5    there is a number after them.  I just wanted to
6    make sure that I remembered what those were because
7    it isn't like just saying page so-and-so of
8    someone's deposition or it's not like referring to
9    a Case Report or a Supplementary Report.
10         I was using the reference of the document
11   as it was given to me.  So I wanted to just refresh
12   my memory as to what that reference number was.
13   Q.    Okay.  So you the documents were Bates
14   stamped RFC something --
15   A.    Yes.
16   Q.    -- and then you looked at the document?
17   A.    Yes.  Just to -- just to see what the
18   document was that's the RFC because I couldn't tell
19   in some cases exactly what the document was that I
20   referenced.
21   Q.    Do you remember what those documents
22   actually were?
23   A.    No.  I don't even know if I did all of
24   them.  But, no, I know I didn't do all of them.  I

Page 11

1    did a couple of them to, again, familiarize myself
2    with the RFC numbering.
3    Q.    Okay.  Did you review any other materials
4    or documents in preparation for your deposition
5    here today?
6    A.    No.
7    Q.    How long did you spend reviewing the
8    report and double-checking those references?
9    A.    Maybe two and a half, three hours.
10   Q.    Did you meet with Miss Keen or any other
11   attorneys representing Mr. Andersen --
12   A.    Yes.
13   Q.    -- in preparing for your deposition?
14   A.    Yes.
15   Q.    When did you meet with --
16   A.    Yesterday.
17   Q.    Who did you meet with?
18   A.    Roshna.
19   Q.    Did you meet with anyone besides Roshna?
20   A.    No.
21   Q.    How long did you and Roshna meet for?
22   A.    It was during that two-and-a-half- to
23   three-hour period that I reviewed documents.  We
24   were not meeting the entire time, you know.  We

Page 12

1    both had other things we were focused on.  But it
2    was within that two-and-a-half- to three-hour
3    period.
4    Q.    Okay.  Can you estimate within that two-
5    to three-hour period of time how long you met with
6    Roshna for?
7    A.    I would say two hours maybe.
8    Q.    So is it accurate to say then you met with
9    Roshna for two hours?  And then you reviewed your
10   report and the references for an hour?
11   A.    In between, yes.  It didn't take all that
12   long to read the report and checking the
13   references.
14   Q.    Was yesterday the first time that you
15   reviewed your report since submitting it on
16   October 1st, 2018?
17   A.    Yes, I think so.  I -- I -- I just don't
18   have any independent recollection of looking at it
19   between the dates that you gave me.
20   Q.    And yesterday being November 28th, 2018?
21   A.    That's correct.
22   Q.    During your meeting with Roshna, did you
23   review or look at any documents that we haven't
24   talked about already?

Page 13

1    A.    That we have not talked about?
2    Q.    Right.
3    A.    No.
4    Q.    During your meeting with Roshna yesterday,
5    did you review any materials or documents that are
6    not listed on your expert report?
7    A.    No.
8    Q.    One of the documents that you reviewed
9    that's indicated on your expert report is the
10   complaint that was filed by Mr. Andersen in this
11   case; is that correct?
12   A.    Yes.
13   Q.    Do you personally know any of the
14   individual defendants that were named in that
15   complaint?
16   A.    You know, I am going to say no although,
17   you know, I know names and I can put faces with the
18   names, but I don't have any personal relationship
19   with any of the individual defendants.
20   Q.    Just so I have a clean record I am going
21   to go through each of the individual defendants
22   that were named in the complaint.  Okay?  So do you
23   personally know James Bednarkiewicz?
24   A.    I don't think so.

RICHARD J. BRZECZEK                                           November 29, 2018

---

Page 14

1   Q.   Do you personally know Paul Nielsen?
2   A.   No.
3   Q.   Do you personally know John Olson?
4   A.   No.
5   Q.   Do you personally know Michael Riley?
6   A.   No.
7   Q.   Do you personally know James Higgins?
8   A.   I don't think so.
9   Q.   Do you personally know Daniel McWeeny?
10  A.   I think I have met him on occasion, but
11  I -- that's about it.  That would be, you know,
12  within the performance of our employee functions
13  with the police department.
14  Q.   Is he one of the individuals that you can
15  put a face to the name?
16  A.   No.
17  Q.   Okay.  Who was the individual that you
18  could put a face to?
19  A.   Rochowicz.
20  Q.   Do you know when the last time was that
21  you met Mr. McWeeny?
22  A.   If I didn't cross-examine him during a
23  trial since 1983, it would be before
24  April 29th, 1983.

Page 15

1   Q.   And that's the date that you retired from
2   CPD?
3   A.   I resigned.  I didn't retire.
4   Q.   Do you have a memory of crossing
5   Mr. McWeeny at any trials after you resigned from
6   CPD on April 29, 1983?
7   A.   No specific memory.  I am just saying
8   unless I did cross-examine him at trial.  I have
9   not seen him since I left the police department.
10  Q.   And during your employment at CPD, if you
11  did meet with Mr. McWeeny, it was in your capacity
12  as an employee of the Chicago Police Department?
13  A.   Yes.
14  Q.   Did you ever work with Mr. McWeeny in any
15  capacity --
16  A.   No.
17  Q.   -- when you were employed --
18  A.   No.
19  Q.   -- by the Chicago Police Department?
20  A.   No.
21  Q.   Do you personally know Richard Bedran?
22  A.   No.
23  Q.   Do you personally know Norbert Rajewski?
24  A.   Spell it for me.

Page 16

1   Q.   Norbert, N-O-R-B-E-R-T, Rajewski,
2   R-A-J-E-W-S-K-I?
3   A.   No.
4   Q.   Do you personally know Larry Pawlowski?
5   A.   No.
6   Q.   And do you know personally know Daniel
7   Fitzgerald?
8   A.   No.
9   Q.   And do you personally know Craig
10  Cegielski?
11  A.   Again, I know Cegielski by name.  I
12  don't -- today I could not put a face to that name
13  or a name to that face.  But I do know of Cegielski
14  being a detective in the Chicago Police Department.
15  Q.   Did you ever work with Mr. Cegielski in
16  any capacity during your employment with the
17  Chicago Police Department?
18  A.   No.
19  Q.   Do you personally know Ted or Thaddeus
20  Melko?
21  A.   Spell the last name.
22  Q.   M-E-L-K-O.
23  A.   No.
24  Q.   And do you personally know Richard

Page 17

1   Rochowicz?
2   A.   You say personally, no, other than, again,
3   just -- we may have been in the academy together.
4   I do -- I know he was not in my class.  But I think
5   that we are roughly the same age.  I think we
6   started about the same time.
7   Q.   Did you ever work with Mr. Rochowicz in
8   any capacity during your employment with Chicago
9   Police Department?
10  A.   No.
11  Q.   Do you know former ASAs Neil Cohen or
12  David Erickson?
13  A.   I did not know those people as assistant
14  state's attorneys.  I do know two people with the
15  same names who were judges, but I don't know if
16  they are the same people.
17  Q.   Okay.  Do you -- did you ever have any
18  dealings with either Mr. Cohen or Mr. Erikson in
19  their capacity as judges?
20  A.   As what?
21  Q.   Judges.
22  A.   If these are the same people, I think I
23  appeared in front of both of them.  That's how I
24  know them.

RICHARD J. BRZECZEK                                         November 29, 2018

Page 18

1    Q.    Okay.  Have you ever had a trial before
2  either Judge Cohen or Judge Erikson?
3    A.    Not that I recall.
4    Q.    Do you know former criminal defense
5  attorney Sheila Murphy?
6    A.    Yes.
7    Q.    How do you know Sheila Murphy?
8    A.    I know she was a judge at one time.  She
9  was the presiding judge of the Sixth Municipal
10 District.  I know I knew her before she went on the
11 bench.  I don't recall how I knew her before she
12 went on the bench.
13        I think this goes back, again, to the
14 '80s.  She may have been a defense attorney at the
15 time I knew her.  And then I know she left to take
16 another position.  She left the judgeship to take
17 another position.  But I have not seen her in more
18 than 20 years.
19   Q.    Did you ever appear before her when she
20 was a judge?
21   A.    Yes.
22   Q.    Did you ever have a trial before her?
23   A.    I don't -- I don't really recall if I did
24 or not.

Page 19

1    Q.    Are you aware that she was Mr. Andersen's
2  criminal defense attorney?
3    A.    No.
4    Q.    Until I mentioned that you didn't know
5  that she represented Mr. Andersen back in 1981 and
6  through his criminal trial and direct appeal?
7    A.    That's correct.
8    MS. ITCHHAPORIA:  Would you mark this, please.
9               (Whereupon, Brzeczek
10              Deposition Exhibit No. 1 was
11              marked for identification.)
12 BY MS. ITCHHAPORIA:
13   Q.    Mr. Brzeczek, the court reporter has
14 provided to you what's been marked as Exhibit 1 to
15 your deposition.  And this is your
16 curriculum vitae; is that correct?
17   A.    That's correct.
18   Q.    And on the second page it says Current as
19 of June 23rd, 2018.  Do you see that?
20   A.    Yes.
21   Q.    Are there any updates to your CV since on
22 June 23rd, 2018?
23   A.    No.
24   Q.    So according to your CV you received a

Page 20

1  bachelor of science degree from Loyola University
2  in 1965?
3    A.    That's correct.
4    Q.    And your major was biology?
5    A.    Yes.
6    Q.    And then you received an MPA from the
7  Illinois Institute of Technology?
8    A.    That's correct.
9    Q.    And that was a master's in public
10 administration?
11   A.    Yes.
12   Q.    And you got that in 1968; is that right?
13   A.    Right.
14   Q.    And then you obtained your law degree from
15 John Marshall Law School in 1972; correct?
16   A.    Yes.
17   Q.    Do you have any other degrees other than
18 those three?
19   A.    No.
20   Q.    And you became a licensed attorney in
21 Illinois in 1972?
22   A.    That's correct.
23   Q.    Are you licensed in any other state
24 besides Illinois?

Page 21

1    A.    No.
2    Q.    Is it accurate that you attended
3  John Marshall Law School when you were working as
4  an employee for the Chicago Police Department?
5    A.    Yes.
6    Q.    Did you go to law school on a full-time
7  basis?
8    A.    Part-time.
9    Q.    Night school?
10   A.    Yes.
11   Q.    How long did it take you to get
12 your degree?
13   A.    Seven semesters.
14   Q.    Have you ever been disciplined by any
15 federal, state, or local agency regarding your
16 license to practice law?
17   A.    No.
18   Q.    Have you ever been investigated by the
19 Illinois Attorney Registration Disciplinary
20 Commission, the AR -- IARDC?
21   A.    You mean as far as someone filing a
22 complaint --
23   Q.    Right.
24   A.    -- that I had to respond to?

RICHARD J. BRZECZEK                                    November 29, 2018

Page 22

1    Q.   Yes.
2    A.   The answer is yes.
3    Q.   How many times has that occurred?
4    A.   Forty-five.
5    Q.   And those are -- strike that.
6         Were those complaints filed by former
7    clients of yours?
8    A.   There were -- some were by former clients.
9    Some were by existing clients.  Just so I'm clear,
10   when you asked me the number, I didn't say 4 or 5.
11   I said 45.
12   Q.   Right.
13   A.   Okay?
14   Q.   Have you ever been reprimanded or censored
15   by the ARDC?
16   A.   No.  I'm not sure if the ARDC can
17   reprimand or censor you.  I think only the Supreme
18   Court can.  But I have never had any -- any
19   complaint result in any action other than being
20   closed out by the ARDC.
21   Q.   So all 45 complaints were closed out?
22   A.   Yes.  Yes.
23   Q.   Do you remember the basis of any of those
24   complaints?

Page 23

1    A.   Everything between A and Z.  People would
2    ask me about complaints and -- I never was
3    intimidated by a client.  Most of the complaints
4    were domestic relation clients; okay?  Which I
5    think statistically those are the clients that
6    complain about their lawyers the most.
7         Secondly, I was never intimidated by the
8    ARDC.  So if someone said that they are going to
9    make a complaint to the bar association, I made
10   sure they went to the right place.  And I gave them
11   little cards with the ARDC's address and phone
12   number on there and said be my guest.  That's what
13   it is there for.
14   Q.   And just so we are clear, you have never
15   been reprimanded or censored by the Illinois
16   Supreme Court either?
17   A.   No.
18   Q.   According to your CV you began your career
19   with the Chicago Police Department in 1964?
20   A.   That's correct.
21   Q.   And did you attend the academy?
22   A.   Yes.
23   Q.   And how long was the police academy for
24   back in 1964?

Page 24

1    A.   If you include the week of field training,
2    13 weeks.
3    Q.   So was that 12 weeks of classroom time and
4    then 1 week out in the field?
5    A.   It is 11, 1 -- 11 weeks in class, 1 in the
6    field, 1 the last week in class.
7    Q.   Do you remember what period of time you
8    attended the academy for?
9    A.   June 8th of 1964 to September 4th of 1964.
10   Q.   So when you graduated from the academy in
11   September 1964, where were you assigned?
12   A.   13th district.
13   Q.   And you were assigned as a patrol officer
14   to the 13th district until November 1964; is that
15   correct?
16   A.   Until November '64, yes.
17   Q.   After November of 1964, where did you go?
18   A.   The 11th district.
19   Q.   Do you know why you transferred from the
20   13th district to the 11th district?
21   A.   At that time they rearranged the district
22   beats twice a year and called them the winter beats
23   and the summer beats.  So they transferred a larger
24   than normal peop -- number of people out of the

Page 25

1    13th district.  Some went to the 18th district
2    which was adjoining to the east.  Some went to the
3    11th district adjoining to the west.  I went to the
4    11th district.
5    Q.   And you stayed in the 11th district until
6    the spring of 1965; is that correct?
7    A.   That's correct.
8    Q.   And in the spring of 1965 you were
9    transferred from the 11th district to the
10   17th district; is that correct?
11   A.   That's correct.
12   Q.   So is it accurate to say that you worked
13   as a patrol officer from September 1964 until
14   October of 1965?
15   A.   That's correct.
16   Q.   What were your duties as a patrol officer?
17   A.   I have walked the post.
18   Q.   I am sorry?
19   A.   I walked the post, the patrol.  I worked
20   the marked squad car both by myself and with a
21   partner.  Rode a motorcycle.  Worked the paddy
22   wagon.  Worked the desk.  Maybe once or twice they
23   put me in a lockup to help out.  That's about it.
24   Q.   Okay.  And then after October of 1970 --

RICHARD J. BRZECZEK                                    November 29, 2018

Page 26

1   of 1965 what was your next assignment?
2        A.    Superintendent's office.
3        Q.    Again, that was -- you were assigned to
4   the Office of the Superintendent under
5   Superintendent Wilson; is that correct?
6        A.    That's correct.
7        Q.    And you did that from October 1965 until
8   March of 1966; is that correct?
9        A.    Yes.
10       Q.    What were your duties when you were
11  assigned to the personal staff of
12  Superintendent Wilson?
13       A.    Primarily I was his driver.  Plus I had
14  office responsibilities that were really determined
15  by him on a daily basis what he wanted me to do.
16       Q.    Were you working for him in your capacity
17  as a patrol officer?
18       A.    Yes.
19       Q.    And you did that for less than a year; is
20  that right?
21       A.    Less than six months.
22       Q.    In March of 1966 you were then transferred
23  to Area 4 unit of the Youth Division?
24       A.    Yes.

Page 27

1        Q.    And how long were you with Area 4?
2        A.    Well, I was assigned to Area 4 for
3   four years.  But I only worked there -- I only
4   worked there maybe about a year and a half to
5   two years.  And then I was detailed which means
6   not -- not transferred on paper, but I was assigned
7   to Youth Division headquarters.
8        Q.    Back in 1966 for that one-and-a-half- to
9   two-year time frame when you were assigned to the
10  Area 4 unit of the Youth Division, where was that
11  located?
12       A.    943 West Maxwell Street.
13       Q.    And was the Youth Division office actually
14  located in Area 4?
15       A.    The Youth Division administrative office
16  was assigned -- it was located in the Area 4
17  building.  We had investigator responsibility for
18  four districts.  Area 4 at that time consisted of
19  the 10th, 11th, 12th, and 13th districts.
20       Q.    So did you work out of the youth
21  administration building -- office?  Sorry.
22       A.    No.
23       Q.    Okay.  Where did you work out of?
24       A.    Out of Area 4 we reported there for

Page 28

1   roll call every morning on the day shift or in the
2   afternoon on the afternoon shift.  Reported there
3   for roll call.  We got our assignments, and we went
4   out on the street.
5        When I talked about Youth Division
6   headquarters, that was located at the headquarters
7   building at 1121 South State Street on the
8   seventh floor.  And that was an administrative
9   building there.
10       Q.    When -- did your duties change then when
11  you went from Area 4 to the Youth Division
12  headquarters?
13       A.    Yes.
14       Q.    Let's start with when you were at Area 4,
15  what were your duties as a youth officer?
16       A.    They were spelled out in the
17  General Order.  One is that there was a statutory
18  provision at the time that any police officer who
19  made an arrest of a juvenile had to take that
20  juvenile to the nearest juvenile police officer
21  without delay.
22       So one of the responsibilities is is that
23  we would process the arrest of juvenile offenders
24  made by other police officers whether they were

Page 29

1   patrol officers or detectives.  So that was one
2   responsibility established by statute.
3        We conducted certain investigations, for
4   example, missing persons, bicycle thefts.  Now, you
5   may think this is funny, but this was in the order,
6   theft of hubcaps.  Apparently someone thought that
7   most hubcaps are stolen by kids.
8        We also investigated crimes committed
9   against children along with the detectives and in
10  some cases crimes committed by children.  Those
11  were the investigative responsibilities as set out
12  by the order at the time.
13       Q.    When you said that you conducted
14  investigations into crimes committed against
15  children along with detectives, so does that mean
16  that there would be a detective assigned and a
17  youth officer?
18       A.    In most cases, yes, because there was kind
19  of a bifurcated approach that was connected at the
20  same time.  In other words, if the child was a
21  victim of sexual assault, the homicide sex unit
22  would come in and investigate that.  And then the
23  youth officers would also be investigating it too.
24       Q.    As a youth officer did you investigate

RICHARD J. BRZECZEK                                November 29, 2018

Page 30

1  sexual assault crimes against children?
2      A.   Yes.
3      Q.   And then you said you also investigated
4  crimes that were committed by children?
5      A.   Yes.
6      Q.   Would that also be along with a detective?
7      A.   Could be and not -- many times detectives
8  would come to us and say that they are looking for
9  somebody.  They may not know who it is, but they
10 know it is a juvenile.  They would ask us for some
11 help.  And based upon our sources, our informants,
12 the kids we knew in the area that we worked, we
13 helped them out.
14     Q.   Did you ever investigate a homicide as a
15 youth officer?
16     A.   Yes, many times.
17     Q.   Do you know how many such investigations
18 you were involved in?
19     A.   No.  You are talking about 50 years ago.
20     Q.   What would your role have been in
21 investigating those homicides involving children?
22     A.   Well, you didn't ask me involving
23 children.  You said did I investigate homicides as
24 a youth officer.  And the answer is yes.  We

Page 31

1  investigated both homicides of adults and homicides
2  of children --
3      Q.   Okay.
4      A.   -- as a youth officer.
5      Q.   How was it that you were getting involved
6  in investigating homicides of adults as a youth
7  officer?
8      A.   Well, one example would be -- I will give
9  you a specific example.  A woman found dead in the
10 alley somewhere up around North Avenue and Rockwell
11 and she had no identification on her.  So we got
12 involved in that because of a missing person's
13 component with the Youth Division, tried to find
14 out who she is, tried to identify her.
15          And it just turned out that my partner and
16 I actually solved that case.  We identified the
17 offender and located him and arrested him.  So
18 that's one example how we get involved.
19     Q.   And then in the case where there was a
20 homicide, what would your -- involving children,
21 what would your role have been?
22     A.   I'm not sure I understand the question
23 about what my role would be.  If there is a
24 homicide involving children, is that your question?

Page 32

1      Q.   Yes.
2      A.   What's my role?  The same as anybody else
3  in connection with a homicide.  And that is to do a
4  component of the investigation with the other
5  people so assigned to see if we can solve the crime
6  by identifying the offender.
7          Now, say roles -- and we had other roles
8  too like the crime lab would be out there, maybe an
9  evidence technician would be out there, maybe
10 different agencies.  But, you know, they had
11 specific technical functions rather than
12 investigative functions.
13     Q.   Did you receive any training apart from
14 the academy for your function as a youth officer?
15     A.   Apart from the academy?
16     Q.   Correct.
17     A.   The training I received prior to becoming
18 a youth officer was conducted in the academy.
19     Q.   Okay.  So there was no, like, special
20 classroom or on-the-job training to become a youth
21 officer?
22     A.   Both.
23     Q.   Both.
24     A.   I was in the classroom.  And then you

Page 33

1  worked with an experienced youth officer for a
2  while until you found out how to prepare all the
3  forms and do things on time.
4      Q.   You said there was a classroom component.
5  Is that separate from the academy?
6      A.   No.  All classroom instruction, you know,
7  regarding police training was conducted at the
8  academy at that time.
9      Q.   Okay.  I guess what I am asking is after
10 the 13 weeks when you initially graduated from the
11 academy, did you then go back to the academy for
12 any classroom training in order to become a youth
13 officer?
14     A.   That's my answer, yes.
15     Q.   Okay.  And how long was that classroom
16 training for?
17     A.   I don't remember.
18     Q.   During the -- during any investigations
19 that you did of a homicide whether it involved
20 adults or children when you were a youth officer,
21 did you ever obtain a confession?
22     MS. KEEN:  I am just going to object to the
23 form.
24     THE WITNESS:  Yes.

RICHARD J. BRZECZEK                                          November 29, 2018

Page 34

BY MS. ITCHHAPORIA:

1  BY MS. ITCHHAPORIA:
2      Q.   How many times did you do that?
3      A.   I don't recall.
4      Q.   Do you recall that the confession that you
5  obtained was ever court reported or if it was an
6  oral statement or a handwritten statement?
7      MS. KEEN:  Objection.  Foundation.
8          Go ahead.
9      THE WITNESS:  The time that I was a police
10 officer and a youth officer, not the whole time
11 that I was a youth officer but at least the early
12 time that I was a youth officer was pre-Miranda.
13 Okay?  Miranda wasn't decided until 1966.
14          So when you ask about court reported
15 statements, handwritten statements, oral
16 statements, back then I don't think that they used
17 court reported statements.
18          Back then I think that, as I recall, the
19 detectives or youth officers would type up the
20 statements, question and answer.  Of course,
21 someone would not -- someone may make an admission
22 to you orally but would not reduce to writing that
23 admission.  You wouldn't have a written statement.
24 It would be simply an oral statement.

Page 35

1  BY MS. ITCHHAPORIA:
2      Q.   What were your duties when you were
3  transferred from Area 4 to the Youth Division
4  headquarters on State Street?
5      A.   I worked directly for the director of the
6  Youth Division at the time.  That was the title of
7  the person who headed up the Youth Division,
8  director of Youth Division.  It was the same
9  position as a district commander in the Patrol
10 Division.
11          I did a lot of things there, work orders,
12 drafted orders for his signature.  I am talking
13 about orders, policy orders regarding the
14 Youth Division only.
15          I did some review work of reports coming
16 in from the various areas.  We did some training of
17 youth officers.  And then there was the usual
18 routine work every day in terms of reports coming
19 in from different divisions, different bureaus.  So
20 those were the kinds of duties that I had.
21      Q.   And you did that for about two years?
22      A.   Yeah.  I would say roughly about
23 two years.
24      Q.   And during the time when you were assigned

Page 36

1  to the Youth Division at State Street, is it
2  accurate to say that you went out investigating
3  actively on the streets and out in the field?
4      A.   That's correct.
5      Q.   After you left the Youth Division in
6  March of 1966, where did you go?
7      A.   I didn't leave the Youth Division in
8  March of '66.
9      Q.   When did you leave?
10     A.   I left the Youth Division in March of
11 1970.
12     Q.   Okay.  And in March of 1970 you became a
13 sergeant?
14     A.   That's correct.
15     Q.   And was your first assignment as a
16 sergeant, was that the Detective Division
17 headquarters located at 1121 South State Street?
18     A.   That's correct.
19     Q.   What were your duties as a sergeant
20 assigned to the Detective Division headquarters?
21     A.   Again, we had some administrative duties
22 in terms of drafting directives for the chief of
23 detectives.  We had some oversight duty in the
24 areas.  There were two of us, two sergeants, that

Page 37

1  we would periodically go out and do audits in each
2  of the areas, case management audits.
3          We would do crime analysis for the chief
4  of detectives and for the rest of the department in
5  terms of trends.  Sometimes -- sometimes we would
6  get involved kind of in a tangential way for the
7  chief of detectives in a major investigation.
8          We would -- I know that I would help the
9  detectives in the bomb and arson unit and some of
10 them in the -- what was called the central
11 intelligence unit at the time.  Those were
12 operational units working out of our office.  I
13 would help them draft search warrants.  Those are
14 some of the things that I can remember.
15     Q.   And you were still going to law school
16 during the time that you were a sergeant of the
17 Detective Division?
18     A.   Yes.
19     Q.   What year did you start at John Marshall
20 Law School?
21     A.   September 1968.
22     Q.   Okay.  You said as part of your duties as
23 a detective assigned to the division,
24 Detective Division headquarters, you would do

RICHARD J. BRZECZEK                                    November 29, 2018

1    audits of case management.  What is that?
2        A.   Well, what happened is at that time there
3    was a multicopy form.  As I recall, it was like a
4    3 by 5, a 3 by 5 index card size.  And that was
5    generated for every Case Report that required a
6    follow-up investigation by detectives.  And that --
7    I am trying to think if it was sometimes referred
8    to colloquially as a case management slip.
9        But detectives were assigned to a case.
10   And if you wanted to know who was assigned to a
11   case, you looked at that case management slip.  So
12   you could be assigned to a case and you would have
13   responsibility for that case despite the fact that
14   multiple detectives may be working on it or have
15   been working on it.
16       But somebody had responsibility for that
17   case because reports had to be submitted in a
18   timely fashion.  And a case detective, a detective
19   assigned to the case was responsible for that
20   happening.
21       So we would go out to the areas, you know,
22   generally unannounced and sit down and pull out the
23   case management slips and audit them and see the
24   timeliness of the reports and if the provisions of

1    Detective Division policy and orders -- and
2    department policy and orders were being complied
3    with.
4        Q.   So when you were doing the audits at the
5    areas, were you looking at anything else besides
6    the case management slips?
7        MS. KEEN:  Objection.
8    BY MS. ITCHHAPORIA:
9        Q.   As far as documents?
10       MS. KEEN:  Form.
11       Go ahead.
12       THE WITNESS:  Yes.  We -- we pulled the files
13   out, go through the files to see what was in there.
14   Again, for compliance.  You know, we wouldn't make
15   any judgments on anything going on with the
16   investigation other than determining whether or not
17   there is compliance with the department directors
18   governing those investigations.
19   BY MS. ITCHHAPORIA:
20       Q.   So were you just looking at seeing if the
21   reports were completed in a timely fashion?
22       A.   That's one dimension.
23       Q.   What else were you looking at?
24       A.   Terms of cases that were determined to

1    be -- they had classifications that are unfounded,
2    suspended, cleared.  And that was usually cleared
3    by arrest.  And then there was another
4    classification, an exceptional clearance.  So we
5    examined those on a random basis to see if they
6    complied with the -- again, with the provisions of
7    the definitions of the classifications.
8        Q.   So, for example, if you were doing an
9    audit of a case that was cleared by arrest, you
10   were looking to see, in fact, if there was an
11   arrest report in the file?
12       A.   Well, not only an arrest report in the
13   file but in those days detectives had to account
14   for their cases for what was happening in court.
15   So we would also be looking for those documents as
16   to what's happening in court and what was the
17   outcome.
18       You know, there was an emphasis at that
19   time in the Detective Division for case
20   disposition, not case disposition within a
21   department but case disposition over in the
22   courthouse.
23       So they had to report at the conclusion of
24   the case what the disposition was because in those

1    days detectives were evaluated every period.  And
2    by period I mean a 28-day block of time by which a
3    department used for calendar purposes and for
4    comparison purposes.
5        So one of the things that detectives'
6    performances would be looked at is are the
7    detectives getting convictions in court.
8        Q.   And so you would look at the detective's
9    report of a case disposition at court to determine
10   if the case was, in fact, cleared by arrest?
11       A.   No.  The case is classified within a
12   department as cleared by arrest.  The arrestee,
13   assuming there is just one arrestee, has a case
14   pending in court, it may be a year later, two years
15   later, whatever, that that case is deposed of in
16   court, the detective assigned to that case is
17   responsible for reporting on the court disposition.
18       Has nothing to do with being cleared by
19   arrest.  You know, that's already been identified.
20   It's further down the line what's the disposition
21   in court.  You can, for example, clear a case by an
22   arrest and then a pretrial motion to quash and
23   suppress is sustained.  The case is over with.
24       It may be cleared by -- by us but then

RICHARD J. BRZECZEK                                    November 29, 2018

Page 42

1 chief at the time wanted to know what the
2 detectives did or did not do correctly, incorrectly
3 that resulted in a motion to quash. That's why
4 they kept track of dispositions.
5      Q.   I guess I was confused because you said
6 you were examining the files at areas to see if
7 they complied with the department's classifications
8 of, like, cleared by arrest or suspended or
9 unfounded. So for cleared by arrest how were you
10 determining if the file had complied with that
11 classification?
12     A.   Well, it is shown as cleared by arrest and
13 there is an arrest report and there is a case
14 pending in the Circuit Court of Cook County, that's
15 all well and good. However, that case has to end
16 sometime in court. And the last bit of information
17 is what happened in court goes into the file.
18          It's the same thing with they maintain
19 other things we look at. For example, at that time
20 the Illinois Department of Corrections would send
21 photographs along with notices of penitentiary
22 releases.
23          Somebody got, let's just say, eight years
24 in a penitentiary for burglary and time off for

Page 43

1 good behavior, they are released at six years, the
2 police department would be notified with a
3 photograph and a disposition that here is a
4 penitentiary release.
5          So they had to keep those in the areas
6 because the reason why they were sent to us is that
7 the inmate being released reports that this is
8 where he is going to live. So it's in Chicago.
9          And then we would break it up -- not --
10 when I say we, Detective Division headquarters
11 would break it up into areas. And that information
12 would go out to the areas and have to be
13 maintained. So those are some of the things we
14 checked.
15     Q.   During the two years that you were a
16 sergeant assigned to the Detective Division at
17 headquarters, how many audits were you involved in?
18     A.   If I told you five, ten, truthfully I
19 don't know.
20     Q.   Okay. How often -- during that time frame
21 how often were audits done?
22     A.   Well, we did audits. But keep in mind
23 that there were six areas at the time. And in each
24 area there were 5 units. So there were 30 outlying

Page 44

1 detective units at the time. And we'd go out --
2 maybe once or twice a month we may go to Area 5
3 burglary one day in the month and do theirs. And
4 then we may go out to Area 2, Area 3 auto theft and
5 do theirs. So it was random selection to get this
6 done.
7      Q.   And it was just you and one other sergeant
8 that was responsible for those audits during the
9 time frame you were a sergeant?
10     A.   Yes, because we reported to the chief of
11 detectives.
12     Q.   You said that as a sergeant assigned to
13 the Detective Division headquarters that you would
14 also get involved or the chief of detectives in
15 major investigations?
16     A.   Yeah. There were certain things that he
17 would direct us to look into.
18     Q.   What -- what kind of things would he
19 direct you to look into?
20     A.   If he had a question about the integrity
21 of a particular investigation, especially if it was
22 an investigation that was -- or a crime was
23 committed that was news worthy, you know, he would
24 ask us to do specific things, you know, that -- for

Page 45

1 me to tell you what specific things right now, I
2 can't tell you.
3          But sometimes would go out and talk to
4 people. We would talk to detectives that were on
5 the case. We would talk to the area supervisors on
6 the case, you know, to bring back information for
7 the chief.
8      Q.   When you were given such an assignment,
9 you weren't actually assigned to the underlying
10 investigation; is that right?
11     A.   Never.
12     Q.   And so a major investigation would be a
13 crime that was newsworthy?
14     A.   That's one, sure. And usually, you know,
15 big crimes, you know, for example -- again, I don't
16 remember the time frame, but there was -- there
17 was -- a Purolator burglary had taken place; okay?
18 It's a burglary. It was a large loss. But it's a
19 major crime.
20          There were other crimes taking place that
21 do not necessarily involve murder or homicide but
22 are major crimes. And, for example, a property
23 crime would be determined by the amount of the
24 loss.

RICHARD J. BRZECZEK                                    November 29, 2018

Page 46

1    So someone breaking into your garage and
2  stealing your lawn mower would not be a major
3  crime.  Somebody breaking into a warehouse where
4  100,000 and half a million dollars worth of drugs
5  are stolen, it's a major crime.  When I was
6  superintendent, we had one out at the airport with
7  Burlington Northern Transport.  We had a major loss
8  out there.  I don't know how many hundreds of
9  thousands of dollars.  It's a major crime because
10 of the size of the loss.
11     Q.   You were assigned as the sergeant to the
12 Detective Division from March of 1970 until
13 March of 1972; is that right?
14     A.   Yes.
15     Q.   And where did you go after March of 1972?
16     A.   Bureau of Inspectional Services.
17     Q.   And how long were you assigned to the
18 Bureau of Inspectional Services?
19     A.   From March of '72 until February or
20 March of '73.
21     Q.   When you were assigned to the Bureau of
22 Inspectional Services, that was -- you were
23 assigned as a sergeant?
24     A.   As a sergeant, yes.

Page 47

1    Q.   During the time that you were assigned as
2  a sergeant going back to the Detective Division
3  headquarters, during that time when you were
4  assigned as a sergeant from the Detective Division
5  headquarters, you never worked out of a detective
6  area; correct?
7    A.   I never was assigned to any detective
8  area.  My assignment was to Detective Division
9  headquarters.
10     Q.   And you never had direct experience as a
11 working detective or supervisor of detectives in
12 the field; is that correct?
13     A.   That's correct.
14     MS. KEEN:  Objection.  Form.
15 BY MS. ITCHHAPORIA:
16     Q.   Have you ever investigated a homicide as a
17 lead detective?
18     A.   Based upon the statement that I just
19 agreed to, never having been a detective I could
20 not be a lead detective in any homicide.
21     Q.   I am sorry, I assume that you also never
22 investigated a homicide as an assisting detective
23 then?
24     MS. KEEN:  Just objection to the form of that.

Page 48

1    THE WITNESS:  Never having been a detective, I
2  never was assigned as assistant detective.
3  BY MS. ITCHHAPORIA:
4    Q.   What were your duties when you were a
5  sergeant assigned to the Bureau of Inspectional
6  Services?
7    A.   The primary function I had was to
8  investigate the Internal Affairs Division.
9    Q.   And how would you go about doing that?
10     A.   How would I go about doing it?
11     Q.   Investigating Internal Affairs Division.
12     A.   Well, first of all, I would pull
13 investigative files from the Internal Affairs
14 Division.  And I would read the file to determine
15 the quality and the integrity, the authenticity and
16 the integrity of the file.
17     And when I would make a determination if
18 questions were raised, I would call in the
19 Internal Affairs investigator who is usually a
20 sergeant and question that person about that
21 particular file or a series of files because they
22 were doing more than one investigation at a time.
23 So I may pull all the files on a particular
24 sergeant investigator in Internal Affairs.

Page 49

1    And then based upon the information I got
2  in that interview, I would then make
3  recommendations to the deputy superintendent that
4  cases should be reinvestigated.  That's one
5  recommendation.
6    Another recommendation is that the
7  sergeant investigator be transferred out of
8  Internal Affairs.
9    And the third recommendation would be that
10 everything seemed to be okay with the
11 investigations of the investigative files.
12     Q.   You said you would read files to determine
13 the integrity and authenticity of the file.  What
14 file are you talking about?
15     A.   The Internal Affairs investigative file.
16     Q.   What would be in the Internal Affairs
17 investigative file typically?
18     A.   Typically?  There would be a complaint by
19 either a citizen or a supervisor.  There would be
20 documents in there that would be supporting
21 documents such as there would be copies of Case
22 Reports, copies of lab reports, copies of polygraph
23 examinations.  Put it this way, copies of the
24 results of polygraph examinations.  Photographs,

RICHARD J. BRZECZEK                                    November 29, 2018

Page 50

1  crime lab reports, statements -- written statements
2  that is.
3          And then there would be a final summary
4  report which would be really the -- not so much the
5  cover sheet but the first document after the cover
6  sheet.
7      Q.   So would you be responsible for drafting
8  the file summary report?
9      A.   No, no.  I'm investigating the people who
10 drafted the final summary report.
11     Q.   Got it.  And in 1972 you became a
12 lieutenant; correct?
13     A.   November 1st, yes.
14     Q.   You -- you were doing -- you were
15 investigating Internal Affairs Division even as a
16 lieutenant?
17     A.   I continued on because when I was promoted
18 lieutenant, I went to lieutenant school.  And in
19 those days every promotion required that the new
20 promotees attend a pre-service school.  So it is a
21 pre-service sergeant school, pre-service lieutenant
22 school, pre-service captain school.  So I attended
23 pre-service lieutenant school.  And then I was
24 assigned back to the deputy superintendent's

Page 51

1  office.
2      Q.   Where did you go after March of 1973?
3      A.   I went to what was then called the Vice
4  Control Division which eventually became known as
5  the Organized Crime Division.  And I was the
6  lieutenant in charge of the gambling section.
7      Q.   And what were your duties as the
8  lieutenant of the gambling section?
9      A.   I oversaw several sergeants and 40
10 detectives -- excuse me 38 detectives and 2 female
11 officers who were not detectives, plus 1 secretary.
12 And we were responsible for gambling enforcement
13 throughout the entire city.
14     Q.   And how long did you do that for?
15     A.   I did that until December 17th of 1973.
16     Q.   And where did you go in December of 1973?
17     A.   I was sent to the superintendent's office.
18 And I became at that time -- the title was aide to
19 the superintendent and legal coordinator.
20     Q.   Was that a civil service position?
21     A.   No.  That's an exempt position.  It is
22 appointed by the superintendent.
23     Q.   And how long were you an aide to the
24 superintendent and legal coordinator?

Page 52

1      A.   Well, despite the fact that they changed
2  titles and ranks, six years.
3      Q.   What title changes did it go through?
4      A.   Well, the person who I replaced was a
5  civilian sent back to the corporation counsel's
6  office.  And they didn't have a slot in the
7  corporation counsel's office for the same pay rate
8  that he was getting at the police department; so
9  they kept him on the payroll at the police
10 department as aide and legal coordinator despite
11 the fact that he was working at the corporation
12 counsel's office.  And they changed my title to
13 executive assistant to the superintendent.
14     Q.   Did your duties change?
15     A.   No.
16     Q.   What were your duties as the aide and
17 legal coordinator for the superintendent?
18     A.   Well, I had to -- I had to review all
19 department directives for correctness.  And that
20 is -- when I say department directives, ones that
21 are being proposed.  I had to review all the
22 sustained Internal Affairs investigations prior to
23 the superintendent affixing his signature for a
24 disposition whether that would be a reprimand, a

Page 53

1  suspension, or a separation.
2          I had to maintain documents and prepare a
3  monthly report on behalf of the superintendent to
4  the Chicago Police Board.  I was giving legal
5  advice to the command personnel on an ad hoc basis
6  as they needed it.  They would come down and talk
7  to me about problems.
8          I would advise the superintendent on legal
9  matters.  I'd advise them on procedural and policy
10 matters.  I generally would review all of the press
11 releases, not the routine ones but the press
12 releases addressing a specific issue for the
13 superintendent.
14         I had to oversee the staff in the
15 superintendent's office.  I generally was included
16 in specialized training programs.  These, for
17 example, would be conducted at the academy.  And
18 they may send the entire department in for
19 in-service training in small groups at a time.  So
20 I would have a fixed time every week to be at the
21 academy to do a presentation to that group that's
22 in there.
23         I had to represent the superintendent at
24 different meetings, functions.  I had to -- I acted

RICHARD J. BRZECZEK                                        November 29, 2018

Page 54

1  as liaison to the secretary of the police board,
2  worked with the hearing officers of the police
3  board at that time on the separation cases.
4          I sometimes did press conferences for the
5  superintendent.  Occasionally -- I wouldn't say
6  every month but maybe six, eight times a year I
7  would have to take my turn relieving the assistant
8  deputy superintendent who may have been on vacation
9  or ill or what have you from field operations.  So
10 that means that I was the person in charge of the
11 whole city on the street.
12         And the list is starting to go down the
13 funnel a little bit right now.  So I can't think
14 of -- if I think of anything else that's important,
15 I will let you know.  But --
16     Q.   Okay.  You said that you would review
17 proposed department directives as the aide and
18 legal coordinator of the superintendent; correct?
19     A.   Yeah, words "executive assistant."  Forget
20 the titles.  The job was the same for that six-year
21 period, yes.
22     Q.   Would you make edits and revisions to
23 those proposed directives?
24     A.   That was the purpose of it.  And in some

Page 55

1  cases, for example, the -- the order on internal
2  discipline in the late '70s -- or middle '70s
3  anyway was 67-21 and had almost an infinite number
4  of amendments to it.  So they couldn't get
5  everybody to agree on what should be the new order.
6          So I just took the project myself and
7  rewrote the whole order and got the thing done
8  because it was way past the shelf life of
9  five years.  And orders expire automatically.  So
10 there were a lot of those things going on.
11         But you also had the people from research
12 and development where they drafted those orders
13 coming and conferring with me as they were drafting
14 them so...
15     Q.   And then after those six years you became
16 the superintendent of the Chicago Police
17 Department?
18     A.   Yes.
19     Q.   And you became the superintendent on
20 January 11th, 1980; is that correct?
21     A.   Yes.
22     Q.   And you did that until April 29th, 1983?
23     A.   Yes.
24     Q.   You were appointed superintendent by then

Page 56

1  Mayor Jane Bryne?
2      A.   Yes.
3      Q.   And then why did you resign in April of
4  1983 from that position?
5      A.   Because the new mayor Harold Washington
6  came in and said he would fire me during -- he said
7  that during the campaign.  And I said he doesn't
8  have to fire me.  I will resign.
9      Q.   So from 1964 to 1980 you have a total of
10 19 years of police experience?
11     A.   Eighteen years and 47 weeks.
12     Q.   So 18 years and 47 weeks of law
13 enforcement experience with the Chicago Police
14 Department, is that correct?
15     A.   Yes.
16     Q.   Have you ever worked for any other law
17 enforcement agency other than at the Chicago Police
18 Department?
19     A.   No.
20     Q.   So in your report when you say based on
21 your experience as a law enforcement officer, you
22 are talking about your experience from being a
23 patrol officer all the way to being a
24 superintendent; is that correct?

Page 57

1      A.   That's my entire experience, yes.
2      Q.   When you were employed by the Chicago
3  Police Department, were you the subject of any
4  citizen complaints or complaint registers?
5      A.   During the time of my employment?
6      Q.   Yes.
7      A.   Yes.  Two.
8      Q.   And what were those two?  Do you remember?
9      A.   One was -- one arose out of a traffic stop
10 where I issued a traffic citation to the driver and
11 he complained that I treated him rudely.  The driver
12 another one was I stopped a car with four people in
13 it, four males, coming with no lights on and it
14 turned out to be four burglars and the four of them
15 said that I physically assaulted them.
16     Q.   Do you remember what the disposition was
17 of those two CRs?
18     A.   Yes.  They were both determined as
19 exonerated which means that the actions on my part
20 was lawful and proper.
21     Q.   Do you know if you were -- if any CRs were
22 initiated against you after you were no longer
23 employed by the Chicago Police Department?
24     A.   Yes.

RICHARD J. BRZECZEK                                    November 29, 2018

Page 58

1    MS. KEEN: Objection. Foundation.
2    THE WITNESS: Yes.
3    BY MS. ITCHHAPORIA:
4    Q.   How many CRs?
5    A.   I don't know.
6    Q.   Do you remember any CRs that were
7    initiated against you after you stopped your
8    employment at the Chicago Police Department?
9    A.   After I -- yeah. I think that there was
10   one.
11   Q.   And what was that CR for?
12   A.   Nobody ever told me.
13   Q.   How do you know that there was one?
14   A.   Because there were people from Internal
15   Affairs trying to contact my wife to come down and
16   talk to the superintendent. And her response was
17   the superintendent knows me personally. If he
18   wants to talk to me, he can call me himself.
19   Q.   Were you ever interviewed as a result of
20   that CR?
21   A.   No.
22   Q.   So you don't know what the outcome was?
23   A.   Of the CR?
24   Q.   Yeah.

Page 59

1    A.   I neither know the outcome, or I could
2    care less what the outcome is.
3    Q.   When you were with -- employed by the
4    Chicago Police Department, were you a defendant in
5    any civil suit arising from your performance other
6    than as a superintendent?
7    A.   Other than as a superintendent? Yes. I
8    remember one case -- we talked about before in my
9    role as giving legal advice. There was an
10   investigation of a couple of police officers up
11   north maybe in the 20th district at the time
12   regarding their committing a sexual assault.
13        And they were brought in for a
14   statement -- one of them was brought in for a
15   statement. And he refused to answer the questions.
16   So I was approached then, and what we did is we had
17   a command officer identify himself to the officer,
18   who he was and his rank, and gave him an order to
19   answer the questions.
20        And the officer continued to refuse to
21   answer the questions. So we immediately drafted a
22   suspension order, had the then superintendent sign
23   it and he was suspended pending separation for
24   refusing to obey a direct order.

Page 60

1         There was a lawsuit filed and it was
2    affirmed in our favor by the Seventh Circuit. I
3    think the name of the case is McLean versus
4    Rochford. And that's one example when I was a
5    defendant in a case when I wasn't the
6    superintendent.
7    Q.   And so it was -- it was -- was that
8    lawsuit brought by that police officer that --
9    A.   McLean. Right.
10   Q.   -- refused to give his --
11   A.   Right.
12   Q.   -- statement?
13        Have you been named in any lawsuits as a
14   defendant since leaving your employment with
15   Chicago Police Department?
16   A.   Are you talking about arising out of any
17   action in the police department?
18   Q.   Right.
19   A.   Or -- no, not -- well, I can't say no
20   because I would be getting papers served on me
21   for years regarding Civil Rights allegations. But
22   my recollection is I am saying as a defendant
23   because I was the superintendent at the time.
24   Q.   Did you ever have to testify in any of

Page 61

1    those cases?
2    A.   I don't know. I know I testified in cases
3    after I left the police department. But I'm not
4    sure if the cause of action arose when I was still
5    in the police department or if it was filed after I
6    left. I don't know.
7    Q.   Other than that McLean case though, can
8    you think of any other cases where you were named
9    as a defendant in a civil suit arising from your
10   performance of duties other than as a
11   superintendent?
12   A.   I cannot think of any right now.
13   Q.   So according to your CV after you resigned
14   from the Chicago Police Department, you joined a
15   law firm Levy & Erens?
16   A.   That's correct.
17   Q.   And you worked there for two years?
18   A.   Yes.
19   Q.   And did you work there for two years as a
20   partner?
21   A.   Yes.
22   Q.   And the firm Levy & Erens concentrated
23   their practice in bankruptcy and real estate law;
24   is that right?

RICHARD J. BRZECZEK                                    November 29, 2018

Page 62

1     A.    Primarily, yes.
2     Q.    And when you were a partner at that firm,
3  was there a criminal investigation that was
4  conducted by the Cook County state's attorney
5  regarding your handling of Chicago Police
6  Department funds and financing during the time that
7  you were superintendent?
8     A.    I think that that investigation that you
9  are referring to was started with the
10 Internal Affairs investigation to which you
11 previously referenced.  And I think that that
12 was -- that was started in 1984.
13    Q.    The investigation was started in 1984?
14    A.    That's my best recollection.  The
15 investigation at the police department started in
16 1984.  I have no idea when the state's attorney's
17 office started the investigation.
18    Q.    Were you indicted in that case?
19    A.    I'm sorry?
20    Q.    Were you indicted?
21    A.    Yes.
22    Q.    Do you remember what year you were
23 indicted?
24    A.    1986, March.

Page 63

1     Q.    And what happened to that case, that
2  criminal case where you were indicted?
3     A.    Public record.  I was acquitted on all
4  charges.
5     Q.    What were the charges?
6     A.    There were 23 counts that they massaged in
7  this indictment.  I think that they said I stole
8  12 -- or misappropriated twelve hundred and some
9  dollars.
10    Q.    And then in 1985 after leaving from
11 Levy & Erens you started your own firm
12 Richard J. Brzeczek Limited?
13    A.    Yes.
14    MS. KEEN:  Misha, when you get to good point, I
15 have to use the restroom.
16    MS. ITCHAPORIA:  Sure.  Let's take a break.
17 Off the record.
18    THE VIDEOGRAPHER:  We are going off the video
19 record at 11:26 a.m.
20              (Recess taken.)
21    THE VIDEOGRAPHER:  We are going back on the
22 video record at 11:38 a.m.
23 BY MS. ITCHAPORIA:
24    Q.    And just to circle back with you to an

Page 64

1  area that we touched before, you said you had gone
2  to lieutenant school, when you -- pre-lieutenant
3  school before you became --
4     A.    Pre-service lieutenant school.
5     Q.    Pre-service lieutenant school.  How long
6  was lieutenant school for?
7     A.    I think it may have been two weeks.  What
8  I remember sergeants was three weeks.  Let's see
9  now.  Back up.  Detective school was four weeks,
10 sergeants three, lieutenants two, captains one.
11    Q.    Sergeant straight detective school was
12 four weeks?
13    A.    Yep.
14    Q.    Okay.
15    A.    When someone was promoted to detective,
16 they went to detective school for four weeks.
17    Q.    Okay.
18    A.    Someone promoted as sergeant, the whole
19 group would go pre-service sergeant school.  Give
20 you instruction on what's expected of you as a
21 sergeant.  Go to lieutenant -- you would get
22 promoted to lieutenant, two weeks, and --
23 lieutenant school, captain one week.
24    Q.    So you attended the two-week pre-service

Page 65

1  lieutenant school.  Did you also attend the
2  pre-service sergeant school?
3     A.    Yes, I did.
4     Q.    And did you attend the four weeks
5  pre-service detective school?
6     A.    Never.
7     Q.    Did you say that you did attend
8  pre-service detective school for four weeks?
9     A.    I said never.
10    Q.    So your law firm Richard J. Brzeczek was
11 in business from 1985 to 2016; is that correct?
12    A.    That's correct.  Actually the office was
13 shut down in '15.  I had some cases hanging over.
14 After I shut the office down, I had to clean up.
15 And then I made it official June 30th of '16
16 because that's when I retired my license.
17    The cases were done already, but I just
18 waited until the end of the period and retired.
19    Q.    Is your license to practice law no longer
20 active then in Illinois?
21    A.    It is retired.  That's correct.  If you
22 look up on the ARDC website, it will show retired.
23    Q.    When you were in private practice from
24 1985 to 2016, what areas of law did you concentrate

RICHARD J. BRZECZEK                                    November 29, 2018

Page 66

1    your practice in?
2        A.    Primarily criminal defense.  But at the
3    beginning, as I mentioned earlier, with the ARDC
4    complaints I did everything at first to try to
5    build up the practice.
6        Q.    Including domestic type relation cases?
7        A.    Yes, domestic relations, small claims,
8    real estate, drafting wills.
9        Q.    Your practice of law has also included
10   both criminal and civil cases; right?
11       A.    Yes.  Yes.
12       Q.    And have you filed Civil Rights cases on
13   behalf of plaintiffs?
14       A.    Yes.
15       Q.    And as --
16       A.    Including plaintiff police officers.
17       Q.    As an attorney have you brought lawsuits
18   against the City of Chicago and the Chicago police
19   officers in Civil Rights cases?
20       A.    Yes.
21       Q.    How many such cases?
22       A.    I don't know.
23       Q.    Would you say that you filed more than ten
24   such civil rights cases against the City of Chicago

Page 67

1    and Chicago police officers?
2        MS. KEEN:  Just objection.  Form.  You mean in
3    his capacity as an attorney?
4        MS. ITCHHAPORIA:  Correct.
5        THE WITNESS:  I could say yes to more than 10,
6    but I doubt if it is more than 20.  So I think it
7    is more than 10 but less than 20.
8    BY MS. ITCHHAPORIA:
9        Q.    Of the more than 10 cases, less than 20,
10   how many have gone to trial?
11       A.    I don't know.
12       Q.    You have -- your CV notes that you have
13   some teaching experience at the University of
14   Louisville School of Justice?
15       A.    Yes.
16       Q.    And you did that from 1977 to 2006?
17       A.    Yes.
18       Q.    What did you teach there?
19       A.    I taught the law regarding internal --
20   internal investigative procedures.
21       Q.    Did you teach anything else there?
22       A.    I did a little bit of -- a little bit of
23   leadership, but that was just a few times.  Mostly
24   what I did was the body of law regarding what the

Page 68

1    administration can do and what police officers'
2    rights were and internal investigations.
3        Q.    What positions did you hold at University
4    of Louisville School of Justice?
5        A.    Position?
6        Q.    Yeah.
7        A.    I was -- there was no position.  I mean if
8    you want to use academic terms, I was like the
9    bottom of the totem pole, like a visiting adjunct
10   lecturer maybe, if that's any kind of a title.
11           What they would do is this was a week-long
12   seminar.  And at times they had maybe even more
13   than five instructors for the week.
14           And then as I recall they worked it down
15   to two of us.  One instructor had policies and
16   procedures for three days, and I had the law for
17   two days.
18       Q.    Have you ever published any articles or
19   journals on police work or police procedure?
20       A.    There are two articles published in the
21   early '80s in the FBI enforcement bulletin.  One
22   was on police officer suicides.  And the other one
23   was on the establishment of a community assessment
24   center and I know that in one of the editions of

Page 69

1    the book on Police Administration, which was
2    originally written by O.W. Wilson and subsequent
3    later different people who have been charged with
4    the responsibility of updating it.  I haven't seen
5    it in years, but there were two or three parts in
6    that book that they referenced my writings.
7           And then there was another thing I did.  I
8    can't think of the publication.  Something like
9    police executives.  But I did a chapter in that
10   book on the relationship between the police chief
11   and the mayor.
12       Q.    Have you ever published anything else
13   besides those three chapters or articles?
14       A.    Actually saying -- well, there is three
15   published, right.  And then the police
16   administration book took from what -- from what I
17   published about the relationship with the mayor and
18   from that publication.  That would be it.
19       Q.    And according to your curriculum vitae you
20   have also been the president of a firm called
21   Consultants on Police Science, Inc.; is that
22   correct?
23       A.    That's correct.
24       Q.    And you are the president and owner of

RICHARD J. BRZECZEK                                    November 29, 2018

Page 70

1  that firm?
2      A.  Yes.
3      Q.  And that Consultants on Police
4  Services, Inc., is still currently in business?
5      A.  It is actually Consultants on Police
6  Science.
7      Q.  Police science.  Sorry.  And it is still
8  in business?
9      A.  Yes.
10     Q.  And what kind of services do you provide
11 for that firm?
12     A.  I established this firm when I was
13 practicing law to keep my expert witness and
14 teaching and consulting business separate.  And so
15 I can't even remember right now when -- the exact
16 year.  1998 is when I established it.  It is an
17 Illinois corporation.  It's now a Florida
18 corporation.
19     Q.  Do you provide services to attorneys that
20 are involved in litigation as an expert?
21     A.  Yes.  That's one of the things.
22     Q.  Does Consultants on Police Science, Inc.,
23 employ anybody else besides yourself?
24     A.  No.

Page 71

1      Q.  You said that's one -- providing expert
2  services is one component.  What's the other
3  component?
4      A.  As I said, teaching.  One of the reasons
5  why I included teaching in there is because I think
6  it was around 1998 there was a change in the
7  Internal Revenue Code.  Prior to that time if I
8  taught, they would issue me the check for the
9  honorarium, you know, in my name for the total
10 amount.  And then I think the Internal Revenue
11 Service code -- or Internal Revenue Code was
12 amended that if they did that, they had to take out
13 withholding.
14         Or in the alternative, if you had say a
15 corporation, limited liability corporation,
16 something like that, another type of entity other
17 than yourself, they could then issue the check in
18 its entirety and then you would be responsible for
19 the payment of the taxes.  So that's what I --
20 had -- the teaching honoraria went in there also.
21     Q.  Okay.  Have you held any teaching
22 positions since 2006?
23     A.  I haven't held any teaching positions
24 anytime.  These are all invitation.  University of

Page 72

1  Louisville was a long time because we had that
2  seminar going on for a long time.
3         But I think it was 2012 that I was invited
4  to come and give a presentation up in Portland,
5  Oregon, by the sheriff's office there.  So -- but I
6  don't do very much of that anymore.
7      Q.  What percentage of your expert witness
8  work focuses on criminal matters versus civil?
9      A.  I would have to think that through a
10 little bit because the last two that I did before
11 this instant one were both civil matters.
12         Now, I'm -- what I am trying to
13 understand -- excuse me.  Maybe I answered
14 erroneously.  Are you saying that the substance of
15 the litigation involves a criminal issue?  Or are
16 you saying it's a criminal case?
17     Q.  Criminal case versus civil case.
18     A.  I have only testified in a criminal case
19 once as an expert witness.
20     Q.  So the rest of the cases where you have
21 been involved as an expert witness have all been
22 civil cases?
23     A.  That's correct.
24     Q.  And of those civil cases how many have

Page 73

1  been for plaintiff versus defendant?
2      A.  They are all plaintiff.
3      Q.  How many times have you been retained and
4  testified as an expert witness against the Chicago
5  Police Department for any of its officers?
6      A.  Can I look at the document I submitted in
7  my past testimony?
8      Q.  Oh, your testimony list?  Sure.  I will
9  pull it out.
10                  (Whereupon, Brzeczek
11                  Deposition Exhibit No. 2 was
12                  marked for identification.)
13 BY MS. ITCHHAPORIA:
14     Q.  The court reporter has handed to you what
15 has been marked as Exhibit 2 which is your expert
16 witness testimony list since 2006.  And it was
17 current as of June 12, 2018; is that correct?
18     A.  That is correct.
19     Q.  Are there any updates to this list?
20     A.  No.
21     Q.  Okay.
22     A.  No.  Other than the instant case.
23     Q.  This case?
24     A.  Right.

RICHARD J. BRZECZEK                                    November 29, 2018

Page 74

1    Q.   Okay.
2    A.   Looking at this, when I told you my
3  testimony as an expert witness in a criminal case
4  was limited to one case, I see there is another one
5  listed here.  People versus Tyrone Hood, the second
6  from the bottom on the first page.  It has a
7  criminal docket number.
8    Q.   Okay.
9    A.   I'm not sure if it was a post-conviction
10 proceeding or what.  But what I did there is I
11 reviewed some materials and submitted an
12 affidavit --
13   Q.   Right.
14   A.   -- in connection with that.  I didn't
15 actually physically testify.
16   Q.   Well, looking at this list --
17   A.   Okay.
18   Q.   -- how many of these -- how many cases are
19 civil cases where you were retained for your expert
20 services against the Chicago Police Department or
21 its officers?
22   MS. KEEN:  Objection.  Form.
23   THE WITNESS:  Okay, going down the list,
24 Craftt versus Flagg involved Chicago police

Page 75

1  officers, Hill versus the City of Chicago.  I don't
2  know about Wilson versus O'Brien, but I didn't
3  testify in that.  So that wouldn't apply.  I just
4  reviewed the case.  Teslow versus City of Chicago,
5  Salgado versus City of Chicago, Castillo versus
6  City of Chicago, Hernandez on Page 2 and Romito on
7  page 2.  I don't have any
8  recollection right now on Pendleton versus Stewart.
9  BY MS. ITCHHAPORIA:
10   Q.   That's seven cases; right?
11   A.   Yes.
12   Q.   And looking at this list since 2006, can
13 you tell me how many times you have been retained
14 as an expert witness by the firm of Loevy & Loevy?
15   A.   Dominguez is one.  I think that criminal
16 case Tyrone Hood involved Loevy & Loevy.  Hernandez
17 on page 2 involved Loevy & Loevy where they
18 represented a police officer in a whistleblower
19 case.  I'm not sure.  It could be Salgado and/or
20 Castillo.  I just don't remember because I had a
21 series of cases also with the O'Connor Law Group.
22 Like Teslow versus City of Chicago is the O'Connor
23 Law Group.  But I know I had a couple others, but I
24 don't remember their names tying them.

Page 76

1    Q.   What about Hill versus City of Chicago, do
2  you remember which plaintiff's firm retained you?
3    MS. KEEN:  Objection.  Calls for speculation.
4    THE WITNESS:  I'm sorry, I didn't hear the last
5  part of your question.
6  BY MS. ITCHHAPORIA:
7    Q.   Do you remember in Hill versus
8  City of Chicago which plaintiff's firm retained
9  you?
10   A.   That was Loevy.  I remember that one.  Now
11 I do.
12   Q.   What about the case of Pendleton versus
13 Stewart, do you remember which plaintiff's firm
14 retained you?
15   A.   If you can tell me more about the case,
16 maybe I can remember.
17   Q.   Do you remember --
18   A.   I don't -- independently I just do not
19 remember.  You know, I know it was settled in
20 January 2016, but I just don't remember.
21   Q.   What about Romito versus City of Chicago,
22 do you remember what firm retained you in that
23 case?
24   A.   Yeah.  John Malloy & Associates.

Page 77

1    Q.   Have you ever testified in a civil case
2  that's gone to trial as an expert witness?
3    A.   Yes.
4    Q.   Which case?
5    A.   Let's go backwards.  Hernandez versus
6  City of Chicago, I testified at trial at that case.
7  But that case resulted in -- I'm not sure what the
8  exact wording would be, but it would be like a
9  mistrial because one of the jurors was determined
10 not to be able to understand English.  So there was
11 no retrial.  The case was settled subsequently.
12 But I did testify at trial there.
13   I testified in the Daubert hearing on Hill
14 versus City of Chicago.  And after that hearing
15 that case was settled.
16   I testified at trial on the People versus
17 Sladjana Vukovic criminal case.
18   Q.   That was a criminal case though; right?
19   A.   Right.  Right.  But I did testify at
20 trial.
21   Q.   Okay.
22   A.   I think that was a jury.
23   Q.   But civil case you have got the Daubert
24 hearing in Hill, and then you have got the

RICHARD J. BRZECZEK                                    November 29, 2018

Page 78

1   testimony that you provided before the mistrial but
2   before a jury in Hernandez; correct?
3       A.   That's correct.  I think the footnotes for
4   each one of those I put in here I think -- oh, the
5   first one, Dominguez versus Hendley, I just saw
6   that now.
7       Q.   Okay.
8       A.   Yeah, that did go to trial in federal
9   court.  That was a Waukegan case.
10      Q.   Have you ever been barred from testifying
11  by any state or federal court as an expert witness?
12      A.   No.
13      MS. KEEN:  Objection.  Foundation.
14  BY MS. ITCHHAPORIA:
15      Q.   Has any portion of your expert opinion
16  ever been barred by any federal or state court?
17      MS. KEEN:  Objection.  Foundation.
18      THE WITNESS:  Not that I know of.
19  BY MS. ITCHHAPORIA:
20      Q.   Do you currently derive any income from
21  any other sources other than serving as an expert
22  witness?
23      A.   Social security.
24      Q.   That's it?

Page 79

1       A.   My portfolio.
2       Q.   In 2017 what percentage of your income was
3   derived from the services that you provided as an
4   expert witness from your consultant firm?
5       MS. KEEN:  Objection.  Foundation.
6       THE WITNESS:  What percentage?  I can't answer
7   that question because I really don't know the exact
8   numbers for my total income nor my expert witness
9   income.
10  BY MS. ITCHHAPORIA:
11      Q.   And for your expert services in this case,
12  what was -- what's your hourly rate for reviewing
13  documents?
14      A.   $500 an hour.
15      Q.   Was that the same for writing reports?
16      A.   Same for everything.  That's what I have
17  charged since 2006.
18      Q.   Have you submitted any invoices for the
19  work that you have done in this case?
20      A.   No.
21      Q.   Do you know how many hours total prior to
22  your deposition today that you put in on this case?
23      A.   I am guessing 15, 20 hours maybe.  It's --
24  I just -- real quickly trying to run through my

Page 80

1   mind.
2       Q.   Is it your plan to submit an invoice after
3   your deposition today?
4       A.   After -- yeah, after this is completed I
5   plan on submitting an invoice, sure.
6       MS. ITCHHAPORIA:  Can you mark that, please.
7              (Whereupon, Brzeczek
8              Deposition Exhibit No. 3 was
9              marked for identification.)
10      MS. KEEN:  Is this testimony list
11  Exhibit No. 2?
12      MS. ITCHHAPORIA:  Yes.
13  BY MS. ITCHHAPORIA:
14      Q.   Mr. Brzeczek, the court reporter has
15  handed to you what has been marked as Exhibit 3 to
16  your deposition, please.  Can you identify
17  Exhibit 3 for the record.
18      A.   Okay, this is the report that I submitted
19  subsequent to my review of the documents that
20  plaintiff's attorneys provided to me and asked me
21  to give an opinion on the -- generically as to the
22  reporting -- give an opinion on the reporting that
23  took place in this case.
24      Q.   And your report consists of seven pages;

Page 81

1   is that correct?
2       A.   Yes.
3       Q.   And that's your signature on the last
4   page?
5       A.   Yes.
6       Q.   Since you prepared your report, has any
7   more information been made available to you by way
8   of documents or depositions?
9       A.   No.
10      Q.   And other than the error that you pointed
11  out on page 2 where you said -- it said Trunko but
12  it's supposed to say LaGace, are there any other
13  errors or mistakes that you see in this report?
14      A.   The -- toward the back of the report I
15  think that Microsoft Word on my Mac decided it was
16  going to become boss and it renumbered some of the
17  paragraphs without my being aware of it.
18      So I apologize for that because when I
19  submitted the report, you know, I know what I put
20  up on the screen, but apparently the automatic
21  indentation and numbering of paragraphs, it did its
22  own thing.
23      So somewhere in here you got a couple of
24  7s and 8s I think that should be --

RICHARD J. BRZECZEK                                    November 29, 2018

Page 82

1    Q.   And if you look on page 3, paragraph 7 --
2    A.   There you are.  That's it.
3    Q.   And it should be paragraph 9?
4    A.   Yeah.  I think that what we want to do is
5    after page 2, No. 8, then make the next one 9, 10,
6    and 11.
7    Q.   Okay.
8    A.   That's -- I know how to count, but I am
9    just saying that that's what happened.
10   Q.   Any other typographical errors or
11   inaccuracies that you noticed in the report?
12   A.   I thought that I may have seen one or two
13   typos in there.  I just don't remember where.  But
14   I can tell you that they don't -- those typos don't
15   affect the substance of the report.
16        You know, like the Trunko versus LaGace, I
17   was just using the wrong name.
18   Q.   And that Trunko versus LaGace typo is in
19   paragraph A on page 2; right?
20   A.   That's correct.  It's one, two, three,
21   four, five -- six lines down the last word in the
22   sixth line on the right -- in the right margin
23   there.
24   Q.   Okay.  And if you recall as we are going

Page 83

1    through the report any other typos, if you can just
2    point them out.
3    A.   Sure.  Okay.  Thank you.
4    Q.   Is there anything else in the report other
5    than the numbering and that one typo that you would
6    want to change?
7    A.   No, not at this time unless I see
8    something as we are going through it.
9    Q.   Does your report contain all the opinions
10   that you intend to testify about at trial?
11   A.   Yes.
12   Q.   Do you intend to supplement your report in
13   any way?
14   MS. KEEN:  Objection.  Form and foundation.
15   THE WITNESS:  I do not intend to supplement the
16   report based upon the assignment given to me.  And
17   I have no other reason to -- no reason to
18   supplement the report at this time.
19   BY MS. ITCHHAPORIA:
20   Q.   So on page 1 of your report there at the
21   top you state I have reviewed the following
22   documents reviewed by the undersigned.  And
23   then --
24   A.   Okay, that should be received.

Page 84

1    Q.   Oh, okay.  Okay.  So it should say I
2    reviewed the following documents -- no, I received
3    the following documents -- what should it say?
4    A.   I reviewed the following documents
5    received by the undersigned.
6    Q.   And it lists the documents that you
7    reviewed; is that correct?
8    A.   Yes.
9    Q.   And then you got under that list of
10   documents that you reviewed, you got a heading
11   that's underlined Facts, right?
12   A.   Yes.
13   Q.   And then that's paragraphs 1 through what
14   we are now going to call 11 that are under the
15   Facts section?
16   A.   Yes.
17   Q.   And then after paragraph 11 you have got a
18   bold heading Opinion.  And then there is Opinion 1
19   through 5 -- what is that -- 5A through J?
20   A.   Yes.
21   Q.   Okay.  So just -- do any of the -- under
22   the Facts section, paragraphs 1 through 11, do any
23   of those paragraphs contain your expert opinions?
24   MS. KEEN:  Objection.  Form and foundation.

Page 85

1    And it is compound to the extent you are asking
2    about all of the numbers.
3    THE WITNESS:  I think that the only place that
4    I can say that an opinion may be somewhat apparent
5    is in paragraph 11 where I said that thereafter
6    detectives obtained the statement from Andersen
7    that describes a somewhat complex and convoluted
8    plot that he contrived to kill Trunko.  And I think
9    that you can regard my descriptive terms as a
10   somewhat complex and convoluted plot as an opinion
11   because that's the way I am seeing it.  Other
12   people may not see it as a complex and convoluted
13   plot, but I did.
14   BY MS. ITCHHAPORIA:
15   Q.   And then under the Opinion, section 1
16   through paragraphs 5A through J, do those
17   paragraphs contain all the expert opinions that you
18   are going to be rendering in this case?
19   MS. KEEN:  I am just going to object to form.
20   Calls for a legal conclusion and foundation.
21   THE WITNESS:  Okay.  You are asking me to look
22   at 5A and thereafter?
23   BY MS. ITCHHAPORIA:
24   Q.   Sorry?

RICHARD J. BRZECZEK                          November 29, 2018

Page 86

1    A.   You are asking me to look at 5A and the
2  paragraphs thereafter?
3    Q.   Oh, I am asking you to look at page 3
4  where it says the heading Opinions, in
5  paragraphs 1, 5 -- through 5J.
6    A.   Okay, one --
7    MS. KEEN:   Same objections.
8    THE WITNESS:   Yeah, those are -- as I look at
9  them, those are the opinions.
10 BY MS. ITCHHAPORIA:
11   Q.   And this is the report that you drafted;
12 correct?
13   A.   Yes.
14   Q.   And you organized your report in this
15 format; correct?
16   A.   Yes.
17   MS. KEEN:   I am just going to object to the
18 extent that calls for any sort of work --
19 disclosure of work product of privileged
20 communication.
21 BY MS. ITCHHAPORIA:
22   Q.   Does the list on -- of documents that you
23 reviewed on page 1, does that contain the total sum
24 of all the documents that you reviewed in order to

Page 87

1  render your expert opinion in this case?
2    A.   Yes.  I have listed everything here that
3  was given to me.  You will see from what I gave you
4  on the flash drive that I reviewed, for example,
5  you see where it says police reports known as
6  Case and Supplementary Reports?  And then Court
7  Attendance Reports?  Well, that's all part of the
8  file, but I just separated them as two different
9  reports even though they come out of the same file.
10 But that's -- that's all that I -- that I looked
11 at.
12   Q.   You just mentioned a file.  Did you review
13 a police file in this case?
14   A.   Well, if -- if the Case Reports and
15 Supplementary Reports and Court Attendance Reports
16 that I looked at appear to me to come out of a file
17 for that RD number, they are all indexed under that
18 RD number assigned to this murder case.
19   Q.   So was it your understanding that you were
20 looking at the investigative file?
21   A.   Yeah, I think you would call it the
22 investigative file.
23   Q.   Were there any other reports in that
24 investigative file or documents under the RD

Page 88

1  number other than Case and Supplementary Reports
2  and Court Attendance Reports?
3    MS. KEEN:   I am just going to object to form
4  and foundation.
5    THE WITNESS:   No.  When I went through it,
6  that's all I recall seeing is the original
7  Case Report and then Supplementary Reports and the
8  Court Attendance Reports.  I just don't recall
9  right now if there was anything else in that
10 grouping of papers, documents that would come
11 within the definition of being the investigative
12 file.  These would be definitely part of the
13 investigative file, but I think that that's all
14 I -- all I looked at.
15 BY MS. ITCHHAPORIA:
16   Q.   Well, putting aside the term
17 "investigative file," do you remember looking at
18 any other police reports other than Case and
19 Supplementary Reports and Court Attendance Reports
20 in order to render your opinion in this case?
21   MS. KEEN:   Objection.  Form.
22   THE WITNESS:   I don't think so.  I don't recall
23 any other reports.
24

Page 89

1  BY MS. ITCHHAPORIA:
2    Q.   So, for example, you didn't look at -- you
3  didn't review Mr. Andersen's arrest report?
4    A.   No, I don't think I even saw that arrest
5  report.
6    Q.   Did you conduct any independent research
7  in order to prepare your report in this case?
8    A.   No.
9    Q.   Did you consult with anyone besides
10 plaintiff's counsel to form your opinions in this
11 case?
12   A.   No.
13   Q.   Are there any documents or materials that
14 you relied upon to form your opinions in this case
15 that are not included in this list?
16   A.   No.
17   Q.   Did you rely on any authoritative text or
18 journals or articles in forming your opinions in
19 this case?
20   MS. KEEN:   Objection.  Form.
21   THE WITNESS:   No.
22 BY MS. ITCHHAPORIA:
23   Q.   Did you rely on any physical or tangible
24 evidence in forming your opinions in this case?

RICHARD J. BRZECZEK                                      November 29, 2018

Page 90

1     A.    Just for the purposes of answering your
2   question, the answer would be no.  But I do see
3   that you have got -- I have listed here written
4   notes of then polygraph examiner John Stout.
5         And theoretically if they were to be used
6   at trial, that those documents would be tangible
7   evidence.  But those -- other than that, you
8   mentioned did I look at the knife or something like
9   that, that she supposedly was killed with, the
10  answer is no.  Okay?
11    Q.    You didn't look at any photographs or
12  anything like that?
13    A.    No.  I did not.
14    Q.    Were there any rules or regulations or
15  General Orders or special orders of the Chicago
16  Police Department that you reviewed in forming your
17  opinions in this case?
18  MS. KEEN:  Objection.  Form.
19  THE WITNESS:  No.
20  BY MS. ITCHHAPORIA:
21    Q.    Who provided you with the documents that
22  you reviewed in order to render your opinions in
23  this case?
24    A.    I think Roshna, Heather.  And Belinda sent

Page 91

1   me one document if I am not mistaken.
2     Q.    So is it accurate to say that the
3   documents that you reviewed were selected by
4   plaintiff's counsel?
5   MS. KEEN:  Objection.  Form.
6   THE WITNESS:  It's accurate because that's
7   always the case when I am retained.
8   BY MS. ITCHHAPORIA:
9     Q.    Were there any documents that you
10  requested to review?
11    A.    No.
12    Q.    Where it says in your report on page 1,
13  "Police reports known as Case and Supplementary
14  Reports," do you know how many Supplementary
15  Reports you reviewed?
16    A.    No, I do not.  I did not count them.
17    Q.    Was it more than one?
18    A.    Yes.
19    Q.    And you mentioned the original Case
20  Report, that was the handwritten document?
21    A.    Yes.  If that's the -- I think it is
22  called a General Offense Report.  It is a
23  handwritten document.  That's the one that is
24  prepared by the uniformed officers responding to

Page 92

1   the call.
2     Q.    So you did not review Daniel Andersen's
3   court reported statement; is that correct?
4     A.    I did not.
5     Q.    You indicate here that you reviewed the
6   deposition and written notes of then
7   polygraph examiner John Stout.  Do you see that?
8     A.    Yes.
9     Q.    Did you review his entire deposition
10  transcript?
11    A.    Yes, I did.
12    Q.    And was that Mr. Stout's deposition
13  transcript in the Andersen case that you reviewed?
14    A.    Say that again, please.
15    Q.    Did you review Mr. Stout's deposition
16  transcript in the Andersen matter, this case?
17    A.    In this case, that's correct.
18    Q.    Okay.  Did the deposition transcript have
19  any exhibits attached to it that you reviewed?
20    A.    I think it had exhibits attached to it
21  which were the exhibits in the polygraph unit file,
22  the notes and the graphs of his running the
23  polygraph at that time.
24    Q.    And you reviewed those?

Page 93

1     A.    Well, I saw the graphs, but I don't know
2   what they mean.  So I'm not going to say I reviewed
3   them because just looking at them it may as well be
4   written in some remote, you know, language because
5   I have no idea how to interpret those or what they
6   mean.
7     Q.    Did you review the other documents that
8   were in the polygraph file that were attached to
9   the deposition transcript of Mr. Stout?
10    A.    If you are referring to his handwritten
11  notes, yes.  Right now I just don't recall anything
12  else there.
13    Q.    You said -- so you reviewed his
14  handwritten notes, Mr. Stout's handwritten notes?
15    A.    Yeah.  As I recall I think that they were
16  on -- the paper was yellow.
17    Q.    Okay.
18    A.    Handwritten notes.
19    Q.    Were you able to read those handwritten
20  notes of Mr. Stout's that were on yellow paper?
21    A.    I think for the most part I was able to,
22  yes.
23    Q.    Are you familiar with Mr. Stout's
24  handwriting?

RICHARD J. BRZECZEK                                     November 29, 2018

Page 94

1     A.    No.
2     Q.    Did you rely on Mr. Stout's deposition
3   testimony for his interpretation of his handwritten
4   notes on that yellow piece of paper?
5     A.    Yes, I did.
6     Q.    Does it indicate in this list that you
7   reviewed select portions of the deposition of
8   former Detective James Higgins?  Do you see that?
9     A.    Yes.
10    Q.    Were you only provided with selected
11  portions of Mr. Higgins's deposition testimony?
12    A.    No.
13    Q.    So you didn't review his entire deposition
14  transcript?  You just reviewed select portions of
15  it?
16    A.    The select portions that I was asked to
17  review.  And that's what I focused on in the
18  preparation of my report.
19    Q.    Okay.  So --
20  MS. KEEN:  Were you finished with your answer?
21  THE WITNESS:  Yes.
22  MS. KEEN:  Okay.
23  BY MS. ITCHHAPORIA:
24    Q.    My question was though is it accurate to

Page 95

1   say that you did not review his entire deposition
2   transcript, Mr. Higgins?
3     A.    That is accurate.
4     Q.    Okay.  Do you remember the date of that
5   deposition transcript that you reviewed of
6   Mr. Higgins, the select portions?
7     A.    The date of the deposition that he sat
8   for?
9     Q.    Right.
10    A.    Sometime in 2017.  That's what I remember.
11    Q.    Okay.  The reason I am asking because
12  Mr. -- there is three deposition transcripts from
13  Mr. Higgins.  So I am trying to determine if you
14  reviewed select portions from each transcript or if
15  it was from one deposition --
16    A.    No.
17    Q.    -- sitting?
18    A.    If you look at the flash drive, it will
19  tell you -- it will actually show you the copy of
20  the deposition --
21    Q.    Okay.
22    A.    -- that I reviewed the selected portions.
23    Q.    So is it -- did you only review selected
24  portions because those were the portions that you

Page 96

1   were told to review?
2     A.    I reviewed selected portions that I was
3   asked to look at.
4     Q.    Do you remember which selected portions of
5   his testimony you reviewed?
6     A.    There were three selected portions.  But I
7   think one of them was somewhere like on page 146
8   and a few pages thereafter.  It's about the --
9   about the only numbers I can remember right now.  I
10  would have to look back at the document and see
11  what I reviewed there.
12    Q.    Okay.  So on the flash drive that you
13  provided to me this morning, did you just -- did
14  you demarcate or highlight the selective portions
15  of Mr. Higgins's deposition testimony that you
16  reviewed?
17    A.    Yes.
18    Q.    Okay.
19    A.    If you go to -- if you bring it up on the
20  screen and go -- open up Comments, you'll see the
21  highlights and then any comments I wrote about
22  that.  And you will see that there -- the
23  highlights are in three different sections.
24    Q.    Okay.

Page 97

1     A.    And those are the sections that I
2   reviewed.
3     Q.    Were there any attachments to the
4   deposition transcript that you were provided with?
5     A.    If there were, I didn't look that far
6   back.  The attachments usually are at the back end.
7   This was more -- as I recall that, I think that
8   deposition transcript was 300 pages long according
9   to the PDF counter up on top.
10    Q.    Okay.
11    A.    So I did not look in the back for the word
12  index or anything like that.
13    Q.    Okay.
14    A.    Just went to those sections.
15    Q.    So if there were exhibits attached to that
16  300-page deposition transcript, you did not look at
17  them?
18    A.    No.  I have no idea what was attached.
19    Q.    And it indicates on your list here on
20  page 1 that you also reviewed the depositions of
21  then Prosecutors Erickson and Cohen.  Do you see
22  that?
23    A.    Yes.
24    Q.    Did you review the entire deposition

RICHARD J. BRZECZEK                                    November 29, 2018

Page 98

1    transcript of Erikson?
2        A.   I read through it.  When you say the
3    entirety, sometimes I skim things, you know, like
4    when you get through the -- when you get in the
5    preliminary questions, things like, you know,
6    background stuff.  I generally jump over that
7    because it doesn't -- it doesn't affect what I am
8    doing.  I am looking for substantive things.  It
9    would be the same thing for Cohen.
10           And my recollection is what they had to
11   say really did not deal with the assignment that I
12   was giving -- given regarding the reporting of the
13   events of the investigation by the detectives.
14       Q.   Were there -- was there more than one
15   deposition transcript for Mr. Cohen?
16       A.   I don't think so.  I mean I am only
17   telling you what I can remember, but -- you know, I
18   said that -- in going through those depositions I'd
19   skim through the background stuff.
20           And unless there was something that I
21   found that would be relevant to the task that I had
22   to deal with, I didn't pay much attention to it.
23   That's why you will see in my Facts and my Opinion
24   I really make no mention of Erikson and Cohen.

Page 99

1        I'm dealing with what I think I have been
2    charged to do.  And that is to look at the
3    reporting behavior of the detectives.
4        Q.   Were there any exhibits that were attached
5    to the deposition transcript of Mr. Erickson?
6        A.   I can't tell you.  I just can't.  I can't.
7    I cannot tell you.
8        Q.   Okay.  Do you -- do you know if you
9    reviewed -- if there were exhibits attached to his
10   deposition transcript, did you review those?
11       A.   No.
12       Q.   And same for Mr. Cohen, if there were
13   exhibits attached to his deposition transcript, did
14   you review those?
15       A.   No.
16       Q.   You also reviewed the deposition
17   transcript of Diane Diaz-Grabowski; is that
18   correct?
19       A.   Yes.
20       Q.   And that was the deposition that she
21   provided in this civil matter?
22       A.   Yes.
23       Q.   Were there any exhibits attached to
24   Miss Grabowski's deposition testimony?

Page 100

1        A.   I don't remember.  I don't recall looking
2    at any attachments to it.
3        Q.   Did you review her entire deposition
4    transcript?
5        A.   Again, I went through it, reading through
6    it.  And I have to say I went from beginning to
7    end, what was provided to me.  But I don't -- I
8    can't tell you that I read every line.  I am
9    looking for things that are pertinent.
10       Q.   But you -- for Miss Grabowski's deposition
11   transcript you put an eye on at least every page of
12   the transcript?
13       A.   Did I do what?
14       Q.   You put your eye on at least every page of
15   the transcript?
16       A.   Yes, I went on every page, you know.
17       Q.   Okay.  And then the other thing you
18   reviewed on this list is your testimony from
19   Palmer versus City of Chicago matter; is that
20   correct?
21       A.   That's correct.
22       Q.   What was the date of the testimony from
23   the Palmer case?
24       A.   April 1982.

Page 101

1        Q.   When you were provided that testimony,
2    were you testifying in your capacity as the
3    superintendent?
4        A.   Yes.
5        Q.   And was that testimony given at a hearing?
6        A.   Yes.
7        Q.   Was that a hearing on a TRO?
8        A.   Yes.
9        Q.   Did you review both your testimony from
10   your direct and cross examination from that
11   hearing?
12       A.   Yes, the entire testimony.  I think
13   Mr. Fioretti was representing the City and
14   Mr. Deutsch and Cunningham I think were
15   representing the plaintiff.
16       Q.   Looking at the Facts section, paragraph 1,
17   you've got Cathy Trunko was found fatally stabbed
18   on 19th January 1980 at about 2210 to 2219 hours.
19   And then you state I cannot read the last digit on
20   the Case Report at 4936 South Paulina Street in
21   Chicago, Illinois.  Do you see that?
22       A.   Yes.
23       Q.   Did you get the information about the date
24   and time from the Case Report?

RICHARD J. BRZECZEK                                                      November 29, 2018

Page 102

1    A.  Yes.  That's why I said I couldn't read
2  the last digit.  In other words, I see that there
3  was a time frame that the officers wrote,
4  2210-22 -- and then I could read the 1, but I
5  couldn't make out the last digit.  So I put the 9
6  in there as being all encompassing because if you
7  went one more, then you change the third digit to a
8  2.  Does that make sense what I just said to you?
9    Q.  I am a little lost.  What digit are you
10 talking about?
11   A.  Okay, let's look at the time frame, 2210,
12 which is 10:10 p.m. in civilian time, to
13 2219 hours.  And I said I can't read the last digit
14 on the Case Report.
15   Q.  Oh.
16   A.  The last digit, you know, of the 2219 that
17 I have in there.  So I put 9 as the maximum number
18 because if you went beyond that, see, it would be
19 2220.  The third digit would have to change.
20   Q.  Got it.
21   A.  So I'm looking at -- it had to be
22 somewhere within a ten-minute period.
23       MS. ITCHHAPORIA:  Okay.  Let's mark the Case
24 Report.

Page 103

1                   (Whereupon, Brzeczek
2                    Deposition Exhibit No. 4 was
3                    marked for identification.)
4  BY MS. ITCHHAPORIA:
5    Q.  The court reporter has handed to you what
6  has been marked as Exhibit No. 4 to your
7  deposition.  Can you identify that, please.
8    A.  That appears to be a Case Report Index
9  under RD number, B, as in boy, 025267, which is
10 assigned to the murder of Cathy, C-A-T-H-Y, Trunko
11 on January 19, 2- 19 -- January 19th, 1980, at
12 about 22 something hours.  I can't make out that
13 last digit.
14   Q.  That's the digit that you are talking
15 about in the Box No. 6?
16   A.  That's the digit, yeah, yeah, somewhere
17 between 10 and 19 in Box 6.
18   Q.  So this is the R -- Exhibit 4 is the Case
19 Report that you are referring to in paragraph 1?
20   A.  That's correct.
21   Q.  Where are you getting the 2210 time frame
22 from?
23   A.  Well, here is what I did, you look at
24 Box 6 and you have three clear digits, 2, 2, 1.

Page 104

1  Okay?  And the fourth digit is not -- to me not
2  readable.  So it's got to be somewhere between 0
3  and 9.  So I don't know if that is a 5, a 6, an 8
4  or what.
5        So I said I can't read the last digit, but
6  it was somewhere between 2210 and 2219.
7    Q.  And you are saying that she was murdered
8  somewhere between that time frame?
9    A.  I'm not saying that.  I'm saying that's
10 what the Case Report says.
11   Q.  Okay.
12   A.  Yeah.
13   Q.  Now, in paragraph 2 you state prior to her
14 being found stabbed it was established that she was
15 contacted by telephone by her best friend Diane
16 Diaz who was at Dot's Tavern in the company of
17 Robert LaGace.  Do you see that?
18   A.  Yes.
19   Q.  You are not saying here that before she
20 was found stabbed, that it was established that she
21 had been contacted by her best friend?
22   A.  Would you repeat the question or read it
23 back to me.
24   Q.  Sure.  At what point -- I guess what I am

Page 105

1  saying -- I will strike the question.
2        At what point was it established that she
3  had been contacted by her best friend?
4    A.  It was established after she was found
5  murdered.
6    Q.  Okay.  And do you know where you got that
7  information from?
8    A.  The Case Report or the Supplementary
9  Report.
10   Q.  And I see here you have LaGace spelled
11 L-a-G-a-c-e.  Where did you get that spelling of
12 LaGace from?
13   A.  I think I got it off the Supplementary
14 Report.
15   Q.  Do you know which detective wrote that
16 Supplementary Report?
17   A.  No.
18       MS. KEEN:  Just Objection.  Foundation, form.
19       THE WITNESS:  I think the -- I think the report
20 that the detective submitted that night, whoever
21 was assigned to the scene.
22 BY MS. ITCHHAPORIA:
23   Q.  That's a report you think you got that
24 information from?

RICHARD J. BRZECZEK                                    November 29, 2018

Page 106

1    THE COURT REPORTER:  I'm sorry, I didn't hear
2  that --
3    MS. KEEN:  I am just going to object to be
4  foundation because he is not looking at any report
5  in front of him.
6    THE COURT REPORTER:  I didn't hear the last
7  part of the question.
8  BY MS. ITCHHAPORIA:
9    Q.  My question was is it -- you said it was
10  from detectives from the scene.  And I am asking
11  you is that where you got the spelling of LaGace
12  from, from that Supplementary Report?
13    MS. KEEN:  And I am just going to object.
14  Foundation.  Calls for speculation because he
15  doesn't have that report in front of him.
16    THE WITNESS:  Yeah, I think in the
17  Supplementary Report which may have very well been
18  the first Supplementary submitted by the
19  detectives.
20    When I say that night, I'm talking about
21  from the time which the body was discovered until
22  the report was submitted on the 20th, that I think
23  that is the report where I got the name LaGace
24  from.

Page 107

1  BY MS. ITCHHAPORIA:
2    Q.  But my question is specifically the
3  capitalizing of the G in LaGace.  Where did you get
4  that from?
5    MS. KEEN:  Objection.  Asked and answered.  It
6  is calling for speculation and foundation.
7    THE WITNESS:  The way I spelled it here?
8  BY MS. ITCHHAPORIA:
9    Q.  Right.
10    A.  On the -- on the report it said LaGace.
11  And -- L-A-G-A-C-E.  I may have changed the
12  spelling to LaGace with the small A -- or the
13  capital G, put it that way.
14    Q.  Now, you say in paragraph 3 here the only
15  thing mentioned about LaGace in any of the police
16  reports (parole -- patrol and detective) is that
17  LaGace was allegedly interviewed by detectives on
18  20th of January 1980.  And according to detectives
19  he said the same thing as did Diane Diaz relative
20  to the phone call.  Do you see that?
21    A.  Yes.
22    Q.  Why here did you say that LaGace was
23  allegedly interviewed by detectives on 20th -- on
24  20 January 1980?

Page 108

1    A.  That's what I read, that -- they're saying
2  that they interviewed them.
3    Q.  So detectives are saying that they
4  interviewed LaGace, but then you are saying it was
5  allegedly -- that he was allegedly interviewed?
6    A.  Yes.
7    MS. KEEN:  Objection.  Form.
8  BY MS. ITCHHAPORIA:
9    Q.  So are you not taking what's on the report
10  as their interview of Mr. LaGace to, in fact, be
11  the truth, that they, in fact, didn't interview
12  him?
13    MS. KEEN:  Objection.  Form.
14    THE WITNESS:  At the time that I wrote this,
15  and today, it is my opinion that when they said
16  that LaGace confirmed the telephone conversation,
17  that Diane Diaz had with the decedent, that's all
18  they said.
19    I'd like to have them explain how LaGace
20  was able to confirm that conversation.  You know,
21  was he listening in on the conversation?  Did they
22  have the phone up to both of their ears?  Or was he
23  only hearing one part of the conversation?  That
24  is, Diaz's side of the conversation.

Page 109

1    So -- and the fact that that's all they
2  said about LaGace, they -- further solidifies my
3  allegedly interviewed him because you can say
4  allegedly.  If you call that an interview, then I'm
5  saying alleged.  I don't think that they conducted
6  a proper interview of LaGace.  But that's all they
7  got from him.
8  BY MS. ITCHHAPORIA:
9    Q.  What -- what is your factual base for
10  saying that the detectives allegedly interviewed
11  Mr. LaGace on January 20th, 1980?
12    MS. KEEN:  Objection.  Asked and answered.
13    THE WITNESS:  I think I just gave you the
14  reason for that.  I just told you that they said
15  that he confirmed the telephone conversation.  How?
16  I want to know how he confirmed it.  What did he
17  hear the two parties saying because if he is only
18  hearing one part of the conversation, he is not
19  hearing the conversation.  The conversation implies
20  exchange of words between two people.  None of that
21  is said.
22  BY MS. ITCHHAPORIA:
23    Q.  But you are not questioning that the
24  detectives did, in fact, interview Mr. LaGace on

RICHARD J. BRZECZEK                                November 29, 2018

Page 110

1  January 20th, 1980?
2      A.  I am.
3      Q.  You are?
4      A.  I am.
5      Q.  Are you saying that they interviewed him
6  but the interview was not thorough or that they
7  just didn't interview him?  Or you can't say?
8      MS. KEEN:  Objection.  Form.
9      THE WITNESS:  Specifically I cannot say.  From
10 what they wrote, if this is all that they got from
11 him, that he confirmed the conversation, in my
12 opinion that wasn't an interview.
13 BY MS. ITCHHAPORIA:
14     Q.  What was it then?
15     A.  I don't know.
16     Q.  What would you call it?  If all they got
17 from Mr. LaGace was that confirmation of the phone
18 call what is that called then in your opinion?
19     A.  Well, considering the totality of the
20 circumstances that I now know by reading other
21 documents, okay?  That apparently they had some
22 information about LaGace, more than he overheard
23 the conversation because Bedran and Rochowicz took
24 him down for a polygraph about 48 hours later.

Page 111

1  Okay?  A little more than 48 hours later.
2          Now, they take him down for a polygraph to
3  confirm that he heard the conversation.  I didn't
4  see any of those questions being asked of him by
5  the polygraph examiner.  I saw nothing in the
6  polygraph examiner's notes that the detectives said
7  that he confirmed the conversation.
8          There is nothing that relates to this
9  confirming a conversation subsequent to that one
10 statement in the Supplementary Report.
11     Q.  So you go on to state here that -- in
12 paragraph 3 that the detectives did not report as
13 to whether or not they asked LaGace if he knew
14 Trunko which is especially problematic since LaGace
15 was at Dot's Tavern with Trunko's best friend Diane
16 Diaz and went to go visit the victim on the night
17 of the murder.  Do you see that?
18     A.  Yes.
19     Q.  Second sentence in paragraph 3?
20     A.  Yes.
21     Q.  Why is that especially problematic?
22     A.  Well, it is problematic because they
23 failed to report that.  Those are facts about the
24 activities of an individual with whom they had

Page 112

1  contact in connection with their investigation of
2  the murder of Cathy Trunko and did not include any
3  of those facts in their -- in any of their reports.
4      Q.  When you are saying in that sentence the
5  detectives, which detectives are you talking about?
6      A.  I'm not sure who wrote that report, but it
7  would be the one who wrote the report, the
8  Supplementary Report about his confirming the
9  telephone conversation.
10     Q.  Okay.
11     MS. ITCHHAPORIA:  All right, can we take a
12 quick break?  I am going to get that report.
13     THE VIDEOGRAPHER:  We are going off the video
14 record at 12:43 p.m.
15              (Recess taken.)
16     THE VIDEOGRAPHER:  We are going back on the
17 video record at 12:54 p.m.
18 BY MS. ITCHHAPORIA:
19     Q.  Okay, Mr. Brzeczek, the court reporter has
20 handed to you what has been marked as Exhibit No. 5
21 to your deposition which is a Supplementary Report
22 dated January 20th, 1980, in the Trunko homicide
23 investigation.  Is this the Supplementary Report
24 that you are referring to in paragraph 3?

Page 113

1      A.  Yes.
2      Q.  Okay.  In the Supplementary Report the
3  reporting officer is Richard Bedran; is that
4  correct?
5      A.  That's correct.
6      Q.  Okay.  So when you say in this paragraph,
7  in paragraph 3 on page 1 that the detectives did
8  not report as to whether or not they asked LaGace,
9  which detective are you referring to now that you
10 have had a chance to look at this report?
11     A.  I'm referring to Detective Richard Bedran.
12     Q.  Okay.  And you say in this paragraph the
13 only thing mentioned about LaGace in any of the
14 police reports is that LaGace was allegedly
15 interviewed by detectives on 20th January 1980.
16         But Mr. LaGace is mentioned in other
17 police reports such as Mr. Stout's Polygraph Case
18 Report; isn't that true?
19     A.  It is true.  The reason why I said this is
20 on December -- excuse me, on January 20th, 1980,
21 that was all that the detectives reported in
22 connection with their contact with Robert LaGace,
23 that he confirmed the telephone conversation.
24     Q.  And I think again there though you

RICHARD J. BRZECZEK                                    November 29, 2018

Page 114

1  pluralized detectives, but you are talking about
2  Detective Richard Bedran?
3      A.  I'm referring to this report that you gave
4  me as Exhibit No. 5 which was prepared and signed
5  by Richard Bedran, yes.
6      Q.  And on page 2 of the report, Mr. Robert
7  LaGace's name is mentioned.  And it states that --
8  it has his identifying information, his address,
9  his phone number.  And it says, "Mr. LaGace stated
10 that he was with Diane Diaz at Dot's and stated the
11 same story as Miss Diaz did regarding the phone
12 call to the victim"?
13     A.  That's correct.
14     Q.  Okay.  You are not questioning that that
15 interview occurred?
16     A.  No.  I'm not questioning that the
17 interview occurred.  I'm simply questioning what
18 Bedran or Bedran wrote here about the extent of the
19 information that he obtained from LaGace.
20     Q.  So is it your opinion that he -- that
21 Mr. Bedran on January 20th, 1980, obtained more
22 information from Mr. Robert LaGace that's not
23 included in this report?
24     THE WITNESS:  I am sorry, could you read that

Page 115

1  question back to me.
2              (Whereupon, the record was
3               read as requested.)
4      THE WITNESS:  I don't know if he obtained more
5  information.  You know, he could have and not
6  reported it, or he also could have not sought
7  additional information from LaGace.
8  BY MS. ITCHHAPORIA:
9      Q.  Okay.  And there is no -- can you point me
10 to any General Order or special order that would
11 have required the detectives in 1980 to seek more
12 information from Mr. LaGace than what's reported in
13 Exhibit 5?
14     A.  No, I can't point you to any
15 General Order.  But in reading the report and
16 reading reports like this for many, many years,
17 this does not make much sense to me that he
18 confirmed -- stated the same, stated the same as
19 Miss Diaz did regarding the phone call to the
20 victim.
21         That doesn't tell me anything about --
22 about what he got from LaGace.  I don't even
23 know -- it seems to me that -- there is no
24 indication here if LaGace was even interviewed out

Page 116

1  of the presence of Diaz.
2      Q.  Okay.  And, again, there is no -- or is
3  there?  Can you point to any General Order or
4  special order that would say that Mr. LaGace and
5  Miss Diaz would have had to be separately
6  interviewed?
7      A.  There is a standing principle in
8  investigations for detectives as a standard rule in
9  law enforcement.  You interview witnesses
10 separately.  Just like you have the rule in court
11 that there is exclusion of -- exclusion of
12 witnesses motion that's made at the beginning of a
13 hearing or trial so they don't hear each other's
14 testimony.
15         You interview the witnesses separately,
16 apart from each other so they are not either
17 parroting or repeating what someone else has said.
18         It's done to obtain additional
19 information.  Or it's done to obtain verification
20 or confirmation of information.  Or it's done to
21 determine if everyone is basically telling the
22 truth.
23         So if you are Diaz and you say A, and
24 LaGace is right there and he says, yeah, I agree

Page 117

1  with that, that's one thing.
2          If you take LaGace apart from Diaz, ask
3  Diaz, she says A and he tells you B, now you have
4  conflicting information and you have to determine
5  at some point who is telling you the truth.
6      Q.  So --
7      A.  So it is all a truth-seeking process that
8  the detectives are charged with pursuing.  And you
9  don't arrive at the truth by throwing everybody in
10 the same pot and say tell me what happened.
11     Q.  Are you assuming that Detective Bedran
12 interviewed Mr. Robert LaGace and Miss Diane Diaz
13 at the same time and in each other's presence on
14 January 20th, 1980?
15     A.  I --
16     MS. KEEN:  Objection.  Misstates his testimony.
17     THE WITNESS:  I did not make any such
18 assumption whatsoever.  I don't know because he did
19 not say that they were -- they were interviewed
20 separately.
21 BY MS. ITCHHAPORIA:
22     Q.  Is there any General Order or special
23 order that you can point me to that was in effect
24 in January 1980 that would have required a

RICHARD J. BRZECZEK                                  November 29, 2018

Page 118

1   detective to report in a Supplementary Report that
2   the interview of two witnesses was conducted in
3   separate interview rooms or at separate times?
4       A.   No.   There is no order that I can point
5   you to right now.  But I can tell you that in 1980
6   that was a standard practice for detectives to
7   separate witnesses.  They did it in all
8   investigations, not only in murder investigations.
9   But the point is to separate the witnesses so they
10  are not repeating or echoing someone else's
11  testimony.
12      Q.   Are you -- are you -- I get that you are
13  saying in 1980 it was standard practice for
14  detectives to separate witnesses.  Are you saying
15  it's also -- it was also standard practice in 1980
16  for detectives to document in a report that they
17  separated witnesses for interviews?
18      A.   Not necessarily to document in a report.
19  But it would be very simple to put in witnesses
20  were interviewed separately or individually.
21      Q.   Have you seen such reports?
22      A.   Yes, I have.
23      Q.   Can you name a case where you have seen
24  such a report?

Page 119

1       A.   No.
2       Q.   You indicate in that paragraph 2 that the
3   detectives did not report as to whether or not they
4   asked LaGace if he knew Trunko.  Do you see that?
5       A.   In paragraph 3?
6       Q.   Right.  The second sentence there.
7       A.   That's correct.
8       Q.   Again, was there a requirement that was in
9   effect in 1980 that would have required
10  Detective Bedran to ask Mr. LaGace if he knew Cathy
11  Trunko?
12      A.   I don't think that there was a
13  General Order or a directive that says that you --
14  to a detective that you have to ask a witness if
15  they know the victim.
16           However, in reviewing what Bedran did here
17  in this report seemed to me, my opinion, that since
18  they establish that he was with -- that LaGace was
19  with Diaz and Diaz was close friends with Trunko,
20  it would logically follow to find out from LaGace
21  if he also knew Trunko.
22           One thing to keep in mind about these
23  policies and procedures to which you are referring
24  is that there are so many situations that -- that

Page 120

1   can arise that you cannot legislate or itemize each
2   one of them.  Much like in the rules of evidence,
3   you know, which you follow during an examination in
4   court of a witness, you have to follow those rules.
5            But the way people conduct examinations
6   within the rules varies.  And they all attempt to
7   get the same information, the truth to come out.
8   And this is what you want to find out here too.
9       Q.   And when you are saying it logically
10  followed that the -- Detective Bedran should have
11  asked that question to Mr. LaGace, what's that
12  based on?
13      A.   Commonsense.
14      Q.   So looking further on in this
15  Supplementary Report by Mr. Bedran, you can see
16  that he interviewed some other people.  Do you see
17  that on page 1, 2, and 3?
18      A.   Yes.
19      Q.   Is it your opinion that those individuals
20  were also improperly interviewed because there is
21  nothing in this report about whether or not those
22  witnesses knew Miss Trunko?
23      MS. KEEN:  Objection.  Misstates the document
24  and assumes facts not in evidence.

Page 121

1       THE WITNESS:  It is my opinion the difference
2   between these other witnesses that are listed here
3   and LaGace is that LaGace was with Diaz.  None of
4   these other witnesses, Grace Jimenez, Kimberly
5   Mikuzis, Theresa Bilter, John and Lillian Kassick,
6   Diane Mottier, Stanley -- or excuse me, Walter
7   Stankiewicz.
8            There is no indication anywhere that they
9   were with Diaz, the close friend of Trunko, that
10  night.  There is no indication that any one of them
11  participated in a phone call with Diaz and Trunko.
12  Only LaGace did that.  So that's how I point to
13  LaGace as being different than the other witnesses
14  that don't have any reference made to them.
15  BY MS. ITCHHAPORIA:
16      Q.   Well, are you assuming though on
17  January 20th when Mr. Bedran interviewed Miss Diaz,
18  that Miss Diaz told Mr. Bedran, Detective Bedran
19  that LaGace had a phone conversation with
20  Miss Trunko?
21      A.   No, I didn't assume that.  I only assumed
22  that what Diaz told Bedran is that Diaz had a phone
23  conversation with Trunko.
24      Q.   Okay.  So going to paragraph 4, you

RICHARD J. BRZECZEK                                    November 29, 2018

Page 122

1  indicate that Detectives Bedran and Rochowicz took
2  Mr. LaGace to the CPD Criminalistics Division on
3  January 24th, 1980, at 6:15 p.m.  Do you see that?
4      A.   Yes.
5      Q.   So it was the day after Mr. Bedran
6  interviewed Mr. Bedran -- sorry.  Strike that.
7           It was the day after Mr. Bedran
8  interviewed Mr. LaGace that Mr. LaGace is being
9  taken for a polygraph; correct?
10     A.   Bedran's report is dated the 20th.  And it
11 does not say when he submitted the report; although
12 there is an approval by his sergeant on the 20th of
13 January at five minutes to 5:00 in the afternoon.
14          Now, they went to the polygraph unit about
15 25 hours after the sergeant approved the report.
16 But that still doesn't tell me when Bedran
17 submitted it.
18          It is dated the 20th, but he didn't say
19 when he turned it in on that day.  Okay, so
20 that's -- that's the only thing that I can get from
21 these two -- from that document, that it was
22 submitted on the 20th and approved by the sergeant
23 but at 1655 hours according to the report.
24     Q.   Now, you said here there is no mention

Page 123

1  whatsoever in the detective's reports that
2  Detectives Bedran and Rochowicz took Mr. LaGace to
3  the polygraph unit for a polygraph exam.  Is there
4  any General Order or special order that you cited
5  in your report that indicated that they were
6  required to document that in their reports?
7      A.   Again, there is no General Order or no
8  directive in the police department in
9  January of 1980 which says that if you are going to
10 take someone to the Criminalistics Division
11 polygraph unit for a polygraph exam, you must
12 document that.
13          The requirement to document that is
14 all-encompassing of what detectives should be
15 documenting in connection with their investigation.
16          Now, the only thing we know from these
17 reports is that Bedran wrote down what he said
18 LaGace told him regarding Cathy Trunko.  He
19 confirmed the telephone call.
20          Now, somewhere between that information
21 and 6:15 on the 21st of January 1980 Bedran and
22 Rochowicz, I think it was, take LaGace down for a
23 polygraph exam.  There is no mention whatsoever of
24 why they did that.  There had to be a reason for

Page 124

1  it.
2      Q.   Can you -- so I get that there is no
3  General Order or special order.  Can you point to
4  any law enforcement standard that I could go look
5  up that was in effect in 1980 that stated it was a
6  requirement of detectives to document in a police
7  report that they took someone to get a polygraph
8  exam?
9      A.   I think if you look at the training
10 bulletins that are distributed department-wide back
11 in those days, you look at the training materials
12 for detectives in the pre-service class, the
13 four-week class I mentioned, if you look at a
14 publication which was called the Criminal
15 Investigation Division Standard Operating Procedure
16 that talked about report writing in there, I think
17 that you will find that you come to the conclusion
18 that detectives are required to document in reports
19 all pertinent information, all of their pertinent
20 activity in relation to the investigation.
21          Taking someone for a polygraph exam is a
22 pertinent event in connection with an
23 investigation.
24     Q.   When you are saying training bulletins,

Page 125

1  which training bulletins are you referring to?
2      A.   Chicago Police Department training
3  bulletins.
4      Q.   Can you give me a number or a date of
5  which training bulletin you are referring to?
6      A.   They came out -- they came out, I think,
7  once a week at that time.  And the research and
8  development historically was the custodian of --
9  the Research and Development Division was the
10 custodian of all department directives, even ones
11 that had expired.
12          So if you wanted to look for something
13 that was rescinded or replaced or archaic,
14 historical no longer applicable, they should have
15 it at the Research and Development Division.
16          The other thing is that because the
17 training bulletin is a department directive.  The
18 other thing is is that you may -- you may try the
19 training division or whatever it is called now, for
20 their historical archives on training bulletins.
21          But those training bulletins came out
22 every week on the topic.  So they could -- they
23 could -- undoubtedly your clients or your
24 cocounsel's client could undoubtedly research their

RICHARD J. BRZECZEK                                    November 29, 2018

Page 126

1  records and find those directives that were in
2  existence at that time.
3        I was one of the authors of the Criminal
4  Investigation Division Standard Operating
5  Procedures Manual.  So I know that that one
6  existed.  And I know it contained multiple chapters
7  specifically directed toward detective's conduct
8  and behavior in connection with their duties and
9  their investigative responsibilities.
10 BY MS. ITCHHAPORIA:
11       Q.   Do you have any of those materials with
12 you back in Florida?
13       A.   No.
14       Q.   And you didn't review any of those
15 materials to render your opinion in this case?
16       A.   The only review I did was in my memory
17 about those materials as I just testified to.
18       Q.   But going back to the training bulletin,
19 can you give me a year or a time frame of when it
20 came out where detectives are required to document
21 all pertinent information?
22       A.   I can't tell you when it came out.  But
23 you can look at the existing directives that were
24 in effect on January 20th, 1980.  And you will find

Page 127

1  that there is a myriad of directives in effect.
2  And it is just a matter of finding the ones which
3  relate to proper report writing, conducting
4  investigations.  All of those topics were covered
5  by, in many cases, more than one directive.
6        Q.   Is it your recollection that those
7  materials that you discussed, the training
8  bulletins, the training material from the four-week
9  pre-service detective school and the operating --
10 the criminal operating procedures defined what
11 pertinent information is?
12       MS. KEEN:  Objection.  Form, foundation.
13       THE WITNESS:  I'm not sure that any of those --
14 any of those directives defined the phrase
15 "pertinent information."  I would be more willing
16 to wager that the word "pertinent" -- or the words
17 "pertinent information" were used with the
18 objective that most people at that time would
19 understand the ordinary meaning of the words
20 "pertinent information" in the context of a police
21 investigation.
22       What could be pertinent information for a
23 nurse in a pediatric ward would not necessarily
24 mean pertinent information in a homicide

Page 128

1  investigation.  So I'm saying the ordinary use of
2  those two words, "pertinent information," that
3  relates to a homicide investigation.
4  BY MS. ITCHHAPORIA:
5        Q.   What in the training materials that were
6  provided for the four-week pre-service at detective
7  school, how -- what's in those materials that would
8  indicate to a detective that they would be required
9  to document in a police report if they took someone
10 to get polygraphed?
11       A.   No. 1, to answer your question, going back
12 to Exhibit No. 5, okay, this is a Supplementary
13 Report prepared by Bedran.  And it appears to be a
14 typewritten report.  It doesn't appear to be a word
15 processor report.  And I don't think that the
16 department had word processors back in January of
17 1980.
18       If you look at the report, it states
19 here -- and I am just going to go over some of
20 the -- some of the highlights.  Cause of death,
21 interviewed.  And then Diane Diaz.  Okay?  And he
22 lists all the witnesses that he interviewed.  Okay?
23       And then he has a little narrative after
24 each one.  And then at the very end you see that he

Page 129

1  has a canvas here.  All these addresses that he
2  listed shows that he was doing a canvas.  He was
3  knocking on doors, asking people at these addresses
4  if they saw or heard anything.  And you could see
5  heard and saw nothing.  Okay?
6        So when you look at this report -- it is
7  only three pages and doesn't have a variety of
8  topics, but you will see that there is a certain
9  format to this.  Okay?
10       Bedran did not learn this in the Patrol
11 Division.  Bedran did not learn this from watching
12 an educational television program.  Bedran did not
13 learn this from reading a book.  This format was
14 taught to the new detectives to follow when they
15 prepare their Supplementary Reports.
16       So report writing was an integral part of
17 the detective's pre-service training.  Bedran just
18 did not make this format up on his own because he
19 thought it looked nice or he thought that that's
20 the way it should be.
21       He is following a format that he was told
22 to follow in preparing these reports.
23       Q.   Do you know how -- of the four weeks
24 pre-service training, do you know how much time was

RICHARD J. BRZECZEK                    November 29, 2018

Page 130

1    dedicated to report writing?
2        A.  No.  But you can find it out very easily
3    going back to those days because they have a
4    syllabus for the four weeks.  And it will give you
5    an hour-by-hour description of what the name of the
6    class was, who was teaching it, and, in essence,
7    you can determine what the substantive material was
8    that was being offered to the new detectives.
9        Q.   Okay.  Well, putting aside the format that
10   Mr. Bedran followed and was perhaps taught at
11   pre-service training, are you saying that the
12   training materials that he would have received
13   during the four weeks of detective school would
14   have indicated to him that it was mandatory to
15   report in a Supplementary Report if you take
16   someone to the polygraph unit to be polygraphed?
17       MS. KEEN:  Objection.  Form.
18       THE WITNESS:  Can I have it read back to me.
19              (Whereupon, the record was
20               read as requested.)
21       THE WITNESS:  Yes.
22   BY MS. ITCHHAPORIA:
23       Q.   And have you -- have you seen those
24   training materials that state that?

Page 131

1        A.   I can't understand what you are saying.
2        Q.   Sorry.  Have you seen those training
3    materials that state that?
4        A.   I saw them like 38 years ago.
5        Q.   What did it -- what did it look like?  So
6    it is written on paper?
7        A.   It is written on paper.
8        Q.   Is it --
9        A.   White paper.  You got the syllabus written
10   on white paper.  It has, you know, Monday, day one,
11   okay, the first week.  And then it has seven hours
12   of classes listed and what they are receiving,
13   criminal law, criminal procedure, report writing,
14   interrogations, interviews, things like that.
15   Okay?
16              And those are some of the more generic
17   topics that they would be taught.  All detectives
18   being taught the same across the board because, you
19   know, you conduct investigations basically
20   generically.  They only change for a specific type
21   of crime.  Okay?
22              So what I am saying is that those
23   instructional materials were in existence for them
24   to follow.  I mean they have to have some direction

Page 132

1    in general terms because, for example, looking at
2    Bedran's format report here -- okay?  At the very
3    end when I told you he did the canvas -- okay?
4              Where do you think he learned about doing
5    canvass?  He learned in detective school.  He may
6    have heard about them if he was a patrol officer
7    because when you are a detective and you come to a
8    scene of a crime, you know, you are working the
9    scene, say a murder, what you do is you take a
10   couple of uniformed officers and you them go
11   down the block ringing bells asking if they saw or
12   heard anything.  They can do the canvas.  Okay?
13              But here, this isn't a big area.  He has
14   got all these addresses within a baseball toss of
15   each other.  And so he does the canvas.
16              Who told him how to do a canvas?  Who told
17   him when to do a canvas?  Where did he learn that?
18   In detective school.  And then after each one of
19   these he said heard and saw nothing.  Okay?
20              It is pretty -- pretty simple except when
21   he got down to John Kassick.  It says see interview
22   because Kassick was part of the canvas, but Kassick
23   gave him some information he thought that he should
24   separate from saw and heard nothing.

Page 133

1              Where do you think he learned this?  He
2    learned this in report writing in detective school.
3    These are not the things that you learn in the
4    academy as a cadet or recruit police officer where
5    you are taught how to write these kinds of reports
6    because you will see in the officer's report here,
7    for example, there is no canvas here.  Okay?  And
8    there is -- there is no format here of listing, you
9    know, who -- who witnesses are or who may have been
10   spoken to because the detectives are doing that.
11   They take over that function.
12              There is a listing here of notifications
13   that the uniformed officers made.  But when you ask
14   me about detectives and report writing, they learn
15   that in detective school.
16       Q.   Right.
17       MS. ITCHHAPORIA:  That was entirely
18   nonresponsive.  And we are going to be here for a
19   really long time if I keep getting long responses
20   like that.
21              I mean you told me he's got a hard stop at
22   4:00.  The first time I am hearing about it is his
23   deposition.  And he has just gone on and given me a
24   response that totally did not answer my question.

RICHARD J. BRZECZEK                                        November 29, 2018

Page 134

```
1   BY MS. ITCHHAPORIA:
2       Q.  So, again, sir, is it your testimony that
3   when detectives were in detective school, that the
4   syllabus indicated in writing that it was mandatory
5   for them to document in a Supplementary Report that
6   if they took someone to the polygraph unit to be
7   polygraphed, that they had to write that down in a
8   report?
9       A.  I cannot say --
10      MS. KEEN:  I am going to object --
11      THE WITNESS:  I cannot say that.
12      MS. KEEN:  Let me just make an objection to
13  form and argumentative.  And the witness is
14  answering the questions that you chose to ask.
15      MS. ITCHHAPORIA:  Okay, I am just saying I am
16  going to have to bring him back if you are not
17  going to instruct him to --
18      MS. KEEN:  If you want to use -- if this is how
19  you want to use your time for six out of
20  seven hours of a deposition, then we can address
21  that at the end of the deposition, whether we think
22  it is worth bringing him back for an hour.
23  BY MS. ITCHHAPORIA:
24      Q.  And so it is accurate to say that you
```

Page 135

```
1   can't point to any instructional materials that
2   would have been provided during detective school
3   that would have made that a requirement; true?
4       MS. KEEN:  Objection.  Misstates his prior
5   testimony and asked and answered and badgering.
6       THE WITNESS:  Again, yes, I cannot point to any
7   document that says if it is mandatory, that you put
8   in a report that someone was taken for a polygraph
9   exam.
10  BY MS. ITCHHAPORIA:
11      Q.  Now, you indicate also in paragraph 4A
12  that in the pretest interview with Bedran and
13  Rochowicz, it appears that officers conveyed to
14  Stout that on at least two prior occasions LaGace
15  was known to have pulled knives on Trunko.  Do you
16  see that?
17      A.  Yes.
18      Q.  Where -- what's the factual basis for that
19  statement?
20      A.  The factual basis for that statement is my
21  reference there is see Stout deposition at page 45
22  and 49 to 50 and RFC-Andersen 008107.  That's where
23  I got it from.
24      MS. ITCHHAPORIA:  Let's look at this.  Mark
```

Page 136

```
1   that, please.
2       MS. KEEN:  You want her to mark this?
3       MS. ITCHHAPORIA:  She could.
4                   (Whereupon, Brzeczek
5                   Deposition Exhibit Nos. 6 - 7
6                   were marked for identification.)
7   BY MS. ITCHHAPORIA:
8       Q.  Mr. Brzeczek, the court reporter has
9   handed to you Exhibit No. 6 to your deposition and
10  Exhibit 7.  Exhibit 6 is Bates marked 8107 and is
11  the document that you referenced in paragraph 4A;
12  correct?
13      A.  Exhibit 6 contains the same RFC number as
14  a number I reference in 4A.
15      Q.  Where does it say on Exhibit 6 that Bedran
16  and Rochowicz conveyed to Stout that on at least
17  two prior occasions LaGace was known to have pulled
18  knives on Trunko?
19      A.  Okay, at the bottom of paragraph 2 of
20  Exhibit 6 it says S, which stands for subject,
21  talking about LaGace, known to have pulled knives
22  on victim.  And then --
23      Q.  Well, just before we get to Exhibit 7, so
24  there is nothing in Exhibit 6 that says that Bedran
```

Page 137

```
1   and Rochowicz conveyed to Mr. Stout that the
2   subject was known to have pulled knives on the
3   victim on two occasions; correct?
4       MS. KEEN:  Objection.  Form.
5       THE WITNESS:  Well, I can't answer that
6   question right now because I'm referencing two
7   documents that I base that statement on.  So I have
8   to look at both documents to see where I referenced
9   that statement because I referenced it from
10  RFC-Andersen 008107, which is my report, and also the
11  deposition.  I put that in the report.  So I need
12  to look at Exhibit No. 7.
13  BY MS. ITCHHAPORIA:
14      Q.  Well, we will get to 7.  I am just saying
15  in Exhibit 6 there is nothing in Exhibit 6 that
16  says that Bedran and Rochowicz conveyed to Stout
17  that LaGace had been known to pull knives on victim
18  Trunko on two prior occasions?  That's not in this
19  document?
20      A.  Okay, let me -- so I understand the
21  question, are you asking me is it stated in here
22  that Bedran and Rochowicz told that to Stout?
23      Q.  No.  I am asking you if in Exhibit 6 it
24  says anywhere here that LaGace was known to have
```

RICHARD J. BRZECZEK                                    November 29, 2018

Page 138

1   pulled knives on victim on two prior occasions?
2       A.   No, it just says one here.
3       Q.   Okay.  And you agree from reviewing
4   Mr. Stout's deposition transcript that the remark
5   section in this Polygraph Case Report came from
6   Mr. Bedran and Mr. Rochowicz; right?
7       A.   The remark section?
8       Q.   Right.
9       A.   The remark section is what Stout writes
10  down based upon what Bedran and Rochowicz told him.
11      Q.   Okay.
12      A.   Okay?
13      Q.   And when you are saying subject known to
14  have pulled knives on victim, are you relying on
15  Mr. Stout's interpretation of his handwriting of
16  the word "knives"?
17      A.   Can you say that again.  I'm not sure I
18  understand what you are asking.
19      Q.   Sure.  Mr. Stout testified that he was
20  relatively sure that it could be -- that that word
21  there that we are looking at could be knives, but
22  he said it was also possible that it could be
23  something else.
24           So I'm just wondering with when you put in

Page 139

1   your report that the subject was known to have
2   pulled knives, if your factual basis for saying
3   that comes from Mr. Stout's deposition testimony of
4   his interpretation of that sentence?
5       A.   Well, looking at this statement that he
6   wrote in his own handwriting, I read it as S, and I
7   interpret that to mean subject.  Known to have
8   pulled knives on V, which I take as victim.  Okay?
9   So I read that as pulled knives.
10      Q.   Okay.
11      A.   I mean I can't -- I can't testify for what
12  Stout may have had to say about his own
13  handwriting.  But this is the way I read it.
14      Q.   Okay.  So then looking at Exhibit 7, which
15  are excerpts from Mr. Stout's deposition, included
16  in Exhibit 7 is pages 45 and then 49 and 50, if you
17  could point to -- from those three pages if you
18  could point to where you got the information that
19  the officers conveyed to Stout that on at least two
20  prior occasions LaGace was known to have pulled
21  knives on Trunko?
22      A.   Okay.  I only see on pages that I am
23  looking at right now, 45 and 49 and 50, that it's
24  in the singular.

Page 140

1       Q.   So where you have written on at least two
2   prior occasions, do you now think that that is
3   inaccurate?
4       A.   I don't recall how I came to the
5   conclusion that on at least two prior occasions
6   LaGace was known to have pulled knives on Trunko.
7   Okay.
8           But as I said here, I only see it here in
9   the singular.  But I thought that in my report --
10  in reading my report now that that was a really
11  strong affirmative statement that on at least two
12  prior occasions.  So I don't have an explanation
13  for that right now.
14      Q.   Okay.  Is there any documents that you
15  reviewed in preparation for your expert report that
16  would indicate where you got that information from?
17      A.   Well, it says in here, you know, the
18  pages that you gave me, 45, 49 to 50 and then the
19  RFC number from Andersen, which is my Exhibit 6.
20  Okay?
21           But other than that I can't recall
22  specifically what caused me to say in paragraph 4A
23  of Exhibit 3 that it appears that those officers,
24  Bedran and Stout, that at least on two prior

Page 141

1   occasions.  I don't know -- I can't tell you right
2   now where I got that from.
3           I would venture to say I didn't make it up
4   because there is no reason to make that up.  But I
5   had to rely upon something.  I can't tell you right
6   now what it was.
7       Q.   Okay.  If you think of it later, if you
8   could --
9       A.   Okay.
10      Q.   -- let me know.
11      A.   Sure.
12      Q.   Then you go on to say in that
13  paragraph that information and the identification
14  of the individual who provided the information to
15  the detectives is not found in any of the police
16  reports related to the Trunko homicide
17  investigation.  What do you mean by that?
18      A.   Okay, let's go back to Exhibit 6.  And
19  Stout writes this information about what I read
20  previously about subject known to have pulled
21  knives on victim.  That I concluded was written by
22  Stout based upon information that Bedran and
23  Rochowicz gave him.  But at the same time I found
24  no reports written by Bedran and/or Rochowicz or

RICHARD J. BRZECZEK                                  November 29, 2018

Page 142

1  any other detective for that matter that included
2  that same information.
3      Q.   And can you again point to any
4  General Order or special order that would have
5  required -- that would have mandated for
6  Detectives Bedran and Rochowicz to document from
7  where they obtained the information as known to
8  have pulled knives on the victim?
9      A.   I can't point to any General Order or
10  special order.  But I would say that not only would
11  that require them to identify the source of the
12  information but more importantly to include the
13  information in one of their reports.  Even assuming
14  that they didn't want to identify the source, they
15  want to protect the source's identity.
16          Detectives receive information that LaGace
17  pulled a knife -- or pulled knives on the victim,
18  that I think is substantive information that should
19  be included in the report.
20      Q.   And you state here that that information,
21  I think -- when you say that information, are you
22  referring to LaGace was known to have pulled knives
23  on Trunko?
24      MS. KEEN:  Where are you reading from?

Page 143

1      MS. ITCHHAPORIA:  From 4, 4A.
2  BY MS. ITCHHAPORIA:
3      Q.   That -- you state that information,
4  comma --
5      A.   That's correct.
6      Q.   Okay.
7      A.   The information that Stout reports here as
8  given to him by Bedran and Rochowicz is the
9  information that I referred to as that information.
10      Q.   But you say that information is not found
11  in any of the police reports related to the Trunko
12  homicide investigation; right?
13      A.   That's correct.
14      Q.   Mr. Stout's Polygraph Case Report is a
15  police report; correct?
16      A.   Yes.  What I am talking about are the
17  Area 3 detectives' reports.  Because this document
18  right here, what you are showing me, Exhibit No. 6,
19  that was not part of the investigative file at
20  Area 3.
21      Q.   But here in your report when you are
22  saying it is not found in any of the police reports
23  it is, in fact, in the Polygraph Case Report of
24  Mr. Stout which is related to the Trunko homicide

Page 144

1  investigation?
2      A.   It is.  It is.
3      Q.   Okay.  Prior to -- I am sorry, moving on
4  to paragraph 5, you state that Mr. Stout conducted
5  a pretest interview with LaGace and that LaGace
6  provided some information to Mr. Stout.  And you
7  document what some of that information is?
8      A.   That would be information that Stout wrote
9  down in the notes that I previously testified to
10  that appeared to be on yellow paper.
11      Q.   And you say that this information that
12  LaGace provided to Stout during the pretest
13  information was nowhere to be found in any of the
14  reports of the detectives in the Trunko homicide
15  investigative file.  Do you see that?
16      A.   Yes.
17      Q.   What's your factual basis for saying that?
18      A.   I looked through the Supplementary Reports
19  and all the other reports in Area 3 that are
20  prepared by the detectives and there is no
21  information that is included in any of those
22  reports that I saw included in the Stout notes.
23      Q.   The -- can you point to any General Order
24  or special order, law enforcement standard that

Page 145

1  would have required the detectives back in 1980 to
2  document in a police report information learned
3  during a pretest interview of a subject during a
4  polygraph exam?
5      MS. KEEN:  Objection.  Form.
6      THE WITNESS:  No.
7  BY MS. ITCHHAPORIA:
8      Q.   The information that Mr. Stout learned
9  during LaGace's pretest interview is documented in
10  Mr. Stout's notes; correct?
11      A.   That's correct.
12      Q.   And his notes are considered to be police
13  reports?
14      MS. KEEN:  Objection.  Form, foundation, calls
15  for a legal conclusion.
16      THE WITNESS:  They are not.
17  BY MS. ITCHHAPORIA:
18      Q.   Why do you say that?
19      A.   Well, same reason that pointed out that
20  Exhibit 6 shows that it's a Polygraph Case
21  Report, Criminalistics Division, Chicago police.
22  It is identified as a police report.
23          A note is not a police report.  That's why
24  we -- that's why we actually came up with the

RICHARD J. BRZECZEK                                    November 29, 2018

Page 146

1  standardized form, an official department report
2  called the General Progress Report after the Palmer
3  case.
4          But a note is not an official report.
5  That's why testimony that you will have from
6  detectives when they talk about they take notes in
7  the course of their investigation and then they
8  transfer those notes to a Supplementary Report
9  because that makes it official.
10     Q.  Okay.  You testified I think earlier that
11  the Polygraph Case Report was not included in the
12  investigative file; is that correct?
13     A.  That's correct.
14     Q.  And what's your factual basis for saying
15  that?
16     A.  Because any time, and even thereafter, the
17  investigative file in the areas did not contain
18  criminalistics reports except for reports like drug
19  testing -- and when I say drug testing, I am
20  talking about get a quantity of white powder and it
21  was tested for cocaine or heroin, or there may be a
22  lab report on fingerprints.  There may be a lab
23  report on blood.  But these kinds of reports never
24  made it to the investigative file.  This report was

Page 147

1  always maintained in the criminalistics division.
2      MS. KEEN:  Can we go off the record for one
3  second?
4      MS. ITCHHAPORIA:  Oh.  All right.  We will take
5  a quick break.
6      THE VIDEOGRAPHER:  We are going off the video
7  record at 1:46 p.m.
8          (Recess taken.)
9      THE VIDEOGRAPHER:  We are going back on the
10  video record at 2:09 p.m.
11  BY MS. ITCHHAPORIA:
12     Q.  Looking at Exhibit 6, Polygraph Case
13  Report, Mr. Stout in the Remark section also
14  included some other information obtained from
15  Detectives Bedran and Rochowicz in accord with his
16  deposition testimony.  Do you remember reading that
17  in his deposition?
18     A.  I think I do remember reading in the
19  deposition.
20     Q.  And in this Exhibit 6 it says that subject
21  known victim two days.  Do you see that?
22     A.  Yes.
23     Q.  And Mr. Stout also documented in the
24  report that LaGace takes a friend's car and drives

Page 148

1  by corner where she, victim, lived.  Said looking
2  for her.  Said didn't see her --
3     A.  Yes.
4     Q.  -- correct?
5     A.  Yes.
6     Q.  So it was conveyed to Mr. Stout from
7  Bedran and Rochowicz that Mr. LaGace did not see
8  Cathy Trunko on the night of her murder; correct?
9     A.  Yes.
10     Q.  Cathy Trunko and the -- again, the
11  information, I think you -- we talked about this
12  earlier, in the Remark section of this Polygraph
13  Case Report, Mr. Stout testified he got that
14  information from Bedran and Rochowicz; correct?
15     A.  That's correct.
16     Q.  Is there -- can you cite to any
17  General Order, standard, special order or law
18  enforcement standard that states that once a
19  detective provides information to another police
20  officer, that that detective is also responsible
21  for documenting the same information in another
22  police report?
23     MS. KEEN:  Objection.  Form, incomplete
24  hypothetical.

Page 149

1      THE WITNESS:  While it can point to any
2  General Order or special order or what you call law
3  enforcement standard, repeat my testimony from
4  before, that the standard operating procedural
5  manual of the Criminal Investigation Division at
6  that time was, in fact, considered a department
7  directive which required compliance.
8          Training materials did not come to the
9  level of a special order or General Order, but they
10  could be enforced for failure to comply with the
11  procedures set forth in training materials.  So,
12  again, we are talking about what you put in the
13  report and what you can leave out of a report
14  depending upon whether or not it is pertinent
15  information.
16  BY MS. ITCHHAPORIA:
17     Q.  Did any of those directives say that once
18  information has been relayed from one police
19  officer to another and that police officer is going
20  to document that in a police report, that the other
21  officer is also responsible for documenting the
22  same information in another police report?
23     MS. KEEN:  Objection.  Assumes facts not in
24  evidence.  Form and incomplete hypothetical.

U.S. Legal Support, Inc.
(312) 236-8352

RICHARD J. BRZECZEK                                November 29, 2018

Page 150

1    THE WITNESS:  As I understand your question, is
2  the provider of the information and the recipient
3  of the information both required to submit reports?
4  BY MS. ITCHHAPORIA:
5    Q.   Right.  Is there any directive that you
6  can point to that says that?
7    MS. KEEN:  Objection.  Incomplete hypothetical.
8    THE WITNESS:  Say again with the detectives
9  conducting the investigation, that they would
10  incorporate in their reports pertinent information
11  that they received.  And without saying it's a
12  General Order or a special order, it's all part of
13  the realm of the directives concerning the conduct
14  of detectives.  And that could be training
15  materials, standard operating procedural manual.
16  It could be a Detective Division order which is not
17  applicable to anybody else outside the
18  Detective Division.
19    So there are and always have been
20  guidelines for the proper reporting of events in an
21  investigation.
22  BY MS. ITCHHAPORIA:
23    Q.   Right.  But is there any department
24  directive that you can think of that was in effect

Page 151

1  in 1980 that says two police officers that have the
2  same information, both officers are required to
3  document that in a police report?
4    MS. KEEN:  It's an objection to incomplete
5  hypothetical and form.
6    THE WITNESS:  I cannot say that there is any
7  department directive as you describe it.  I think
8  that my definition of directive is more
9  encompassing than yours.
10    I am not limiting it to special orders or
11  general orders.  I am talking about anything that
12  could be written and affect a detective's conduct
13  or behavior in the performance of his duties.  And
14  whether or not there was a directive, using that
15  term in the broadest sense, whether or not there
16  was a directive saying that Officer A gives
17  information to Officer B, that both of them have to
18  include it in their respective reports, I cannot
19  answer that question.
20  BY MS. ITCHHAPORIA:
21    Q.   Okay.
22    A.   Can we just go back to No. 6 for a moment?
23  You asked me to clear something up for you if I
24  remember.

Page 152

1    Q.   No. --
2    A.   When you asked me about -- No. 6 is
3  the --
4    Q.   Exhibit No. 6?
5    A.   Yeah, Exhibit No. 6.  You asked me
6  about -- when I said on -- on more than -- on at
7  least two occasions about --
8    Q.   Subject known to have pulled knives on
9  victim?
10    A.   Yes, pulled knives on victim.  I sat here
11  during the break and I thought about that.  My
12  experience, someone in possession of a knife pulls
13  it on another person, it's usually a single knife.
14  People don't walk around with multiple knives in
15  their hands and threaten people with multiple
16  knives.  Usually it is a single knife.
17    And I took the plural of knife here,
18  knives, not to mean multiple knives at one attack
19  or one threat but more than one threat because it's
20  more than one knife.  Does that make sense to you?
21    Q.   Okay.  So that's -- it was an assumption
22  that you made though that because it says knives,
23  that it occurred on two separate occasions?
24    A.   Two or more.  Two or more.  Okay?  As soon

Page 153

1  as we got to the plural, I saw the word "knives."
2  And I thought about it.  The only explanation that
3  I have for my thinking at that time is that my
4  experience knives, whether they are used as threats
5  or actually used to inflict harm on someone, single
6  instrument.
7    They put knives in here.  I'm taking that
8  as a single instrument on more than one occasion.
9    Q.   And the factual basis for saying that then
10  is based on your experience?
11    A.   Based on my experience, yes.
12    Q.   So in your report you focused on -- in
13  paragraph 4A that the information that LaGace was
14  known to have pulled knives on Trunko is not found
15  in any police reports.  Why did you focus in on
16  that particular statement as opposed to the other
17  statements that are in Mr. Stout's Polygraph Case
18  Report such as LaGace went to the corner where she
19  lived, didn't see her and that he had only known
20  her for two days?
21    A.   The fundamental answer to that question is
22  Cathy Trunko was stabbed to death.
23    Q.   So can you expound on that a little bit
24  more?

RICHARD J. BRZECZEK                    November 29, 2018

Page 154

1    A.   That's why I focused on knives.  That I
2  thought was the most important piece of information
3  that the detectives gave Stout that -- about the
4  knives.  And I'm thinking that even with a
5  rudimentary fundamental education, he would know
6  the difference that Stout is.  That is, he knows
7  the difference between knife and knives especially
8  since there is a change in letters in the plural.
9         And because she was stabbed to death, the
10  history of LaGace threatening her with knives or
11  whatever he did with the knives, however they
12  described it, knives, stabbing, that's important
13  information.
14    Q.   I want to just draw your attention to
15  paragraph -- I'm sorry, page 49 of Exhibit 7.
16    A.   Okay.  Page 49?
17    Q.   Right.  If you just read lines 8 through
18  22 to yourself, and then let me know when you are
19  done.
20    A.   I read that.
21    Q.   During Mr. Stout's deposition you could
22  see that he is agreeing when a question is being
23  posed by plaintiff's counsel that he documented in
24  his report that the subject was known to pull a

Page 155

1  knife in the singular.  Do you see that?
2    A.   I do.
3    Q.   So would you -- the fact that Mr. Stout in
4  his deposition is going -- you know, using the word
5  "knife" singularly but in his report has knives,
6  does that change your opinion in any way?
7    MS. KEEN:  Objection.  Misstates the evidence
8  in the record and form.
9    THE WITNESS:  No.  It doesn't -- it doesn't
10  change my opinion because the person who propounded
11  the question is the one who used the word "knife"
12  first.  I know Stout didn't make any corrections,
13  knife versus knives.
14         I mean but the person who propounded the
15  question, you know, in the way I look at it, it is
16  a leading question.  So the testimony is right,
17  pulled the knife on the victim.  And it says I do.
18  Okay?
19         Now, that deposition was March of 2017.  I
20  know somewhere he even claimed having trouble
21  reading his own notes.  But the notes were written
22  on the 21st of January 1980.  So we are talking
23  about 37 years and 2 months later when you bring
24  this up about the person propounding the question

Page 156

1  says pull a knife.  And here he is talking about
2  knives.  So --
3    BY MS. ITCHHAPORIA:
4    Q.   So you don't think it's possible that he
5  was using -- that Mr. Stout is using the word
6  "knife" and "knives" interchangeably?
7    A.   As far as you are asking me the question
8  possible, anything is possible.  I mean I don't
9  know what was going on in his mind or how he was
10  using those words.  I'm just saying that this --
11  this report right here --
12    MS. KEEN:  Exhibit 6?
13    THE WITNESS:  Exhibit 6, okay, is -- maybe for
14  lack of a better term to describe it by me, this is
15  written as part of a res gestae of the information
16  as he is receiving it, the right part of that, I
17  think, of the meeting with Bedran and Rochowicz.
18         Now, we have someone else using the word
19  "knife."  He didn't use it initially.  He didn't --
20  he did not initiate that.  And I know he didn't
21  make any correction to it.  But even though he may
22  have or may not have been familiar with this report
23  of this, Exhibit 6, but that's -- that's the only
24  thing that I can attribute that what I previously

Page 157

1  described as a fairly strong, affirmative statement
2  on at least two occasions by taking the word
3  "knives."
4    BY MS. ITCHHAPORIA:
5    Q.   Can you point to any General Order,
6  special order, or law enforcement standard or
7  applying the broad definition that you provided for
8  directives that states that it's not a sufficient
9  discharge of a detective's obligation to disclose
10  exculpatory information after the detective shares
11  the information with another police officer who
12  does document that information in a police report?
13    MS. KEEN:  Objection to the extent it calls for
14  a legal opinion.
15    THE WITNESS:  I tried to follow your question.
16  Are you asking if the officer or detective who is
17  sharing the information, so the one providing the
18  information to another police officer, does that
19  officer have to document the fact that he shared
20  the information and what the information was?  Is
21  that your question?
22    BY MS. ITCHHAPORIA:
23    Q.   No.  I think we already covered this.
24         My question is can you point to any

RICHARD J. BRZECZEK                                          November 29, 2018

Page 158

1  orders, directives, law enforcement standards that
2  says it's not sufficient when a detective discloses
3  exculpatory information to a police officer who
4  then does, in fact, record that information in a
5  police report?
6      MS. KEEN:  Objection.  Incomplete hypothetical,
7  form, asked and answered and -- that's it.
8      THE WITNESS:  Again, I'm not sure I understand
9  the second part of the question.  I understand what
10 you are asking about a directive's existence.  But
11 if you can just tell me about the second part of
12 disclosing exculpatory information.  I'm not sure I
13 follow you.
14 BY MS. ITCHHAPORIA:
15     Q.  Sure.  Is there -- is there a directive
16 that says or General Order, whatever, law
17 enforcement standard that it's not sufficient
18 enough of a detective's discharge to disclose
19 exculpatory information if they share that
20 information with another police officer who does,
21 in fact, document that information in a police
22 report?
23     MS. KEEN:  Same objection.
24     THE WITNESS:  I don't -- I don't think that I

Page 159

1  can point to any specific directive to answer your
2  question.  But the -- the purpose of sharing
3  information is to acquaint more people with the
4  expertise in that area of investigation to
5  participate, so to speak.
6          The issue is did the detective document,
7  record, memorialize the information that he gave to
8  someone else or he received from someone else.  I
9  think that's the whole essence right there.
10 BY MS. ITCHHAPORIA:
11     Q.  Do you agree that LaGace -- the fact that
12 LaGace did not see Trunko on the night of the
13 murder, that that is not exculpatory of
14 Mr. Andersen?
15     MS. KEEN:  Objection.  Assumes facts not in
16 evidence.  It is an incomplete hypothetical.
17     THE WITNESS:  It is not exculpatory?
18 BY MS. ITCHHAPORIA:
19     Q.  Right.
20     A.  Exculpatory as to LaGace or as to
21 Andersen?
22     Q.  As to Andersen.
23     A.  I don't have an opinion on that.  I really
24 don't.

Page 160

1      Q.  Okay.  Was the focus in your -- was the
2  focus of your opinions in this case only to look at
3  the detectives -- strike that.
4          Was the focus of your opinions in this
5  case to look at the report writing aspect?
6      A.  The focus of my opinion is the conduct of
7  the detectives in either the recording or
8  memorializing information that they had that they
9  acquired during the course of the investigation.
10 And that subsequently would either contribute to
11 the identification of the person responsible or
12 exonerate a potential suspect.
13         And eventually that information goes to
14 the prosecutor, you know, in compliance with
15 Brady v. Maryland.  But the prosecutor doesn't get
16 the information if it is not contained in the
17 reports.
18         So -- and my focus is on whether or not
19 there was proper disclosure of information in the
20 report writing by the detectives.  That's my
21 primary focus on is because there are events that
22 are happening that -- and I'm not focused on
23 Andersen at all.
24         But when you get to exculpatory, there

Page 161

1  is -- there are events happening, information,
2  facts that appear to be exculpatory for Andersen
3  that were not disclosed.  Not even recorded.
4          You know, it wasn't that they were put in
5  the report and the report was hidden.  They were
6  never written in the report that I know of.
7      Q.  Did you -- in the materials that you
8  reviewed, was there anything that you read that
9  indicated that Detective Higgins was aware that
10 Mr. LaGace was taken to be polygraphed on
11 January 20th, 1980?
12     A.  Before when I testified about Higgins, I
13 told you about a focus on several sections of the
14 deposition.  And I read those only in preparation
15 of my report.  Subsequently just breezed through
16 the deposition.  Okay?  The whole deposition, you
17 know, end to end.
18         Let me see.  Find out if -- if Higgins
19 knew that they took them to -- took LaGace to the
20 polygraph examiner?
21     Q.  Right.
22     A.  Before they took him?
23     Q.  Or at any point during the investigation.
24     A.  I do recall something where Higgins says

RICHARD J. BRZECZEK                                    November 29, 2018

Page 162

1  he thinks that the polygraph is useless.  Do you
2  remember that in his testimony?  So I have to say
3  now that Higgins had to become aware of the fact if
4  the polygraph was brought up and he is answering
5  questions about his opinion, it being useless, and
6  talked about he didn't know why -- now it is coming
7  back to me.  He didn't know why they took LaGace
8  for a polygraph exam.  Was it to show that he was
9  lying about something or was he a suspect.  I
10  remember he was talking about those things.
11       So when he knew about that, I don't know.
12  But he apparently knew about it.  And he could have
13  known about it from his preparation for the
14  deposition because it's in his deposition and he
15  did testify that he did some preparation for the
16  deposition.
17       So I don't know at what point, you know,
18  in time was he aware of they are going to the
19  polygraph exam.  But he did, in fact, say that they
20  took them.  He didn't know why.  He speculated why.
21  And that was it.
22       Q.   Your testimony is not that Mr. Higgins was
23  aware during the course of the Trunko homicide
24  investigation that he knew that LaGace was being

Page 163

1  taken to get polygraphed?
2       MS. KEEN:  Objection.  Misstates his testimony.
3       THE WITNESS:  That he knew that they were
4  taking him for polygraph.
5  BY MS. ITCHHAPORIA:
6       Q.   Right.
7       A.   I can't say that when they took him he
8  knew or didn't know.  They took him at 6:15 in the
9  evening.  I think Higgins was working days as I
10  recall.  But one of the things I think that
11  bothered me that I didn't -- now that you ask me
12  about it, but, you know, I didn't address it in
13  my -- in my report because I was not asked to focus
14  on that area.
15       But he said that everybody just does
16  things on an investigation.  And, you know, reports
17  go into the investigative file.
18       And he talked about the fact that there is
19  no sufficient thing as a lead detective.  Well, I
20  can tell you back in 19 -- January 1980 there were
21  case assignment slips that I talked about before
22  and some detective had to be assigned to the Trunko
23  murder.
24       I have never seen that case assignment

Page 164

1  slip.  But somebody had to be assigned to it.  They
2  just do not have a murder investigation going on
3  with nobody responsible for it.  Because if nobody
4  is generating reports, then who are you going to
5  point the finger at?  So somebody has to be
6  responsible for that investigation.
7       And based upon the fact that he did the
8  interrogation and I think he also said that there
9  was no physical evidence tying anybody into the
10  crime, I kind of got the impression that he was the
11  lead investigator in the case.
12       Q.   Are you aware that's not part of your
13  expert opinions in this case?  You were not asked
14  to render any opinions about whether or not
15  Mr. Higgins was, in fact, the lead detective; is
16  that correct?
17       MS. KEEN:  Objection.  His -- he is answering
18  the questions that you are asking him.  And this is
19  a part of his --
20       MS. ITCHHAPORIA:  That's a speaking objection,
21  Roshna.
22       MS. KEEN:  I am making a record.
23       MS. ITCHHAPORIA:  Speaking objection.
24       MS. KEEN:  Don't interrupt me, please.

Page 165

1       MS. ITCHHAPORIA:  That's a speaking objection.
2  So I will interrupt --
3       MS. KEEN:  You can say that after I am done
4  making --
5       MS. ITCHHAPORIA:  No.  Because now you are
6  coaching the witness.  That's what your speaking
7  objection is.
8       MS. KEEN:  I'm not coaching a witness.  I am
9  making a record here.  You are trying to --
10       MS. ITCHHAPORIA:  I disagree.
11       MS. KEEN:  -- claw back disclosures.  And I'm
12  saying for the record he is answering the questions
13  that you are asking him at his expert deposition
14  pursuant to his Rule 26(a)(2) disclosure.
15       MS. ITCHHAPORIA:  Well, I would move to strike
16  that because it is absolutely nonresponsive to the
17  question that I asked.
18  BY MS. ITCHHAPORIA:
19       Q.   Mr. Higgins testified at his deposition
20  in this case, on page 220 he was asked, "And just
21  to be clear, if in -- well, did you have any
22  knowledge back in January 1980 or prior to
23  January 24th, 1980, that Robert LaGace had been
24  polygraphed by John Stout?"  "I did not know."  Did

RICHARD J. BRZECZEK                                    November 29, 2018

Page 166

1  you disregard that testimony in order to render
2  your opinions in this case?
3      A.   Did I disregard?
4      Q.   That testimony of Mr. Higgins?
5      A.   I wasn't reading that testimony when I
6  prepared my opinion in this case.  As I told you, I
7  was only asked to look at three sections, you know,
8  small sections, a few pages in Higgins's testimony,
9  deposition testimony for the preparation of my
10 report.
11     Q.   Okay.  So other than -- other than those
12 selected portions, the three selected portions, you
13 did not rely on any other portion of Mr. --
14     A.   No.
15     Q.   -- Higgins's deposition testimony in order
16 to render your opinions in this case; is that
17 correct?
18     A.   That's correct.
19     Q.   Okay.
20     A.   My opinion is here -- you asked me today
21 about Higgins, knowing about this.  And that wasn't
22 the sections that I was asked to look at.  But I
23 told you that I read it on my own subsequent to my
24 submitting the report.  And I remember his saying

Page 167

1  that he did not know that they took him for a
2  polygraph exam.
3      Q.   In the three sections that you reviewed of
4  Mr. Higgins's deposition testimony that you relied
5  on for your expert opinion in this case, was there
6  anything in there that indicated that Mr. Higgins
7  was aware during the Trunko homicide investigation
8  that LaGace had been taken for a polygraph?
9      A.   Not that I recall, no.
10     Q.   And you did not review the deposition
11 transcript of Daniel McWeeny; correct?
12     A.   No, I did not.
13     Q.   And you did not review the deposition
14 transcript of John Olson; correct?
15     A.   No, I did not.
16     Q.   And you did not review any of the
17 transcripts from any of the criminal proceedings
18 relating to Mr. Andersen; correct?
19     A.   No, I did not.
20     Q.   Okay.  So you can't say one way or another
21 if any of those detectives that I just talked about
22 had information about whether or not Mr. LaGace was
23 taken for a polygraph during the Trunko homicide
24 investigation?

Page 168

1      A.   That's correct.
2      Q.   In paragraph 6 of your report on page 2,
3  you state that LaGace submitted to a polygraph exam
4  but was deemed to be an unfit subject as the
5  examiner could not establish standards for LaGace
6  and was of the opinion that LaGace was not
7  purposely trying to defeat the purpose or objective
8  of the polygraph exam.  Do you see that?
9      A.   Yes.
10     Q.   When you say was deemed to be an unfit
11 subject, who was deeming him to be unfit?
12     A.   Stout.
13     Q.   And did you get that -- did you get that
14 from Mr. Stout's deposition testimony or his notes
15 or his Case Report?
16     A.   I said see Stout deposition at 60 to 62.
17     Q.   Well, what I am asking you is the term
18 "unfit subject."  Is that -- are those your words
19 or Mr. Stout's words?
20     A.   I know I used it.  So I'm claiming it.
21 But I don't know if he used it.  I do recall that
22 in the pre-polygraph examination, they tried to
23 develop some standards on him and they couldn't do
24 it.  He was upsetting the measuring devices on the

Page 169

1  polygraph.
2           And so -- and he also said that he did not
3  think that he was purposefully trying to defeat or
4  undermine the objective of the polygraph.
5           So if you had someone with say palsy in
6  their extremities, for example, or shaking all the
7  time, I think that that would be a person who would
8  be unfit for a polygraph.  In other words, they
9  don't qualify to have those physical measurements
10 taken because the palsy interferes with the ability
11 of the machine to measure it.  So that's why it
12 would be unfit.  That's why I used that word.
13     Q.   Okay.  What's your factual basis for
14 saying that Mr. LaGace was an unfit subject?
15     A.   That Stout could not establish standards
16 for him because -- and Stout says he wasn't trying
17 to do this on purpose.  LaGace was not trying to do
18 it on purpose to defeat the polygraph.  He just --
19 some people cannot be polygraphed.
20     Q.   When you are talking about standards, are
21 you talking about Mr. LaGace's physiological
22 responses to the relevant and irrelevant questions
23 that he was being posed to during the pretest?  Or
24 are you talking about during the actual four

RICHARD J. BRZECZEK                                    November 29, 2018

Page 170

1  components of the test when he is done -- doing the
2  stim and the straight through and they are
3  measuring his --
4      A.  I think it was --
5      Q.  -- blood pressure?
6      A.  I think it was the physiological
7  measurements that -- that Stout identified that you
8  can't get standards.  So that's why -- when I say
9  unfit, I'm not attributing anything untoward toward
10 LaGace.  It's just that somehow he doesn't have the
11 ability to be measured on a polygraph.  Okay?
12 That's why he is not fit to do a polygraph.
13     Q.  During your employment with CPD, were you
14 ever trained in administering polygraphs?
15     A.  No.
16     Q.  Have you ever administered a polygraph?
17     A.  No.
18     Q.  Back in 1980 through 1982 do you know what
19 the law was in Illinois as far as the admissibility
20 of polygraph in court?
21     A.  In Illinois at the time?
22     Q.  Right.
23     A.  Not admissible.
24     Q.  Did --

Page 171

1      A.  In any proceeding.  That is including
2  criminal.
3      Q.  And this fact that you have included here
4  in No. 6, how is that relevant to your overall
5  opinion about report writing?
6      A.  No. 6?
7      Q.  Right.
8      A.  Well, Bedran and Rochowicz took LaGace
9  down for a polygraph exam.  It could not be
10 conducted.  They didn't report that they took him
11 down.  If they did report that they took him down,
12 they would have to report also that he could not be
13 tested for the reasons that Stout said.
14         That to me is all important.  It is all
15 tied into why did you take him there in the first
16 place.
17     Q.  Mr. Stout did note in his -- in a report
18 that Mr. LaGace's responsive -- responses were
19 erratic during the polygraph; correct?
20     MS. KEEN:  Objection.  Form.
21     THE WITNESS:  I think that he said that, yes.
22 BY MS. ITCHHAPORIA:
23     Q.  And -- let me just find that.  Mr. Stout
24 documented that in a Chicago Police Department

Page 172

1  Criminalistics Department Lab Report; correct?
2      A.  I mean if you show me the report, I can
3  identify it as such.  But I just don't recall where
4  he documented.
5      Q.  I am going to show the witness
6  RFC-Andersen 85.
7      A.  Okay.  Okay.  That's -- that's the Chicago
8  Police Department Laboratory Report.
9      Q.  Did you review this report in preparation
10 for your expert opinion in this matter?
11     A.  I think I did.  I think it was part of the
12 documents -- part of the documents that were given
13 to me.
14     Q.  And the -- this report that Mr. Stout
15 prepared, it is an official Chicago police report;
16 correct?
17     A.  Yes.
18     MS. KEEN:  Objection.  Form.
19     THE WITNESS:  Yes.
20 BY MS. ITCHHAPORIA:
21     Q.  During your career at CPD, did you ever
22 have an occasion to take an individual to the
23 polygraph unit for a polygraph exam?
24     A.  Not that I recall.  You mentioned

Page 173

1  polygraph unit, probably not because for internal
2  investigations we used an outside contractor.  So
3  that would not answer your question for the
4  polygraph.
5      Q.  In paragraph 7 here you concluded some
6  information about LaGace knowing James Clark was
7  Trunko's boyfriend.  LaGace said that on Friday
8  night in another bar Trunko showed/taught LaGace
9  some card tricks and that she was pretty good at
10 it.  Do you see that?
11     A.  Yes.
12     Q.  And then you got some cites to Stout's
13 deposition and RFC-Andersen at 8109.  Do you see
14 that?
15     A.  Yes.
16     Q.  Where are you getting the information that
17 James Clark was Trunko's boyfriend?
18     A.  I think that LaGace told that to Stout and
19 Stout noted in his notes on the yellow paper.
20     Q.  Okay.  All right, we will circle back
21 to that because I have incomplete on an entire
22 document.
23         (Whereupon, Ms. Benjamin exits
24          at 2:46 o'clock p.m.)

RICHARD J. BRZECZEK                                    November 29, 2018

Page 174

1  BY MS. ITCHHAPORIA:
2      Q.  I just want to go back to something you
3  said on paragraph 5.  There in the middle you
4  state -- you are talking about some of the
5  information that Stout learned during the pretest
6  interview.  And you say, "Among this information
7  was while or shortly after Diaz was on the phone
8  with Trunko and offering to pick Trunko up with a
9  car, LaGace drove over to the area of Trunko's home
10 but was unable to find her."  Do you see that?
11     A.  Yes.
12     Q.  Why did you say "while or shortly after
13 Diaz was on the phone"?
14     A.  As far as when LaGace left to go pick her
15 up?
16     Q.  Correct.
17                     (Whereupon, Ms. Benjamin
18                     entered at 2:47 o'clock p.m.)
19     THE WITNESS:  I wasn't sure of his exact time
20 of his departure whether -- was Diaz and Trunko
21 still on the phone when he left or did the phone
22 call end.  But I wanted to put LaGace's departure
23 from the bar as close as possible to that phone
24 call.

Page 175

1  BY MS. ITCHHAPORIA:
2      Q.  Did you -- when you reviewed the selected
3  portions of Miss Diaz's testimony, did you review
4  the portion where she stated that she was on the
5  phone with Cathy Trunko even after Mr. LaGace left
6  Dot's Tavern?
7      MS. KEEN:  Objection to form.  Mischaracterizes
8  his prior testimony.
9      THE WITNESS:  I think I do which would make it
10 during the phone conversation, not shortly after.
11 BY MS. ITCHHAPORIA:
12     Q.  All right.  So I am just wondering why you
13 put in here shortly after.  What's your factual
14 basis for saying that?
15     A.  Well, again --
16     MS. KEEN:  Objection.  Asked and answered.
17     THE WITNESS:  Again, he left.  And there is no
18 indication that Diaz and Trunko stayed on the phone
19 for any length of time.  So Diaz could have ended
20 that phone conversation before Trunko -- before
21 LaGace even got in the car to go pick up Trunko.
22         So it is just, again, part of the
23 res gestae of the phone call and LaGace's leaving.
24

Page 176

1  BY MS. ITCHHAPORIA:
2      Q.  Right.  But did you review Miss Diaz's
3  testimony where she says she continued the
4  conversation for at least five minutes more with
5  Miss Trunko after Mr. LaGace had left?
6      A.  After he left the bar.
7      Q.  Correct.
8      A.  But we don't know how far he got going to
9  pick up Trunko.  You know, that I don't know.
10     Q.  Right.  But I'm saying -- my question is
11 did you review the portion of her deposition
12 testimony where she testified she continued talking
13 to Miss Trunko even after LaGace had left
14 Dot's Tavern?
15     A.  I think I did.
16     Q.  But you are saying that you put in here
17 shortly after because you are not sure how far
18 Mr. Trunko got -- how far Mr. LaGace got to finding
19 Trunko?
20     MS. KEEN:  Objection.  Asked and answered.
21     THE WITNESS:  That's right.
22 BY MS. ITCHHAPORIA:
23     Q.  Was there anything that you read in the
24 materials that you have reviewed that indicated

Page 177

1  that on January 19th, 1980, when LaGace and Diaz
2  were at Dot's Tavern that LaGace knew where Trunko
3  lived?
4      A.  I seem to think that he did know where she
5  lived.  And it may be based on the fact that he
6  didn't have to get any information from either Diaz
7  or Trunko as to where to go to her home.  I got the
8  impression that he did know where she lived.
9      Q.  Was there any -- from the materials that
10 you reviewed anything that indicated that
11 Mr. LaGace on January 19th, 1980, actually drove to
12 Trunko's home located at 5006 South Paulina?
13     A.  I don't recall that specific location.
14 But I remember that there was some material I read
15 where he came back to Dot's Tavern and was
16 breathing heavy and seemed to be anxious or
17 something like that, you know.
18         He did not -- he did not appear to be from
19 the testimony as calm as he was when he left or at
20 least there was more indicators when he came back.
21     Q.  Miss Diaz -- in the selected portions of
22 Miss Diaz's testimony that you reviewed, did you
23 look at the portion where she stated that when
24 Mr. LaGace returned to Dot's Tavern, he asked her

RICHARD J. BRZECZEK                                      November 29, 2018

Page 178

1  where Trunko lived?
2      MS. KEEN:  Objection.  Mischaracterizes his
3  testimony repeatedly.  He said he eyeballed every
4  page.  So form and mischaracterizes his testimony,
5  argumentative.
6      THE WITNESS:  No, I don't -- I don't think I
7  recall reading that.  I think that that would have
8  stuck in my mind if I did read it because if he
9  takes off to go pick her up at home and then comes
10  back and has to ask where she lives, that doesn't
11  sound right.
12  BY MS. ITCHHAPORIA:
13     Q.  Did you review Miss Diaz's court reported
14  statement that she provided to Mr. Andersen's
15  criminal defense attorney in 1981?
16     A.  No, I did not.
17     Q.  Did you review a memorandum that
18  summarized ASAs:  Erickson and Corboy's interview
19  of Miss Diaz in 1981?
20     A.  No, I did not.
21     Q.  And going back to paragraph 5 there is a
22  sentence there that you put in paren.  Do you see
23  that in parentheses?
24     A.  In No. 5?

Page 179

1      Q.  Yeah.
2      A.  Which one are you asking me about now?
3      Q.  In paragraph 5 there is a sentence in
4  parentheses.  Do you see that?
5      A.  Where it says also missing?
6      Q.  Right.
7      A.  Okay.  Okay.
8      Q.  When you are talking about detectives'
9  reports here, which reports are you talking about?
10     A.  Supplementary Reports.
11     Q.  And which detectives' reports are you
12  talking about?
13     A.  Well, whatever Supplementary Reports I was
14  given.  I really didn't look at who wrote the
15  reports.  I was looking at the reports from the
16  from the substantive standpoint.  And I did not
17  find anything addressing that issue in any of the
18  detectives' reports.
19     Q.  And which detective would have been
20  responsible, in your opinion, for attempting to
21  confirm that LaGace's companion Diane Diaz, that he
22  did or did not leave Dot's Tavern to go pick up
23  Trunko?
24     A.  I have no idea who was assigned to the

Page 180

1  case.
2      Q.  In reviewing Miss Diaz's deposition
3  testimony for your report, isn't it true that
4  Miss Diaz testified at her deposition that she
5  never told the police that Bob LaGace was at
6  Dot's Tavern and that he left to go get
7  Miss Trunko?
8      A.  She told the police that he never left the
9  tavern?
10     Q.  Right.  She never told the police that?
11     A.  I don't think I read that.
12     THE COURT REPORTER:  I'm sorry, I didn't hear
13  that.
14     THE WITNESS:  I don't think I read that.  That
15  just does not ring a bell with me.
16  BY MS. ITCHHAPORIA:
17     Q.  Are you aware that Miss Diaz admitted to
18  ASAs Erikson, Cohen, and Corboy in August of 1981
19  that she did not tell the police about Bob LaGace
20  leaving Dot's Tavern to find Miss Trunko because
21  she was nervous?
22     A.  No, because I did not -- I was not
23  provided that document to which you referred.  Was
24  that the same document that you referred in the

Page 181

1  first question, or did you say her deposition?
2      You asked two questions, this last one and
3  the one before that.  Did you reference that
4  document, or was it her deposition?  That she did
5  not tell the police that he left the tavern?
6      Q.  That information -- the information that
7  Miss Diaz admitted to three attorneys in
8  August 1981 that she did not tell the police about
9  Mr. LaGace leaving Dot's Tavern to go find
10  Miss Trunko was in her deposition and was also in a
11  memorandum that was written by ASA Corboy?
12     MS. KEEN:  I am just going to object to the
13  mischaracterization -- mischaracterization of the
14  facts in evidence and mischaracterization.
15  BY MS. ITCHHAPORIA:
16     Q.  So which document are you saying that you
17  did not receive?
18     A.  Well, I didn't -- I didn't receive the
19  ASA Corboy memo.  I don't know if I got that part
20  of the testimony of Diaz's deposition.
21     Q.  Did you review an investigative report
22  from the State's Attorney's Office concerning an
23  interview of Miss Diaz on June 18th, 2015?
24     A.  No.

RICHARD J. BRZECZEK                                    November 29, 2018

Page 182

1    MS. ITCHHAPORIA:  Can you mark this as the next
2  exhibit, please.
3                    (Whereupon, Brzeczek
4                    Deposition Exhibit No. 8 was
5                    marked for identification.)
6  BY MS. ITCHHAPORIA:
7    Q.   Mr. Brzeczek, the court reporter has
8  handed to you what has been marked as Exhibit 8 to
9  your deposition, Bates marked RFC-Andersen 008108
10  and 008109.  And you previously mentioned
11  Mr. Stout's notes on yellow paper.  Is this the
12  document that you reviewed?
13    A.   Yes.
14    Q.   And did you review both pages?
15    A.   I think I did.  I think that they were
16  like one above the other.
17    Q.   And this -- this is -- the document at
18  the top, there is -- on page 8108 it's entitled
19  Polygraph Examiner's Question Sheet.  Do you see
20  that?
21    A.   Yes.
22    Q.   And this is a Chicago Police Department
23  official report; correct?
24    A.   Right.

Page 183

1    Q.   And I was asking you about where -- in
2  paragraph 7 on page 2 of your report you indicate
3  that LaGace knew that James Clark was Trunko's
4  boyfriend.  So what is the factual basis for that
5  statement?
6    A.   Look at page 2 of Exhibit 8.
7    Q.   Okay.
8    A.   The upper portion, you see the
9  paragraph there that shows like two with the half
10  parentheses?
11    Q.   Uh-huh.  Yes.
12    A.   Okay.  It said -- here is what I read,
13  "Subject didn't know her well.  Two days.  They met
14  through J.J. (John Ryan).  Victim was Jimmy
15  Clark's."  Okay.  Okay.  That's how I got that.
16    Q.   Okay.  So when it says was Jimmy
17  Clark's -- victim was Jimmy Clark's, did you assume
18  that to mean she was --
19    A.   His girlfriend.
20    Q.   -- with him?  Okay.
21        And it says in this note Jimmy Clark.  And
22  then later there is a reference to Jim Clark.  But
23  your report says James Clark.  Where did you get
24  James from?

Page 184

1    A.   I -- I took Jimmy and just turned it into
2  his -- the name for which Jimmy is kind of an
3  alternative or a nickname.  That's why I used
4  James.
5    Q.   Is that -- is that an assumption that you
6  made that Jimmy Clark could also -- that could be a
7  nickname for James Clark?
8    A.   Yes.  Yes.
9    Q.   And then you indicate in paragraph 7 of
10  your report that LaGace said that on Friday night
11  in another bar Trunko showed/taught LaGace some
12  card tricks.  Where are you getting that
13  information that occurred in another bar?
14    A.   Okay, he said he met her Friday.  We were
15  at J.J.'s.  She showed me a few card tricks.  She
16  was pretty good.  She was with Jim Clark at that
17  point.  That's what he says here.
18        Okay, your question is about -- okay, when
19  you say in another bar, I'm presuming that J.J.'s,
20  where they said they met, J.J.'s is the bar,
21  another bar from Dot's Tavern.
22    Q.   Okay.  But earlier it says met through
23  J.J. (John Ryan).
24    A.   I understand.

Page 185

1    Q.   So even though it says in this report J.J.
2  is John Ryan, you thought J.J.'s meant a bar?
3    A.   Yeah, because he said he met her Friday.
4  We were at J.J.'s.  So I just thought that that was
5  a bar.
6    Q.   Okay, you didn't take that to mean J.J. as
7  in John Ryan -- at John Ryan's?
8    A.   At John Ryan's house, no.  No, I did not
9  take it that way.
10    Q.   Going to paragraph 8, you state at the
11  bottom there, talking about Diane Grabowski, "I do
12  not know what she told the police.  But I have
13  reviewed the police report and see that none of the
14  foregoing information appears in there.  If
15  Grabowski did actually tell the police any of this
16  information, the officer receiving the information
17  had to record it in an official police report and
18  make this information part of the file."  Do you
19  see that?
20    A.   Yeah.
21    Q.   Okay.  And going -- is there any
22  General Order, special order, department directive,
23  law enforcement standard that you can point me to
24  that specifically states that an officer is

RICHARD J. BRZECZEK                                      November 29, 2018

Page 186

1   required to document everything that a witness
2   tells them in a police report?
3       MS. KEEN:  Objection to the form of the
4   question.  Asked and answered.
5       THE WITNESS:  Going back to the quantum of
6   documents or reports or references or orders,
7   guidelines, training bulletins, this kind of
8   information, if it was, in fact, told to the police
9   at the time, should be included in the
10  Supplementary Report.  Pertinent information.
11      Now, taking -- taking the Supplementary
12  Report from Bedran, he interviewed Diane Diaz and
13  gave her quite a few lines in his report as to what
14  she had to say.  None of it deals with what she
15  alleges she told the police according to her
16  deposition that was not recorded.  So you are
17  asking me about where should -- where does it say
18  they should record everything that a witness tells
19  them in an interview?
20      There is nothing that says they have to
21  record everything verbatim that it says but
22  pertinent information.  And I think that what she
23  said here in the deposition as to what she told the
24  police is pertinent information.

Page 187

1       MS. ITCHHAPORIA:  Can you just scroll to the
2   top of his response.
3   BY MS. ITCHHAPORIA:
4       Q.   So you say -- okay --
5       MS. ITCHHAPORIA:  Oh, I am sorry.
6       THE VIDEOGRAPHER:  Excuse me, I need to go off
7   the record.
8       MS. ITCHHAPORIA:  Oh, okay.
9       THE VIDEOGRAPHER:  We are going off the video
10  record at 3:04 p.m.
11      (Recess taken.)
12      THE VIDEOGRAPHER:  Back on the video record at
13  3:09 p.m.
14  BY MS. ITCHHAPORIA:
15      Q.   So, Mr. Brzeczek, in your last response
16  you reference a quantum of documents, reports,
17  references, orders, guidelines, and training
18  bulletins.  But I'm -- I'm asking you to identify a
19  specific document that I can go and look at that
20  says detectives are required to document what a
21  witness tells them during an interview.
22      A.   I cannot give you a specific document
23  because I don't know one from my own personal
24  memory or knowledge right now.  But I will tell you

Page 188

1   that there are documents in existence that date
2   back to 1980 at the time that this happened and
3   thereafter that will give you the answer to those
4   questions about what is required of detectives to
5   put in their reports.
6       Q.   And when you are saying documents, what
7   exactly are you talking about?
8       A.   I am talking about orders, training
9   bulletins, training syllabi, the standard operating
10  procedure manual, division -- division special
11  orders from Detective Division.  There is just a
12  quantum of documents that relate to the quality of
13  investigation, the conduct, the behavior of
14  detectives in conducting an investigation.
15      Q.   Do any of those quantum documents state
16  that it's necessary and mandated for a detective to
17  record in a police report everything that a witness
18  tells them?
19      MS. KEEN:  This has been asked and answered
20  multiple times and objection to form.
21      THE WITNESS:  The answer is, yes, pertinent
22  information.  For example, I mean if the witness
23  says that, you know, I'm talking to you while my
24  hair is in curlers, that's not pertinent.  Okay?

Page 189

1       I'm talking about pertinent information to
2   the commission of the crime to the investigation
3   that will be helpful.
4   BY MS. ITCHHAPORIA:
5       Q.   So is it your testimony that the quantum
6   of documents that you are referring to that you
7   can't identify specifically right now says
8   detectives are required to record pertinent
9   information that a witness tells them or all the
10  information that a witness tells them?
11      MS. KEEN:  Objection.  Misstates his testimony
12  and compound.
13      THE WITNESS:  I'm telling you that pertinent
14  information is the basic requirement of reporting.
15  You don't want to put, as I said, extraneous
16  information.  Interviewed the witness who had her
17  hair in curlers.  It's not -- it doesn't -- it's
18  not relevant to anything that she had her hair in
19  curlers.
20      But what she had to say, where she was,
21  how far away she was when she saw something or
22  heard something, that's all pertinent.
23  BY MS. ITCHHAPORIA:
24      Q.   Is there a department directive that you

RICHARD J. BRZECZEK                                        November 29, 2018

Page 190

1  can identify by number or date or title that says
2  detectives are required to document in a police
3  report all pertinent information that a witness
4  tells them that was in effect in 1980?
5      MS. KEEN:  Objection.  Asked and answered.
6      THE WITNESS:  No.
7  BY MS. ITCHHAPORIA:
8      Q.   You state in this paragraph and -- that we
9  were just looking at in that last sentence there,
10 the last full sentence in paragraph 8, that the
11 officer receiving the information had to record it
12 in an official police report and make this
13 information part of the file.  Are you saying here
14 that it was incumbent on the officer to put the
15 report in the file?
16     A.   You talk about mechanical things, putting
17 the report in the file, making it part -- making it
18 a part of the file, you have to understand what all
19 of that means.
20          When a detective prepares a Supplementary
21 Report, the original goes down to the central
22 records section.  Whatever that's called now.  It
23 used to be called the Records Division.  But that's
24 where -- that's the central repository of these

Page 191

1  reports.
2          There is also what's called a running or a
3  street file in each area for those cases.  A copy
4  of the report goes into that file also.
5          So, as I said, he prepares a report.  I
6  think in a way it's not relevant to try to dissect
7  is it the downtown file or the area file.  They are
8  two separate files.
9          But what's important is that there is a
10 document that you and I or anyone else can go
11 reference in a police department file containing
12 the information.
13     Q.   You would agree back in 1980 that
14 detectives were not responsible for putting their
15 Supplementary Reports in any file based -- once a
16 detective drafts a report, they submit it for
17 approval; correct?
18     A.   Yeah.  The detective prepares the report
19 like we reference I think in Exhibit No. 5.  Okay?
20 Detective submits the report.  It goes to a
21 sergeant.  The sergeant approves it.  And then the
22 processing of that report, as I just described it,
23 it then takes place.  A copy goes in the area file;
24 a copy goes downtown.

Page 192

1      Q.   Right.  But the processing of that report,
2  that's not the responsibility of the detectives
3  back in 1980; correct?
4      A.   That is correct.  That is correct.  The
5  detective's responsibility is to prepare the report
6  and submit it for processing.
7      Q.   Now, you say in addition it had to be
8  disclosed to the prosecutors.  What's the it that
9  you are referring to?
10     A.   It is the information that she gave --
11 that she supposedly gave to the police that was not
12 found in any police report.  But assuming she gave
13 that information to the police, it should have been
14 memorialized in a Supplementary Report and then
15 disclosed to the prosecutors.
16     Q.   Are you saying that in this case the
17 prosecutors did not get that information?
18     A.   I don't know what the prosecutors got.
19 And that's, again, beyond the scope of my focus or
20 my inquiry.
21     Q.   You reviewed both Mr. Erickson and
22 Mr. Cohen's deposition transcript; correct?
23     A.   I really didn't pay much attention to what
24 was in there because, again, it's an area beyond

Page 193

1  what I was specifically asked to do.  And that is
2  to focus on the conduct of the detectives'
3  reporting.
4      Q.   Okay.  So when you are saying in addition
5  it had to be disclosed to prosecutors, you are not
6  saying that did not occur in this case?  You are
7  just saying generally that is what typically
8  occurs?
9      A.   That's why --
10     MS. KEEN:  Objection.  Misstates his document
11 and his prior testimony.
12     THE WITNESS:  Okay.
13     MS. KEEN:  You can answer.
14     THE WITNESS:  Yeah.  I'm not -- what I'm saying
15 is that the information that Diaz said she gave to
16 the police, I did not find in any police report
17 that was provided to me.  If it was not in a police
18 report that I looked at, and I am assuming I was
19 given all the reports in that file, then I am going
20 to presume it was not given to the prosecutors
21 because prosecutors get the reports and they go
22 through the reports as they get them.
23          So if it's not in any police report, it
24 wouldn't be disclosed to the prosecutors then

RICHARD J. BRZECZEK                    November 29, 2018

Page 194

1    unless, unless the detectives told it to them
2    verbally.  And I don't think that there is a
3    prosecutor that I know would accept that kind of
4    information.
5    BY MS. ITCHHAPORIA:
6        Q.    But it's possible that the prosecutors got
7    that information from some other source other than
8    police reports; correct?
9        MS. KEEN:  Objection.  Calls for speculation,
10   lacks foundation, incomplete hypothetical.
11       THE WITNESS:  If you ask me if they -- if it's
12   possible that they got it from some other source,
13   whenever you say possible within the realm of, you
14   know, anything being possible, I would say yes.
15            Probable?  Highly improbable because you
16   have to maybe suggest to me what other sources you
17   may be talking about.
18   BY MS. ITCHHAPORIA:
19       Q.    All right.  Let me do that then.  In
20   Mrs. Diaz's court statement that she
21   provided to Andersen's criminal defense attorney
22   that she talked about in her deposition and that
23   she provided to the criminal defense attorney in
24   1981, she stated that on the night of the murder

Page 195

1    she was at the tavern with Mr. LaGace, that
2    Mr. LaGace left, and then he came back and he was
3    breathing heavily and that he was missing a knife.
4            That court reported statement was provided
5    to Mr. Erickson and Mr. Cohen before the start of
6    Mr. Andersen's criminal trial.  So that is
7    information that they had; correct?
8        MS. KEEN:  I am going to object that it is
9    outside the scope of this witness's knowledge.  You
10   are making factual representations to him and then
11   asking him whether these factual representations
12   are correct.  So objection.  Calls for speculation.
13   Lacks foundation.
14   BY MS. ITCHHAPORIA:
15       Q.    And I will tell you Mr. Erickson testified
16   to that at his deposition.
17       MS. KEEN:  Same objections.
18       THE WITNESS:  The -- the information that you
19   just described to me was provided to the
20   prosecution by the defense attorney.  The fact that
21   the defense attorney did that, turned it over to
22   the prosecution, in my opinion does not exonerate
23   the detectives for failing to document that same
24   information in their reports.

Page 196

1            That's the kind of information that Brady
2    versus Maryland talks about specifically.  And that
3    is if the police have exculpatory information, they
4    are to turn it over to the prosecutors who are
5    required to turn it over to the defense.  You know,
6    you don't have -- the defense doesn't have any
7    obligation that I know of to turn exculpatory
8    information over to the prosecution unless it falls
9    within one of the requirements under the
10   Supreme Court rules concerning criminal discovery.
11           So you are saying that even though the
12   prosecutors may have obtained that same information
13   from another source, it does not discharge the
14   detective's duty under Brady?
15       MS. KEEN:  Objection.  Calls for a legal
16   conclusion, a legal opinion, and mischaracterizes
17   his prior testimony.
18       THE WITNESS:  I don't think that the detectives
19   can hide behind the mantle of the fact that -- what
20   did you say a year and a half later -- the defense
21   attorney gave that statement to the prosecutors?
22   The prosecutors should have had that assuming that
23   Diaz did tell that to the police.  They should have
24   had that within two weeks after they charged

Page 197

1    Andersen or whenever discovery started.  Okay?  Put
2    it that way.  That's when -- that's when they have
3    to turn things over.  It is actually after the
4    indictment or the information being filed.
5    BY MS. ITCHHAPORIA:
6        Q.    But you are not going to be offering any
7    opinion that the prosecutors in this case, in
8    Mr. Andersen's case, did not have that information
9    that Diaz was at the bar with LaGace, that LaGace
10   left to go get Trunko, and he came back about
11   30 minutes later and was sweating and breathing
12   heavy?
13       MS. KEEN:  Objection.  Form.
14       THE WITNESS:  I'm not going to have any opinion
15   on that at all.
16   BY MS. ITCHHAPORIA:
17       Q.    Looking at page 3 of your report in the
18   last sentence there in that paragraph you say,
19   "Therefore based on existing CPD policies and
20   procedures."  What existing CPD policies and
21   procedures are you referring to there?
22       A.    Okay, we are still talking about the
23   quantum of information of directives and training
24   materials that dictate how detectives should

RICHARD J. BRZECZEK                          November 29, 2018

Page 198

1   conduct themselves. And those have not really
2   changed over the years, over the decades, over the
3   centuries except as was required to comply with
4   changes in the law.
5           For example, Brady versus Maryland imposed
6   new requirements on the police and the prosecution.
7   Okay? So those would be the only changes. These
8   policies of turning over exculpatory information,
9   exculpatory evidence has been the law since 1963.
10          That's even before I was a police officer.
11  It hasn't changed. It may have become a little
12  more open. It may have become a little more
13  compliant with the spirit of Brady. But it hasn't
14  changed.
15          And they were -- they were required then,
16  they are required now, and they were required at
17  least after Brady to comply with the law and
18  disclose this information.
19      Q.   Can you identify a CPD policy that was in
20  existence in 1995, that specifically stated CPD
21  officers and detectives who possess this
22  information were required to record and disclose
23  it?
24      MS. KEEN: Other than what he has testified to?

Page 199

1   Objection. Asked and answered, form.
2       THE WITNESS: You said 1985 or 1980?
3   BY MS. ITCHHAPORIA:
4       Q.   1980.
5       A.   My answer to that question would be the
6   same as it has been. And that is they were
7   required to memorialize it and disclose it. And
8   that is within the entire spectrum of directives
9   and training materials that --
10      Q.   You can't identify a specific
11  General Order or --
12      A.   No.
13      Q.   -- a specific order that says that?
14      MS. KEEN: Other than what he has already
15  testified to, objection. This has been asked and
16  answered. He has identified specific things, and
17  you keep asking the same thing.
18      MS. ITCHHAPORIA: But I am asking him specific.
19  And then he is going to a quantum of documents.
20  That's totally unresponsive.
21      MS. KEEN: But he has repeatedly identified
22  specific things such as Brady versus Maryland.
23      MS. ITCHHAPORIA: I'm --
24      MS. KEEN: And then you go back and ask a

Page 200

1   question --
2       MS. ITCHHAPORIA: I've got limited time. So
3   I'm not going to get -- I'm not going to engage.
4       MS. KEEN: And then you go back and ask a
5   question saying so you can't identify anything.
6   And you keep doing that. And it is really
7   inappropriate.
8           The witness is answering. If you don't
9   like the answer, that's -- you know, it is what it
10  is. You have to not ask the same question over and
11  over again.
12  BY MS. ITCHHAPORIA:
13      Q.   The information that Miss Diaz says that
14  she told the police, you are not going to be
15  offering any opinions at trial whether or not that
16  information is exculpatory; are you?
17      MS. KEEN: Objection. Asked and answered.
18      THE WITNESS: No.
19  BY MS. ITCHHAPORIA:
20      Q.   Going on paragraph 7, but which we talked
21  about earlier it should be paragraph 9 --
22      A.   Okay.
23      Q.   -- you indicate, "There is no reference in
24  the officer's report as to how they received this

Page 201

1   information or from whom and when. And it's
2   referring to information officers received about
3   Andersen having a gun." Do you see that?
4       A.   Yes.
5       Q.   When you are talking about in the
6   officer's report, which officers are you referring
7   to?
8       A.   That would be the officers who I think
9   were the ones that ended up arresting Andersen.
10  They responded to a call about him with a gun.
11  And -- well, I am saying they responded to. I said
12  a call about him with a gun. They received
13  information about him having a gun.
14          They did not say from where they got that
15  information, how they got that information, by what
16  means. Was it by radio? Was it an informant or
17  what. That's just -- it is missing.
18      Q.   And which report are you saying that they
19  should have documented that in?
20      A.   In their Case Report or -- I don't know if
21  it was a Case Report. It could have been a
22  Supplementary Report to this case, but there is a
23  report there that they got information that he had
24  a gun. And that's how he came to their attention.

RICHARD J. BRZECZEK                                    November 29, 2018

Page 202

1    Q.   And so is there -- can you point to a
2  specific General Order or special order that says
3  patrol officers are required to document in a
4  Case Report or a Supplementary Report who they
5  receive information from, whether -- and how they
6  receive it, whether it's on the radio, from someone
7  directly?
8    A.   Yes.  There is standard reporting
9  procedures for patrol officers.  The two big
10 lines of demarcation are receiving a radio
11 assignment or an on-view assignment.
12       That's what you will find at the beginning
13 of every police report written by patrol officers.
14 Okay?  In terms of -- going back -- here they have
15 in Exhibit No. 4 reporting officer's responding to
16 a girl bleeding at 4936 South Paulina.
17       We don't know if that came over the radio
18 or somebody waved them down.  But I am going to
19 assume that that came over the radio because they
20 would identify someone -- we will call them hand
21 wavers, waving them down saying there is a girl
22 bleeding there.
23       Or if they saw her laying on the sidewalk
24 bleeding, they would have said this is an on-view

Page 203

1  incident because they have to notify communications
2  that they came across something.  So this would be
3  more -- I would be more inclined to think of this
4  as a radio assignment a girl bleeding.
5        But the other one that we talked about
6  with Andersen being arrested, information.  Didn't
7  say that they were responding to a call, responding
8  to information, a hand waver or anything like that
9  or on view.  It's just they got information.
10   Q.   So is it your testimony that the
11 exist -- the 19 -- sorry, that the standard
12 reporting procedures for patrol officer that were
13 in existence --
14   THE COURT REPORTER:  I'm sorry, can you start
15 that again, please.
16   MS. ITCHHAPORIA:  Sure.
17 BY MS. ITCHHAPORIA:
18   Q.   Is it your testimony that the standard
19 report -- reporting procedures for patrol officers
20 that was in effect in 1980 required patrol officers
21 to document the source of the information?
22   A.   That's correct.
23   Q.   And when you are saying standard reporting
24 procedures, are those procedures in General Orders

Page 204

1  or special orders?
2    A.   Yeah, and in the -- in the field reporting
3  manual, whatever that may be called now.  But back
4  then it was called the Field Reporting Manual
5  because there were instructional materials given to
6  each officer on how to prepare the reports and
7  what's required in the reports.
8    Q.   Then going to paragraph 11 of -- sorry.
9  Going to paragraph 10 of your report, you mention
10 that the -- the last sentence, "Not only is there
11 no mention of his, Robert LaGace, being taken for a
12 polygraph exam, but there is also no mention of any
13 visible scars on the face, and slash, or neck of
14 LaGace by the detectives."
15       Was there a requirement in existence in
16 1980 that detectives had to document the physical
17 appearance of a witness or a suspect in a
18 Supplementary Report?
19   A.   Yes.  Again, if you have a suspect in this
20 case, LaGace, and I'm saying suspect because they
21 took him for a polygraph exam, there is no
22 indication that LaGace was a witness to anything.
23 He was taken there as a suspect.
24       Now, Andersen says that he knows there is

Page 205

1  a guy by the name of Bob which is a short version
2  for Robert.  He has a scar on his face and on his
3  neck.  There is no mention that LaGace had a scar
4  on his face and/or neck or didn't have one.
5        You know, these are things that could not
6  only implicate somebody, but they can also
7  exonerate someone.  So if Andersen is saying it is
8  Bob with a scar on his face and his neck and LaGace
9  didn't have one, that would kind of rule out LaGace
10 as the person about whom Andersen is speaking.  So
11 that's why it's important to document these things.
12   Q.   And so where does it say that -- where
13 does it say that patrol officers are specifically
14 required to document physical appearances of
15 witnesses or suspects?
16   MS. KEEN:  Objection.  Form, assumes facts not
17 in evidence, and asked and answered.
18   THE WITNESS:  Same quantum of information I
19 told you about before.  And I am just adding
20 specifically the Field Reporting Manual because it
21 tells you about how to put descriptions into the
22 report which includes scars, marks, tattoos, moles,
23 things about how tall someone is.
24

RICHARD J. BRZECZEK                                    November 29, 2018

Page 206

```
 1   BY MS. ITCHHAPORIA:
 2       Q.   And you are saying the Field Reporting
 3   Manual says to put descriptions into reports.
 4   Which reports?
 5       A.   Case and Supplementary Reports.
 6       Q.   Other than the Field Reporting Manual, is
 7   there any other written document, rule, policy,
 8   procedure that says that when you are saying
 9   quantum of information?
10       A.   The other document would be the Rules and
11   Regulations of the police department because the
12   Field Reporting Manual is basically a guideline
13   manual which requires uniformity in reporting.  So
14   if you fail to comply with the provisions of the
15   Field Reporting Manual, you could be cited for
16   failure to obey a direct order whether written or
17   oral.  That's Rule No. 6 of the Rules and
18   Regulations in effect at the time.
19            So there is a directive that can be
20   enforced if the officers are not preparing the
21   reports in accordance with the requirements or the
22   guidelines of the Field Reporting Manual.
23       Q.   You state in paragraph --
24       MS. KEEN:  I am sorry, he is just getting --
```

Page 207

```
 1       MS. ITCHHAPORIA:  Go ahead.  Okay.  Thank you.
 2   BY MS. ITCHHAPORIA:
 3       Q.   You state in paragraph 8 of your report
 4   that LaGace may have had something to do with the
 5   murder and he was at least a possible suspect.  But
 6   from your review of Stout's deposition and notes,
 7   you know that Mr. LaGace answered no both during
 8   the pretest and the polygraph exam as far as
 9   whether or not he is the one that stabbed Cathy
10   Trunko; correct?
11       A.   Yes.
12       Q.   And so are you -- when you say LaGace may
13   have had something to do with the murder, are you
14   discounting his responses that he provided during
15   his pretest and polygraph?
16       A.   You mean responses to, no, I didn't kill
17   Cathy Trunko?
18       Q.   Right.  No, I didn't kill her, and, no, I
19   didn't stab her?
20       A.   Am I disregarding them?  Yes, I am because
21   generally when people are asked questions, that did
22   you kill someone, the answer is no.  You know, the
23   answer no is -- comes up more frequently than the
24   answer yes.  Okay?  Especially on the first line of
```

Page 208

```
 1   questioning, the first major line in questioning.
 2            If it's repeated over a period of time,
 3   you know, about someone is in custody, can you come
 4   back, are you sure you don't want to change your
 5   mind about your answer, they may change to yes.
 6            But initially no prevails significantly
 7   substantially, overwhelmingly over yes.  So I put
 8   that aside.  And I look at the other information
 9   that's available to me to say that -- say that
10   LaGace should have been ruled out, if he was to be
11   ruled out, more definitively than he was.
12       Q.   In paragraph 11 there you say, "Detectives
13   obtained a statement from Andersen that describes a
14   somewhat complex and convoluted plot that he
15   contrived to kill Trunko."  And we talked about
16   that earlier being your opinion; correct?
17       A.   That's correct.  I said I used those words
18   "convoluted" and "complex."  That was my opinion.
19       Q.   You didn't read Mr. Andersen's deposition
20   transcript; correct?
21       A.   No.
22       Q.   And you didn't read his court reported
23   statement?
24       A.   No.
```

Page 209

```
 1       Q.   So is your factual basis for saying that
 2   the plot was -- what is your factual basis for that
 3   statement?
 4       A.   The Supplementary Reports.
 5       Q.   Is there a specific Supplementary Report?
 6       A.   There probably is, but I can't tell you
 7   which one right now.
 8       Q.   Are you critical of that Supplementary
 9   Report that documents Mr. Andersen's statements
10   about his involvement in the killing of
11   Miss Trunko?
12       A.   Yes.
13       Q.   Why?
14       A.   Everything fits in real nice and neat.  It
15   is like they made a puzzle and built it themselves.
16       Q.   What's your basis for saying that?
17       A.   Things just don't happen that smoothly.
18   It all fit into real nice pieces.  That's the way
19   you want it to go.  Why I don't know, but that's
20   the way -- that's the impression I got.
21       Q.   When you say things don't happen that
22   smoothly, what is your basis for saying that?
23       A.   Okay.
24       Q.   Is that based on your experience?
```

RICHARD J. BRZECZEK                                          November 29, 2018

Page 210

1      A.   Well, it was -- yes, it is based upon my
2  experience.  Let's just start with, for example, he
3  gets arrested.  Okay?  And the whole way he gets
4  arrested, you know, they have information with a
5  gun.  And then he is picked up and he is being
6  driven into the station and then he wants to
7  confess to the Trunko murder because later on he
8  says he just wanted to talk to real police
9  detectives that are investigating it.  So they go
10 from 9 to Area 3.
11         I mean it all fits into pieces.  It just
12 doesn't make any sense.  Things, in my experience,
13 just do not happen that way.
14     MS. KEEN:  And just so we are clear, you -- you
15 are asking him to expand upon opinions that are not
16 reflected in his disclosure.
17 BY MS. ITCHHAPORIA:
18     Q.   Well, I just want to be clear, that
19 opinion that you just rendered is not in your
20 report here?
21     A.   No, it's not.  But you asked me about it;
22 so that's why I gave it to you.
23     Q.   Well, you are not going to be offering any
24 testimony at trial about it; correct, that opinion

Page 211

1  that you just provided?
2      MS. KEEN:  I am just going to object to the
3  extent he is asked a question, he is going to
4  answer it.
5      THE WITNESS:  Counsel, offering an opinion at
6  trial, that depends on who asks me the questions.
7  Okay?  And I only respond to the questions.  I mean
8  I don't decide what opinion, you know, I'm going
9  to -- I just don't walk in there and announce the
10 opinion, like, say, counsel, would -- making an
11 argument.
12     MS. KEEN:  I can represent that that opinion
13 that you just elicited from him is not one that we
14 are -- we have offered him for or that he is
15 disclosed in his report.  So just be aware that
16 that's an expansion that you are soliciting.
17 BY MS. ITCHHAPORIA:
18     Q.   In the Opinion section of your report in
19 paragraph 2 there you state all police officers are
20 taught in their respecting -- respective academies
21 that the polygraph is an investigative tool,
22 albeit, in many instances an important tool.
23         Is that what was being taught in -- when
24 was that being taught in the respective academies

Page 212

1  to police officers?
2      A.   It was being taught when I was in the
3  academy.  It was being taught before I was in the
4  academy.  And it was being taught after I was in
5  the academy.
6      Q.   And you haven't studied polygraph use; is
7  that correct?
8      A.   I am sorry, what?
9      Q.   You have not studied polygraph use; is
10 that correct?
11     A.   Well, it depends on what you mean by
12 studying polygraph use.  I mean I have read
13 extensively on the use of a polygraph.  But I have
14 no idea how to administer the test.  I have no idea
15 how to interpret the test.
16         But I have read the pros and cons about
17 polygraph use.  I read the reasoning behind the
18 general rule among courts in the United States.
19 Polygraph evidence is not admissible because it
20 doesn't, you know, meet the -- meet the
21 requirements of the Frye test.
22         You know, so I have read a lot about
23 polygraph.  And we also employed it a lot in
24 internal investigations.  And we modified that

Page 213

1  policy likewise.
2          So when you asked me about studied
3  polygraph use, I guess if I read one book, you
4  know, a comprehensive tome about polygraph, then I
5  have to say, yes, I studied polygraph use.
6          Am I qualified to administer?  No.  Am I
7  qualified to interpret?  No.  You know, I just know
8  it as an investigative tool.
9      Q.   I apologize if I have asked you this, but
10 did you review the deposition of Frank LaGace?
11     A.   No.  It's, no, you didn't ask me, and, no,
12 I didn't review it.
13     Q.   You state here, going to 5B, that the
14 detectives failed to report the reasons why they
15 regarded Robert LaGace as a suspect.  Is there a
16 specific policy that you can identify that mandates
17 that detectives in 1980 were required to document
18 why they believe someone was a suspect?
19     MS. KEEN:  Objection.  Form.  Asked and
20 answered.
21     THE WITNESS:  Well, we don't know at this point
22 how the detectives convinced or persuaded LaGace to
23 submit to the polygraph exam.
24         Now, let's assume that all of this

RICHARD J. BRZECZEK                                    November 29, 2018

Page 214

1   happened just as it did, okay, and LaGace turns
2   around and sues the detectives for false
3   imprisonment, false arrest, things like this
4   because they dragged him down for the polygraph.
5   He wasn't free to leave, and they had no probable
6   cause to arrest him.
7           So we want to know about these things as
8   to why are you doing things so that when the
9   question comes up next month, next year, five years
10  from now, maybe even in litigation, we have a
11  documented reason why they took him down for a
12  polygraph exam and how they went down.
13          He volunteered to go down.  We don't even
14  know if he volunteered.  We don't know that from
15  any of the reports because there are no reports by
16  the detectives.  The only report is by Stout.
17  BY MS. ITCHHAPORIA:
18      Q.  Did you review the polygraph waiver that
19  Mr. LaGace signed?
20      A.  I don't think that was provided to me or
21  if it was in the -- in the folder with Stout's
22  reports, I may have seen the waiver, but I kind of
23  went past it.  You know -- excuse me, I do
24  recollect now.  I do remember the waiver in Stout's

Page 215

1   file.
2       Q.  Okay.  So Mr. LaGace did, in fact, go to
3   the -- go to the -- get polygraphed voluntarily?
4       MS. KEEN:  Objection.  Assumes facts not in
5   evidence.  Calls for speculation.
6       THE WITNESS:  I would not -- I would not
7   necessarily draw that conclusion.
8   BY MS. ITCHHAPORIA:
9       Q.  Would you agree that he consented to be
10  polygraphed?
11      MS. KEEN:  Objection.  Calls for speculation.
12      THE WITNESS:  What's missing in your question
13  for me to answer is would I agree that he
14  voluntarily and freely consented to submit to a
15  polygraph.  And the answer is I don't know.
16  BY MS. ITCHHAPORIA:
17      Q.  Even after you have reviewed the -- the
18  polygraph waiver?
19      A.  I'm going to presume that there was
20  nothing really difficult going on there because the
21  Criminalistics Division, the crime lab people, you
22  know, don't get into the kinds of confrontations
23  with say subjects on a polygraph exam like you
24  would think detectives would in the area with a

Page 216

1   potential suspect.
2           You know, Stout is not going to -- and I
3   am not speaking for him, but I am saying people
4   like Stout are not going to risk a confrontation,
5   the reputation being impugned, or whatever or even
6   a CR number, you know, fighting over someone to
7   submit to a polygraph exam.
8           So that -- Stout is the guy that I look to
9   as adding credence to your question, he did it
10  voluntarily.  If he got down there voluntarily, I
11  don't know.  But maybe by the time he got down
12  there, he was convinced to be voluntary.  I don't
13  know.
14      Q.  There was nothing that you read that
15  indicated that Robert LaGace had a relationship
16  with Trunko other than knowing her for two days;
17  right?
18      MS. KEEN:  Object.
19      THE WITNESS:  As far as what I read, that's
20  been about the extent of it.
21  BY MS. ITCHHAPORIA:
22      Q.  And there was no evidence in anything that
23  you read that Robert LaGace had a history of sexual
24  assault?

Page 217

1       A.  I don't know anything about Robert
2   LaGace's background.
3       Q.  Now, from your review of Miss Diaz's
4   testimony, did you review her testimony where she
5   testified that Mr. Andersen and Cathy Trunko were
6   friends?
7       A.  Say -- I am sorry, I somehow --
8       Q.  Did you review Miss Diaz's deposition
9   testimony portion where she testified that
10  Mr. Andersen and Cathy Trunko were friends prior to
11  Miss Trunko's murder?
12      A.  Yeah, I am not sure to what degree they
13  were friends, but I think that they were
14  acquaintances because they lived in the same
15  neighborhood.
16      Q.  Are you aware that other women accused
17  Mr. Andersen of sexual assault?
18      MS. KEEN:  Objection.  This assumes facts that
19  are not -- first of all, there is a protective
20  order on some of this stuff.
21      MS. ITCHHAPORIA:  I am talking about Andrea
22  Rolly [phonetic].  That's --
23      THE COURT REPORTER:  I'm sorry, I didn't hear
24  you.

RICHARD J. BRZECZEK                                November 29, 2018

Page 218

1    MS. KEEN:  I think you are treading very close
2  to the line here.
3        Second of all, this is far afield now of
4  what this expert has been presented on.  And I
5  don't really know what the purpose is of that
6  question other than to harass and embarrass the
7  plaintiff in this case.
8        I don't see how you can tie that out to
9  anything that's in his report.  You are also asking
10  for him to talk about facts that have nothing to do
11  with his opinion.
12  BY MS. ITCHHAPORIA:
13    Q.    Well, you state in this -- in your report
14  that the detectives regarded Mr. LaGace as a
15  suspect; correct?
16    A.    I stated in my report that they had to.
17    Q.    Okay.  And isn't it true that based on
18  your experience in law enforcement and materials
19  that you have read in your training that victims of
20  sexual assault either know their offender before
21  the sexual assault or if they don't know the
22  offender, then the offender has a history or
23  pattern of sexual assaults?
24    MS. KEEN:  I am just going to object.  This is

Page 219

1  far afield of this expert's opinion that has been
2  disclosed in this case.  And it also lacks
3  foundation as the time period what type of sexual
4  assault.  It's an incomplete hypothetical.
5    THE WITNESS:  Based upon my experience,
6  training, education, I do know that there is
7  prevalence of sexual assault victims being known to
8  the offender beforehand, family relationships,
9  neighbors, school teachers, whatever it might be.
10    I do know that sex offenders many times
11  have high recidivism rates.
12  BY MS. ITCHHAPORIA:
13    Q.    Right.  But with Robert LaGace you don't
14  know -- there was nothing that you read in any of
15  the materials that indicated that he had a history
16  of sexual violence or that he knew Miss Trunko for
17  more than two days, but yet you concluded in your
18  report that Mr. LaGace had to be regarded by the
19  detectives as a suspect.  Is that only because they
20  took Mr. LaGace to get a polygraph?
21    MS. KEEN:  Objection.  Compound, form,
22  assumes facts not in evidence, and misstates his
23  opinion.
24    THE WITNESS:  Since they took him for a

Page 220

1  polygraph exam, that raised some bright red flags
2  in my mind.  And I would like to know why they took
3  him for a polygraph exam.
4  BY MS. ITCHHAPORIA:
5    Q.    But is the only reason that you are saying
6  the detectives would have regarded Mr. LaGace as a
7  suspect, is it based only on the fact that they
8  took him to get the polygraph?
9    A.    Not necessarily.  While there is nothing
10  in the police reports, Diaz said in her deposition
11  that she told all this information to the
12  detectives.  And I'm presuming she told it to them
13  when they interviewed her as memorialized in
14  Bedran's report on the 20th of January.  I
15  don't think that she parcelled that information
16  out.
17        Now, there is enough there to at least
18  rule him out.  I mean we do know based upon what
19  has been brought forth that LaGace left
20  Dot's Tavern to go pick Trunko up.  Okay?  We do
21  know that.
22        And then he came back.  And even
23  forgetting about the condition in which he was
24  back as described by Diaz.  He left.  He was real

Page 221

1  anxious to go pick her up.  And he came back in a
2  short time.  And then he says he didn't see her.
3  And he tells the polygraph operator he didn't kill
4  her.
5        It seems to me that besides confirming the
6  phone call, you know, if he was really legitimate,
7  Bedran would have more information coming from him
8  where he went over, couldn't find her, couldn't see
9  her, you know, because that's important in terms of
10  the time frame between the time she left home when
11  she was on the phone and the time she turned up
12  dead.
13    Q.    And that's based on your -- that's based
14  on the assumption that Miss Diaz did, in fact, tell
15  the police officers that information that
16  Mr. LaGace left the tavern and then came back and
17  his appearance when he came back?
18    MS. KEEN:  Objection.  Form.
19    THE WITNESS:  Yeah, that's based on the fact
20  that she said she told that to the police.
21  BY MS. ITCHHAPORIA:
22    Q.    Right.  And you got that from her
23  deposition testimony?
24    A.    That's the only place I remember seeing

RICHARD J. BRZECZEK                                          November 29, 2018

---

Page 222

1  it, right.
2      MS. ITCHHAPORIA:  I think we are probably at a
3  good stopping point.  I am about to head into a
4  different area.  I am getting close to your -- like
5  five minutes from your hard stop so --
6      MS. KEEN:  Can you just tell me how much
7  on-the-record time we have had total today?  Would
8  it be possible --
9      THE WITNESS:  Four hours and ten minutes at the
10 last break.
11     MS. KEEN:  Is that what she calculated or --
12     MS. ITCHHAPORIA:  That was what the
13 videographer's time was.
14     MS. KEEN:  Okay.  So --
15     THE VIDEOGRAPHER:  We are now at 4:51.
16     MS. KEEN:  Okay.  So you have about two hours
17 left for a re-dep, two hours and eight minutes.
18 Okay.
19         Can you just confirm that with your -- not
20 right now but just to confirm your total amount of
21 on-the-record testimony, the time we have been on
22 the record.  Thank you.
23     MS. ITCHHAPORIA:  Off the record.
24     THE VIDEOGRAPHER:  We are going off the video

---

Page 223

1  record at 3:52 p.m.
2                      (Whereupon, proceedings were
3                       had off the video record.)
4      THE COURT REPORTER:  Would you like me to
5  time stamp the deposition?
6      MS. ITCHHAPORIA:  Yes.
7      MS. KEEN:  I will take a copy.
8      MS. BENJAMIN:  I don't need a copy.
9                      (Whereupon, further
10                      proceedings in said cause were
11                      adjourned sine die.)
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 224

1  STATE OF ILLINOIS  )
2                     )    SS:
3  COUNTY OF COOK     )
4          Patricia L. Wangler, as an Officer of the
5  Court, says that she is a shorthand reporter doing
6  business in the State of Illinois, that she
7  reported in shorthand the proceedings of said
8  hearing, and that the foregoing is a true and
9  correct transcript of her shorthand notes so taken
10 as aforesaid, and contains the proceedings given at
11 said hearing.
12         IN TESTIMONY WHEREOF:  I have hereunto set
13 my verified digital signature this
14 12th day of December, 2018.
15
16
17         _Patricia L. Wangler_____
18         Patricia L. Wangler, CSR
19         Lic. No. 084-002417
20
21
22
23
24

---

U.S. Legal Support, Inc.
(312) 236-8352

RICHARD J. BRZECZEK

November 29, 2018
Index: $500..5:00

**$**

**$500**  79:14

**0**

**0**  104:2

**008107**  135:22 137:10

**008108**  182:9

**008109**  182:10

**025267**  103:9

**1**

**1**  19:10,14 24:4,5,6 51:11 83:20 84:13, 18,22 85:15 86:5,23 91:12 97:20 101:16 102:4 103:19,24 113:7 120:17 128:11

**10**  67:5,7,9 82:5 103:17 204:9

**100,000**  46:4

**10:08**  5:7

**10:10**  102:12

**10th**  27:19

**11**  24:5 82:6 84:14, 17,22 85:5 204:8 208:12

**1121**  28:7 36:17

**11:26**  63:19

**11:38**  63:22

**11th**  24:18,20 25:3, 4,5,9 27:19 55:20

**12**  24:3 63:8 73:17

**12:43**  112:14

**12:54**  112:17

**12th**  27:19

**13**  24:2 33:10

**13th**  24:12,14,20 25:1 27:19

**146**  96:7

**15**  65:13 79:23

**16**  65:15

**1655**  122:23

**1700**  5:5

**17th**  25:10 51:15

**18**  56:12

**18th**  25:1 181:23

**19**  56:10 103:11,17 163:20 203:11

**1963**  198:9

**1964**  23:19,24 24:9, 11,14,17 25:13 56:9

**1965**  20:2 25:6,8,14 26:1,7

**1966**  26:8,22 27:8 34:13 36:6

**1968**  20:12 37:21

**1970**  25:24 36:11, 12 46:12

**1972**  20:15,21 46:13,15 50:11

**1973**  51:2,15,16

**1977**  67:16

**1980**  55:20 56:9 101:18 103:11 107:18,24 109:11 110:1 112:22 113:15,20 114:21 115:11 117:14,24 118:5,13,15 119:9 122:3 123:9,21 124:5 126:24 128:17 145:1 151:1 155:22 161:11 163:20 165:22,23 170:18 177:1,11 188:2 190:4 191:13 192:3 199:2,4 203:20 204:16 213:17

**1981**  19:5 178:15, 19 180:18 181:8 194:24

**1982**  100:24 170:18

**1983**  14:23,24 15:6 55:22 56:4

**1984**  62:12,13,16

**1985**  63:10 65:11, 24 199:2

**1986**  62:24

**1995**  198:20

**1998**  70:16 71:6

**19th**  101:18 103:11 177:1,11

**1:46**  147:7

**1st**  12:16 50:13

**2**

**2**  9:11 44:4 51:10 73:11,15 75:6,7,17 80:11 81:11 82:5,19 102:8 103:24 104:13 114:6 119:2 120:17 136:19 155:23 168:2 183:2, 6 211:19

**2-**  103:11

**20**  5:5 18:18 67:6,7, 9 79:23 107:24

**200**  5:10

**2006**  67:16 71:22 73:16 75:12 79:17

**2012**  72:3

**2015**  181:23

**2016**  65:11,24 76:20

**2017**  79:2 95:10 155:19

**2018**  5:6 12:16,20 19:19,22 73:17

**20th**  59:11 106:22 107:18,23 109:11

**110:1**  112:22 113:15,20 114:21 117:14 121:17 122:10,12,18,22 126:24 161:11 220:14

**21st**  123:21 155:22

**22**  103:12 154:18

**220**  165:20

**2210**  101:18 102:11 103:21 104:6

**2210-22**  102:4

**2219**  101:18 102:13,16 104:6

**2220**  102:19

**23**  63:6

**23rd**  19:19,22

**24th**  122:3 165:23

**25**  122:15

**26(a)(2)**  165:14

**28-day**  41:2

**28th**  12:20

**29**  15:6

**29th**  5:6 14:24 55:22

**2:09**  147:10

**2:46**  173:24

**2:47**  174:18

**3**

**3**  38:4 44:4 80:8,15, 17 82:1 86:3 107:14 111:12,19 112:24 113:7 119:5 120:17 140:23 143:17,20 144:19 197:17 210:10

**30**  43:24 197:11

**300**  97:8

**300-page**  97:16

**30th**  65:15

**37**  155:23

**38**  51:10 131:4

**3:04**  187:10

**3:09**  187:13

**3:52**  223:1

**4**

**4**  22:10 26:23 27:1, 2,10,14,16,18,24 28:11,14 35:3 103:2,6,18 121:24 143:1 202:15

**40**  51:9

**45**  22:11,21 135:21 139:16,23 140:18

**47**  56:11,12

**48**  110:24 111:1

**49**  135:22 139:16, 23 140:18 154:15, 16

**4936**  101:20 202:16

**4:00**  133:22

**4:51**  222:15

**4A**  135:11 136:11, 14 140:22 143:1 153:13

**4th**  24:9

**5**

**5**  22:10 38:4 43:24 44:2 84:19 86:5 104:3 112:20 114:4 115:13 128:12 144:4 174:3 178:21, 24 179:3 191:19

**50**  30:19 135:22 139:16,23 140:18

**5006**  177:12

**5:00**  122:13

RICHARD J. BRZECZEK

**5A** 84:19 85:16,22 86:1

**5B** 213:13

**5J** 86:5

---

**6**

**6** 103:15,17,24 104:3 136:5,9,10, 13,15,20,24 137:10, 15,23 140:19 141:18 143:18 145:20 147:12,20 151:22 152:2,4,5 156:12,13,23 168:2 171:4,6 206:17

**60** 168:16

**62** 168:16

**64** 24:16

**66** 36:8

**67-21** 55:3

**6:15** 122:3 123:21 163:8

---

**7**

**7** 82:1 136:5,10,23 137:12,14 139:14, 16 154:15 173:5 183:2 184:9 200:20

**70s** 55:2

**72** 46:19

**73** 46:20

**7s** 81:24

---

**8**

**8** 82:5 104:3 154:17 182:4,8 183:6 185:10 190:10 207:3

**80s** 18:14 68:21

**8107** 136:10

**8108** 182:18

**8109** 173:13

**85** 172:6

**8s** 81:24

**8th** 24:9

---

**9**

**9** 82:3,5 102:5,17 104:3 200:21 210:10

**943** 27:12

---

**A**

**a.m.** 5:7 63:19,22

**ability** 169:10 170:11

**absolutely** 165:16

**academic** 68:8

**academies** 211:20,24

**academy** 17:3 23:21,23 24:8,10 32:14,15,18 33:5,8, 11 53:17,21 133:4 212:3,4,5

**accept** 194:3

**accord** 147:15

**accordance** 206:21

**account** 40:13

**accurate** 12:8 21:2 25:12 36:2 91:2,6 94:24 95:3 134:24

**accused** 217:16

**acquaint** 159:3

**acquaintances** 217:14

**acquired** 160:9

**acquitted** 63:3

**acted** 53:24

**action** 22:19 60:17 61:4

**actions** 57:19

**active** 65:20

**actively** 36:3

**activities** 111:24

**activity** 124:20

**actual** 169:24

**ad** 53:5

**adding** 205:19 216:9

**addition** 192:7 193:4

**additional** 115:7 116:18

**address** 23:11 114:8 134:20 163:12

**addresses** 129:1,3 132:14

**addressing** 53:12 179:17

**adjoining** 25:2,3

**adjourned** 223:11

**adjunct** 68:9

**administer** 212:14 213:6

**administered** 170:16

**administering** 170:14

**administration** 20:10 27:21 68:1 69:1,16

**administrative** 27:15 28:8 36:21

**admissibility** 170:19

**admissible** 170:23 212:19

**admission** 34:21, 23

**admitted** 180:17 181:7

**adults** 31:1,6 33:20

**advice** 53:5 59:9

**advise** 53:8,9

**Affairs** 48:8,11,13, 19,24 49:8,15,16 50:15 52:22 58:15 62:10

**affect** 82:15 98:7 151:12

**affidavit** 74:12

**affirmative** 140:11 157:1

**affirmed** 60:2

**affixing** 52:23

**afield** 218:3 219:1

**afternoon** 28:2 122:13

**age** 17:5

**agencies** 32:10

**agency** 21:15 56:17

**agree** 55:5 116:24 138:3 159:11 191:13 215:9,13

**agreed** 5:12 47:19

**agreeing** 154:22

**agreement** 6:6

**ahead** 34:8 39:11 207:1

**aide** 51:18,23 52:10,16 54:17

**airport** 46:6

**albeit** 211:22

**all-encompassing** 123:14

**allegations** 60:21

**alleged** 109:5

**allegedly** 107:17, 23 108:5 109:3,4,10 113:14

**alleges** 186:15

**alley** 31:10

**alternative** 71:14 184:3

**amended** 71:12

**amendments** 55:4

**amount** 45:23 71:10 222:20

**analysis** 37:3

**and/or** 75:19 141:24 205:4

**Andersen** 5:3 11:11 13:10 19:5 85:6 92:13,16 140:19 159:14,21, 22 160:23 161:2 167:18 197:1 201:3, 9 203:6 204:24 205:7,10 208:13 217:5,10,17

**Andersen's** 19:1 89:3 92:2 178:14 194:21 195:6 197:8 208:19 209:9

**Andrea** 217:21

**announce** 211:9

**answering** 90:1 134:14 162:4 164:17 165:12 200:8

**anxious** 177:16 221:1

**anymore** 72:6

**anytime** 71:24

**apologize** 81:18 213:9

**apparent** 85:4

**apparently** 29:6 81:20 110:21 162:12

RICHARD J. BRZECZEK

November 29, 2018
Index: appeal..Bates

**appeal** 19:6

**appearance** 204:17 221:17

**appearances** 205:14

**appeared** 17:23 144:10

**appears** 103:8 128:13 135:13 140:23 185:14

**applicable** 6:8 125:14 150:17

**apply** 75:3

**applying** 157:7

**appointed** 51:22 55:24

**approach** 29:19

**approached** 59:16

**approval** 122:12 191:17

**approved** 122:15, 22

**approves** 191:21

**April** 14:24 15:6 55:22 56:3 100:24

**AR** 21:20

**archaic** 125:13

**archives** 125:20

**ARDC** 22:15,16,20 23:8 65:22 66:3

**ARDC's** 23:11

**area** 26:23 27:1,2, 10,14,16,18,24 28:11,14 30:12 35:3 43:24 44:2,4 45:5 47:6,8 64:1 132:13 143:17,20 144:19 159:4 163:14 174:9 191:3,7,23 192:24 210:10 215:24 222:4

**areas** 35:16 36:24 37:2 38:21 39:5

42:6 43:5,11,12,23 65:24 146:17

**argument** 211:11

**argumentative** 134:13 178:5

**arise** 120:1

**arising** 59:5 60:16 61:9

**arose** 57:9 61:4

**arrest** 28:19,23 40:3,9,11,12 41:10, 12,19,22 42:8,9,12, 13 89:3,4 214:3,6

**arrested** 31:17 203:6 210:3,4

**arrestee** 41:12,13

**arresting** 201:9

**arrive** 117:9

**arson** 37:9

**articles** 68:18,20 69:13 89:18

**ASA** 181:11,19

**ASAS** 17:11 178:18 180:18

**asks** 211:6

**aspect** 160:5

**assault** 29:21 30:1 59:12 216:24 217:17 218:20,21 219:4,7

**assaulted** 57:15

**assaults** 218:23

**assessment** 68:23

**assigned** 24:11,13 26:3,11 27:2,6,9,16 29:16 32:5 35:24 36:20 37:23 38:9, 10,12,19 41:16 43:16 44:12 45:9 46:11,17,21,23 47:1,4,7 48:2,5 50:24 87:18 103:10 105:21 163:22

164:1 179:24

**assignment** 26:1 36:15 45:8 47:8 83:16 98:11 163:21, 24 202:11 203:4

**assignments** 28:3

**assistant** 17:13 48:2 52:13 54:7,19

**assisting** 47:22

**Associates** 76:24

**association** 23:9

**assume** 6:18 47:21 121:21 183:17 202:19 213:24

**assumed** 121:21

**assumes** 120:24 149:23 159:15 205:16 215:4 217:18 219:22

**assuming** 41:13 117:11 121:16 142:13 192:12 193:18 196:22

**assumption** 117:18 152:21 184:5 221:14

**attached** 92:19,20 93:8 97:15,18 99:4, 9,13,23

**attachments** 97:3, 6 100:2

**attack** 152:18

**attempt** 120:6

**attempting** 179:20

**attend** 23:21 50:20 65:1,4,7

**Attendance** 87:7, 15 88:2,8,19

**attended** 21:2 24:8 50:22 64:24

**attention** 98:22 154:14 192:23 201:24

**attorney** 18:5,14 19:2 20:20 21:19 62:4 66:17 67:3 178:15 194:21,23 195:20,21 196:21

**attorney's** 62:16 181:22

**attorneys** 11:11 17:14 70:19 80:20 181:7

**attribute** 156:24

**attributing** 170:9

**audio** 5:11

**audit** 38:23 40:9

**audits** 37:1,2 38:1 39:4 43:17,21,22 44:8

**August** 180:18 181:8

**authenticity** 48:15 49:13

**authoritative** 89:17

**authors** 126:3

**auto** 44:4

**automatic** 81:20

**automatically** 55:9

**Avenue** 31:10

**aware** 19:1 81:17 161:9 162:3,18,23 164:12 167:7 180:17 211:15 217:16

**B**

**bachelor** 20:1

**back** 18:13 19:5 23:24 27:8 33:11 34:16,18 45:6 47:2 50:24 52:5 63:21,24 64:9 81:14 96:10 97:6,11 104:23

112:16 115:1 124:10 126:12,18 128:11,16 130:3,18 134:16,22 141:18 145:1 147:9 151:22 162:7 163:20 165:11,22 170:18 173:20 174:2 177:15,20 178:10, 21 186:5 187:12 188:2 191:13 192:3 195:2 197:10 199:24 200:4 202:14 204:3 208:4 220:22,24 221:1,16, 17

**background** 98:6, 19 217:2

**backwards** 77:5

**badgering** 135:5

**bankruptcy** 61:23

**bar** 23:9 173:8 174:23 176:6 184:11,13,19,20,21 185:2,5 197:9

**barred** 78:10,16

**base** 109:9 137:7

**baseball** 132:14

**based** 30:11 47:18 49:1 56:20 83:16 120:12 138:10 141:22 153:10,11 164:7 177:5 191:15 197:19 209:24 210:1 218:17 219:5 220:7,18 221:13,19

**basic** 189:14

**basically** 116:21 131:19 206:12

**basis** 21:7 22:23 26:15 40:5 53:5 135:18,20 139:2 144:17 146:14 153:9 169:13 175:14 183:4 209:1, 2,16,22

**Bates** 8:12,15,16,

RICHARD J. BRZECZEK

November 29, 2018
Index: beats..center

19 10:13 136:10
182:9

**beats** 24:22,23

**Bednarkiewicz**
13:23

**Bedran** 15:21
110:23 113:3,11
114:2,5,18,21
117:11 119:10,16
120:10,15 121:17,
18,22 122:1,5,6,7,
16 123:2,17,21
128:13 129:10,11,
12,17 130:10
135:12 136:15,24
137:16,22 138:6,10
140:24 141:22,24
142:6 143:8 147:15
148:7,14 156:17
171:8 186:12 221:7

**Bedran's** 122:10
132:2 220:14

**began** 23:18

**beginning** 5:15
66:3 100:6 116:12
202:12

**behalf** 5:18 53:3
66:13

**behavior** 43:1 99:3
126:8 151:13
188:13

**Belinda** 90:24

**bell** 180:15

**bells** 132:11

**bench** 18:11,12

**Benjamin** 5:20
173:23 174:17
223:8

**bicycle** 29:4

**bifurcated** 29:19

**big** 45:15 132:13
202:9

**Bilter** 121:5

**biology** 20:4

**bit** 42:16 54:13
67:22 72:10 153:23

**bleeding** 202:16,
22,24 203:4

**block** 41:2 132:11

**blood** 146:23 170:5

**board** 53:4 54:1,3
131:18

**Bob** 180:5,19
205:1,8

**body** 67:24 106:21

**bold** 84:18

**bomb** 37:9

**book** 69:1,6,10,16
129:13 213:3

**boss** 81:16

**bothered** 163:11

**bottom** 9:12 68:9
74:6 136:19 185:11

**Boulevard** 5:10

**Box** 103:15,17,24

**boy** 103:9

**boyfriend** 173:7,17
183:4

**Brady** 160:15
196:1,14 198:5,13,
17 199:22

**break** 43:9,11
63:16 112:12 147:5
152:11 222:10

**breaking** 46:1,3

**breathing** 177:16
195:3 197:11

**breezed** 161:15

**bright** 220:1

**bring** 7:5 45:6
96:19 134:16
155:23

**bringing** 134:22

**broad** 157:7

**broadest** 151:15

**brought** 59:13,14
60:8 66:17 162:4
220:19

**Bryne** 56:1

**Brzeczek** 5:3,16
6:5,10,15 9:2 19:9,
13 63:12 65:10
73:10 80:7,14 103:1
112:19 136:4,8
182:3,7 187:15

**build** 66:5

**building** 27:17,21
28:7,9

**built** 209:15

**bulletin** 68:21
125:5,17 126:18

**bulletins** 124:10,
24 125:1,3,20,21
127:8 186:7 187:18
188:9

**Bureau** 46:16,18,
21 48:5

**bureaus** 35:19

**burglars** 57:14

**burglary** 42:24
44:3 45:17,18

**Burlington** 46:7

**business** 65:11
70:4,8,14

**C**

**C-A-T-H-Y** 103:10

**cadet** 133:4

**calculated** 222:11

**calendar** 41:3

**call** 28:1,3 48:18
58:18 84:14 87:21
92:1 107:20 109:4
110:16,18 114:12
115:19 121:11
123:19 149:2
174:22,24 175:23

201:10,12 202:20
203:7 221:6

**called** 6:11 24:22
37:10 51:3 69:20
91:22 110:18
124:14 125:19
146:2 190:22,23
191:2 204:3,4

**calling** 107:6

**calls** 76:3 85:20
86:18 106:14
145:14 157:13
194:9 195:12
196:15 215:5,11

**calm** 177:19

**campaign** 56:7

**canvas** 129:1,2
132:3,12,15,16,17,
22 133:7

**canvass** 132:5

**capacity** 15:11,15
16:16 17:8,19 26:16
67:3 101:2

**capital** 107:13

**capitalizing** 107:3

**captain** 50:22
64:23

**captains** 64:10

**car** 25:20 57:12
147:24 174:9
175:21

**card** 38:4 173:9
184:12,15

**cards** 23:11

**care** 59:2

**career** 23:18
172:21

**case** 10:9 13:11
31:16,19 37:2 38:1,
5,8,9,11,12,13,17,
18,19,23 39:6 40:9,
19,20,21,24 41:9,
10,11,13,15,16,21,
23 42:13,15 45:5,6
49:21 59:8 60:3,5

61:7 62:18 63:1,2
72:16,17,18 73:22,
23 74:3,4 75:4,16,
19 76:12,15,23
77:1,4,6,7,11,15,17,
18,23 78:9 79:11,
19,22 80:23 85:18
87:1,6,13,14,18
88:1,7,18,20 89:7,
11,14,19,24 90:17,
23 91:7,13,19
92:13,16,17 100:23
101:20,24 102:14,
23 103:8,18 104:10
105:8 113:17
118:23 126:15
138:5 143:14,23
145:20 146:3,11
147:12 148:13
153:17 160:2,5
163:21,24 164:11,
13 165:20 166:2,6,
16 167:5 168:15
180:1 192:16 193:6
197:7,8 201:20,21,
22 202:4 204:20
206:5 218:7 219:2

**cases** 10:19 29:10,
18 39:24 40:14 49:4
54:3 55:1 61:1,2,8
65:13,17 66:6,10,
12,19,21,24 67:9
72:20,22,24 74:18,
19 75:10,21 127:5
191:3

**Castillo** 75:5,20

**Cathy** 101:17
103:10 112:2
119:10 123:18
148:8,10 153:22
175:5 207:9,17
217:5,10

**caused** 140:22

**Cegielski** 16:10,
11,13,15

**censor** 22:17

**censored** 22:14
23:15

**center** 68:24

RICHARD J. BRZECZEK

**central** 37:10 190:21,24

**centuries** 198:3

**certified** 5:22

**chance** 113:10

**change** 28:10 52:14 71:6 83:6 102:7,19 131:20 154:8 155:6,10 208:4,5

**changed** 52:1,12 107:11 198:2,11,14

**chapter** 69:9

**chapters** 69:13 126:6

**charge** 51:6 54:10

**charged** 69:3 79:17 99:2 117:8 196:24

**charges** 63:4,5

**check** 71:8,17

**checked** 43:14

**checking** 12:12

**Chicago** 5:4,6,10, 21 15:12,19 16:14, 17 17:8 21:4 23:19 43:8 53:4 55:16 56:13,17 57:2,23 58:8 59:4 60:15 61:14 62:5 66:18,24 67:1 73:4 74:20,24 75:1,4,5,6,22 76:1, 8,21 77:6,14 90:15 100:19 101:21 125:2 145:21 171:24 172:7,15 182:22

**chief** 36:22 37:3,7 42:1 44:10,14 45:7 69:10

**child** 29:20

**children** 29:9,10, 15 30:1,4,21,23 31:2,20,24 33:20

**chose** 134:14

**circle** 63:24 173:20

**Circuit** 42:14 60:2

**circumstances** 110:20

**citation** 57:10

**cite** 148:16

**cited** 123:4 206:15

**cites** 173:12

**citizen** 49:19 57:4

**city** 5:4,21 51:13 54:11 66:18,24 75:1,4,5,6,22 76:1, 8,21 77:6,14 100:19 101:13

**civil** 6:7 51:20 59:5 60:21 61:9 66:10, 12,19,24 72:8,11, 17,22,24 74:19 77:1,23 99:21

**civilian** 52:5 102:12

**claimed** 155:20

**claiming** 168:20

**claims** 66:7

**Clark** 5:5 173:6,17 183:3,21,22,23 184:6,7,16

**Clark's** 183:15,17

**class** 17:4 24:5,6 124:12,13 130:6

**classes** 131:12

**classification** 40:4 42:11

**classifications** 40:1,7 42:7

**classified** 41:11

**classroom** 24:3 32:20,24 33:4,6,12, 15

**claw** 165:11

**clean** 7:1 13:20 65:14

**clear** 22:9 23:14 41:21 103:24 151:23 165:21 210:14,18

**clearance** 40:4

**cleared** 40:2,9 41:10,12,18,24 42:8,9,12

**client** 23:3 125:24

**clients** 22:7,8,9 23:4,5 125:23

**close** 119:19 121:9 174:23 218:1 222:4

**closed** 22:20,21

**coaching** 165:6,8

**cocaine** 146:21

**cocounsel's** 125:24

**code** 71:7,11

**Cohen** 17:11,18 18:2 97:21 98:9,15, 24 99:12 180:18 195:5

**Cohen's** 192:22

**colloquially** 38:8

**comma** 143:4

**command** 53:5 59:17

**commander** 35:9

**comments** 96:20, 21

**commission** 21:20 189:2

**committed** 29:8, 10,14 30:4 44:23

**committing** 59:12

**Commonsense** 120:13

**communication** 86:20

**communications** 203:1

**community** 68:23

**companion** 179:21

**company** 104:16

**comparison** 41:4

**complain** 23:6

**complained** 57:11

**complaint** 13:10, 15,22 21:22 22:19 23:9 49:18 57:4

**complaints** 22:6, 21,24 23:2,3 57:4 66:4

**completed** 39:21 80:4

**complex** 85:7,10, 12 208:14,18

**compliance** 39:14, 17 149:7 160:14

**compliant** 198:13

**complied** 39:2 40:6 42:7,10

**comply** 149:10 198:3,17 206:14

**component** 31:13 32:4 33:4 71:2,3

**components** 170:1

**compound** 85:1 189:12 219:21

**comprehensive** 213:4

**concentrate** 65:24

**concentrated** 61:22

**concluded** 141:21 173:5 219:17

**conclusion** 40:23 85:20 124:17 140:5 145:15 196:16 215:7

**condition** 220:23

**conduct** 89:6 120:5 126:7 131:19 150:13 151:12 160:6 188:13 193:2 198:1

**conducted** 29:3,13 32:18 33:7 53:17 62:4 109:5 118:2 144:4 171:10

**conducting** 127:3 150:9 188:14

**conferences** 54:4

**conferring** 55:13

**confess** 210:7

**confession** 33:21 34:4

**confirm** 108:21 111:3 179:21 222:19,20

**confirmation** 110:17 116:20

**confirmed** 108:16 109:15,16 110:11 111:7 113:23 115:18 123:19

**confirming** 111:9 112:8 221:5

**conflicting** 117:4

**confrontation** 216:4

**confrontations** 215:22

**confused** 42:5

**connected** 29:19

**connection** 7:12 32:3 74:14 112:1 113:22 123:15 124:22 126:8

**cons** 212:16

**consented** 215:9, 14

**considered** 145:12 149:6

RICHARD J. BRZECZEK

November 29, 2018
Index: consist..definition

**consist** 8:6

**consisted** 27:18

**consists** 80:24

**consult** 89:9

**consultant** 79:4

**Consultants** 69:21 70:3,5,22

**consulting** 70:14

**contact** 58:15 112:1 113:22

**contacted** 104:15, 21 105:3

**contained** 126:6 160:16

**context** 127:20

**continued** 50:17 59:20 176:3,12

**contractor** 173:2

**contribute** 160:10

**contrived** 85:8 208:15

**Control** 51:4

**conversation** 108:16,20,21,23,24 109:15,18,19 110:11,23 111:3,7,9 112:9 113:23 121:19,23 175:10, 20 176:4

**conveyed** 135:13 136:16 137:1,16 139:19 148:6

**convictions** 41:7

**convinced** 213:22 216:12

**convoluted** 85:7, 10,12 208:14,18

**Cook** 42:14 62:4

**coordinator** 51:19, 24 52:10,17 54:18

**copies** 49:21,22,23

**copy** 7:18 95:19 191:3,23,24 223:7,8

**Corboy** 180:18 181:11,19

**Corboy's** 178:18

**corner** 148:1 153:18

**corporation** 52:5, 7,11 70:17,18 71:15

**correct** 9:8 12:21 13:11 19:7,16,17 20:3,8,15,22 23:20 24:15 25:6,7,10,11, 15 26:5,6,8 32:16 36:4,14,18 47:6,12, 13 50:12 54:18 55:20 56:14,24 61:16 65:11,12,21 67:4 69:22,23 72:23 73:17,18 78:2,3 81:1 82:20 84:7 86:12,15 92:3,17 99:18 100:20,21 103:20 113:4,5 114:13 119:7 122:9 136:12 137:3 143:5, 13,15 145:10,11 146:12,13 148:4,8, 14,15 164:16 166:17,18 167:11, 14,18 168:1 171:19 172:1,16 174:16 176:7 182:23 191:17 192:3,4,22 194:8 195:7,12 203:22 207:10 208:16,17,20 210:24 212:7,10 218:15

**correction** 156:21

**corrections** 42:20 155:12

**correctly** 42:2

**correctness** 52:19

**counsel** 5:12 89:10 91:4 154:23 211:5, 10

**counsel's** 52:5,7,

12

**count** 82:8 91:16

**counter** 97:9

**counts** 63:6

**County** 42:14 62:4

**couple** 11:1 59:10 75:23 81:23 132:10

**court** 5:22 6:1 9:18 19:13 22:18 23:16 34:5,14,17 40:14,16 41:7,9,14,16,17,21 42:14,16,17 73:14 78:9,11,16 80:14 87:6,15 88:2,8,19 92:3 103:5 106:1,6 112:19 116:10 120:4 136:8 170:20 178:13 180:12 182:7 194:20 195:4 196:10 203:14 208:22 217:23 223:4

**courthouse** 40:22

**courts** 212:18

**cover** 50:5

**covered** 127:4 157:23

**CPD** 15:2,6,10 122:2 170:13 172:21 197:19,20 198:19,20

**CR** 58:11,20,23 216:6

**Craftt** 74:24

**Craig** 16:9

**credence** 216:9

**crime** 32:5,8 37:3 44:22 45:13,19,23 46:3,5,9 50:1 51:5 131:21 132:8 164:10 189:2 215:21

**crimes** 29:8,10,14 30:1,4 45:15,20,22

**criminal** 18:4 19:2, 6 62:3 63:2 66:2,10 72:8,15,16,17,18 74:3,7 75:15 77:17, 18 124:14 126:3 127:10 131:13 149:5 167:17 171:2 178:15 194:21,23 195:6 196:10

**criminalistics** 122:2 123:10 145:21 146:18 147:1 172:1 215:21

**critical** 209:8

**cross** 101:10

**cross-examine** 14:22 15:8

**crossing** 15:4

**CRS** 57:17,21 58:4, 6

**Cunningham** 101:14

**curlers** 188:24 189:17,19

**current** 19:18 73:17

**curriculum** 19:16 69:19

**custodian** 125:8, 10

**custody** 208:3

**CV** 19:21,24 23:18 61:13 67:12

---

**D**

**daily** 26:15

**Daniel** 5:3 14:9 16:6 92:2 167:11

**date** 15:1 95:4,7 100:22 101:23 125:4 188:1 190:1

**dated** 112:22 122:10,18

**dates** 12:19

**Daubert** 77:13,23

**David** 17:12

**day** 28:1 35:18 44:3 122:5,7,19 131:10

**days** 40:13 41:1 50:19 68:16,17 124:11 130:3 147:21 153:20 163:9 183:13 216:16 219:17

**dead** 31:9 221:12

**deal** 98:11,22

**dealing** 99:1

**dealings** 17:18

**deals** 186:14

**death** 128:20 153:22 154:9

**decades** 198:2

**decedent** 108:17

**December** 51:15, 16 113:20

**decide** 211:8

**decided** 34:13 81:15

**dedicated** 130:1

**deemed** 168:4,10

**deeming** 168:11

**defeat** 168:7 169:3, 18

**defendant** 5:20 59:4 60:5,14,22 61:9 73:1

**defendants** 5:19 13:14,19,21

**defense** 18:4,14 19:2 66:2 178:15 194:21,23 195:20, 21 196:5,6,20

**defined** 127:10,14

**definition** 88:11

151:8 157:7

**definitions** 40:7

**definitively** 208:11

**degree** 20:1,14
21:12 217:12

**degrees** 20:17

**delay** 28:21

**demarcate** 96:14

**demarkation**
202:10

**department** 14:13
15:9,12,19 16:14,17
17:9 21:4 23:19
37:4 39:2,17 40:21
41:3,12 42:20 43:2
52:8,10,19,20 53:18
54:17 55:17 56:14,
18 57:3,23 58:8
59:4 60:15,17 61:3,
5,14 62:6,15 73:5
74:20 90:16 123:8
125:2,10,17 128:16
146:1 149:6 150:23
151:7 171:24 172:1,
8 182:22 185:22
189:24 191:11
206:11

**department's** 42:7

**department-wide**
124:10

**departure** 174:20,
22

**depending** 149:14

**depends** 211:6
212:11

**deposed** 41:15

**deposition** 5:2,4
6:5,15 8:17 9:3 10:8
11:4,13 19:10,15
73:11 79:22 80:3,8,
16 92:6,9,12,15,18
93:9 94:2,7,11,13
95:1,5,7,12,15,20
96:15 97:4,8,16,24
98:15 99:5,10,13,
16,20,24 100:3,10

103:2,7 112:21
133:23 134:20,21
135:21 136:5,9
137:11 138:4 139:3,
15 147:16,17,19
154:21 155:4,19
161:14,16 162:14,
16 165:13,19 166:9,
15 167:4,10,13
168:14,16 173:13
176:11 180:2,4
181:1,4,10,20
182:4,9 186:16,23
192:22 194:22
195:16 207:6
208:19 213:10
217:8 220:10
221:23 223:5

**depositions** 6:19
81:8 97:20 98:18

**deputy** 49:3 50:24
54:8

**derive** 78:20

**derived** 79:3

**describe** 151:7
156:14

**describes** 85:7
208:13

**description** 130:5

**descriptions**
205:21 206:3

**descriptive** 85:9

**desk** 25:22

**detailed** 27:5

**detective** 16:14
29:16 30:6 36:16,20
37:17,23,24 38:18
39:1 40:19 41:16
43:10,16 44:1,13
46:12 47:2,4,5,7,8,
11,17,19,20,22
48:1,2 64:9,11,15,
16 65:5,8 94:8
105:15,20 107:16
113:9,11 114:2
117:11 118:1
119:10,14 120:10
121:18 127:9 128:6,

8 130:13 132:5,7,18
133:2,15 134:3
135:2 142:1 148:19,
20 150:16,18
157:10,16 158:2
159:6 161:9 163:19,
22 164:15 179:19
188:11,16 190:20
191:16,18,20

**detective's** 41:8
123:1 126:7 129:17
151:12 157:9
158:18 192:5
196:14

**detectives** 29:1,9,
15 30:7 34:19 36:23
37:4,7,9 38:6,9,14
40:13 41:1,7 42:2
44:11,14 45:4 47:11
51:10,11 85:6 98:13
99:3 106:10,19
107:17,18,23 108:3
109:10,24 111:6,12
112:5 113:7,15,21
114:1 115:11 116:8
117:8 118:6,14,16
119:3 122:1 123:2,
14 124:6,12,18
126:20 129:14
130:8 131:17
133:10,14 134:3
141:15 142:6,16
144:14,20 145:1
146:6 147:15 150:8,
14 154:3 160:3,7,20
167:21 187:20
188:4,14 189:8
190:2 191:14 192:2
194:1 195:23
196:18 197:24
198:21 204:14,16
208:12 210:9
213:14,17,22 214:2,
16 215:24 218:14
219:19 220:6,12

**detectives'** 41:5
143:17 179:8,11,18
193:2

**determination**
48:17

**determine** 41:9

48:14 49:12 95:13
116:21 117:4 130:7

**determined** 26:14
39:24 45:23 57:18
77:9

**determining** 39:16
42:10

**Deutsch** 101:14

**develop** 168:23

**development**
55:12 125:8,9,15

**devices** 168:24

**Diane** 99:17 104:15
107:19 108:17
111:15 114:10
117:12 121:6
128:21 179:21
185:11 186:12

**Diaz** 104:16 107:19
108:17 111:16
114:10,11 115:19
116:1,5,23 117:2,3,
12 119:19 121:3,9,
11,17,18,22 128:21
174:7,13,20 175:18,
19 177:1,6,21
178:19 179:21
180:4,17 181:7,23
186:12 193:15
196:23 197:9
200:13 220:10,24
221:14

**Diaz's** 108:24
175:3 176:2 177:22
178:13 180:2
181:20 194:20
217:3,8

**Diaz-grabowski**
99:17

**dictate** 197:24

**die** 223:11

**difference** 121:1
154:6,7

**difficult** 215:20

**digit** 101:19 102:2,
5,7,9,13,16,19

103:13,14,16 104:1,
5

**digits** 103:24

**dimension** 39:22

**direct** 19:6 44:17,
19 47:10 59:24
101:10 206:16

**directed** 126:7

**direction** 131:24

**directive** 119:13
123:8 125:17 127:5
149:7 150:5,24
151:7,8,14,16
158:15 159:1
185:22 189:24
206:19

**directive's** 158:10

**directives** 36:22
52:19,20 54:17,23
125:10 126:1,23
127:1,14 149:17
150:13 157:8 158:1
197:23 199:8

**directly** 35:5 202:7

**director** 35:5,8

**directors** 39:17

**disagree** 165:10

**discharge** 157:9
158:18 196:13

**Disciplinary** 21:19

**discipline** 55:2

**disciplined** 21:14

**disclose** 157:9
158:18 198:18,22
199:7

**disclosed** 161:3
192:8,15 193:5,24
211:15 219:2

**discloses** 158:2

**disclosing** 158:12

**disclosure** 86:19
160:19 165:14
210:16

RICHARD J. BRZECZEK

November 29, 2018
Index: disclosures..evidence

disclosures
165:11

discounting
207:14

discovered 106:21

discovery 196:10
197:1

discussed 127:7

disposition 40:20,
21,24 41:9,17,20
43:3 52:24 57:16

dispositions 42:4

disregard 166:1,3

disregarding
207:20

dissect 191:6

distributed 124:10

district 6:9 18:10
24:12,14,18,20,21
25:1,3,4,5,9,10 35:9
59:11

districts 27:18,19

division 26:23
27:7,10,13,15 28:5,
11 31:13 35:3,6,7,8,
10,14 36:1,5,7,10,
16,20 37:17,23,24
39:1 40:19 43:10,16
44:13 46:12 47:2,4,
8 48:8,11,14 50:15
51:4,5 122:2 123:10
124:15 125:9,15,19
126:4 129:11
145:21 147:1 149:5
150:16,18 188:10,
11 190:23 215:21

divisions 35:19

docket 74:7

document 10:10,
16,18,19 50:5 73:6
91:1,20,23 96:10
118:16,18 120:23
122:21 123:6,12,13
124:6,18 126:20
128:9 134:5 135:7
136:11 137:19

142:6 143:17 144:7
145:2 149:20 151:3
157:12,19 158:21
159:6 173:22
180:23,24 181:4,16
182:12,17 186:1
187:19,20,22 190:2
191:10 193:10
195:23 202:3
203:21 204:16
205:11,14 206:7,10
213:17

documented
145:9 147:23
154:23 171:24
172:4 201:19
214:11

documenting
123:15 148:21
149:21

documents 8:7,22
9:4 10:13,21 11:4,
23 12:23 13:5,8
39:9 40:15 49:20,21
53:2 79:13 80:19
81:8 83:22 84:2,3,4,
6,10 86:22,24 87:24
88:10 89:13 90:6,21
91:3,9 93:7 110:21
137:7,8 140:14
172:12 186:6
187:16 188:1,6,12,
15 189:6 199:19
209:9

dollars 46:4,9 63:9

domestic 23:4
66:6,7

Dominguez 75:15
78:5

doors 129:3

Dot's 104:16
111:15 114:10
175:6 176:14 177:2,
15,24 179:22 180:6,
20 181:9 184:21
220:20

double-checked
9:11,24 10:3

double-checking
11:8

doubt 67:6

downtown 191:7,
24

draft 37:13

drafted 35:12
50:10 55:12 59:21
86:11

drafting 36:22 50:7
55:13 66:8

drafts 191:16

dragged 214:4

draw 154:14 215:7

drive 7:10 8:14,22
87:4 95:18 96:12

driven 210:6

driver 26:13 57:10

drives 147:24

drove 174:9 177:11

drug 146:18,19

drugs 46:4

duly 6:11

duties 25:16 26:10
28:10,15 35:2,20
36:19,21 37:22 48:4
51:7 52:14,16 61:10
126:8 151:13

duty 36:23 196:14

— E —

earlier 66:3 146:10
148:12 184:22
200:21 208:16

early 34:11 68:21

ears 108:22

easily 130:2

east 25:2

echoing 118:10

editions 68:24

edits 54:22

education 154:5
219:6

educational
129:12

effect 117:23 119:9
124:5 126:24 127:1
150:24 190:4
203:20 206:18

Eighteen 56:11

elicited 211:13

else's 118:10

embarrass 218:6

emphasis 40:18

employ 70:23

employed 15:17
57:2,23 59:3 212:23

employee 14:12
15:12 21:4

employment
15:10 16:16 17:8
57:5 58:8 60:14
170:13

encompassing
102:6 151:9

end 42:15 65:18
97:6 100:7 128:24
132:3 134:21
161:17 174:22

ended 175:19
201:9

enforced 149:10
206:20

enforcement
51:12 56:13,17,21
68:21 116:9 124:4
144:24 148:18
149:3 157:6 158:1,
17 185:23 218:18

engage 200:3

English 77:10

entered 174:18

entire 6:24 11:24
51:13 53:18 57:1
92:9 94:13 95:1
97:24 100:3 101:12
173:21 199:8

entirety 71:18 98:3

entitled 182:18

entity 71:16

Erens 61:15,22
63:11

Erickson 17:12
97:21 99:5 178:18
192:21 195:5,15

Erikson 17:18 18:2
98:1,24 180:18

erratic 171:19

erroneously 72:14

error 81:10

errors 81:13 82:10

essence 130:6
159:9

establish 119:18
168:5 169:15

established 29:2
70:12,16 104:14,20
105:2,4

establishment
68:23

estate 61:23 66:8

estimate 12:4

et al 5:4

evaluated 41:1

evening 163:9

event 124:22

events 98:13
150:20 160:21
161:1

eventually 51:4
160:13

evidence 32:9
89:24 90:7 120:2,24
149:24 155:7

RICHARD J. BRZECZEK

November 29, 2018
Index: exact..focus

159:16 164:9
181:14 198:9
205:17 212:19
215:5 216:22
219:22

**exact** 70:15 77:8
79:7 174:19

**exam** 123:3,11,23
124:8,21 135:9
145:4 162:8,19
167:2 168:3,8 171:9
172:23 204:12,21
207:8 213:23
214:12 215:23
216:7 220:1,3

**examination** 6:13
101:10 120:3
168:22

**examinations**
49:23,24 120:5

**examined** 6:12
40:5

**examiner** 90:4
92:7 111:5 161:20
168:5

**examiner's** 111:6
182:19

**examining** 42:6

**exceptional** 40:4

**excerpts** 139:15

**exchange** 109:20

**exclusion** 116:11

**exculpatory**
157:10 158:3,12,19
159:13,17,20
160:24 161:2 196:3,
7 198:8,9 200:16

**excuse** 51:10
72:13 113:20 121:6
187:6 214:23

**executive** 52:13
54:19

**executives** 69:9

**exempt** 51:21

**exhibit** 19:10,14
73:11,15 80:8,11,
15,17 103:2,6,8,
112:20 114:4
115:13 128:12
136:5,9,10,13,15,
20,23,24 137:12,15,
23 139:14,16
140:19,23 141:18
143:18 145:20
147:12,20 152:4,5
154:15 156:12,13,
23 182:2,4,8 183:6
191:19 202:15

**exhibits** 92:19,20,
21 97:15 99:4,9,13,
23

**exist** 203:11

**existed** 126:6

**existence** 126:2
131:23 158:10
188:1 198:20
203:13 204:15

**existing** 22:9
126:23 197:19,20

**exits** 173:23

**exonerate** 160:12
195:22 205:7

**exonerated** 57:19

**expand** 210:15

**expansion** 211:16

**expected** 64:20

**experience** 47:10
56:10,13,21,22 57:1
67:13 152:12 153:4,
10,11 209:24 210:2,
12 218:18 219:5

**experienced** 33:1

**expert** 13:6,9
70:13,20 71:1 72:7,
19,21 73:4,15 74:3,
19 75:14 77:2
78:11,15,21 79:4,8,
11 84:23 85:17 87:1
140:15 164:13
165:13 167:5
172:10 218:4

**expert's** 219:1

**expertise** 159:4

**expire** 55:9

**expired** 125:11

**explain** 108:19

**explanation**
140:12 153:2

**expound** 153:23

**extensively**
212:13

**extent** 85:1 86:18
114:18 157:13
211:3 216:20

**extraneous** 189:15

**extremities** 169:6

**eye** 100:11,14

**eyeballed** 178:3

———————

**F**

**face** 14:15,18
16:12,13 204:13
205:2,4,8

**faces** 13:17

**fact** 38:13 40:10
41:10 52:1,11
108:10,11 109:1,24
143:23 149:6 155:3
157:19 158:4,21
159:11 162:3,19
163:18 164:7,15
171:3 177:5 186:8
195:20 196:19
215:2 220:7 221:14,
19

**facts** 84:11,15,22
98:23 101:16
111:23 112:3
120:24 149:23
159:15 161:2
181:14 205:16
215:4 217:18
218:10 219:22

**factual** 109:9
135:18,20 139:2

144:17 146:14
153:9 169:13
175:13 183:4
195:10,11 209:1,2

**fail** 206:14

**failed** 111:23
213:14

**failing** 195:23

**failure** 149:10
206:16

**fairly** 157:1

**falls** 196:8

**false** 214:2,3

**familiar** 6:18 93:23
156:22

**familiarize** 11:1

**family** 219:8

**fashion** 38:18
39:21

**fatally** 101:17

**favor** 60:2

**FBI** 68:21

**February** 46:19

**federal** 6:7 21:15
78:8,11,16

**female** 51:10

**field** 24:1,4,6 36:3
47:12 54:9 204:2,4
205:20 206:2,6,12,
15,22

**fighting** 216:6

**figure** 8:20

**file** 40:11,13 42:10,
17 48:14,16,21
49:13,14,15,17 50:8
87:8,9,12,13,16,20,
22,24 88:12,13,17
92:21 93:8 143:19
144:15 146:12,17,
24 163:17 185:18
190:13,15,17,18
191:3,4,7,11,15,23
193:19 215:1

**filed** 13:10 22:6
60:1 61:5 66:12,23
197:4

**files** 39:12,13 42:6
48:13,21,23 49:11,
12 191:8

**filing** 21:21

**final** 50:3,10

**financing** 62:6

**find** 31:13 119:20
120:8 124:17 126:1,
24 130:2 161:18
171:23 174:10
179:17 180:20
181:9 193:16
202:12 221:8

**finding** 127:2
176:18

**finger** 164:5

**fingerprints**
146:22

**finished** 94:20

**Fioretti** 101:13

**fire** 56:6,8

**firm** 61:15,22 62:2
63:11 65:10 69:20
70:1,11,12 75:14
76:2,8,13,22 79:4

**fit** 170:12 209:18

**fits** 209:14 210:11

**Fitzgerald** 16:7

**fixed** 53:20

**Flagg** 74:24

**flags** 220:1

**flash** 7:10 8:14,22
87:4 95:18 96:12

**floor** 28:8

**Florida** 70:17
126:12

**focus** 153:15
160:1,2,4,6,18,21
161:13 163:13
192:19 193:2

RICHARD J. BRZECZEK

November 29, 2018
Index: focused..Hernandez

**focused** 12:1 94:17 153:12 154:1 160:22

**focuses** 72:8

**folder** 214:21

**follow** 119:20 120:3,4 129:14,22 131:24 157:15 158:13

**follow-up** 38:6

**footnotes** 78:3

**foregoing** 185:14

**Forget** 54:19

**forgetting** 220:23

**form** 33:23 38:3 39:10 47:14,24 67:2 74:22 83:14 84:24 85:19 88:3,21 89:10,14,20 90:18 91:5 105:18 108:7, 13 110:8 127:12 130:17 134:13 137:4 145:5,14 146:1 148:23 149:24 151:5 155:8 158:7 171:20 172:18 175:7 178:4 181:14 186:3 188:20 197:13 199:1 205:16 213:19 219:21 221:18

**format** 8:7 86:15 129:9,13,18,21 130:9 132:2 133:8

**forming** 89:18,24 90:16

**forms** 33:3

**Forty-five** 22:4

**found** 31:9 33:2 98:21 101:17 104:14,20 105:4 141:15,23 143:10, 22 144:13 153:14 192:12

**foundation** 34:7

**G**

**gambling** 51:6,8,

58:1 78:13,17 79:5 83:14 84:24 85:20 88:4 105:18 106:4, 14 107:6 127:12 145:14 194:10 195:13 219:3

**four-week** 124:13 127:8 128:6

**fourth** 104:1

**frame** 27:9 43:20 44:9 45:16 102:3,11 103:21 104:8 126:19 221:10

**Frank** 213:10

**free** 214:5

**freely** 215:14

**frequently** 207:23

**Friday** 173:7 184:10,14 185:3

**friend** 104:15,21 105:3 111:15 121:9

**friend's** 147:24

**friends** 119:19 217:6,10,13

**front** 17:23 106:5, 15

**Frye** 212:21

**full** 190:10

**full-time** 21:6

**function** 32:14 48:7 133:11

**functions** 14:12 32:11,12 53:24

**fundamental** 153:21 154:5

**funds** 62:6

**funnel** 54:13

**funny** 29:5

12

**garage** 46:1

**gave** 12:19 23:10 59:18 87:3 109:13 114:3 132:23 140:18 141:23 154:3 159:7 186:13 192:10,11,12 193:15 196:21 210:22

**general** 28:17 90:15 91:22 115:10, 15 116:3 117:22 119:13 123:4,7 124:3 132:1 142:4,9 144:23 146:2 148:17 149:2,9 150:12 151:11 157:5 158:16 185:22 199:11 202:2 203:24 212:18

**generally** 38:22 53:10,15 98:6 193:7 207:21

**generated** 38:5

**generating** 164:4

**generic** 131:16

**generically** 80:21 131:20

**gestae** 156:15 175:23

**girl** 202:16,21 203:4

**girlfriend** 183:19

**give** 31:8 60:10 64:19 72:4 80:21,22 125:4 126:19 130:4 187:22 188:3

**giving** 53:4 59:9 98:12

**good** 5:1 42:15 43:1 63:14 173:9 184:16 222:3

**govern** 6:19

**governing** 39:18

**Grabowski** 185:11,15

**Grabowski's** 99:24 100:10

**Grace** 121:4

**graduated** 24:10 33:10

**graphs** 92:22 93:1

**ground** 6:22

**group** 53:21 64:19 75:21,23

**grouping** 88:10

**groups** 53:19

**guess** 33:9 42:5 104:24 213:3

**guessing** 79:23

**guest** 23:12

**guideline** 206:12

**guidelines** 150:20 186:7 187:17 206:22

**gun** 201:3,10,12,13, 24 210:5

**guy** 205:1 216:8

**H**

**hair** 188:24 189:17, 18

**half** 11:9 27:4 46:4 183:9 196:20

**hand** 6:1 202:20 203:8

**handed** 73:14 80:15 103:5 112:20 136:9 182:8

**handling** 62:5

**hands** 152:15

**handwriting** 93:24 138:15 139:6,13

**handwritten** 34:6, 15 91:20,23 93:10,

14,18,19 94:3

**hanging** 65:13

**happen** 209:17,21 210:13

**happened** 38:2 42:17 63:1 82:9 117:10 188:2 214:1

**happening** 38:20 40:14,16 160:22 161:1

**harass** 218:6

**hard** 133:21 222:5

**harm** 153:5

**Harold** 56:5

**head** 222:3

**headed** 35:7

**heading** 84:10,18 86:4

**headquarters** 27:7 28:6,12 35:4 36:17, 20 37:24 43:10,17 44:13 47:3,5,9

**hear** 76:4 106:1,6 109:17 116:13 180:12 217:23

**heard** 111:3 129:4, 5 132:6,12,19,24 189:22

**hearing** 54:2 77:13,14,24 101:5, 7,11 108:23 109:18, 19 116:13 133:22

**Heather** 90:24

**heavily** 195:3

**heavy** 177:16 197:12

**held** 71:21,23

**helped** 30:13

**helpful** 189:3

**Hendley** 78:5

**Hernandez** 75:6, 16 77:5 78:2

RICHARD J. BRZECZEK

**heroin** 146:21

**hidden** 161:5

**hide** 196:19

**Higgins** 14:7 94:8 95:2,6,13 161:9,12, 18,24 162:3,22 163:9 164:15 165:19 166:4,21 167:6

**Higgins's** 94:11 96:15 166:8,15 167:4

**high** 219:11

**highlight** 96:14

**highlighting** 8:6

**highlights** 96:21, 23 128:20

**Highly** 194:15

**Hill** 75:1 76:1,7 77:13,24

**historical** 125:14, 20

**historically** 125:8

**history** 154:10 216:23 218:22 219:15

**hoc** 53:5

**hold** 68:3

**home** 174:9 177:7, 12 178:9 221:10

**homicide** 29:21 30:14 31:20,24 32:3 33:19 45:21 47:16, 20,22 112:22 127:24 128:3 141:16 143:12,24 144:14 162:23 167:7,23

**homicides** 30:21, 23 31:1,6

**honoraria** 71:20

**honorarium** 71:9

**Hood** 74:5 75:16

**hour** 12:10 79:14 134:22

**hour-by-hour** 130:5

**hourly** 79:12

**hours** 11:9 12:7,9 79:21,23 101:18 102:13 103:12 110:24 111:1 122:15,23 131:11 134:20 222:9,16,17

**house** 185:8

**hubcaps** 29:6,7

**hundred** 63:8

**hundreds** 46:8

**hypothetical** 148:24 149:24 150:7 151:5 158:6 159:16 194:10 219:4

---

**I**

**IARDC** 21:20

**idea** 62:16 93:5 97:18 179:24 212:14

**identification** 8:13 19:11 31:11 73:12 80:9 103:3 136:6 141:13 160:11 182:5

**identified** 31:16 41:19 145:22 170:7 199:16,21

**identify** 5:14 31:14 59:17 80:16 103:7 142:11,14 172:3 187:18 189:7 190:1 198:19 199:10 200:5 202:20 213:16

**identifying** 32:6 114:8

**identity** 142:15

**ill** 54:9

**Illinois** 5:6,10 6:9 20:7,21,24 21:19 23:15 42:20 65:20 70:17 101:21 170:19,21

**immediately** 59:21

**implicate** 205:6

**implies** 109:19

**important** 54:14 154:2,12 171:14 191:9 205:11 211:22 221:9

**importantly** 142:12

**imposed** 198:5

**impression** 164:10 177:8 209:20

**imprisonment** 214:3

**improbable** 194:15

**improperly** 120:20

**impugned** 216:5

**in-service** 53:19

**inaccuracies** 82:11

**inaccurate** 140:3

**inappropriate** 200:7

**incident** 203:1

**inclined** 203:3

**include** 24:1 112:2 142:12 151:18

**included** 53:15 66:9 71:5 89:15 114:23 139:15 142:1,19 144:21,22 146:11 147:14 171:3 186:9

**includes** 8:2 205:22

**including** 7:23 66:6,16 171:1

**income** 78:20 79:2, 8,9

**incomplete** 148:23 149:24 150:7 151:4 158:6 159:16 173:21 194:10 219:4

**incorporate** 150:10

**incorrectly** 42:2

**incumbent** 190:14

**indentation** 81:21

**independent** 12:18 89:6

**independently** 76:18

**index** 38:4 97:12 103:8

**indexed** 87:17

**indication** 115:24 121:8,10 175:18 204:22

**indicators** 177:20

**indicted** 62:18,20, 23 63:2

**indictment** 63:7 197:4

**individual** 5:19 13:14,19,21 14:17 111:24 141:14 172:22

**individually** 118:20

**individuals** 14:14 120:19

**infinite** 55:3

**inflict** 153:5

**informant** 201:16

**informants** 30:11

**information** 42:16 43:11 45:6 49:1

81:7 101:23 105:7, 24 110:22 114:8,19, 22 115:5,7,12 116:19,20 117:4 120:7 123:20 124:19 126:21 127:11,15,17,20,22, 24 128:2 132:23 139:18 140:16 141:13,14,19,22 142:2,7,12,13,16, 18,20,21 143:3,7,9, 10 144:6,7,8,11,13, 21 145:2,8 147:14 148:11,14,19,21 149:15,18,22 150:2, 3,10 151:2,17 153:13 154:2,13 156:15 157:10,11, 12,17,18,20 158:3, 4,12,19,20,21 159:3,7 160:8,13, 16,19 161:1 167:22 173:6,16 174:5,6 177:6 181:6 184:13 185:14,16,18 186:8, 10,22,24 188:22 189:1,9,10,14,16 190:3,11,13 191:12 192:10,13,17 193:15 194:4,7 195:7,18,24 196:1, 3,8,12 197:4,8,23 198:8,18,22 200:13, 16 201:1,2,13,15,23 202:5 203:6,8,9,21 205:18 206:9 208:8 210:4 220:11,15 221:7,15

**initial** 9:4

**initially** 33:10 156:19 208:6

**initiate** 156:20

**initiated** 57:22 58:7

**inmate** 43:7

**inquiry** 192:20

**Inspectional** 46:16,18,22 48:5

**instances** 211:22

RICHARD J. BRZECZEK

November 29, 2018
Index: instant..Keen

**instant** 72:11 73:22

**Institute** 20:7

**instruct** 134:17

**instruction** 33:6
64:20

**instructional**
131:23 135:1 204:5

**instructor** 68:15

**instructors** 68:13

**instrument** 153:6,
8

**integral** 129:16

**integrity** 44:20
48:15,16 49:13

**intelligence** 37:11

**intend** 83:10,12,15

**interchangeably**
156:6

**interferes** 169:10

**internal** 48:8,11,
13,19,24 49:8,15,16
50:15 52:22 55:1
58:14 62:10 67:19,
20 68:2 71:7,10,11
173:1 212:24

**interpret** 93:5
139:7 212:15 213:7

**interpretation**
94:3 138:15 139:4

**interrogation**
164:8

**interrogations**
131:14

**interrupt** 164:24
165:2

**interview** 49:2
108:10,11 109:4,6,
24 110:6,7,12
114:15,17 116:9,15
118:2,3 132:21
135:12 144:5 145:3,
9 174:6 178:18
181:23 186:19
187:21

**interviewed** 58:19
107:17,23 108:2,4,5
109:3,10 110:5
113:15 115:24
116:6 117:12,19
118:20 120:16,20
121:17 122:6,8
128:21,22 186:12
189:16 220:13

**interviews** 118:17
131:14

**intimidated** 23:3,7

**investigate** 29:22,
24 30:14,23 48:8

**investigated** 21:18
29:8 30:3 31:1
47:16,22

**investigating**
29:23 30:21 31:6
36:2 48:11 50:9,15
210:9

**investigation** 32:4
37:7 38:6 39:16
44:21,22 45:10,12
48:22 59:10 62:3,8,
10,13,15,17 98:13
112:1,23 123:15
124:15,20,23 126:4
127:21 128:1,3
141:17 143:12
144:1 146:7 149:5
150:9,21 159:4
160:9 161:23
162:24 163:16
164:2,6 167:7,24
188:13,14 189:2

**investigations**
29:3,14 30:17 33:18
39:18 44:15 49:11
52:22 68:2 116:8
118:8 127:4 131:19
173:2 212:24

**investigative**
29:11 32:12 48:13
49:11,15,17 67:20
87:20,22,24 88:11,
13,17 126:9 143:19
144:15 146:12,17,
24 163:17 181:21
211:21 213:8

**investigator** 27:17
48:19,24 49:7
164:11

**invitation** 71:24

**invited** 72:3

**invoice** 80:2,5

**invoices** 79:18

**involve** 45:21

**involved** 30:18
31:5,12,18 33:19
37:6 43:17 44:14
70:20 72:21 74:24
75:16,17

**involvement**
209:10

**involves** 72:15

**involving** 30:21,22
31:20,24

**irrelevant** 169:22

**issue** 53:12 71:8,17
72:15 159:6 179:17

**issued** 57:10

**Itchhaporia** 5:18
6:4,14 7:17 8:2,9,
16,20 9:1,22 19:8,
12 34:1 35:1 39:8,
19 47:15 48:3 58:3
63:16,23 67:4,8
73:13 75:9 76:6
78:14,19 79:10
80:6,12,13 83:19
85:14,23 86:10,21
88:15 89:1,22 90:20
91:8 94:23 102:23
103:4 105:22 106:8
107:1,8 108:8
109:8,22 110:13
112:11,18 115:8
117:21 121:15
126:10 128:4
130:22 133:17
134:1,15,23 135:10,
24 136:3,7 137:13
143:1,2 145:7,17
147:4,11 149:16
150:4,22 151:20
156:3 157:4,22

158:14 159:10,18
163:5 164:20,23
165:1,5,10,15,18
171:22 172:20
174:1 175:1,11
176:1,22 178:12
180:16 181:15
182:1,6 187:1,3,5,8,
14 189:4,23 190:7
194:5,18 195:14
197:5,16 199:3,18,
23 200:2,12,19
203:16,17 206:1
207:1,2 210:17
211:17 214:17
215:8,16 216:21
217:21 218:12
219:12 220:4
221:21 222:2,12,23
223:6

**itemize** 120:1

———————————

**J**

**J.J.** 183:14 184:23
185:1,6

**J.j.'s** 184:19,20
185:2

**J.j.'s.** 184:15 185:4

**Jackson** 5:10

**James** 13:23 14:7
94:8 173:6,17
183:3,23,24 184:4,7

**Jane** 56:1

**January** 55:20
76:20 101:18
103:11 107:18,24
109:11 110:1
112:22 113:15,20
114:21 117:14,24
121:17 122:3,13
123:9,21 126:24
128:16 155:22
161:11 163:20
165:22,23 177:1,11
220:14

**Jim** 183:22 184:16

**Jimenez** 121:4

**Jimmy** 183:14,16,
17,21 184:1,2,6

**job** 54:20

**john** 14:3 20:15
21:3 37:19 76:24
90:4 92:7 121:5
132:21 165:24
167:14 183:14
184:23 185:2,7,8

**joined** 61:14

**journals** 68:19
89:18

**judge** 18:2,8,9,20

**judges** 17:15,19,21

**judgeship** 18:16

**judgments** 39:15

**jump** 98:6

**June** 19:19,22 24:9
65:15 73:17 181:23

**jurors** 77:9

**jury** 77:22 78:2

**Justice** 67:14 68:4

**juvenile** 28:19,20,
23 30:10

———————————

**K**

**Kassick** 121:5
132:21,22

**Keen** 5:17 7:16,19,
24 8:11,18 11:10
33:22 34:7 39:7,10
47:14,24 58:1 63:14
67:2 74:22 76:3
78:13,17 79:5 80:10
83:14 84:24 85:19
86:7,17 88:3,21
89:20 90:18 91:5
94:20,22 105:18
106:3,13 107:5
108:7,13 109:12
110:8 117:16
120:23 127:12
130:17 134:10,12,
18 135:4 136:2

RICHARD J. BRZECZEK

November 29, 2018
Index: Kelly..long

137:4 142:24 145:5,
14 147:2 148:23
149:23 150:7 151:4
155:7 156:12
157:13 158:6,23
159:15 163:2
164:17,22,24 165:3,
8,11 171:20 172:18
175:7,16 176:20
178:2 181:12 186:3
188:19 189:11
190:5 193:10,13
194:9 195:8,17
196:15 197:13
198:24 199:14,21,
24 200:4,17 205:16
206:24 210:14
211:2,12 213:19
215:4,11 216:18
217:18 218:1,24
219:21 221:18
222:6,11,14,16
223:7

**Kelly** 5:8

**kids** 29:7 30:12

**kill** 85:8 207:16,18,
22 208:15 221:3

**killed** 90:9

**killing** 209:10

**Kimberly** 121:4

**kind** 29:18 37:6
44:18 68:10 70:10
164:10 184:2 186:7
194:3 196:1 205:9
214:22

**kinds** 35:20 133:5
146:23 215:22

**knew** 18:10,11,15
30:12 111:13 119:4,
10,21 120:22
161:19 162:11,12,
24 163:3,8 177:2
183:3 219:16

**knife** 90:8 142:17
152:12,13,16,17,20
154:7 155:1,5,11,
13,17 156:1,6,19
195:3

**knives** 135:15
136:18,21 137:2,17
138:1,14,16,21
139:2,8,9,21 140:6
141:21 142:8,17,22
152:8,10,14,16,18,
22 153:1,4,7,14
154:1,4,7,10,11,12
155:5,13 156:2,6
157:3

**knocking** 129:3

**knowing** 166:21
173:6 216:16

**knowledge** 165:22
187:24 195:9

---

## L

**L-A-G-A-C-E** 9:19
105:11 107:11

**lab** 32:8 49:22 50:1
146:22 172:1
215:21

**Laboratory** 172:8

**lack** 156:14

**lacks** 194:10
195:13 219:2

**Lagace** 9:17,19
81:12 82:16,18
104:17 105:10,12
106:11,23 107:3,10,
12,15,17,22 108:4,
10,16,19 109:2,6,
11,24 110:17,22
111:13,14 113:8,13,
14,16,22 114:9,19,
22 115:7,12,22,24
116:4,24 117:2,12
119:4,10,18,20
120:11 121:3,12,13,
19 122:2,8 123:2,
18,22 135:14
136:17,21 137:17,
24 139:20 140:6
142:16,22 144:5,12
147:24 148:7
153:13,18 154:10
159:11,12,20
161:10,19 162:7,24

165:23 167:8,22
168:3,5,6 169:14,17
170:10 171:8 173:6,
7,8,18 174:9,14
175:5,21 176:5,13,
18 177:1,2,11,24
180:5,19 181:9
183:3 184:10,11
195:1,2 197:9
204:11,14,20,22
205:3,8,9 207:4,7,
12 208:10 213:10,
15,22 214:1,19
215:2 216:15,23
218:14 219:13,18,
20 220:6,19 221:16

**Lagace's** 114:7
145:9 169:21
171:18 174:22
175:23 179:21
217:2

**language** 93:4

**large** 45:18

**larger** 24:23

**Larry** 16:4

**late** 55:2

**law** 20:14,15 21:3,
6,16 37:15,20
56:12,16,21 61:15,
23 65:10,19,24 66:9
67:19,24 68:16
70:13 75:21,23
116:9 124:4 131:13
144:24 148:17
149:2 157:6 158:1,
16 170:19 185:23
198:4,9,17 218:18

**lawful** 57:20

**lawn** 46:2

**lawsuit** 60:1,8

**lawsuits** 60:13
66:17

**lawyers** 23:6

**laying** 202:23

**lead** 47:17,20
163:19 164:11,15

**leadership** 67:23

**leading** 155:16

**learn** 129:10,11,13
132:17 133:3,14

**learned** 132:4,5
133:1,2 145:2,8
174:5

**leave** 36:7,9 149:13
179:22 214:5

**leaving** 60:14
63:10 175:23
180:20 181:9

**lecturer** 68:10

**led** 9:5

**left** 15:9 18:15,16
36:5,10 61:3,6
174:14,21 175:5,17
176:5,6,13 177:19
180:6,8 181:5 195:2
197:10 220:19,24
221:10,16 222:17

**legal** 5:9 51:19,24
52:10,17 53:4,8
54:18 59:9 85:20
145:15 157:14
196:15,16

**legislate** 120:1

**legitimate** 221:6

**length** 175:19

**letters** 154:8

**level** 149:9

**Levy** 61:15,22
63:11

**liability** 71:15

**liaison** 54:1

**license** 21:16
65:16,19

**licensed** 20:20,23

**lieutenant** 50:12,
16,18,21,23 51:6,8
64:2,4,5,6,21,22,23
65:1

**lieutenants** 64:10

**life** 55:8

**lights** 57:13

**likewise** 213:1

**Lillian** 121:5

**limited** 63:12 71:15
74:4 200:2

**limiting** 151:10

**lines** 82:21 154:17
186:13 202:10

**list** 54:12 73:8,16,
19 74:16,23 75:12
80:10 84:9 86:22
89:15 94:6 97:19
100:18

**listed** 13:6 74:5
87:2 90:3 121:2
129:2 131:12

**listening** 108:21

**listing** 133:8,12

**lists** 84:6 128:22

**litigation** 70:20
72:15 214:10

**live** 43:8

**lived** 148:1 153:19
177:3,5,8 178:1
217:14

**lives** 178:10

**local** 6:8 21:15

**located** 5:9 27:11,
14,16 28:6 31:17
36:17 177:12

**location** 177:13

**lockup** 25:23

**Loevy** 75:14,16,17
76:10

**logically** 119:20
120:9

**long** 11:7,21 12:5,
12 21:11 23:23 27:1
33:15 46:17 51:14,
23 64:5 72:1,2 97:8
133:19

RICHARD J. BRZECZEK

November 29, 2018
Index: longer..murder

**longer** 57:22 65:19 125:14

**looked** 10:16 38:11 41:6 87:10,16 88:14 129:19 144:18 193:18

**loss** 45:18,24 46:7, 10

**lost** 102:9

**lot** 35:11 55:10 212:22,23

**loud** 6:24

**Louisville** 67:14 68:4 72:1

**Loyola** 20:1

**lying** 162:9

_____

**M**

**M-E-L-K-O** 16:22

**Mac** 81:15

**machine** 169:11

**made** 23:9 28:19, 24 65:15 81:7 116:12 121:14 133:13 135:3 146:24 152:22 184:6 209:15

**maintain** 42:18 53:2

**maintained** 43:13 147:1

**major** 20:4 37:7 44:15 45:12,19,22 46:2,5,7,9 208:1

**make** 6:23 7:17 10:6 23:9 34:21 39:14 48:17 49:2 54:22 82:5 98:24 102:5,8 103:12 115:17 117:17 129:18 134:12 141:3,4 152:20 155:12 156:21 175:9 185:18

190:12 210:12

**makes** 146:9

**making** 8:7 164:22 165:4,9 190:17 195:10 211:10

**males** 57:13

**Malloy** 76:24

**management** 37:2 38:1,8,11,23 39:6

**mandated** 142:5 188:16

**mandates** 213:16

**mandatory** 130:14 134:4 135:7

**mantle** 196:19

**manual** 126:5 149:5 150:15 188:10 204:3,4 205:20 206:3,6,12, 13,15,22

**March** 26:8,22 36:6,8,10,12 46:12, 13,15,19,20 51:2 62:24 155:19

**margin** 8:8 9:13 82:22

**mark** 19:8 80:6 102:23 135:24 136:2 182:1

**marked** 19:11,14 25:20 73:12,15 80:9,15 103:3,6 112:20 136:6,10 182:5,8,9

**marks** 205:22

**Marshall** 20:15 21:3 37:19

**Maryland** 160:15 196:2 198:5 199:22

**massaged** 63:6

**master's** 20:9

**material** 127:8 130:7 177:14

**materials** 7:5,8,13, 21,22 11:3 13:5 74:11 89:13 124:11 126:11,15,17 127:7 128:5,7 130:12,24 131:3,23 135:1 149:8,11 150:15 161:7 176:24 177:9 197:24 199:9 204:5 218:18 219:15

**matter** 5:3 92:16 99:21 100:19 127:2 142:1 172:10

**matters** 53:9,10 72:8,11

**maximum** 102:17

**Maxwell** 27:12

**mayor** 56:1,5 69:11,17

**Mclean** 60:3,9 61:7

**Mcweeny** 14:9,21 15:5,11,14 167:11

**meaning** 127:19

**means** 27:5 54:10 57:19 190:19 201:16

**meant** 185:2

**measure** 169:11

**measured** 170:11

**measurements** 169:9 170:7

**measuring** 168:24 170:3

**mechanical** 190:16

**meet** 11:10,15,17, 19,21 15:11 212:20

**meeting** 11:24 12:22 13:4 156:17

**meetings** 53:24

**Melko** 16:20

**memo** 181:19

**memorandum**

178:17 181:11

**memorialize** 159:7 199:7

**memorialized** 192:14 220:13

**memorializing** 160:8

**memory** 10:12 15:4,7 126:16 187:24

**mention** 98:24 122:24 123:23 204:9,11,12 205:3

**mentioned** 19:4 66:3 87:12 90:8 91:19 107:15 113:13,16 114:7 124:13 172:24 182:10

**met** 12:5,8 14:10,21 183:13 184:14,20, 22 185:3

**Michael** 14:5

**Microsoft** 81:15

**middle** 55:2 174:3

**Mikuzis** 121:5

**million** 46:4

**mind** 43:22 80:1 119:22 156:9 178:8 208:5 220:2

**minutes** 122:13 176:4 197:11 222:5, 9,17

**Miranda** 34:13

**misappropriated** 63:8

**mischaracterizati on** 181:13

**mischaracterizes** 175:7 178:2,4 196:16

**Misha** 5:18 7:24 63:14

**missing** 29:4 31:12 179:5 195:3 201:17 215:12

**misstates** 117:16 120:23 135:4 155:7 163:2 189:11 193:10 219:22

**mistake** 9:12

**mistaken** 91:1

**mistakes** 81:13

**mistrial** 77:9 78:1

**modified** 212:24

**moles** 205:22

**moment** 151:22

**Monday** 131:10

**month** 44:2,3 54:6 214:9

**monthly** 53:3

**months** 26:21 155:23

**morning** 5:1 28:1 96:13

**motion** 41:22 42:3 116:12

**motorcycle** 25:21

**Mottier** 121:6

**move** 165:15

**moving** 144:3

**mower** 46:2

**MPA** 20:6

**multicopy** 38:3

**multiple** 38:14 126:6 152:14,15,18 188:20

**Municipal** 18:9

**murder** 45:21 87:18 103:10 111:17 112:2 118:8 132:9 148:8 159:13 163:23 164:2 194:24 207:5,13

210:7 217:11

**murdered** 104:7
105:5

**Murphy** 18:5,7

**myriad** 127:1

**N**

**N-O-R-B-E-R-T**
16:1

**named** 13:14,22
60:13 61:8

**names** 13:17,18
17:15 75:24

**narrative** 128:23

**nearest** 28:20

**neat** 209:14

**necessarily** 45:21
118:18 127:23
215:7 220:9

**neck** 204:13 205:3,
4,8

**needed** 53:6

**neighborhood**
217:15

**neighbors** 219:9

**Neil** 17:11

**nervous** 180:21

**news** 44:23

**newsworthy** 45:13

**nice** 129:19 209:14,
18

**nickname** 184:3,7

**Nielsen** 14:1

**night** 21:9 105:20
106:20 111:16
121:10 148:8
159:12 173:8
184:10 194:24

**nonresponsive**
133:18 165:16

**Norbert** 15:23 16:1

**normal** 24:24

**north** 31:10 59:11

**Northern** 6:9 46:7

**Nos** 136:5

**note** 145:23 146:4
171:17 183:21

**noted** 173:19

**notes** 7:12 8:3,6,8
67:12 90:4 92:6,22
93:11,14,18,20 94:4
111:6 144:9,22
145:10,12 146:6,8
155:21 168:14
173:19 182:11
207:6

**noticed** 82:11

**notices** 42:21

**notifications**
133:12

**notified** 43:2

**notify** 203:1

**November** 5:6
12:20 24:14,16,17
50:13

**number** 10:5,12
22:10 23:12 24:24
55:3 74:7 87:17,18
88:1 102:17 103:9
114:9 125:4 136:13,
14 140:19 190:1
216:6

**numbering** 11:2
81:21 83:5

**numbers** 79:8 85:2
96:9

**nurse** 127:23

**O**

**O'BRIEN** 75:2

**O'CONNOR** 75:21,
22

**O.W.** 69:2

**obey** 59:24 206:16

**object** 33:22 85:19
86:17 88:3 106:3,13
134:10 181:12
195:8 211:2 216:18
218:24

**objection** 34:7
39:7 47:14,24 58:1
67:2 74:22 76:3
78:13,17 79:5 83:14
84:24 88:21 89:20
90:18 91:5 105:18
107:5 108:7,13
109:12 110:8
117:16 120:23
127:12 130:17
134:12 135:4 137:4
145:5,14 148:23
149:23 150:7 151:4
155:7 157:13 158:6,
23 159:15 163:2
164:17,20,23 165:1,
7 171:20 172:18
175:7,16 176:20
178:2 186:3 188:20
189:11 190:5
193:10 194:9
195:12 196:15
197:13 199:1,15
200:17 205:16
213:19 215:4,11
217:18 219:21
221:18

**objections** 86:7
195:17

**objective** 127:18
168:7 169:4

**obligation** 157:9
196:7

**obtain** 33:21
116:18,19

**obtained** 20:14
34:5 85:6 114:19,21
115:4 142:7 147:14
196:12 208:13

**occasion** 14:10
153:8 172:22

**Occasionally** 54:5

**occasions** 135:14
136:17 137:3,18
138:1 139:20 140:2,
5,12 141:1 152:7,23
157:2

**occur** 193:6

**occurred** 22:3
114:15,17 152:23
184:13

**occurs** 193:8

**October** 12:16
25:14,24 26:7

**offender** 31:17
32:6 218:20,22
219:8

**offenders** 28:23
219:10

**Offense** 91:22

**offered** 130:8
211:14

**offering** 174:8
197:6 200:15
210:23 211:5

**office** 26:2,4,14
27:13,15,21 37:12
51:1,17 52:6,7,12
53:15 62:17 65:12,
14 72:5 181:22

**officer** 24:13 25:13,
16 26:17 28:15,18,
20 29:17,24 30:15,
24 31:4,7 32:14,18,
21 33:1,13,20
34:10,11,12 56:21,
23 59:17,20 60:8
68:22 75:18 113:3
132:6 133:4 148:20
149:19,21 151:16,
17 157:11,16,18,19
158:3,20 185:16,24
190:11,14 198:10
203:12 204:6

**officer's** 133:6
200:24 201:6
202:15

**officers** 28:24
29:1,23 34:19 35:17
51:11 54:2 59:10
66:16,19 67:1 73:5
74:21 75:1 91:24
102:3 132:10
133:13 135:13
139:19 140:23
151:1,2 198:21
201:2,6,8 202:3,9,
13 203:19,20
205:13 206:20
211:19 212:1
221:15

**officers'** 68:1

**official** 65:15
146:1,4,9 172:15
182:23 185:17
190:12

**Olson** 14:3 167:14

**on-the-job** 32:20

**on-the-record**
222:7,21

**on-view** 202:11,24

**one-and-a-half-**
27:8

**open** 96:20 198:12

**operating** 124:15
126:4 127:9,10
149:4 150:15 188:9

**operational** 37:12

**operations** 54:9

**operator** 221:3

**opinion** 78:15
80:21,22 84:18
85:4,10,15 87:1
88:20 98:23 108:15
110:12,18 114:20
119:17 120:19
121:1 126:15 155:6,
10 157:14 159:23
160:6 162:5 166:6,
20 167:5 168:6
171:5 172:10
179:20 195:22
196:16 197:7,14
208:16,18 210:19,

RICHARD J. BRZECZEK

November 29, 2018
Index: opinions..plaintiff's

24 211:5,8,10,12,18
218:11 219:1,23

**opinions** 83:9
84:23 85:17 86:4,9
89:10,14,18,24
90:17,22 160:2,4
164:13,14 166:2,16
200:15 210:15

**opposed** 153:16

**oral** 34:6,15,24
206:17

**orally** 34:22

**order** 28:17 29:5,12
33:12 55:1,5,7
59:18,22,24 86:24
88:20 89:7 90:22
115:10,15 116:3,4
117:22,23 118:4
119:13 123:4,7
124:3 142:4,9,10
144:23,24 148:17
149:2,9 150:12,16
157:5,6 158:16
166:1,15 185:22
199:11,13 202:2
206:16 217:20

**orders** 35:11,12,13
39:1,2 55:9,12
90:15 151:10,11
158:1 186:6 187:17
188:8,11 203:24
204:1

**ordinary** 127:19
128:1

**Oregon** 72:5

**organized** 51:5
86:14

**original** 88:6 91:19
190:21

**originally** 69:2

**other's** 116:13
117:13

**outcome** 40:17
58:22 59:1,2

**outlying** 43:24

**overheard** 110:22

**oversaw** 51:9

**oversee** 53:14

**oversight** 36:23

**overwhelmingly**
208:7

**owner** 69:24

---

**P**

**p.m.** 102:12 112:14,
17 122:3 147:7,10
173:24 174:18
187:10,13 223:1

**paddy** 25:21

**pages** 80:24 96:8
97:8 129:7 139:16,
17,22 140:18 166:8
182:14

**Palmer** 100:19,23
146:2

**palsy** 169:5,10

**paper** 27:6 93:16,
20 94:4 131:6,7,9,
10 144:10 173:19
182:11

**papers** 60:20 88:10

**paragraph** 82:1,3,
19 84:17 85:5
101:16 103:19
104:13 107:14
111:12,19 112:24
113:6,7,12 119:2,5
121:24 135:11
136:11,19 140:22
141:13 144:4
153:13 154:15
168:2 173:5 174:3
178:21 179:3 183:2,
9 184:9 185:10
190:8,10 197:18
200:20,21 204:8,9
206:23 207:3
208:12 211:19

**paragraphs** 81:17,
21 84:13,22,23
85:16,17 86:2,5

**parcelled** 220:15

**paren** 178:22

**parentheses**
178:23 179:4
183:10

**parole** 107:16

**parroting** 116:17

**part** 37:22 57:19
76:5 87:7 88:12
93:21 106:7 108:23
109:18 129:16
132:22 143:19
150:12 156:15,16
158:9,11 164:12,19
172:11,12 175:22
181:19 185:18
190:13,17,18

**Part-time** 21:8

**participate** 159:5

**participated**
121:11

**parties** 6:6 109:17

**partner** 25:21
31:15 61:20 62:2

**parts** 69:5

**past** 55:8 73:7
214:23

**patrol** 24:13 25:13,
16,19 26:17 29:1
35:9 56:23 107:16
129:10 132:6 202:3,
9,13 203:12,19,20
205:13

**pattern** 218:23

**Patti** 5:23

**Paul** 14:1

**Paulina** 101:20
177:12 202:16

**Pawlowski** 16:4

**pay** 52:7 98:22
192:23

**payment** 71:19

**payroll** 52:9

**PDF** 8:7 97:9

**pediatric** 127:23

**pending** 41:14
42:14 59:23

**Pendleton** 75:8
76:12

**penitentiary**
42:21,24 43:4

**peop** 24:24

**people** 17:13,14,
16,22 23:1 24:24
32:5 45:4 50:9
55:11 57:12 58:14
69:3 74:5 77:16
85:12 109:20 120:5,
16 127:18 129:3
152:14,15 159:3
169:19 207:21
215:21 216:3

**percentage** 72:7
79:2,6

**Perfect** 8:10

**performance**
14:12 59:5 61:10
151:13

**performances**
41:6

**period** 11:23 12:3,5
24:7 41:1,2 54:21
65:18 102:22 208:2
219:3

**periodically** 37:1

**person** 35:7 48:20
52:4 54:10 152:13
155:10,14,24
160:11 169:7
205:10

**person's** 31:12

**personal** 13:18
26:11 187:23

**personally** 13:13,
23 14:1,3,5,7,9
15:21,23 16:4,6,9,
19,24 17:2 58:17

**personnel** 53:5

**persons** 29:4

**persuaded** 213:22

**pertinent** 100:9
124:19,22 126:21
127:11,15,16,17,20,
22,24 128:2 149:14
150:10 186:10,22,
24 188:21,24 189:1,
8,13,22 190:3

**phone** 23:11
107:20 108:22
110:17 114:9,11
115:19 121:11,19,
22 174:7,13,21,23
175:5,10,18,20,23
221:6,11

**phonetic** 217:22

**photograph** 43:3

**photographs**
42:21 49:24 90:11

**phrase** 127:14

**physical** 89:23
164:9 169:9 204:16
205:14

**physically** 57:15
74:15

**physiological**
169:21 170:6

**pick** 174:8,14
175:21 176:9 178:9
179:22 220:20
221:1

**picked** 210:5

**piece** 94:4 154:2

**pieces** 209:18
210:11

**place** 5:5,11 23:10
45:17,20 80:23 85:3
171:16 191:23
221:24

**plaintiff** 5:17 66:16
73:1,2 101:15 218:7

**plaintiff's** 76:2,8,
13 80:20 89:10 91:4
154:23

RICHARD J. BRZECZEK

November 29, 2018
Index: plaintiffs..Progress

**plaintiffs** 66:13

**plan** 80:2,5

**plot** 85:8,10,13
208:14 209:2

**plug** 7:20

**plural** 152:17 153:1
154:8

**pluralized** 114:1

**point** 63:14 83:2
104:24 105:2 115:9,
14 116:3 117:5,23
118:4,9 121:12
124:3 135:1,6
139:17,18 142:3,9
144:23 149:1 150:6
157:5,24 159:1
161:23 162:17
164:5 184:17
185:23 202:1
213:21 222:3

**pointed** 81:10
145:19

**pole** 68:9

**police** 14:13 15:9,
12,19 16:14,17 17:9
21:4 23:19,23
28:18,20,24 33:7
34:9 43:2 52:8,9
53:4 54:1,2 55:16
56:10,13,17 57:3,23
58:8 59:4,10 60:8,
15,17 61:3,5,14
62:5,15 66:16,18
67:1 68:1,19,22
69:1,9,10,15,21
70:3,5,7,22 73:5
74:20,24 75:18
87:5,13 88:18 90:16
91:13 107:15
113:14,17 123:8
124:6 125:2 127:20
128:9 133:4 141:15
143:11,15,22 145:2,
12,21,22,23 148:19,
22 149:18,19,20,22
151:1,3 153:15
157:11,12,18 158:3,
5,20,21 171:24
172:8,15 180:5,8,

10,19 181:5,8
182:22 185:12,13,
15,17 186:2,8,15,24
188:17 190:2,12
191:11 192:11,12,
13 193:16,17,23
194:8 196:3,23
198:6,10 200:14
202:13 206:11
210:8 211:19 212:1
220:10 221:15,20

**policies** 68:15
119:23 197:19,20
198:8

**policy** 35:13 39:1,2
53:9 198:19 206:7
213:1,16

**polygraph** 49:22,
24 90:4 92:7,21,23
93:8 110:24 111:2,
5,6 113:17 122:9,14
123:3,11,23 124:7,
21 130:16 134:6
135:8 138:5 143:14,
23 145:4,20 146:11
147:12 148:12
153:17 161:20
162:1,4,8,19 163:4
167:2,8,23 168:3,8
169:1,4,8,18
170:11,12,16,20
171:9,19 172:23
173:1,4 182:19
204:12,21 207:8,15
211:21 212:6,9,12,
13,17,19,23 213:3,
4,5,23 214:4,12,18
215:15,18,23 216:7
219:20 220:1,3,8
221:3

**polygraphed**
128:10 130:16
134:7 161:10 163:1
165:24 169:19
215:3,10

**polygraphs**
170:14

**portfolio** 79:1

**portion** 78:15
166:13 175:4

176:11 177:23
183:8 217:9

**portions** 94:7,11,
14,16 95:6,14,22,24
96:2,4,6,14 166:12
175:3 177:21

**Portland** 72:4

**posed** 154:23
169:23

**position** 18:16,17
35:9 51:20,21 56:4
68:5,7

**positions** 68:3
71:22,23

**possess** 198:21

**possession**
152:12

**post** 25:17,19

**post-conviction**
74:9

**pot** 117:10

**potential** 160:12
216:1

**powder** 146:20

**practice** 21:16
61:23 65:19,23
66:1,5,9 118:6,13,
15

**practicing** 70:13

**pre-lieutenant**
64:2

**pre-miranda** 34:12

**pre-polygraph**
168:22

**pre-service** 50:20,
21,22,23 64:4,5,19,
24 65:2,5,8 124:12
127:9 128:6 129:17,
24 130:11

**preliminary** 98:5

**preparation** 7:6
9:3,20 11:4 94:18
140:15 161:14
162:13,15 166:9

172:9

**prepare** 33:2 53:2
89:7 129:15 192:5
204:6

**prepared** 81:6
91:24 114:4 128:13
144:20 166:6
172:15

**prepares** 190:20
191:5,18

**preparing** 11:13
129:22 206:20

**presence** 116:1
117:13

**present** 5:14

**presentation**
53:21 72:4

**presented** 218:4

**president** 69:20,24

**presiding** 18:9

**press** 53:10,11
54:4

**pressure** 170:5

**presume** 193:20
215:19

**presuming** 184:19
220:12

**pretest** 135:12
144:5,12 145:3,9
169:23 174:5 207:8,
15

**pretrial** 41:22

**pretty** 132:20 173:9
184:16

**prevails** 208:6

**prevalence** 219:7

**previously** 62:11
141:20 144:9
156:24 182:10

**Primarily** 26:13
62:1 66:2

**primary** 48:7
160:21

**principle** 116:7

**prior** 32:17 52:22
71:7 79:21 104:13
135:4,14 136:17
137:18 138:1
139:20 140:2,5,12,
24 144:3 165:22
175:8 193:11
196:17 217:10

**private** 65:23

**privileged** 86:19

**probable** 194:15
214:5

**problematic**
111:14,21,22

**problems** 53:7

**procedural** 53:9
149:4 150:15

**procedure** 6:7
68:19 124:15
131:13 188:10
206:8

**procedures** 67:20
68:16 119:23 126:5
127:10 149:11
197:20,21 202:9
203:12,19,24

**proceeding** 74:10
171:1

**proceedings**
167:17 223:2,10

**process** 28:23
117:7

**processing** 191:22
192:1,6

**processor** 128:15

**processors**
128:16

**produce** 8:16,18

**product** 86:19

**program** 129:12

**programs** 53:16

**Progress** 146:2

RICHARD J. BRZECZEK

**project** 55:6

**promoted** 50:17
64:15,18,22

**promotees** 50:20

**promotion** 50:19

**proper** 57:20 109:6
127:3 150:20
160:19

**property** 45:22

**proposed** 52:21
54:17,23

**propounded**
155:10,14

**propounding**
155:24

**pros** 212:16

**prosecution**
195:20,22 196:8
198:6

**prosecutor**
160:14,15 194:3

**prosecutors** 97:21
192:8,15,17,18
193:5,20,21,24
194:6 196:4,12,21,
22 197:7

**protect** 142:15

**protective** 217:19

**provide** 70:10,19

**provided** 9:5 19:14
78:1 79:3 80:20
90:21 94:10 96:13
97:4 99:21 100:7
101:1 128:6 135:2
141:14 144:6,12
157:7 178:14
180:23 193:17
194:21,23 195:4,19
207:14 211:1
214:20

**provider** 150:2

**providing** 71:1
157:17

**provision** 28:18

**provisions** 38:24
40:6 206:14

**public** 20:9 63:3

**publication** 69:8,
18 124:14

**published** 68:18,
20 69:12,15,17

**pull** 38:22 48:12,23
73:9 137:17 154:24
156:1

**pulled** 39:12
135:15 136:17,21
137:2 138:1,14
139:2,8,9,20 140:6
141:20 142:8,17,22
152:8,10 153:14
155:17

**pulls** 152:12

**Purolator** 45:17

**purpose** 54:24
159:2 168:7 169:17,
18 218:5

**purposefully**
169:3

**purposely** 168:7

**purposes** 41:3,4
90:1

**pursuant** 6:6
165:14

**pursuing** 117:8

**put** 7:20 13:17
14:15,18 16:12
25:23 49:23 78:4
79:22 81:19 100:11,
14 102:5,17 107:13
118:19 135:7
137:11 138:24
149:12 153:7 161:4
174:22 175:13
176:16 178:22
188:5 189:15
190:14 197:1
205:21 206:3 208:7

**putting** 88:16
130:9 190:16
191:14

**puzzle** 209:15

---

## Q

**qualified** 213:6,7

**qualify** 169:9

**quality** 48:15
188:12

**quantity** 146:20

**quantum** 186:5
187:16 188:12,15
189:5 197:23
199:19 205:18
206:9

**quash** 41:22 42:3

**question** 7:1
31:22,24 34:20
44:20 48:20 76:5
79:7 90:2 94:24
104:22 105:1 106:7,
9 107:2 115:1
120:11 128:11
133:24 137:6,21
150:1 151:19
153:21 154:22
155:11,15,16,24
156:7 157:15,21,24
158:9 159:2 165:17
173:3 176:10 181:1
182:19 184:18
186:4 199:5 200:1,
5,10 211:3 214:9
215:12 216:9 218:6

**questioning**
109:23 114:14,16,
17 208:1

**questions** 48:18
59:15,19,21 98:5
111:4 134:14 162:5
164:18 165:12
169:22 181:2 188:4
207:21 211:6,7

**quick** 112:12 147:5

**quickly** 79:24

---

## R

**R-A-J-E-W-S-K-I**
16:2

**radio** 201:16 202:6,
10,17,19 203:4

**Raise** 6:1

**raised** 48:18 220:1

**Rajewski** 15:23
16:1

**random** 40:5 44:5

**rank** 59:18

**ranks** 52:2

**rate** 52:7 79:12

**rates** 219:11

**re-dep** 222:17

**read** 12:12 48:14
49:12 93:19 98:2
100:8 101:19 102:1,
4,13 104:5,22 108:1
114:24 115:3
130:18,20 139:6,9,
13 141:19 154:17,
20 161:8,14 166:23
176:23 177:14
178:8 180:11,14
183:12 208:19,22
212:12,16,17,22
213:3 216:14,19,23
218:19 219:14

**readable** 104:2

**reading** 100:5
110:20 115:15,16
129:13 140:10
142:24 147:16,18
155:21 166:5 178:7

**real** 61:23 66:8
79:24 209:14,18
210:8 220:24

**realm** 150:13
194:13

**rearranged** 24:21

**reason** 43:6 83:17
95:11 109:14

113:19 123:24
141:4 145:19
214:11 220:5

**reasoning** 212:17

**reasons** 71:4
171:13 213:14

**recall** 18:3,11,23
34:3,4,18 38:3
68:14 82:24 88:6,8,
22 93:11,15 97:7
100:1 140:4,21
161:24 163:10
167:9 168:21 172:3,
24 177:13 178:7

**receive** 7:4 32:13
142:16 181:17,18
202:5,6

**received** 19:24
20:6 32:17 83:24
84:2,5 130:12
150:11 159:8
200:24 201:2,12

**receiving** 131:12
156:16 185:16
190:11 202:10

**recess** 63:20
112:15 147:8
187:11

**recidivism** 219:11

**recipient** 150:2

**recollect** 214:24

**recollection** 12:18
60:22 62:14 75:8
98:10 127:6

**recommendation**
49:5,6,9

**recommendations**
49:3

**record** 5:2,13 6:4
7:1 8:21 13:20 63:3,
17,19,22 80:17
112:14,17 115:2
130:19 147:2,7,10
155:8 158:4 159:7
164:22 165:9,12
185:17 186:18,21
187:7,10,12 188:17

RICHARD J. BRZECZEK

November 29, 2018
Index: recorded..required

189:8 190:11
198:22 222:22,23
223:1,3

**recorded** 161:3
186:16

**recording** 5:11
160:7

**records** 8:23 126:1
190:22,23

**recruit** 133:4

**red** 220:1

**reduce** 34:22

**reference** 10:10,12
121:14 135:21
136:14 181:3
183:22 187:16
191:11,19 200:23

**referenced** 10:20
62:11 69:6 136:11
137:8,9

**references** 9:10,24
10:2 11:8 12:10,13
186:6 187:17

**referencing** 137:6

**referred** 38:7 143:9
180:23,24

**referring** 10:8 62:9
93:10 103:19
112:24 113:9,11
114:3 119:23 125:1,
5 142:22 189:6
192:9 197:21 201:2,
6

**reflect** 6:4 8:21

**reflected** 210:16

**refresh** 10:11

**refuse** 59:20

**refused** 59:15
60:10

**refusing** 59:24

**regard** 85:9

**regarded** 213:15
218:14 219:18
220:6

**registers** 57:4

**Registration** 21:19

**regulations** 90:14
206:11,18

**reinvestigated**
49:4

**relate** 127:3 188:12

**related** 141:16
143:11,24

**relates** 111:8 128:3

**relating** 167:18

**relation** 23:4 66:6
124:20

**relations** 66:7

**relationship** 13:18
69:10,17 216:15

**relationships**
219:8

**relative** 107:19

**relayed** 149:18

**release** 43:4

**released** 43:1,7

**releases** 42:22
53:11,12

**relevant** 98:21
169:22 171:4
189:18 191:6

**relied** 89:14 167:4

**relieving** 54:7

**rely** 89:17,23 94:2
141:5 166:13

**relying** 138:14

**remark** 138:4,7,9
147:13 148:12

**remember** 10:21
22:23 24:7 33:17
37:14 45:16 57:8,16
58:6 59:8 62:22
64:8 70:15 75:20,24
76:2,7,10,13,16,17,
19,20,22 82:13
88:17 95:4,10 96:4,

9 98:17 100:1
147:16,18 151:24
162:2,10 166:24
177:14 214:24
221:24

**remembered** 10:6

**remote** 93:4

**render** 87:1 88:20
90:22 126:15
164:14 166:1,16

**rendered** 210:19

**rendering** 85:18

**renumbered** 81:16

**repeat** 104:22
149:3

**repeated** 208:2

**repeatedly** 178:3
199:21

**repeating** 116:17
118:10

**replaced** 52:4
125:13

**report** 9:6,9,10,12,
23 10:9 11:8 12:10,
12,15 13:6,9 38:5
40:11,12,23 41:9
42:13 50:4,8,10
53:3 56:20 80:18,24
81:6,13,14,19
82:11,15 83:1,4,9,
12,16,18,20 86:11,
14 88:7 89:3,5,7
91:12,20,22 94:18
101:20,24 102:14,
24 103:8,19 104:10
105:8,9,14,16,19,23
106:4,12,15,17,22,
23 107:10 108:9
111:10,12,23 112:6,
7,8,12,21,23 113:2,
8,10,18 114:3,6,23
115:15 118:1,16,18,
24 119:3,17 120:15,
21 122:10,11,15,23
123:5 124:7,16
127:3 128:9,13,14,
15,18 129:6,16
130:1,15 131:13

132:2 133:2,6,14
134:5,8 135:8
137:11 138:5 139:1
140:9,10,15 142:19
143:14,15,21,23
145:2,21,22,23
146:1,2,4,8,11,22,
23,24 147:13,24
148:13,22 149:13,
20,22 151:3 153:12,
18 154:24 155:5
156:11,22 157:12
158:5,22 160:5,20
161:5,6,15 163:13
166:10,24 168:2,15
171:5,10,11,12,17
172:1,2,8,9,14,15
180:3 181:21
182:23 183:2,23
184:10 185:1,13,17
186:2,10,12,13
188:17 190:3,12,15,
17,21 191:4,5,16,
18,20,22 192:1,5,
12,14 193:16,18,23
197:17 200:24
201:6,18,20,21,22,
23 202:4,13 203:19
204:9,18 205:22
207:3 209:5,9
210:20 211:15,18
213:14 214:16
218:9,13,16 219:18
220:14

**reported** 27:24
28:2 34:5,14,17
44:10 92:3 113:21
115:6,12 178:13
194:20 195:4
208:22

**reporter** 5:22 6:1
9:18 19:13 73:14
80:14 103:5 106:1,6
112:19 136:8
180:12 182:7
203:14 217:23
223:4

**reporting** 41:17
80:22 98:12 99:3
113:3 150:20
189:14 193:3 202:8,
15 203:12,19,23

204:2,4 205:20
206:2,6,12,13,15,22

**reports** 35:15,18
38:17,24 39:21 43:7
49:22 50:1 79:15
87:5,6,7,9,14,15,23
88:1,2,7,8,18,19,23
91:13,14,15 107:16
112:3 113:14,17
115:16 118:21
123:1,6,17 124:18
129:15,22 133:5
141:16,24 142:13
143:7,11,17,22
144:14,18,19,22
145:13 146:18,23
150:3,10 151:18
153:15 160:17
163:16 164:4 179:9,
10,11,13,15,18
186:6 187:16 188:5
191:1,15 193:19,21,
22 194:8 195:24
204:6,7 206:3,4,5,
21 209:4 214:15,22
220:10

**repository** 190:24

**represent** 53:23
211:12

**representations**
195:10,11

**represented** 19:5
75:18

**representing** 5:17
11:11 101:13,15

**reprimand** 22:17
52:24

**reprimanded**
22:14 23:15

**reproduce** 8:19

**reputation** 216:5

**requested** 7:4
91:10 115:3 130:20

**require** 142:11

**required** 38:5
50:19 115:11
117:24 119:2 123:6

RICHARD J. BRZECZEK

November 29, 2018
Index: requirement..separate

124:18 126:20 128:8 142:5 145:1 149:7 150:3 151:2 186:1 187:20 188:4 189:8 190:2 196:5 198:3,15,16,22 199:7 202:3 203:20 204:7 205:14 213:17

**requirement** 119:8 123:13 124:6 135:3 189:14 204:15

**requirements** 196:9 198:6 206:21 212:21

**requires** 206:13

**res** 156:15 175:23

**rescinded** 125:13

**research** 55:11 89:6 125:7,9,15,24

**resign** 56:3,8

**resigned** 15:3,5 61:13

**respecting** 211:20

**respective** 151:18 211:20,24

**respond** 21:24 211:7

**responded** 201:10,11

**responding** 91:24 202:15 203:7

**response** 58:16 133:24 187:2,15

**responses** 6:23 133:19 169:22 171:18 207:14,16

**responsibilities** 26:14 28:22 29:11 126:9

**responsibility** 27:17 29:2 38:13,16 69:4 192:2,5

**responsible** 38:19 41:17 44:8 50:7

51:12 71:18 148:20 149:21 160:11 164:3,6 179:20 191:14

**responsive** 8:23 171:18

**rest** 37:4 72:20

**restroom** 63:15

**result** 22:19 58:19

**resulted** 42:3 77:7

**results** 49:24

**retained** 73:3 74:19 75:13 76:2,8, 14,22 91:7

**retire** 15:3

**retired** 15:1 65:16, 18,21,22

**retrial** 77:11

**returned** 177:24

**Revenue** 71:7,10, 11

**review** 11:3 12:23 13:5 35:15 52:18,21 53:10 54:16 80:19 87:12 89:3 91:10 92:2,9,15 93:7 94:13,17 95:1,23 96:1 97:24 99:10,14 100:3 101:9 126:14, 16 167:10,13,16 172:9 175:3 176:2, 11 178:13,17 181:21 182:14 207:6 213:10,12 214:18 217:3,4,8

**reviewed** 7:5,21 9:9,23 11:23 12:9, 15 13:8 74:11 75:4 83:21,22 84:2,4,7, 10 86:23,24 87:4 90:16,22 91:3,15 92:5,13,19,24 93:2, 13 94:7,14 95:5,14, 22 96:2,5,11,16 97:2,20 99:9,16 100:18 140:15 161:8 167:3 175:2

176:24 177:10,22 182:12 185:13 192:21 215:17

**reviewing** 11:7 79:12 119:16 138:3 180:2

**revisions** 54:22

**rewrote** 55:7

**RFC** 10:4,14,18 11:2 136:13 140:19

**RFC-ANDERSEN** 135:22 137:10 172:6 173:13 182:9

**Richard** 5:3,16 6:5, 10 15:21 16:24 63:12 65:10 113:3, 11 114:2,5

**right-hand** 9:13

**rights** 60:21 66:12, 19,24 68:2

**Riley** 14:5

**ring** 180:15

**ringing** 132:11

**risk** 216:4

**Robert** 104:17 113:22 114:6,22 117:12 165:23 204:11 205:2 213:15 216:15,23 217:1 219:13

**Rochford** 60:4

**Rochowicz** 14:19 17:1,7 110:23 122:1 123:2,22 135:13 136:16 137:1,16,22 138:6,10 141:23,24 142:6 143:8 147:15 148:7,14 156:17 171:8

**Rockwell** 31:10

**Rode** 25:21

**role** 30:20 31:21,23 32:2 59:9

**roles** 32:7

roll 28:1,3

**Rolly** 217:22

**Romito** 75:6 76:21

**rooms** 118:3

**Roshna** 5:17 11:18,19,21 12:6,9, 22 13:4 90:24 164:21

**roughly** 17:5 35:22

**routine** 35:18 53:11

**rudely** 57:11

**rudimentary** 154:5

**rule** 116:8,10 165:14 205:9 206:7, 17 212:18 220:18

**ruled** 208:10,11

**rules** 6:7,8,19,22 90:14 120:2,4,6 196:10 206:10,17

**run** 79:24

**running** 92:22 191:2

**Ryan** 183:14 184:23 185:2,7

**Ryan's** 185:7,8

—————————

**S**

**Salgado** 75:5,19

**sat** 95:7 152:10

**scar** 205:2,3,8

**scars** 204:13 205:22

**scene** 105:21 106:10 132:8,9

**school** 20:15 21:3, 6,9 37:15,20 50:18, 20,21,22,23 64:2,3, 4,5,6,9,11,16,19,23 65:1,2,5,8 67:14 68:4 127:9 128:7 130:13 132:5,18

133:2,15 134:3 135:2 219:9

**science** 20:1 69:21 70:6,7,22

**scope** 192:19 195:9

**screen** 81:20 96:20

**scroll** 187:1

**search** 37:13

**secretary** 51:11 54:1

**section** 51:6,8 84:15,22 85:15 101:16 138:5,7,9 147:13 148:12 190:22 211:18

**sections** 96:23 97:1,14 161:13 166:7,8,22 167:3

**security** 78:23

**seek** 115:11

**select** 94:7,14,16 95:6,14

**selected** 91:3 94:10 95:22,23 96:2,4,6 166:12 175:2 177:21

**selection** 44:5

**selective** 96:14

**semesters** 21:13

**seminar** 68:12 72:2

**send** 42:20 53:18

**sense** 102:8 115:17 151:15 152:20 210:12

**sentence** 111:19 112:4 119:6 139:4 178:22 179:3 190:9, 10 197:18 204:10

**separate** 33:5 70:14 118:3,7,9,14 132:24 152:23 191:8

RICHARD J. BRZECZEK

November 29, 2018
Index: separated..stated

**separated** 87:8
118:17

**separately** 116:5,
10,15 117:20
118:20

**separation** 53:1
54:3 59:23

**September** 24:9,
11 25:13 37:21

**sergeant** 36:13,16,
19 37:16 43:16
44:7,9,12 46:11,23,
24 47:2,4 48:5,20,
24 49:7 50:21
64:11,18,19,21 65:2
122:12,15,22
191:21

**sergeants** 36:24
51:9 64:8,10

**series** 48:21 75:21

**served** 60:20

**service** 51:20
71:11

**services** 46:16,18,
22 48:6 70:4,10,19
71:2 74:20 79:3,11

**serving** 78:21

**set** 29:11 149:11

**settled** 76:19
77:11,15

**seventh** 28:8 60:2

**sex** 29:21 219:10

**sexual** 29:21 30:1
59:12 216:23
217:17 218:20,21,
23 219:3,7,16

**shaking** 169:6

**share** 158:19

**shared** 157:19

**shares** 157:10

**sharing** 157:17
159:2

**sheet** 50:5,6

182:19

**Sheila** 18:5,7

**shelf** 55:8

**sheriff's** 72:5

**shift** 28:1,2

**short** 205:1 221:2

**shortly** 174:7,12
175:10,13 176:17

**show** 65:22 95:19
162:8 172:2,5

**showed** 184:15

**showed/taught**
173:8 184:11

**showing** 143:18

**shown** 42:12

**shows** 129:2
145:20 183:9

**shut** 65:13,14

**side** 108:24

**sidewalk** 202:23

**sign** 59:22

**signature** 35:12
52:23 81:3

**signed** 114:4
214:19

**significantly** 208:6

**simple** 118:19
132:20

**simply** 9:9 34:24
114:17

**sine** 223:11

**single** 152:13,16
153:5,8

**singular** 139:24
140:9 155:1

**singularly** 155:5

**sir** 134:2

**sit** 38:22

**sitting** 95:17

**situations** 119:24

**six-year** 54:20

**sixth** 18:9 82:22

**size** 38:4 46:10

**skim** 98:3,19

**Sladjana** 77:17

**slash** 204:13

**slip** 38:8,11 164:1

**slips** 38:23 39:6
163:21

**slot** 52:6

**small** 53:19 66:7
107:12 166:8

**smoothly** 209:17,
22

**so-and-so** 10:7

**Social** 78:23

**soliciting** 211:16

**solidifies** 109:2

**solve** 32:5

**solved** 31:16

**someone's** 10:8

**sort** 86:18

**sought** 115:6

**sound** 178:11

**source** 142:11,14
194:7,12 196:13
203:21

**source's** 142:15

**sources** 30:11
78:21 194:16

**South** 5:5 28:7
36:17 101:20
177:12 202:16

**speak** 159:5

**speaking** 164:20,
23 165:1,6 205:10
216:3

**special** 32:19

90:15 115:10 116:4
117:22 123:4 124:3
142:4,10 144:24
148:17 149:2,9
150:12 151:10
157:6 185:22
188:10 202:2 204:1

**specialized** 53:16

**specific** 15:7 31:9
32:11 44:24 45:1
53:12 131:20 159:1
177:13 187:19,22
199:10,13,16,18,22
202:2 209:5 213:16

**specifically** 107:2
110:9 126:7 140:22
185:24 189:7 193:1
196:2 198:20
205:13,20

**spectrum** 199:8

**speculated** 162:20

**speculation** 76:3
106:14 107:6 194:9
195:12 215:5,11

**Spell** 15:24 16:21

**spelled** 28:16
105:10 107:7

**spelling** 105:11
106:11 107:12

**spend** 11:7

**spirit** 198:13

**spoken** 133:10

**spring** 25:6,8

**squad** 25:20

**stab** 207:19

**stabbed** 101:17
104:14,20 153:22
154:9 207:9

**stabbing** 154:12

**Stacy** 5:20

**staff** 26:11 53:14

**stamp** 8:12,15
223:5

**stamped** 8:17

**stampeded** 10:14

**stamps** 8:19

**standard** 116:8
118:6,13,15 124:4,
15 126:4 144:24
148:17,18 149:3,4
150:15 157:6
158:17 185:23
188:9 202:8 203:11,
18,23

**standardized**
146:1

**standards** 158:1
168:5,23 169:15,20
170:8

**standing** 116:7

**standpoint** 179:16

**stands** 136:20

**Stankiewicz** 121:7

**Stanley** 121:6

**start** 28:14 37:19
195:5 203:14 210:2

**started** 17:6 62:9,
12,13,15,17 63:11
197:1

**starting** 54:12

**state** 20:23 21:15
28:7 35:4 36:1,17
78:11,16 83:21
101:19 104:13
111:11 130:24
131:3 142:20 143:3
144:4 168:3 174:4
185:10 188:15
190:8 206:23 207:3
211:19 213:13
218:13

**state's** 17:14 62:4,
16 181:22

**stated** 114:9,10
115:18 124:5
137:21 175:4
177:23 194:24
198:20 218:16

RICHARD J. BRZECZEK

November 29, 2018
Index: statement..tavern

**statement** 34:6,23, 24 47:18 59:14,15 60:12 85:6 92:3 111:10 135:19,20 137:7,9 139:5 140:11 153:16 157:1 178:14 183:5 194:20 195:4 196:21 208:13,23 209:3

**statements** 34:15, 16,17,20 50:1 153:17 209:9

**states** 114:7 128:18 148:18 157:8 185:24 212:18

**station** 210:6

**statistically** 23:5

**statute** 29:2

**statutory** 28:17

**stayed** 25:5 175:18

**stealing** 46:2

**Stewart** 75:8 76:13

**stim** 170:2

**stole** 63:7

**stolen** 29:7 46:5

**stop** 57:9 133:21 222:5

**stopped** 57:12 58:7

**stopping** 222:3

**story** 114:11

**Stout** 90:4 92:7 93:9 135:14,21 136:16 137:1,16,22 138:9,19 139:12,19 140:24 141:19,22 143:7,24 144:4,6,8, 12,22 145:8 147:13, 23 148:6,13 154:3,6 155:3,12 156:5 165:24 168:12,16 169:15,16 170:7 171:13,17,23

**Stout's** 92:12,15 93:14,20,23 94:2 113:17 138:4,15 139:3,15 143:14 145:10 153:17 154:21 168:14,19 173:12 182:11 207:6 214:21,24

**straight** 64:11 170:2

**street** 5:5 27:12 28:4,7 35:4 36:1,17 54:11 101:20 191:3

**streets** 36:3

**strike** 22:5 105:1 122:6 160:3 165:15

**strong** 140:11 157:1

**stuck** 178:8

**studied** 212:6,9 213:2,5

**studying** 212:12

**stuff** 98:6,19 217:20

**subject** 57:3 136:20 137:2 138:13 139:1,7 141:20 145:3 147:20 152:8 154:24 168:4,11,18 169:14 183:13

**subjects** 215:23

**submit** 80:2 150:3 191:16 192:6 213:23 215:14 216:7

**submits** 191:20

**submitted** 38:17 73:6 74:11 79:18 80:18 81:19 105:20 106:18,22 122:11, 17,22 168:3

**submitting** 12:15 80:5 166:24

**subpoena** 6:6 7:4 8:23

**subsequent** 69:2 80:19 111:9 166:23

**subsequently** 77:11 160:10 161:15

**substance** 72:14 82:15

**substantially** 208:7

**substantive** 98:8 130:7 142:18 179:16

**sues** 214:2

**sufficient** 157:8 158:2,17 163:19

**suggest** 194:16

**suicides** 68:22

**suit** 59:5 61:9

**Suite** 5:5

**sum** 86:23

**summarized** 178:18

**summary** 50:3,8, 10

**summer** 24:23

**superintendent** 26:4,5,12 46:6 49:3 51:19,22,24 52:13, 17,23 53:3,8,13,23 54:5,8,18 55:16,19, 24 56:24 58:16,17 59:6,7,22 60:6,23 61:11 62:7 101:3

**superintendent's** 26:2 50:24 51:17 53:15

**supervisor** 47:11 49:19

**supervisors** 45:5

**supplement** 83:12,15,18

**Supplementary** 10:9 87:6,15 88:1,7, 19 91:13,14 105:8, 13,16 106:12,17,18 111:10 112:8,21,23 113:2 118:1 120:15 128:12 129:15 130:15 134:5 144:18 146:8 179:10,13 186:10, 11 190:20 191:15 192:14 201:22 202:4 204:18 206:5 209:4,5,8

**Support** 5:9

**supporting** 49:20

**supposed** 81:12

**supposedly** 90:9 192:11

**suppress** 41:23

**Supreme** 22:17 23:16 196:10

**suspect** 160:12 162:9 204:17,19,20, 23 207:5 213:15,18 216:1 218:15 219:19 220:7

**suspects** 205:15

**suspended** 40:2 42:8 59:23

**suspension** 53:1 59:22

**sustained** 41:23 52:22

**swear** 5:24

**sweating** 197:11

**sworn** 6:3,12

**syllabi** 188:9

**syllabus** 130:4 131:9 134:4

**T**

**T-R-U-N-K-O** 9:14

**takes** 147:24 178:9 191:23

**taking** 5:5,11 45:20 108:9 124:21 153:7 157:2 163:4 186:11

**talk** 45:3,4,5 53:6 58:16,18 146:6 190:16 210:8 218:10

**talked** 12:24 13:1 28:5 59:8 124:16 148:11 162:6 163:18,21 167:21 194:22 200:20 203:5 208:15

**talking** 30:19 35:12 49:14 56:22 60:16 102:10 103:14 106:20 112:5 114:1 136:21 143:16 146:20 149:12 151:11 155:22 156:1 162:10 169:20,21,24 174:4 176:12 179:8,9,12 185:11 188:7,8,23 189:1 194:17 197:22 201:5 217:21

**talks** 196:2

**tall** 205:23

**tangential** 37:6

**tangible** 89:23 90:6

**task** 9:4 98:21

**tatoos** 205:22

**taught** 67:19 71:8 129:14 130:10 131:17,18 133:5 211:20,23,24 212:2, 3,4

**tavern** 104:16 111:15 175:6 176:14 177:2,15,24

**172**:14 173:18,19 174:5 214:16 216:2, 4,8

RICHARD J. BRZECZEK

November 29, 2018
Index: taxes..trial

179:22 180:6,9,20 181:5,9 184:21 195:1 220:20 221:16

**taxes** 71:19

**teach** 67:18,21

**teachers** 219:9

**teaching** 67:13 70:14 71:4,5,20,21, 23 130:6

**technical** 32:11

**technician** 32:9

**Technology** 20:7

**Ted** 16:19

**telephone** 104:15 108:16 109:15 112:9 113:23 123:19

**television** 129:12

**telling** 98:17 116:21 117:5 189:13

**tells** 117:3 186:2,18 187:21 188:18 189:9,10 190:4 205:21 221:3

**ten** 43:18 66:23 222:9

**ten-minute** 102:22

**tender** 7:13

**tendered** 8:22

**term** 88:16 151:15 156:14 168:17

**terms** 35:18 36:22 37:5 39:24 68:8 85:9 132:1 202:14 221:9

**Teslow** 75:4,22

**test** 170:1 212:14, 15,21

**tested** 146:21 171:13

**testified** 6:12 61:2 72:18 73:4 77:1,6, 13,16 126:17 138:19 144:9 146:10 148:13 161:12 165:19 176:12 180:4 195:15 198:24 199:15 217:5,9

**testify** 60:24 74:15 75:3 77:12,19 83:10 139:11 162:15

**testifying** 78:10 101:2

**testimony** 73:7,8, 16 74:3 78:1 80:10 94:3,11 96:5,15 99:24 100:18,22 101:1,5,9,12 116:14 117:16 118:11 134:2 135:5 139:3 146:5 147:16 149:3 155:16 162:2,22 163:2 166:1,4,5,8,9, 15 167:4 168:14 175:3,8 176:3,12 177:19,22 178:3,4 180:3 181:20 189:5, 11 193:11 196:17 203:10,18 210:24 217:4,9 221:23 222:21

**testing** 146:19

**text** 89:17

**Thaddeus** 16:19

**theft** 29:6 44:4

**thefts** 29:4

**theoretically** 90:5

**Theresa** 121:5

**thing** 6:21 42:18 55:7 69:7 81:22 98:9 100:17 107:15, 19 113:13 117:1 119:22 122:20 123:16 125:16,18 156:24 163:19 199:17

**things** 9:20 12:1 33:3 35:11 37:14 41:5 42:19 43:13 44:16,18,24 45:1 55:10 70:21 98:3,5, 8 100:9 131:14 133:3 162:10 163:10,16 190:16 197:3 199:16,22 205:5,11,23 209:17, 21 210:12 214:3,7,8

**thinking** 153:3 154:4

**thinks** 162:1

**thought** 29:6 82:12 129:19 132:23 140:9 152:11 153:2 154:2 185:2,4

**thousands** 46:9

**threat** 152:19

**threaten** 152:15

**threatening** 154:10

**threats** 153:4

**three-hour** 11:23 12:2,5

**throwing** 117:9

**thumb** 9:15

**tie** 218:8

**tied** 171:15

**Tim** 5:8

**time** 11:24 12:5,14 14:20 17:6 18:8,15 24:3,7,21 27:9,18 28:18 29:12,20 33:3,8 34:9,10,12 35:6,24 37:11,16 38:2 40:19 41:2 42:1,19,24 43:20,23 44:1,9 45:16 47:1,3 48:22 51:18 53:19, 20 54:3 57:5 59:11 60:23 62:6 71:7 72:1,2 83:7,18 92:23 101:24 102:3, 11,12 103:21 104:8

106:21 108:14 117:13 125:7 126:2, 19 127:18 129:24 133:19,22 134:19 141:23 146:16 149:6 153:3 162:18 169:7 170:21 174:19 175:19 186:9 188:2 200:2 206:18 208:2 216:11 219:3 221:2, 10,11 222:7,13,21 223:5

**timeliness** 38:24

**timely** 38:18 39:21

**times** 22:3 30:7,16 34:2 54:6 67:23 68:12 73:3 75:13 118:3 188:20 219:10

**title** 35:6 51:18 52:3,12 68:10 190:1

**titles** 52:2 54:20

**today** 7:9 9:3,20,21 11:5 16:12 79:22 80:3 108:15 166:20 222:7

**told** 43:18 58:12 74:2 96:1 109:14 121:18,22 123:18 129:21 132:3,16 133:21 137:22 138:10 161:13 166:6,23 173:18 180:5,8,10 185:12 186:8,15,23 194:1 200:14 205:19 220:11,12 221:20

**tome** 213:4

**tool** 211:21,22 213:8

**top** 83:21 97:9 182:18 187:2

**topic** 125:22

**topics** 127:4 129:8 131:17

**toss** 132:14

**total** 56:9 71:9 79:8,21 86:23 222:7,20

**totality** 110:19

**totally** 133:24 199:20

**totem** 68:9

**touched** 64:1

**track** 42:4

**traffic** 57:9,10

**trained** 170:14

**training** 24:1 32:13,17,20 33:7, 12,16 35:16 53:16, 19 124:9,11,24 125:1,2,5,17,19,20, 21 126:18 127:7,8 128:5 129:17,24 130:11,12,24 131:2 149:8,11 150:14 186:7 187:17 188:8, 9 197:23 199:9 218:19 219:6

**transcript** 92:10, 13,16,18 93:9 94:14 95:2,5,14 97:4,8,16 98:1,15 99:5,10,13, 17 100:4,11,12,15 138:4 167:11,14 192:22 208:20

**transcripts** 95:12 167:17

**transfer** 146:8

**transferred** 24:19, 23 25:9 26:22 27:6 35:3 49:7

**Transport** 46:7

**treading** 218:1

**treated** 57:11

**trends** 37:5

**trial** 14:23 15:8 18:1,22 19:6 67:10 77:2,6,12,16,20 78:8 83:10 90:6 116:13 195:6

RICHARD J. BRZECZEK

November 29, 2018
Index: trials..white

200:15 210:24
211:6

trials 15:5

tricks 173:9
184:12,15

TRO 101:7

trouble 155:20

true 113:18,19
135:3 180:3 218:17

Trunko 9:14 81:11
82:16,18 85:8
101:17 103:10
111:14 112:2,22
119:4,11,19,21
120:22 121:9,11,20,
23 123:18 135:15
136:18 137:18
139:21 140:6
141:16 142:23
143:11,24 144:14
148:8,10 153:14,22
159:12 162:23
163:22 167:7,23
173:8 174:8,20
175:5,18,20,21
176:5,9,13,18,19
177:2,7 178:1
179:23 180:7,20
181:10 184:11
197:10 207:10,17
208:15 209:11
210:7 216:16 217:5,
10 219:16 220:20

Trunko's 111:15
173:7,17 174:9
177:12 183:3
217:11

truth 108:11 116:22
117:5,9 120:7

truth-seeking
117:7

truthfully 43:18

turn 54:7 196:4,5,7
197:3

turned 31:15 57:14
122:19 184:1
195:21 221:11

turning 198:8

turns 214:1

twelve 63:8

two- 12:4

two-and-a-half-
11:22 12:2

two-week 64:24

two-year 27:9

tying 75:24 164:9

type 34:19 66:6
71:16 131:20 219:3

typewritten 128:14

typically 49:17,18
193:7

typo 82:18 83:5

typographical
82:10

typos 82:13,14
83:1

Tyrone 74:5 75:16

——————————

U

U.S. 5:9

Uh-huh 183:11

unable 174:10

unannounced
38:22

underlined 84:11

underlying 45:9

undermine 169:4

undersigned
83:22 84:5

understand 8:6
31:22 72:13 77:10
127:19 131:1
137:20 138:18
150:1 158:8,9
184:24 190:18

understanding
87:19

Understood 7:3

undoubtedly
125:23,24

unfit 168:4,10,11,
18 169:8,12,14
170:9

unfounded 40:1
42:9

uniformed 91:24
132:10 133:13

uniformity 206:13

unit 26:23 27:10
29:21 37:9,11 92:21
122:14 123:3,11
130:16 134:6
172:23 173:1

United 212:18

units 37:12 43:24
44:1

University 20:1
67:13 68:3 71:24

unresponsive
199:20

untoward 170:9

updates 19:21
73:19

updating 69:4

upper 183:8

upsetting 168:24

useless 162:1,5

usual 35:17

——————————

V

vacation 54:8

varies 120:6

variety 129:7

venture 141:3

verbally 194:2

verbatim 186:21

verification 116:19

version 205:1

versus 5:4 60:3
72:8,17 73:1 74:5,
24 75:1,2,4,5,8,22
76:1,7,12,21 77:5,
14,16 78:5 82:16,18
100:19 155:13
196:2 198:5 199:22

Vice 51:3

victim 29:21
111:16 114:12
115:20 119:15
136:22 137:3,17
138:1,14 139:8
141:21 142:8,17
147:21 148:1 152:9,
10 155:17 183:14,
17

victims 218:19
219:7

video 5:11 63:18,
22 112:13,17 147:6,
10 187:9,12 222:24
223:3

videographer's
222:13

view 203:9

violence 219:16

visible 204:13

visit 111:16

visiting 68:9

vitae 19:16 69:19

voluntarily 215:3,
14 216:10

voluntary 216:12

volunteered
214:13,14

Vukovic 77:17

——————————

W

wager 127:16

wagon 25:22

wait 6:24

waited 65:18

waiver 214:18,22,
24 215:18

walk 152:14 211:9

walked 25:17,19

Walter 121:6

Wangler 5:23

wanted 10:5,11
26:15 38:10 42:1
125:12 174:22
210:8

ward 127:23

warehouse 46:3

warrants 37:13

Washington 56:5

watching 129:11

Waukegan 78:9

waved 202:18

waver 203:8

wavers 202:21

waving 202:21

website 65:22

week 24:1,4,6
53:20 64:23 68:13
125:7,22 131:11

week-long 68:11

weeks 24:2,3,5
33:10 56:11,12
64:7,8,9,12,16,22
65:4,8 129:23
130:4,13 196:24

west 5:10 25:3
27:12

whatsoever
117:18 123:1,23

whistleblower
75:18

white 131:9,10
146:20

RICHARD J. BRZECZEK

November 29, 2018
Index: wife..youth

**wife** 58:15

**wills** 66:8

**Wilson** 26:5,12
69:2 75:2

**winter** 24:22

**withholding** 71:13

**witness's** 195:9

**witnesses** 116:9,
12,15 118:2,7,9,14,
17,19 120:22 121:2,
4,13 128:22 133:9
205:15

**woman** 31:9

**women** 217:16

**wondering** 138:24
175:12

**word** 9:14 81:15
82:21 97:11 127:16
128:14,16 138:16,
20 153:1 155:4,11
156:5,18 157:2
169:12

**wording** 77:8

**words** 29:20 54:19
102:2 109:20
127:16,19 128:2
156:10 168:18,19
169:8 208:17

**work** 15:14 16:15
17:7 27:20,23
35:11,15,18 61:19
68:19 72:8 79:19
86:18,19

**worked** 25:12,19,
21,22 27:3,4 30:12
33:1 35:5 47:5 54:2
56:16 61:17 68:14

**working** 21:3 26:16
37:12 38:14,15
47:11 52:11 132:8
163:9

**worth** 46:4 134:22

**worthy** 44:23

**write** 133:5 134:7

**writes** 138:9
141:19

**writing** 9:5 34:22
79:15 124:16 127:3
129:16 130:1
131:13 133:2,14
134:4 160:5,20
171:5

**writings** 69:6

**written** 34:23 50:1
69:2 90:3 92:6 93:4
131:6,7,9 140:1
141:21,24 151:12
155:21 156:15
161:6 181:11
202:13 206:7,16

**wrong** 82:17

**wrote** 96:21 102:3
105:15 108:14
110:10 112:6,7
114:18 123:17
139:6 144:8 179:14

———————————

**Y**

**year** 24:22 26:19
27:4 37:19 41:14
54:6 62:22 70:16
126:19 196:20
214:9

**years** 18:18 27:3,5
30:19 35:21,23
41:14 42:23 43:1,15
52:2 55:9,15 56:10,
11,12 60:21 61:17,
19 69:5 115:16
131:4 155:23 198:2
214:9

**yellow** 93:16,20
94:4 144:10 173:19
182:11

**yesterday** 11:16
12:14,20 13:4

**youth** 26:23 27:7,
10,13,15,20 28:5,
11,15 29:17,23,24
30:15,24 31:4,6,13
32:14,18,20 33:1,
12,20 34:10,11,12,

19 35:3,6,7,8,14,17
36:1,5,7,10