RICHARD BRZECZEK                                    December 20, 2018

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION
      DANIEL ANDERSEN,                  )
 3                                      )
             Plaintiff,                 )
 4                                      )
      v.                                ) Case No.: 16 CV 1963
 5                                      )
      CITY OF CHICAGO, et al.,          )
 6                                      )
             Defendants.                )
 7
```

 8              The videotaped deposition of

 9    RICHARD J. BRZECZEK, called by the plaintiff for examination

10    pursuant to notice and pursuant to the Rules of Civil Procedure

11    for the United States District Courts pertaining to the taking

12    of depositions, taken before Devan J. Moore, a certified

13    shorthand reporter within and for the County of Cook and State

14    of Illinois, at 20 South Clark Street, Suite 1700, Chicago,

15    Illinois, on the 20th day of December 2018.

16

17

18

19

20

21

22

23

24

RICHARD BRZECZEK                                December 20, 2018

---

Page 2

```
 1          APPEARANCES:
 2          LOEVY & LOEVY, by
            MS. HEATHER LEWIS DONNELL
 3          311 North Aberdeen Street
            3rd Floor
 4          Chicago, IL 60607
            (312)957-8722
 5              for the plaintiff;
 6          BORKAN & SCAHILL, LTD., by
            MS. MISHA ITCHHAPORIA
 7          20 South Clark Street
            Suite 1700
 8          Chicago, IL 60603
            (312) 580-1030
 9              for the individual
                defendant officers;
10
            ROCK FUSCO & CONNELLY, LLC, by
11          MS. STACY A. BENJAMIN
            321 North Clark Street
12          Chicago, IL 60654
            (312) 494-1000
13              for the defendant
                City of Chicago.
14
15      ALSO PRESENT:
16      Mr. Scott Johnson, videographer.
17
18
19
20
21
22
23
24
```

---

Page 3

```
 1              I N D E X
 2
 3      Witnesses:                            Page
        Brzeczek
 4
            Examination by:
 5
            Ms. Itchhaporia               5
 6
            Ms. Benjamin                 52
 7
 8
 9
10
11
12              E X H I B I T S
13
        Number                               Page
14      Brzeczek Deposition Exhibit No. 9    19
15
16
17
18
19
20
21
22
23
24
```

---

Page 4

```
 1          THE VIDEOGRAPHER:  This is the videotaped deposition of
 2      Richard Brzeczek being taken in the matter of Andersen versus
 3      City of Chicago, et al., Case No. 16 CV 1963.  This deposition
 4      is taking place at 20 South Clark Street, December 20th, 2018.
 5      The time is 3:07 p.m.
 6              My name is Scott Johnson.  I'm the
 7      videographer with U.S. Legal Support, located at 200 West
 8      Jackson Boulevard, Chicago, Illinois.  The court reporter today
 9      is Devan Moore.  A video and audio recording will be taking
10      place unless all parties have agreed to go off the record.
11              Would counsel please state their names for the
12      record?
13          MS. ITCHHAPORIA:  Misha Itchhaporia for the individual
14      defendant officers.
15          MS. BENJAMIN:  Stacy Benjamin for defendant, City of
16      Chicago.
17          MS. DONNELL:  Heather Lewis Donnell on behalf of the
18      plaintiff, Daniel Andersen.
19          THE VIDEOGRAPHER:  Will the court reporter please swear
20      in the witness?
21
22
23
24
```

---

Page 5

```
 1              (Witness sworn.)
 2              RICHARD J. BRZECZEK,
 3      called as a witness herein, having been first duly sworn, was
 4      examined and testified as follows:
 5              EXAMINATION
 6              BY
 7              MS. ITCHHAPORIA:
 8      Q   Mr. Brezeczek, have you reviewed any materials
 9      relating to this case since November 29th, 2018, which was the
10      first part of your deposition, to today's date?
11      A   Yes.
12      Q   What did you review?
13      A   Based upon the questions that you asked me about
14      the Diane Diaz Grabowski statement taken by Sheila Murphy,  I
15      reviewed that.  And based upon the questions that you asked me
16      about Detective Higgins, I looked at his deposition.
17              And it wasn't the complete one that I had, but
18      it was like 352 pages of his initial deposition time, from the
19      beginning to the end.  I just kind of skimmed over it to see if
20      there was anything in there that would be helpful for me to
21      answer any other questions that you may have about Higgins.
22      Those would be the two that I looked at.
23      Q   Okay.  So are you saying that you looked at the
24      same deposition transcript from Mr. Higgins that you had
```

---

U.S. Legal Support, Inc.
(312) 236-8352

RICHARD BRZECZEK                                December 20, 2018

Page 6

1  provided on the flash drive?
2      A   I did.  But remember my testimony was and my report
3  said it was selective portions of Higgins' deposition; so I
4  re-read the thing from beginning to end.
5      Q   Did you take any notes on the deposition, or the
6  statement, of Ms. Diaz?
7      A   No, other than a couple of things that I committed
8  to memory.
9      Q   And was Ms. Diaz's statement something that was
10 provided to you since the first part of your deposition?
11     A   I asked Counsel for a copy of that statement.  And
12 I did not ask for a copy of the Higgins deposition.  I just
13 read what was previously given to me.  As I said, I think it
14 was like 352 pages.  It could be more.  It could be less; but I
15 know it was incomplete because at the end they cut it off.  He
16 said he was tired or something, and they cut it off.  So I know
17 it wasn't a complete deposition, but it was the substantial
18 majority of it.
19     Q   And so other than Ms. Diaz's statement and
20 reviewing the entirety of Higgins' deposition that was 352
21 pages, did you review anything else related to this case from
22 the first part of your deposition to today's date?
23     A   I think I looked at my report one more time.
24 That's it.

Page 7

1      Q   Okay.  And so, in preparation -- or strike that.
2          You did not review the deposition transcript
3  of Frank Legace; correct?
4      A   No, I did not.
5      Q   You did not review the deposition transcript of
6  Michael Riley; correct?
7      A   No.
8      Q   You did not review the deposition transcript of
9  James Bernarkiewicz; correct?
10     A   Bernarkiewicz?  No.
11     Q   You did not review the deposition transcript of
12 Paul Nielsen?
13     A   No.
14     Q   Did you review the deposition of Craig Cegielski?
15     A   No.
16     Q   You did not review the deposition transcripts of
17 Sheila Murphy either; correct?
18     A   No.
19     Q   And you did not review any of the transcripts from
20 the pre-trial hearing in the criminal case involving Daniel
21 Andersen?
22     A   No.
23     Q   And you did not review the transcripts from the
24 criminal trial in Peoples versus Andersen either; correct?

Page 8

1      A   No, I don't think so.  I have no rec- -- I'm trying
2  to remember looking at transcripts so I'm not confused if
3  they're a deposition or trial.  I have no recollection of
4  looking at trial transcripts.
5      Q   And it's not included in your report under the list
6  of documents that you've reviewed, so it's not something that
7  you've reviewed to render your opinions in this case?
8      A   No.  No.
9      Q   And you did not review Mr. Andersen's
10 court-reported statement; correct?
11     A   No.  I reviewed nothing but Andersen, whether his
12 confession was a court-reported statement or any subsequent
13 court-reported statements given by him.
14     Q   Okay.  I'm going to hand to you what we've
15 previously marked as Brzeczek 3 to the first part of your
16 deposition, which is your report.
17              (Whereupon, Brzeczek Deposition
18               Exhibit No. 3 was tendered to the
19               witness.)
20 BY MS. ITCHHAPORIA:
21     Q   I just want to turn your attention to Paragraph
22 2 -- oh, I'm sorry -- Paragraph 3 of your report.  On the first
23 page there, there's a sentence in the middle of Paragraph 3
24 where you state, "The detectives did not report as to whether

Page 9

1  or not they asked Legace if he knew Trunko".
2          Do you see that?
3      A   Yes.
4      Q   And we looked at Mr. Stout's polygraph case report
5  last time, and it was documented in Mr. Stout's polygraph case
6  report that Legace had known Trunko for 2 days.
7          Do you remember that?
8      A   Yes. I can recall that, yeah.
9      Q   Now, it's possible that Detective Bedran did in
10 fact ask Mr. Legace if he knew the victim Trunko and just
11 didn't put that information in his report; correct?
12     MS. DONNELL:  Objection.  Calls for speculation.
13     THE WITNESS:  The only thing I know is that the detective
14 that you mentioned, or any other detective, did not put
15 anything about that in any of their reports.  Whether it's
16 possible, I don't know.  It would be speculation.  But I saw
17 nothing.  I was only relying upon the detective reports.
18 BY ITCHHAPORIA:
19     Q   And last time we looked at that report, and it was
20 Detective Bedran that had interviewed  Mr. Legace on January
21 20th, 1980.  Do you remember looking at that report?
22     A   I think, yes, I do.  That's the one where --
23          Is that the report where it says that Legace
24 confirmed the telephone conversation that Diaz talked about to

RICHARD BRZECZEK                                    December 20, 2018

Page 10

1   the detectives?
2        Q    Right.  It's essentially that, yes.  And we marked
3   it as Exhibit 5, I believe, at your deposition last time.
4        A    Okay.  That's -- I remember that.
5        Q    Do you agree that the absence of information in a
6   police report does not mean that a question was not asked of
7   the witness?
8        MS. DONNELL:  Objection.  Incomplete hypothetical.  It
9   calls for speculation.
10       THE WITNESS:  Just repeat the question.
11       MS. ITCHHAPORIA:  Sure.  Can you...?
12       THE WITNESS:  Will you read it back to me?
13              (Whereupon, the record was read as
14               requested.)
15       THE WITNESS:  That's one possibility, yes.
16  BY MS. ITCHHAPORIA:
17       Q    Do you agree that in 1980 that the -- that
18  detectives had discretion about information that they should
19  include in their supplementary reports?
20       A    When you say, "discretion", it was not unbridled
21  discretion.  The discretion was pertinent information versus
22  non-pertinent information.
23       Q    And we talked about this last time, but there was
24  no general order, or law enforcement standard, or special order

Page 11

1   that defined the term "pertinent information" that was in
2   effect in 1980; correct?
3        A    I'm not sure if that term was specifically defined
4   in any Department directive, but that was the word that was
5   used repeatedly in preparing reports, is that you include
6   "pertinent information".
7             And I think that I read in Higgins'
8   deposition, you know, answer the questions: Who?  What?  Where?
9   When?  Why?  And how?  You know, that has been repeatedly
10  drilled into police officers' heads during the pre-service
11  Academy and into detectives during the pre-service detective
12  training.
13       Q    Now, in Paragraph 5 of your report, on the second
14  page you talk about the pre-test interview that Mr. Stout
15  conducted of Mr. Legace; and you indicated in your report that
16  Legace provided the examiner with information that was nowhere
17  to be found in any of the reports of the detectives in the
18  Trunko homicide investigative file.
19            Do you see that?
20       A    Yes.
21       Q    Now, you have no idea if Mr. Legace relayed this
22  same information that he gave to Stout during the pretest to
23  Detectives Bedran and Rochowicz, who took him to get
24  polygraphed; correct?

Page 12

1        A    As far as my personally knowing if Legace told that
2   same information to detectives as he told Stout, the answer is,
3   yes, I do not know.  I just know it was not recorded.  Stout
4   recorded it.  Detectives did not.
5        Q    And so would you agree that if Mr. Legace never
6   told the detectives the information that he relayed to Stout
7   during his pre-test, then you wouldn't expect to see a report
8   documenting that information?
9        MS. DONNELL:  Objection.  Calls for speculation.
10       THE WITNESS:  If Legace did not tell the detectives, the
11  answer would be, yes, I would not expect that to be in the
12  report because I do not know how the detectives would have
13  known that from Legace.  But I understand the detectives
14  learned that from Stout.
15  BY MS. ITCHHAPORIA:
16       Q    And isn't it true that, in your experience as a
17  police officer, the witness oftentimes relays bits and pieces
18  of information to the police?
19       A    Well, yes, that's true.  When you talk about a
20  witness, witnesses will relay bits and pieces based upon their
21  own perceptions.
22       Q    And isn't it also true in your experience as a
23  police officer that a witness may hold back information from
24  the police?

Page 13

1        A    Yes.
2        Q    In 1980, do you agree that it was acceptable for a
3   detective to convey information that he learned from a witness
4   or a suspect to Person A, and then for Person A to document
5   that information in a police report?
6        MS. DONNELL:  Objection.  Incomplete hypothetical.
7        THE WITNESS:  So I understand it, if a detective got
8   information from Person A, he could relate that information
9   verbally to another detective who could incorporate it in the
10  report?  Is that what you're asking?
11       MS. ITCHHAPORIA:  No.  No.  So let me do it again.
12  BY MS. ITCHHAPORIA:
13       Q    So in 1980, would it be acceptable for a detective
14  to convey information that he learned from a witness or a
15  suspect to Person A and then Person A document that information
16  in a police report?
17       A    Who is Person A?
18       Q    Anybody.  Just Person A,  Person A who is going to
19  document that information in a police report.
20       A    So Person A would have to be some sworn officer in
21  a department.
22       Q    Okay.  Let's say a polygraph examiner.
23       A    Well, okay, in that case, yes, he could learn
24  information and pass it on to the polygraph examiner; but at

RICHARD BRZECZEK                                    December 20, 2018

Page 14

1  some point in time that detective learning that information
2  would be required to document it.
3      Q    Required based on what?
4      A    Based upon the recording requirements placed upon
5  detectives in 1980.
6      Q    And what was that recording requirement?
7      A    They're contained in the Standard Operating
8  Procedure and other Department directives that are in the
9  current possession of the City defendant in this case.  I don't
10 have those documents with me now.  And they may be regarded
11 historical documents because of changes, but those documents
12 are preserved on a historical basis.
13          So if you want to know exactly which documents
14 I'm talking about, in addition to the one that I identified as
15 the Standard Operating Procedural Manual, the City defendant
16 would have all of those documents in its archives.
17     Q    The Standard Operating Procedure Manual?
18     A    Yeah.  It was written in the early 1970s.  So put
19 it this way: It was published in the early 1970s, and it was
20 call the Criminal Investigation Division Standard Operating
21 Procedures, and --
22     Q    So --
23     MS. DONNELL:  Hold on just a second, Misha.
24     THE WITNESS:  And it may have undergone a name-change,

Page 15

1  because in 1980 I changed the name from Criminal Investigation
2  Division back to Detective Division.  So it may have undergone
3  a name-change somewhere around 1980/'81.
4          But that was the procedural manual for
5  procedures to be followed by detectives in connection with
6  their official duties, which included reporting.
7  BY MS. ITCHHAPORIA:
8      Q    Do you know what the name may have changed to in
9  1980?
10     A    As I testified to, the Detective Division Standard
11 Operating Procedures.
12     Q    Were you also -- did you also --
13     A    Now, when I say, "1980", keep in mind that the date
14 in question here, January 19th, is 8 days before I became
15 superintendent- -- after I became superintendent.  And I can
16 tell you with absolute certainty I did not change that name in
17 the first 8 days.  It happened either in late 1980, early 1981.
18     Q    This Standard Operating Manual (sic) that applied
19 to detectives, was it organized in chapters?  Sections?
20     A    It was organized in chapters.  For example, there
21 was a chapter on handcuffs.  Because, believe it or not, in
22 1980 -- excuse me -- in 1970 uniformed officers were not
23 required to carry handcuffs.  No officers were required to
24 carry handcuffs.  Detectives were then made -- it put a

Page 16

1  requirement on detectives that they carry handcuffs.  And
2  that's just one there.
3          There was a chapter in there on conducting
4  line-ups, a chapter in there on conducting photo identification
5  line-ups.
6      Q    Was there a chapter for report writing for
7  detectives?
8      A    Yes.
9      Q    Were you involved in the writing of the Standard
10 Operating Manual?
11     A    Yes, I was.
12     Q    In what year?
13     A    Again, it's going to be 1970/1971.
14     Q    What portion of it did you draft?
15     A    Well, I drafted some of the administrative
16 portions.  I drafted the portions on line-ups.  I drafted the
17 portions on identifications.  I'm trying to remember, because I
18 haven't seen that manual in 35-plus years.  I think I may have
19 also drafted anything having to do with statements,
20 confessions, things like that.
21          I also was responsible for taking the drafts
22 submitted by peers of mine from other units, like auto theft
23 and burglary, as to what they submitted; and I was responsible
24 for the overall editing of those chapters.

Page 17

1      Q    When was the last time that you saw the Detective
2  Division Standard Operating Manual?
3      A    I said over 35 years ago.
4      Q    You did not review that document to prepare your
5  expert report in this case; correct?
6      A    No.  I have not seen that document in over 35
7  years.
8      Q    What did the Detective Division Standard Operating
9  Manual say about report writing as it relates to detectives
10 specifically?
11     A    I think it dealt with -- in my recollection, it
12 dealt with the necessity for preparing qualitative reports and
13 reporting facts of the investigation.
14          Keep in mind that the Brady Requirement --
15 that's B-R-A-D-Y.  The Brady requirement came in 1963, so it
16 was pretty well-established law in terms of, you know,
17 exculpatory information to be provided likewise.
18     Q    Do you have a specific memory of what the Detective
19 Division Standard Operating Manual said about report writing as
20 it relates to detectives?
21     A    It only -- it only related to report writing as it
22 relates to detectives.  It did not have any provisions for
23 report writing for patrol officers or officers -- say, even if
24 they were detectives in the Intelligence Division or in the

RICHARD BRZECZEK                                          December 20, 2018

Page 18

1  Vice Control Division at that time, or anyplace else.  It was
2  strictly for the Detective Division.
3      Q    Okay.  Do you have a specific memory of what any
4  portion of that report writing section said, like explicitly?
5      A    No, I do not have a specific memory.
6      Q    Let's move on to Paragraph 7, which -- on Page 3,
7  but which we talked about last time really should be numbered
8  Paragraph 9.
9      Q    Okay.  That's correct.
10     Q    Do you see in there there's a sentence in the
11  middle of that paragraph that states, "There's no reference in
12  the officers' report as to how they received this information
13  or from whom and when"?   And this is referring to Andersen
14  having a gun.  Do you see that?
15     A    That's correct.
16     Q    And you testified at Part 1 of your deposition that
17  the Standard Reporting Procedures for police officers that was
18  in effect in 1980 required police officers to document the
19  source of the information?
20     A    That's correct.
21     Q    And I believe you testified at Part 1 of your
22  deposition that the Standard Reporting Procedures for police --
23  for police officers that was in effect in 1980 was called the
24  Field Reporting Manual?

Page 19

1      A    That's correct.
2      Q    And I think you said that it was beat officers that
3  should have put in their supplementary report where they got
4  the information that Andersen had a gun, and that was per the
5  Field Reporting Manual; is that right?
6      A    Well, the Field Manual would require them either,
7  A, to submit a supplementary report in connection with the
8  Cathy Trunko murder, if that would be the appropriate way to
9  report the incident.  But if they got a call, at the time, of
10  somebody having a gun, that could have necessitated the
11  preparation of a new original case report under a separate RD
12  number, or Records Division number.
13         So I'm not addressing the fact as to whether
14  or not they should have prepared a new case report or a
15  supplementary report.  I'm talking about whatever report they
16  prepared should have contained the information as to how they
17  got the information about the gun, from where they got it.
18  Again, it goes back to the who, what, why, when, where and how
19  questions that I recall Detective Higgins testifying to.
20     MS. ITCHHAPORIA:  If you can mark that as 9, please.
21            (Whereupon, Brzeczek Deposition
22             Exhibit No. 9 was marked for
23             identification.)
24  BY MS. ITCHHAPORIA:

Page 20

1      Q    Mr. Brzeczek, I'm handing to you what's been marked
2  as Exhibit 9 for your deposition. Can you identify this
3  document for me, please?
4      A    Exhibit No. 9 is entitled Chicago Police Field
5  Reporting Manual General Reporting Instructions.
6      Q    And is this the Field Reporting Manual that you
7  were referring to during the first part of your deposition?
8      A    This is the Field Reporting Manual.  This document
9  that you gave me became effective in July of 1975.  And you can
10  tell that from the information contained in the lower left-hand
11  corner on the first page, because it gives a CPD form number,
12  63.450; and in parentheses "7/75" is the month and year of
13  issuance.
14         I'm not sure how many of these during my
15  career have been issued, but I will tell you that there was a
16  predecessor document like this in 1964 when I became a police
17  officer.
18     Q    And the Field Reporting Manual is an instructional
19  manual; correct?
20     A    Well, the Field Reporting Manual is not an
21  instructional manual.  The Field Reporting Manual is the
22  guidelines by which case reports by police officers are to be
23  prepared.
24     Q    The Field Reporting Manual was provided to recruit

Page 21

1  police officers in the Academy; is that correct?
2      A    That's correct.  Each individual officer received a
3  copy of the Field Reporting Manual.
4      Q    And the -- it was --
5         The Field Reporting Manual is the instructions
6  manual for the preparation of case reports in the Department?
7      A    It is the policy and guideline to be followed.
8  When you use the word, "instructional manual", I found in my
9  experience that instructions on how to use the Field Reporting
10  Manual, how to prepare these reports, were contained in
11  instructional materials that were provided to the officers in
12  the Academy.
13         And then there was something at that time
14  called training bulletins, and training bulletins addressed
15  reporting instructions.  In other words, let's say -- to use
16  the lawyers' terms, they would annotate.  The training
17  bulletins would annotate these policy guidelines and say, "This
18  is the way you do it".
19     Q    Mr. Brzeczek, I don't have much time.  So I would
20  appreciate if you'd just answer the question that I'm
21  specifically posing to you and not expand, because that's just
22  going to eat into my time.
23     MS. DONNELL:  I'm just going to object, Misha, because he
24  did answer your question.  He was telling you why he's not

RICHARD BRZECZEK                                    December 20, 2018

Page 22

1  using the term "instruction manual", and he just defined what
2  the distinction --
3        MS. ITCHHAPORIA:  Okay.  Well, Heather, I'm going to
4  disagree.  And I think that's a speaking objection.
5        MS. DONNELL:  It's not a speaking objection.
6        MS. ITCHHAPORIA:  You can object to form, then.
7        MS. DONNELL:  You're interrupting me.  And I'm allowed to
8  make my record, too; so please don't interrupt me.
9             What I'm saying is that I don't think that
10 your instructions to the witness were appropriate.  He's
11 answering the questions.  And we can proceed; but he was
12 absolutely being responsive to your question.
13 BY MS. ITCHHAPORIA:
14       Q    Yes or no, Mr. Brzeczek, the Field Reporting Manual
15 is the instructions manual for the preparation of case reports
16 in the Chicago Police Department?
17       A    In the broader sense of the word "instruction",
18 yes.
19       Q    And case reports are those which are prepared in
20 connection with crimes being reported to the Chicago Police
21 Department; correct?
22       A    Yes.
23       Q    Now, looking at Exhibit 9, the Field Reporting
24 Manual, where does it say in here that police officers are

Page 23

1  required to document in a report who they receive information
2  from and how?
3        A    Do you want me to take time to read this whole
4  thing?
5        Q    Do you need to look -- do you need to look over the
6  whole thing in order to answer that question?
7        A    Well, I do, because you're asking me where does it
8  say something, and I'm going to look for it, then.
9        MS. ITCHHAPORIA:  Okay.  Well, let's go off the record so
10 you can look at that.
11       THE VIDEOGRAPHER:  Off the record at 3:34 p.m.
12             (Whereupon, there was a brief pause.)
13       THE VIDEOGRAPHER:  Back on the record at 3:36 p.m.
14       THE WITNESS:  Okay.  On Exhibit No. 9, on the first page,
15 it would be Roman Numeral I, Field Case Reports.  Then under
16 that, "A: Introduction.  And then Arabic 1.
17             Quote, "A uniformed officer -- excuse me.  "A
18 uniformed patrol officer normally is the first to respond to
19 calls for police service and to incidents brought to the
20 attention of the Department.  This results in an interview with
21 a complainant or witness to obtain pertinent -- and that's my
22 emphasis -- information."
23
24 BY MS. ITCHHAPORIA:

Page 24

1        Q    There's nothing in that section that you just read
2  that explicitly states that a uniformed patrol officer is
3  required to document in a police report from where or how they
4  got information?
5        A    Yes, there is.
6        Q    It explicitly states that in Paragraph A1?
7        A    Yes.  The word "pertinent", as I've been testifying
8  to.  It doesn't recite every time that you're going to -- this
9  is not kindergarten where you recite -- you're going to answer
10 the questions who, what, when, where, why and how to every
11 item.  It just simply says, "pertinent information".
12       Q    That section that we just looked at, Instruction A,
13 Arabic 1, does not say anything about who, what, why, or where;
14 does it?
15       A    No, because that's in a different manual, as I
16 testified to before, regarding training bulletins and Academy
17 instructional materials.
18       Q    I want to go back to that manual that you were
19 talking about, the Detective Division Standard Operating
20 Manual, that previously may have been called --
21             What did you say it was?  It may have been
22 called, the Criminal --
23       A    The Criminal Investigation Division Manual.  It was
24 simply, you know, a change in the name.  That's all it is.

Page 25

1        Q    Do you know if that manual was given to detectives
2  in detectives school?
3        A    That manual was given to every detective who was an
4  existing detective or became a detective from the time of its
5  issuance in either 1970 or '71 until at least the end of my
6  career in April of 1983.  What happened thereafter, I have no
7  idea.
8        Q    Did that document that we're talking about, whether
9  it was called the Criminal Investigation or the Detective
10 Division Standard Operating Manual, explicitly state that
11 detectives were required to document in a police report the
12 reasons why they took someone to get a polygraph test?
13       A    I can tell you the answer to that question is "no".
14       Q    Did that document, whatever iteration it was under,
15 Criminal Investigation or Detective Division Standard Operating
16 Manual, explicitly state that police officers were required --
17 or sorry -- detectives were required to document in a police
18 report the reasons why they personally believed someone was a
19 suspect?
20       A    Using that language, per se, the answer is, no.
21       Q    And did that document, in 1980, require detectives
22 to document in a physical report the -- any distinguishing
23 marks or features of a suspect or witness that was interviewed?
24       A    I'm not sure if it's in that Standard Operating

RICHARD BRZECZEK                                          December 20, 2018

Page 26

1  Procedures document or in another document, but the answer to
2  that question is, yes.  You put down the characteristics of a
3  suspect in a crime; and that is, the physical characteristics.
4      Q   What does the Manual specifically say about a
5  detective's -- that mandates a detective to document in a
6  police report the physical appearance of a witness or a
7  suspect?
8      A   I said I'm not sure if that Manual says it by
9  itself, but there are other documents that placed that
10 reporting requirement on detectives.
11     Q   Right.  But I'm talking about that specific manual,
12 so I don't care about any other document right now.  I'm talking
13 about the Criminal Investigation Division Standard Operating
14 Procedure.  Does that -- did that, in 1980, explicitly state
15 that detectives were required to document in a police report
16 the physical appearance or distinguishing marks or features of
17 a suspect or a witness?
18     A   The only answer I can give you that's honest at
19 this point is, I do not recall.
20     Q   Now, you testified at the first part of your
21 deposition last time that you did not review the portion of
22 Ms. Diaz's deposition testimony where she testified that she
23 never told the police that Bob Legace left the tavern to go and
24 attempt to pick up Ms. Cathy Trunko?

Page 27

1      A   Yes, I recall that.
2      Q   You recall testifying to that?
3      A   I recall testifying that I did not read that in her
4  deposition.  I'm not saying it's not there.  I did not read
5  that part of it.
6      Q   Okay.  Do you agree with me that, if Ms. Diaz did
7  not tell the detectives that information, which is that Bob
8  Legace left the tavern to go and pick Ms. Trunko up, then that
9  information would not be included in a detective's report?
10     A   The answer is, yes, if she did not tell him that or
11 if anyone else did not tell the detectives that.
12     Q   Do you -- did you read the portion of Ms. Diaz's
13 deposition testimony where she testified that her memory about
14 the night of Cathy's murder was better in 1981?
15     A   Yes.
16     Q   Did you read the portion of Ms. Diaz's deposition
17 testimony where she testified that when she was on the phone
18 with Cathy Trunko on the night of Cathy Trunko's murder,
19 January 19th, 1980, that Cathy told her that, quote, "Danny's
20 at the door"?
21     A   I don't remember if she said, "Danny's at the
22 door," but I know she's saying Danny is by her house in the
23 yard or something like that; but that somebody by the name of
24 Danny was by her house.

Page 28

1      Q   You note in Paragraph 8 -- or what really should be
2  numbered as 10 in your report -- on Page 3 there, the last
3  sentence says, "There's no mention of any visible scars on the
4  face and/or neck of Legace by the detectives."
5          Do you see that?
6      A   That's correct.
7      Q   And when you say, "detectives" there, which
8  detectives are you referring to?
9      A   Any detective that was assigned to the case who
10 happened to see Legace.
11     Q   Do you know which detectives that were involved in
12 the Cathy Trunko homicide investigation saw or interacted with
13 Mr. Legace?
14     A   Well, I know Bedran and Rochowicz did.  I know that
15 Higgins did.  Those are the ones that I can remember.
16     Q   What's your basis for saying that Higgins
17 interacted or saw Mr. Legace back in 1980 during the Trunko
18 homicide investigation?
19     A   According to -- I'm sorry.  I'm sorry. Take
20 Higgins out. I misunderstood the question.  It was Bedran and
21 Rochowicz.
22          The reason why I included Higgins is because
23 Danny said somebody had -- this guy Bob had a scar on his face
24 and neck.  And I have some recollection -- I thought he told

Page 29

1  that to Higgins; so take Higgins out.  I have no idea that
2  Higgins ever saw Legace.
3      Q   Okay.  So if there was a report that was to be
4  drafted about Legace's features, it would be a report that
5  would have had to be drafted by Bedran and Rochowicz?
6      A   Well, if they're the ones that actually saw him.
7  They're the only ones that I know that I could reasonably
8  connect to Legace as having seen him.
9      Q   And in reaching that opinion in this report, did
10 you make the assumption that Bob, the one that Andersen had
11 mentioned, who had a scar on his face or neck, was in fact
12 Robert Legace?
13     A   I'm not sure if I made the assumption; but I tied
14 in the fact that Diaz said that he had a scar on his face, as I
15 recall.  At some point in time she said that.  I'm not sure
16 when, but she did say that.
17     Q   Are you saying that Bob, who Andersen mentioned, is
18 the same person as Robert Legace?
19     A   No.  I'm only saying that Bob mentioned by Andersen
20 supposedly had a scar on his face and on his neck.  The only
21 Bob that I remember from the reports is Bob Legace.  And then
22 somewhere in a document I saw -- or I read that Diaz said that
23 that Legace had a scar on his neck.
24     Q   If Robert Legace did not have any visible scar on

RICHARD BRZECZEK                                    December 20, 2018

Page 30

1  his face or neck, then there would be no reason for any
2  detective to document that in a report; correct?
3      A    There would be no reason to document it because you
4  generally do not document negatives.
5      Q    What do you mean by that?
6      A    Well, for example, let's say in a domestic violence
7  situation or in a fight, an assault and battery, if someone
8  says that, "I got punched in the eye" or "He hit me in the eye
9  with a baseball bat", or something like that, and there's no
10  black eye or there's no injury there, you would document that
11  because we were trained that, if someone is assaulted and
12  there's a physical injury, that there would be some evidence of
13  a physical injury.
14          So if there is no physical injury to be seen,
15  you would document that.  That's the kind of negative that you
16  would document.
17      Q    What's the kind of negative that you would not
18  document?
19      A    If you had a suspect and, say, like in this case --
20  let's try to grab this one up -- if Danny says he has a scar on
21  his neck and on his face he doesn't, it's not necessary to
22  document that because scars don't come and go.  If he said the
23  guy had a mustache and the suspect doesn't have a mustache, you
24  may want to document that because mustaches are removable at

Page 31

1  will.  Those are the kinds of things.
2      Q    Looking at the top there, Paragraph 6 -- 8, on
3  Page 3, you state, "Legace may have had something to do with
4  the murder, and he was at least a possible suspect".
5          Do you see that?
6      A    Okay.  But I think that it's referring back to the
7  prior sentence; but I do see that.  Okay.
8      Q    Do you have any factual basis to say that Robert
9  Legace killed Cathy Trunko?
10      A    No.
11      Q    Are you aware of any physical evidence that
12  connects Robert Legace to the murder of Cathy Trunko?
13      A    No.
14      Q    So saying that Legace may have had something to do
15  with the murder, is that pure speculation on your part?
16      A    It's not speculation.  The information is relative
17  to the -- relevant to the investigation because it suggests
18  that Legace may have had something to do with the murder and he
19  was at least a possible suspect.  There's nothing there that I
20  said that Legace committed the murder.  Everything there was
21  possibles.
22      Q    Are you're saying it's possible even though
23  Mr. Legace told Mr. Stout that he was not the one that stabbed
24  Cathy Trunko and that he was not responsible for causing her

Page 32

1  death?
2      A    Are you asking me to take Legace out of being a
3  possible suspect because he denies it?
4      Q    No.  I'm asking you if you -- if you're saying that
5  Legace may have had something to do with the murder despite his
6  responses to Mr. Stout that he did not kill Cathy Trunko and
7  did not cause her death?
8      A    Well, the responses that Legace gave -- or even if
9  they weren't responses, they were volunteered statements to
10  Stout that, "I didn't kill her" or "I had nothing to do with
11  it", that proclamation of innocence is very, very low on most
12  detectives' totem poles or responsibility because most people
13  will deny having anything to do with a murder or someone's
14  murder even though they may be the actual offender.
15      Q    And in that situation where someone denies being
16  involved in a murder, then would you agree that it's okay
17  for the detective to keep that person in an interview room to
18  question them further about their possible involvement?
19      A    Well, I think that it would be okay to question
20  them further to see how consistent the statements are because
21  that's more than a denial that they didn't do it.  It's
22  generally the inconsistency among the statements coming from
23  the potential suspect or witness that leads you to begin to
24  focus on somebody.

Page 33

1      Q    You state in that paragraph also, looking at Page
2  3, in the last sentence that, "Therefore, based on existing CPD
3  policies and procedures, as well as the law, CPD officers and
4  detectives who possess this information were required to report
5  and disclose it."
6          What CPD officers are you referring to in that
7  paragraph?
8      A    I'm talking about CPD policies and procedures and
9  the law require all officers and detectives who possess this
10  information to record and disclose it.  That's all I'm saying
11  there.  I'm not saying which ones.  I'm saying that everybody
12  has an obligation to disclose the information.
13      Q    Okay.  But applying that to what we know about the
14  facts of this case, because you're saying, "this
15  information" -- "this information", being --
16          Well, what do you mean by "this information"?
17      A    Let me go back and read the early part of
18  Paragraph 8.
19          (Whereupon, there was a brief pause.)
20  THE WITNESS:    Okay.  I think that the recitation in
21  Paragraph 8 of Exhibit 3 is information that I lifted from the
22  documents that I reviewed.  And I began telling -- or taking
23  the position, okay, "I do not know what she told the police
24  because I wasn't there, but I have reviewed the police reports

RICHARD BRZECZEK                                        December 20, 2018

Page 34

1  and see that none of the foregoing information appears in
2  there," in the report it says. And that is the information
3  that she said she told the police.
4          "If Grabowski -- that's Diaz -- "did actually
5  tell the police any of this information -- I'm just saying if
6  she told the police any of this information -- "the officer
7  receiving the information had to record it into an official
8  police report and make this information part of the file."
9  That's the information I'm talking about.
10         Q.  Okay.  There is no indication that anything that
11 you read that a CPD officer had any interactions with Diaz. It
12 was only Detective Bedran and Rochowicz; correct?
13         MS. DONNELL:  Objection, to the extent it calls for
14 speculation.
15         THE WITNESS:  Okay. When I talk about, "If Grabowski did
16 actually tell the police any of this information, the officer
17 receiving the information," I made no distinction between
18 "officer" and "detective".
19          "Officer" is a generic term.  A detective is
20 an officer.  An officer may not be a detective.  A sergeant is
21 an officer.  A superintendent is an officer, but an officer is
22 not a superintendent.  An officer is not a sergeant.  Okay?
23          So when I use the word "officer", it's the
24 vernacular that I use to describe everybody across the board.

Page 35

1  I'm not limiting it to rank, or assignment, or anything. I'm
2  talking about the rule is, if you get this information, you're
3  required to record it.
4  BY MS. ITCHHAPORIA:
5          Q.  Okay.  But then on Page 3 then you do make a
6  distinction when you say, "CPD officers and detectives".
7  That's what's confusing to me. So I'm wondering why you make
8  that distinction there.
9          A.  It's an emphasis, "CPD officers and detectives".
10         Q.  You're not going to be offering any opinions at
11 trial about the falsity or truthfulness of Mr. Andersen's
12 court-reported statement; correct?
13         A.  No.
14         Q.  You don't have any background or training in the
15 area of the phenomena of alleged false confessions; correct?
16         MS. DONNELL:  Objection. Form.
17         THE WITNESS:  I didn't hear the last part of your
18 question.
19 BY MS. ITCHHAPORIA:
20         Q.  You don't have any background or training in the
21 area of the phenomena of false confessions; correct?
22         MS. DONNELL:  Objection. Form.
23         THE WITNESS:  When you say background or training in the
24 area of false confessions, to me false confessions is kind of a

Page 36

1  multifaceted issue.  Which one maybe are you talking about?
2  Which facet of it?
3  BY MS. ITCHHAPORIA:
4          Q.  Social sciences, as far as social sciences of false
5  confessions.
6          A.  You're talking about the research that's done as to
7  why people falsely confess?
8          Q.  Right.
9          A.  No, I have no background in that.
10         Q.  You state on Page 4, under Opinion 1, the last
11 sentence there, "Willfully concealing exculpatory information
12 includes the failure to report the discovery of exculpatory
13 information in routine police reports."
14         What's your basis for this statement?
15         A.  In my opinion, there is such a focus upon an
16 officer's responsibility, which includes detectives, to report
17 exculpatory information.  And the willful concealment of
18 exculpatory information includes the failure to report the
19 discovery of exculpatory information in routine police reports
20 It doesn't have to be --
21          It doesn't have to be a -- in my opinion -- a
22 willful, knowing, and intentional act.  Detectives are
23 professionals.  They're trained for their purposes within the
24 scheme of things in the police department; and their failure to

Page 37

1  include exculpatory information can only be considered willful.
2          Q.  Are you aware of any studies or authoritative texts
3  that substantiate that opinion that, "Willfully concealing
4  exculpatory information includes the failure to report the
5  discovery of exculpatory information in police reports"?
6          A.  As far as studies are concerned, I'm not.  But I
7  have had exposure to literally hundreds of such situations both
8  when I was a police officer and when I was a defense attorney.
9          Q.  Putting aside your experience, is there any text
10 that I can go and look at, or journal, or article that
11 substantiates that opinion that you have in this paragraph that
12 we're looking at?
13         A.  One of the more recent documents that impressed me
14 was a Georgetown Law Review article that I think was published
15 in 2015, and it was written by one of the judges -- one of the
16 then judges in the 9th Circuit regarding prosecutorial
17 misconduct, including the withholding of exculpatory evidence.
18 I found that one to be quite impressive.
19         Q.  Does that Georgetown Law Review article state that
20 willfully concealing exculpatory information includes the
21 failure to report the discovery of exculpatory information in
22 police reports?
23         A.  For me to answer -- say -- use those exact words, I
24 do not know.

U.S. Legal Support, Inc.
(312) 236-8352

RICHARD BRZECZEK                                    December 20, 2018

---

Page 38

1    Q   Well, not using those exact words, is that the gist
2  of the article?
3    A   No, that's not the gist of the article.  The gist
4  of the article is more serious, more gullible, more
5  comprehensive than just the failure to report exculpatory
6  information in routine police reports, but it demonstrates that
7  it's part of the problem.
8    Q   Well, you're saying that you're impressed by that
9  article, but I'm not necessarily concerned with what you're
10 impressed with.
11       Does that article, this Georgetown Law Review
12 article from 2015, support your opinion and equate willfully
13 concealing something with failing to report?
14   A   Yes.  And when I say it impresses me, it caught my
15 attention that someone would have written a document of that
16 degree of sophistication regarding this very serious problem.
17   Q   We talked about last time the scope of your
18 assignment in this case.  And it's not within the scope of your
19 assignment, in your expert opinion in this case, to determine
20 whether any of the defendant officers in this case willfully
21 concealed exculpatory information; correct?
22   A   My understanding of my assignment is to examine
23 what the detectives did in the investigation of the murder of
24 Cathy Trunko; and included in that is what they did not do,

---

Page 39

1  and also in included in there is what they reported and what
2  they did not report.
3    MS. ITCHHAPORIA:  Can I get my question read back,
4  please?
5              (Whereupon, the record was read as
6              requested.)
7    THE WITNESS:  If my answer didn't satisfy your question,
8  in looking at the fact that Bedran and Rochowicz took Legace to
9  the polygraph operator and failed to report it, the answer is,
10 yes.
11 BY MS. ITCHHAPORIA:
12   Q   Other than those two detectives, are you saying
13 that any other detective in this case willfully concealed
14 exculpatory information?
15   A   Right now I cannot think of identifying any other
16 detective who may have concealed exculpatory information.
17   Q   Other than the two detectives that you mentioned,
18 Bedran and Rochowicz, are you saying that any other defendant
19 officer in this case willfully concealed exculpatory
20 information?
21   A   Well, if you understand how detectives operate, one
22 of the things that -- when you talk about social science, is
23 that they work in environments in their headquarters that are
24 conducive to interpersonal communications; meaning, that they

---

Page 40

1  talk to each other and they tell each other what's going on
2  more so than what they actually put down on paper.
3          So the fact that it was not put down on paper,
4  but that they took Legace for the polygraph exam, I would have
5  to believe that Higgins knew about it.
6    Q   What's your factual basis for saying that Higgins
7  knew about it?
8    A   My factual basis is that my experience says, as I
9  told you, that they talked to each other.
10   Q   Did you read any testimony or anything in this case
11 that indicated that Detective Higgins spoke to Detective Bedran
12 and Rochowicz about taking Mr. Legace to be polygraphed?
13   A   Now, that's the very essence of the problem.  They
14 did not report or document what they were saying to each other
15 or what they did.
16   Q   Isn't it true that Mr. Higgins testified at his
17 deposition that he was not aware during the Trunko homicide
18 investigation that Detective Bedran and Rochowicz took
19 Mr. Legace to be polygraphed?
20   A   I remember his testifying to that, and I don't
21 believe him.
22   Q   So you're making a credibility determination?
23   A   No, I'm not, because he's the lead detective on the
24 case.  He's assigned to the case.  And the detectives who are

---

Page 41

1  doing investigative work on his case are telling him what
2  they're doing.  That's the normal run-of-the-mill
3  investigation.  That's how they talk to each other in the squad
4  rooms.
5          If they didn't tell him that they took Legace
6  for the polygraph examination, either there's something
7  drastically wrong with the interpersonal communications among
8  the detectives in that Area 3 unit, or they failed to document
9  what took place.
10   Q   Well, you didn't read anything from Detective
11 Bedran or Rochowicz that indicated that they informed
12 Mr. Higgins that they took Mr. Legace to be polygraphed;
13 correct?
14   A   No, I did not.
15   Q   And so the testimony that Mr. Higgins provided in
16 his deposition that he wasn't aware that Bedran and Rochowicz
17 took Legace to be polygraphed, you're disregarding that
18 testimony because you don't believe it?
19   A   No, I'm not disregarding the testimony.  I'm looking
20 at the testimony because he's consistent.  He says he didn't
21 know that they took him for a polygraph exam.  He didn't know
22 his date of appointment to the police department.  He didn't
23 know the date that he retired, so his testimony is consistent
24 about what he doesn't know.

---

RICHARD BRZECZEK                                    December 20, 2018

Page 42

1    Q    But you're saying that you don't believe him
2    because he was the lead detective, and detectives talk to each
3    other; is that right?
4    A    He's the lead detective.  And when one someone -- I
5    think I testified in the first part of my deposition that, at
6    that time, there were case assignments.  That's contrary to his
7    testimony also, that nobody was assigned to the case.  He said
8    that specifically.
9         Somebody is assigned to the case because
10   somebody has to be responsible for the case.  So somebody's
11   name goes onto the case assignment slip.  And, in my opinion --
12   I haven't seen the case assignment slip; but from reading what
13   I did, he's the assigned detective.
14        So when other detectives are doing things --
15   if you're the lead detective and I'm in your unit and I do
16   something, I'm going to tell you what I did; or I'm going to
17   write a report, or I'm going to write up a note or something
18   for you.  I'm going to let you know what we're doing on your
19   case.
20   Q    If Detectives Bedran and Rochowicz did not tell
21   Mr. Higgins that they took Robert Legace for a polygraph, do
22   you agree that there's no way that Mr. Higgins would have been
23   made aware of that?
24   MS. DONNELL:  Objection.  Calls for speculation.

Page 43

1    THE WITNESS:  If they did not tell Higgins, in the
2    purest, theoretical sense, yes, he would not know that.
3         But I cannot imagine in the Chicago Police
4    Department, the way the Detective Division operated back
5    then -- I can't speak for now -- that detectives did not talk
6    to each other about what they're doing to help each other on
7    their cases.
8    BY MS. ITCHHAPORIA:
9    Q    You state in Paragraph 1 of your opinion that the,
10   "Fundamental principle in American criminal juris prudence that
11   persons charged with the responsibility of criminal
12   investigations and criminal prosecutions or to exonerate the
13   innocent as well as pursue and prosecute the guilty."
14        What fundamental principle are you referring
15   to?
16   A    The fundamental principle of people charged with
17   the prosecution function -- and that is both the prosecution
18   and police investigation -- are not simply to prosecute and
19   convict.
20        In virtually every prosecutor's office manual
21   and police department training bulletins their obligation is to
22   do justice; and that is, you prosecute the ones that the
23   evidence shows may be guilty, and you exonerate the ones that
24   the evidence shows that they did not commit the crime.

Page 44

1    MS. DONNELL:  Misha, can we take just a quick bathroom
2    break?
3    MS. ITCHHAPORIA:  Sure.
4    THE VIDEOGRAPHER:  Off the record at 4:11 p.m.
5         (Whereupon, a brief recess was taken.)
6    THE VIDEOGRAPHER:  Back on the record at 4:19 p.m.
7    BY MS. ITCHHAPORIA:
8    Q    You state in Page 5.  It's 5C of your opinion.
9    You're asking some questions there at the last sentence, "For
10   instance, did they follow up on it, conduct any additional
11   investigation, disregard it as irrelevant for some reason?"
12        And you're talking about the information
13   provided by Legace to the polygraph examiner that was then
14   relayed to Detective Bedran and Rochowicz.  Do you see that?
15   A    Yes.
16   Q    There was no policy, or rule, or regulation that
17   was in effect in 1980 that required detectives to do follow-up
18   investigation; correct?
19   A    When you say a rule or -- what?  A directive?
20   Q    Rule, directive, regulation.
21   A    Well, there was a requirement that they conduct a
22   follow-up investigation on information.
23   Q    Where was that rule?
24   A    When I say, "a rule", there was a requirement.  If

Page 45

1    I used the word "rule", I meant to use the word "requirement".
2    There was a requirement that they follow up information that
3    they receive.
4    Q    Where does that requirement come from?
5    A    The requirement comes from the body of directives
6    currently in the -- the body of directives in existence at that
7    time currently in the possession of the Defendant City.
8    Q    And the directives that you're able to name, is
9    that the Detective Division Standard Operating Manual?
10   A    That's one of them.
11   Q    Are you able to name any others?
12   A    The instructions that the detectives received as to
13   what the raison d'etre is in the police department; and that is
14   to conduct follow-up investigations on information received in
15   connection with the report of a crime.
16   Q    Anything else?
17   A    As I said, my prior answer, the collection -- the
18   body of directives in existence at that time.
19        And if you want me to recite the directives,
20   again: general orders, special orders, notices, the Operating
21   Procedural Manual, training bulletins, field reporting manuals,
22   other reporting directives that are the body of directives
23   dealing with reporting information in connection with the
24   investigation of a crime.

RICHARD BRZECZEK                                        December 20, 2018

Page 46

1    Q    Other than giving me this broad overview of the
2    body of directives, you can't give me the number or the title
3    of any general order or special order that stated that;
4    correct?
5    A    Not from 38 years ago.
6    Q    And there was nothing that you put in your report
7    citing to any general order, or specific order, or any
8    directive; correct?
9    A    I don't have access to any of those directives.
10   They're in the possession of the defendant, City of Chicago.
11   Q    Did you ever ask plaintiff's counsel for any
12   general orders, or special orders of Department directives?
13   A    No.
14   Q    I want to move on to Paragraph 5D of your report,
15   on Page 5.  You testified last time that you reviewed your
16   testimony from the Palmer litigation; is that correct?
17   A    That's correct.
18   Q    What year did you testify in the Palmer case?
19   A    April 1982.  I don't remember the exact date.  I
20   think it's on the transcript, but I didn't pay attention to it.
21   Q    And do you remember what date the TRO had been
22   entered by the District Court of the Northern District of
23   Illinois in the Palmer case?
24   A    I think it was April of 1982, but I'm not sure if

Page 47

1    it was the beginning of the month, end of the month.  It could
2    have been March.  It could have been May.  But it was sometime
3    in the area of April of '82.
4    Q    And did that --
5         And that was when you were the superintendent;
6    correct?
7    A    That's correct.
8    Q    Did that -- the TRO that was entered by the
9    District Court, did that cause you to issue any sort of orders?
10   A    I issued a Department notice, which basically was
11   our mechanism by which we were going to procedurally implement
12   the provisions of the temporary retraining order.
13   Q    When did you issue the Department notice?
14   A    You have to look at it as to what the effective
15   date is.  I don't recall.  It was April of '82.
16   Q    Other than the Department notice, did that cause
17   you to issue any sort of general orders or special orders to
18   implement the effects of -- to implement the TRO?
19   A    No.  The Department notice is a department-level
20   directive which carries with it the same enforceability and
21   sanctions for violations thereof as any other Department
22   directive, as it applies to the people to whom it is directed.
23        Whether or not anything took place in the year
24   that I was still superintendent -- I was still superintendent

Page 48

1    for one more year after that -- I don't recall.  And if
2    anything was issued subsequent to April of '83, I do not know.
3    Q    You state in this Paragraph 5D that you also
4    testified in the Palmer case that, "Prior to the issuance of
5    the TRO and the Department directive, all police officers'
6    notes were considered personal, but police officers were
7    required to preserve their notes for court testimony and
8    incorporate their notes in official reports."
9         When you're saying here "required", what made
10   that a requirement?
11   A    What requirement are you talking about?
12   Q    You testified --
13        You're saying that, in Paragraph 5D, that you
14   testified in the Palmer litigation that, prior to the issuance
15   of the TRO, the Department directed that all police officers
16   notes were considered personal and that officers were required
17   to preserve their notes for court testimony --
18   A    Stop right there.
19   Q    -- so I'm asking in 1980 what made that a
20   requirement of detectives?
21   A    That, again, was somewhere in the collection of
22   directives in the Department, and guidelines, that made that a
23   requirement.  It just was not pulled out of the thin air and
24   said, "Well, you're going to do it" or "You're not going to do

Page 49

1    it".  Everybody had to preserve their notes.  All -- and when
2    I'm saying, "everybody", all detectives.
3         In fact, even police officers who would make
4    notes on their own at the scene in preparation of their case
5    report, whatever case they were going to make, were required to
6    keep their notes for the purpose of court testimony.  That was
7    something that was given to everybody going through the Academy
8    and class, in terms of report writing, note-taking, and those
9    kinds of procedures that are implemented in connection with the
10   investigation of a crime.
11   Q    And you're saying that those documents were in
12   effect in 1980?
13   A    Those documents were in effect in 1980.  Those
14   documents were in effect in 1964.  And those documents were in
15   effect, as far as I know, after 1980.
16   Q    What documents, specifically by name, are you
17   referring to?
18   A    Let's start with training bulletins.  Let's start
19   with training material in the Academy.  Let's start with
20   directives within divisions as to maintaining notes and
21   preserving notes.
22        In fact, I even gave instructions that, when
23   you use a notebook, use a notebook that can be opened with
24   loose leaf fillers so that, when you can take -- when you do

RICHARD BRZECZEK                                    December 20, 2018

1   your notes, you can take your notes out of the notebook and
2   present them to whoever's asking for them at trial without
3   having them look at all the other notes in the book. That was
4   a specific instruction to us as to the type of notebook we
5   should purchase.
6       Q   Can you give me the date or the number of that
7   training bulletin that said that?
8       A   The date: 1964. Sometime between June 8th of 1964
9   when I was sworn in and September 4th of '64 when I graduated
10  from the Academy.
11          Can I give you a number? No; but I can give
12  you a date of that directive that I knew that existed at that
13  time.
14      Q   The Department directive that you're referring to
15  here was issued in April of -- well, when was it issued?
16      A   What directive are you referring to?
17      Q   The one that you're referring to in your report in
18  Paragraph 5D. You say, "I also testified prior to the issuance
19  of the TRO and the Department directive".
20      A   Okay. That's in the Department notice that I
21  referred to. Is that correct?
22          Okay. "I also testified that prior to the
23  issuance of a temporary retraining order and a Department
24  directive", which means the Department notice that I issued.

1       Q   So that means "notice"? "Department directive"
2   means Department notice?
3       A   No. A department notice is one type of directive
4   in a department. It could be a general order. It could be a
5   special order. It could be a notice. It could be a bureau
6   special order or a bureau notice, a division special order or
7   notice. It could be a training material.
8           If you look at Rule 6 of the Police Department
9   Rules and Regulations, the Rule prohibits violation of any
10  order or directive, whether written or oral. So "directives"
11  is the generic, all-inclusive term for the various kinds of
12  written orders that come down from people who are authorized to
13  issue them.
14      Q   Okay. But the Department directive that you're
15  specifically referring to here on Page 5, Paragraph
16  5D, that's -- you're referring to the Department notice that
17  you said was issued in April 1982; is that correct?
18      A   That's correct.
19      Q   The TRO and the Department notice of April 1982 did
20  not apply retroactively; correct?
21      A   It did not.
22      Q   If you look further down on that Paragraph 5D, you
23  state towards, like, the second sentence from the bottom, "In
24  addition, detectives were required to record information in

1   their possession about witnesses they believed should be
2   polygraphed and other information about those polygraph results
3   as well as any other related information they had regardless of
4   what was documented by the polygraph examiner."
5           What specific general order, or special order,
6   or Department guideline addressed a detective's
7   responsibilities and requirements as it relates to polygraphs?
8       A   I cannot give you a specific directive that relates
9   to polygraph.
10      Q   You did not look at Sheila Murphy's file that was
11  produced in this case; correct?
12      A   That's correct.
13      Q   So you are not able to testify about what documents
14  she had at the time of Mr. Andersen's criminal trial; correct?
15      A   That's correct.
16      MS. ITCHHAPORIA: At this time I'm going to look over any
17  notes, and I'm going to pass the mic on to Stacy over here.
18          EXAMINATION
19          BY
20      MS. BENJAMIN:
21      Q   All right. You were just asked some questions
22  about notes and their preservation before and after the
23  Department directive that was issued as a result of the TRO.
24      A   Yes.

1       Q   Okay. So I want to make sure I'm clear with
2   understanding what you just said.
3           Is it your testimony that all Chicago Police
4   Officers -- including detectives, beat officers, and on up --
5   who have investigated any matter were required to preserve any
6   notes they took even before April of 1982, and that that goes
7   back to at least when you first went through the Academy in
8   1964?
9       A   That's correct.
10      Q   And where does that come from? Where does that
11  statement --
12      A   My recollection, my strongest recollection, was
13  sitting in the classroom in the Police Academy and having the
14  training division instructor teach us about taking notes, as I
15  mentioned, the type of notebook we should use, and preserving
16  the notes for use at trial.
17      Q   Okay. And were they preserved by the Chicago
18  Police Department, those notes?
19      A   No. As I said here in my report, the notes were
20  personal, and they were to be maintained by the police officer
21  or detective, if you want that distinction; but they should
22  be -- it was applicable to everybody, as your question
23  adequately covered everyone. Whoever's doing the
24  investigation, making notes, you keep the notes.

RICHARD BRZECZEK                                    December 20, 2018

Page 54

1    Q   If a police officer or detective, prior to April of
2   1982, took notes and then incorporated materials from their
3   notes into reports, is it your testimony that it was the rule
4   in the Chicago Police Department before April of 1982 that
5   those notes still had to be preserved?
6    A   That's correct.
7    Q   And besides a training instructor who gave you that
8   information, can you point to a specific order, or directive,
9   or any other document published, promulgated, by the Chicago
10  Police Department that made that requirement explicit?
11   A   I can point to our materials that were handed to us
12  in the Academy as part of the training syllabus; training
13  bulletins on report writing and taking notes.
14          And you'd have to search the directives of
15  your client in the archives as to what existed -- what else
16  existed at that time.  Those are the things that existed that I
17  personally and specifically remember.
18   Q   Okay.  Then why is it that you had to issue a
19  Department directive in April of 1982 directing people to
20  maintain and retain notes if that was already being done?
21       MS. DONNELL:  Objection.  Form.  Assumes facts not in
22  evidence.
23       THE WITNESS:  Actually, your question is incomplete.  I
24  didn't issue the Department notice for them to maintain the

Page 55

1   notes, as they were maintained prior to the TRO.
2          As I wrote in my report here, the difference
3   now is the notes were not kept by the officers and the
4   detectives.  They went into the investigative, or running, or
5   street file that was maintained at the Area.  That's the
6   difference.
7   BY MS. BENJAMIN:
8    Q   And what about police officers and their notes?
9   Where were they -- was that part of that directive that was
10  issued?
11   A   My recollection is that the notice --
12          As I said to you, the notice is a
13  Department-wide directive that applies to people who are to be
14  governed by it.  And we were focused at that time in preserving
15  the notes that detectives were making in connection with
16  investigations.
17          And we also standardized the note-taking
18  process to -- with the creation of what was called the General
19  Progress Report, or sometimes colloquially known as the GPR.
20  So those were the two functions that -- the focus was on
21  detective note-taking and maintaining those notes in the
22  running file or the street file at the Area.
23   Q   Okay.  Let's go back to 1980.  Were detectives
24  required to take notes as part of their work?

Page 56

1    A   Well, when you say, "required to take notes", they
2   were urged to take notes as part of their work because, as
3   you're gathering information, you cannot possibly remember
4   everybody's name, age, and address with whom you spoke, so you
5   wrote those people's names down; and many times you wrote down
6   what they said even if it was in a shorthand version like,
7   "Didn't see anything" or something like that.
8          And the reason being is that it established a
9   credibility in the report that they eventually prepared
10  because, when they were cross-examined on the stand about the
11  report and they listed that they interviewed 13 witnesses,
12  okay, and if they didn't take any notes, a simple question
13  would be, "How do we know -- how do you know where -- "Tell me
14  where John Brown lives".  "Well, I would have to look at my
15  report".  "Well, what did you look at when you prepared the
16  report?" And he'd say, "My notes".  And if he had the notes,
17  he'd produce the notes.
18          So if they didn't take notes, it established a
19  credibility question in cross-examination.  So we wanted them
20  to document it to keep the chain of the flow going. That was
21  the purpose of it.
22   Q   Okay.  So, for instance, prior to April of 1982, is
23  it your testimony that it was the requirement of the Chicago
24  Police Department that a detective who, say, went out on a

Page 57

1   canvass and went to 10 homes on a street, and nobody saw
2   anything, but he writes down the names of the person at the
3   address that he spoke to, to find out heard and saw nothing,
4   those notes that included the name and address that were then
5   used to create a report should have been retained?
6    A   Yes.
7    Q   In 1980?
8    A   By the detective.
9    Q   For how long?
10   A   Until the case is over with and in court.
11   Q   Until, meaning, there's a conviction or a
12  not-guilty?
13   A   The case is over, whatever that means.
14   Q   What does that mean?
15   A   Yeah.  Well, usually the case could be over with on
16  a pretrial motion.  The case could be over with a plea of
17  guilty.  The case could be over with a bench or a jury trial
18  resulting in, A, a conviction or, B, an acquittal.
19   Q   In your experience in the Detective Division, prior
20  to 1982 -- I forget the dates; you were there -- were you aware
21  that notes were ever produced in criminal litigation --
22   A   When you say --
23   Q   -- these personal notes that you're referring to?
24   A   When you say, "produced in criminal litigation",

RICHARD BRZECZEK                                    December 20, 2018

Page 58

1  are you talking about produced as discovery?
2      Q   Yes.
3      A   Generally, I do not recall it ever being produced
4  in criminal discovery except when the officer or detective
5  testifying that, "I prepared my report based on the notes that
6  I took". "Do you have those notes with you?" "Yes, I do."
7  "Can I see them? "
8          And that's when they were shown to the defense
9  attorney, because they had to do with the credibility of his
10 report. That's what the testing of the cross-examination was
11 accomplishing.
12     Q   So you're saying that the Police Department
13 required officers to keep personal notes that they took through
14 the conclusion of a criminal matter in order to bolster the
15 credibility of their report?
16     MS. DONNELL: Objection. Form.
17     THE WITNESS: Not to bolster the credibility of the
18 report, to establish the basis of the report.
19          Using your example, officer does a canvass.
20 He goes and interviews 10 people in the area. He gets their
21 name, department number, telephone number. They all saw
22 nothing. Okay? "How do you remember all of these people you
23 interviewed?" "Well, I wrote them down. Here's my notes."
24 Okay?

Page 59

1          But there's another dimension to that. The
2  defense attorney can go and find somebody and get them to
3  testify that they saw something. Now we already have it
4  memorialized that the detectives spoke with him. He said, "I
5  saw nothing." So now you have a great impeachment question on
6  cross for the prosecutor.
7          So it was done for various reasons. It was to
8  establish credibility along the line of what the detective had
9  written, or the police officer had written, and to obviate the
10 occurrence of a witness coming forward who's now testifying
11 that they saw all kinds of things happening when they said,
12 "No, I didn't see anything happening". So those are reasons.
13     Q   If the report is identical to the notes, what
14 significance do the notes have?
15     A   The notes are created res gestae of the process
16 itself, the interview process. The report is prepared sometime
17 later in the station. It could be the same day. It could be
18 the next day. So they're the basis upon which the report is
19 prepared.
20     Q   Was there any case law that you were aware of that
21 required Chicago Police Officers to maintain notes prior to
22 1982?
23     A   I don't know of any case law prior to 1982, and I
24 don't think I'm aware of any case law after 1982.

Page 60

1      Q   And you've anticipated my next question.
2          There is, to your knowledge, no constitutional
3  requirement that police officers maintain their notes from an
4  investigation?
5      A   No, there's no constitutional requirement. It has
6  to do with, like a lot of procedures, establishing variability,
7  credibility of whatever activity the police are involved in,
8  just like there's no constitutional requirement that police
9  take pictures of a crime scene, for example, or take a video,
10 or have Dash cams, or have body cameras.
11          There's no constitutional requirement for
12 that, but they do it for a variety of reasons, again, as you
13 know from common knowledge, and what you read about and see, to
14 establish credibility, what really happened.
15     Q   Does the --
16          You mentioned the Criminal Investigation
17 Division Standard Operating Procedure Manual. Did that
18 document contain a requirement that detectives maintain notes
19 from an investigation?
20     A   I cannot say with any degree of certainty that it
21 did.
22     Q   Okay. And if in fact that was the policy of the
23 Chicago Police Department that detectives do that, would you
24 expect to find it in the Criminal Investigation Division

Page 61

1  Standard Operating Procedure?
2      A   Well, A, you could say, yes, one could expect to
3  find it. B, you could also say that it was such a routine
4  procedure that everybody practiced and knew about at the time;
5  it wasn't necessary to include it.
6      Q   Signing a report would be a routine procedure;
7  correct? As routine as it gets; right?
8      A   Do you mean the person who prepared it?
9      Q   Correct.
10     A   Yes.
11     Q   Okay. Is that something that you would expect to
12 find information about what to do about signatures in the
13 Criminal Investigation Division Standard Operating Procedures?
14     A   I think I lost you.
15     Q   Okay.
16     A   Say it again.
17     Q   The matters that were so routine and procedure, the
18 purpose of something like a Criminal Investigation Division
19 Standard Operating Procedure was to document exactly what those
20 routine procedures are; correct?
21     A   Right.
22     Q   So one would expect if notes were required to be
23 maintained prior to 1982, regarding an investigation, that
24 routine procedure would have been included in the Standard

RICHARD BRZECZEK                                    December 20, 2018

Page 62

1  Operating Procedures that you, in part, drafted and edited? I
2  think you said "edited".
3        A    Yeah, there are certain parts I drafted, certain
4  parts I edited that were submitted by other people. I had the
5  overall responsibility for editing the whole manual.
6             Now, what was in there, what was not in there,
7  we're now talking about, this year, 47 years, if it came out in
8  '71.  If it came out in '70, we're talking 48 years.  That's
9  all I can tell you.  I don't -- I can't -- for me to say "yes"
10 or "no" would be speculative for either answer.
11       Q    Okay.  You do know that, at least, that this
12 Criminal Investigation Division Standard Operating Procedure
13 was to make clear what all the routine procedures were for the
14 Detective Division or then the Criminal Investigative Division?
15       MS. DONNELL:  Objection to form.
16 BY MS. BENJAMIN:
17       Q    Is that right?
18       A    Well, it's not necessarily made clear what all the
19 standard or the routine procedures were.  There were a lot of
20 things addressed there.  Okay?  And, yes, I think anytime you
21 come out with a directive -- whether it's in a manual, or a
22 training bulletin, or a general order -- it's done to
23 standardize the procedure so everybody is behaving the same way
24 and to get this consensus of behavior among everyone so that

Page 63

1  you can have an expectation of how they're going to conduct
2  themselves in a given situation.  I agree with you on that.
3        Q    So then you would agree that the note -- retention
4  of notes, through the end of a criminal matter would be
5  included in that Standard Operating Procedure Manual -- or it
6  should be?
7        A    Yes.
8        Q    And you have no explanation for why -- if it's not
9  in there, why it wasn't included?
10       A    No, I have none.
11       Q    I'm going to ask you a couple of questions about --
12            In your report, on Page 4, within the
13 paragraph of No. 3, the second to the last sentence, "The
14 detectives were taught that all relevant facts or information
15 must be included in their reports."
16            Now, we've also talked a lot about exculpatory
17 and inculpatory evidence.  When a detective is investigating a
18 crime, say, at the scene where it has occurred, and there is no
19 offender known at that point, is a detective able to determine
20 what facts or evidence is inculpatory or exculpatory at that
21 point in time?
22       A    I don't know.  I mean, it's a hypothetical.  And I
23 think that you can find situations that a detective conducting
24 an investigation at the scene -- like, let's say he's the

Page 64

1  initial detective responding to the scene, as far as
2  possibilities are concerned, there's information that he can
3  acquire that's inculpatory or exculpatory.
4        Q    Okay.  So then let's talk about the specific facts
5  of the Trunko homicide.
6             There is no offender present at the time the
7  body is found, correct, to your knowledge of the facts?
8        A    Yes.  Yes.
9        Q    And when the detectives are investigating, without
10 an offender in mind, the question of whether some bit of
11 evidence is inculpatory or exculpatory is unknown at that
12 point; they're just facts?
13       A    Yeah.  I mean, at that early stage I don't think
14 that you can make a judgment as to inculpatory or exculpatory.
15 I mean, even in this situation --
16            I mean, I always maintain that every detective
17 does criminology profiling.  You don't need the FBI telling you
18 how to criminally profile.  They'll come to the scene, and one
19 of the first questions they'll ask is "What kind of person
20 committed this crime?"  That's profiling right there.
21            When you look at what you have -- and you're
22 correct.  It's very preliminary.  You don't know what's there.
23 So -- and, again, whatever's there may eventually, you know,
24 fit into the inculpatory or exculpatory categories, but there's

Page 65

1  no guarantee.
2        Q    And, in fact, detectives really don't even have the
3  opportunity to make that assessment of whether evidence is
4  inculpatory or exculpatory until there is a suspect?
5        MS. DONNELL:  Objection.  Form, to the extent it calls
6  for speculation.
7        THE WITNESS:  I think that there are -- I think that
8  there are situations without the suspect.  Okay?
9             For example, Ms. Trunko was stabbed to death.
10 But if they found the body with the knife that caused the
11 injuries still in her, okay, I think that that could be
12 determined at that point to be more on the inculpatory side
13 than the exculpatory side.  I think that --
14 BY MS. BENJAMIN:
15       Q    Inculpatory --
16       MS. DONNELL:  I'm sorry.  He didn't finish.
17       MS. BENJAMIN:  I'm sorry.
18       THE WITNESS:  Inculpatory of the fact that, whomever may
19 have done it, this instrument could be tied to that person.
20 That's what I'm talking about.
21 BY MS. BENJAMIN:
22       Q    Well, let's -- let me ask you, then, about
23 Mr. Legace and the polygraph that was taken for him -- or that
24 he was taken to.

RICHARD BRZECZEK                                    December 20, 2018

---

Page 66

1         At that point, Daniel Andersen was not a
2  suspect in the crime?  That was 3 days before his arrest.
3         A    Yeah, that's correct.  I was just trying to get the
4  dates in my mind.
5         Q    Any of the evidence related to his polygraph
6  examination, was that inculpatory or exculpatory in relation to
7  Mr. Legace?
8         A    Well, I think he had a situation there that some of
9  it was inculpatory and some of it was exculpatory.
10        Q    And are the detectives trained to consider the
11  evidence in terms of inculpatory or exculpatory, or are they
12  trained to consider it in terms of pertinent when preparing
13  their reports?
14        A    Well, what you have is pertinent, as you can see
15  from the Field Reporting Manual, which was my Exhibit 9 to
16  which I testified to earlier up in the first paragraph, it's
17  pertinent.  Right?  But then you have pertinent inculpatory and
18  pertinent exculpatory.
19        Q    Can the pertinentence (sic) -- I don't know if
20  that's even a word -- of evidence, is that assessed at the time
21  that the evidence is observed or known, or are detectives
22  expected to keep considering that throughout an investigation?
23        A    Well, I will agree that what could initially be
24  pertinent could become impertinent later on.  I think that most

---

Page 67

1  detectives are trained to consider everything pertinent
2  initially until they sort things out a little bit; and then
3  they can get into the classifications as to whether or not it's
4  pertinent or impertinent.
5              And then under "pertinent", inculpatory or
6  exculpatory.  Once you determine that something is impertinent
7  it has no useful investigatory (sic) or evidentiary value to
8  that particular case.
9         Q    And whether or not something is pertinent is, in
10  the end, a subjective determination by an individual officer?
11        A    I would not say "in the end".  I would say at the
12  beginning it could be a subjective determination; "This is
13  pertinent"; "This is not pertinent".  That's why it's always
14  safe to consider everything pertinent until you have
15  non-subjective bases to make it impertinent.
16             In the end I think that it's more focused and
17  more clear as to what's pertinent and impertinent because you
18  have a quantum of information that is much, much greater than
19  you had when you first started.
20        Q    And would you agree that a situation where an
21  investigation -- a confession is made, that earlier information
22  may then be looked at differently and become impertinent based
23  on the confession?
24             For instance, Mr. Legace went out to look for

---

Page 68

1  Cathy Trunko and never found her.  Is it possible that that
2  information is assessed as impertinent by the time you have
3  information that someone else has confessed to the crime?
4         MS. DONNELL:  Objection.  Form.
5         THE WITNESS:  Well, again, how you posited the question
6  to me, Mr. Legace went out to look for Cathy Trunko and said
7  he could not find her.  That's --
8  BY MS. BENJAMIN:
9         Q    Let's just go with that being true.
10        MS. DONNELL:  I'm sorry.  You interrupted his answer.
11  BY MS. BENJAMIN:
12        Q    Okay.  You can finish.
13        A    As to the issue as to whether or not he found her,
14  is only, thus far, determined by his own statement that he did
15  not find her.  So knowing that -- and it's his statement that
16  he did not find her.  Okay?
17             The confession 3 or 4 days later from another
18  person may or may not render that presumption that he didn't
19  find her impertinent.  It may.  I'm not sure, because I was not
20  asked to and I did not look at the facts and circumstances and
21  the totality of the confession.
22        Q    So assuming the confession -- this is a
23  hypothetical.  Mr. Legace -- it was learned by police that he
24  went out to look for Cathy Trunko the night she was murdered.

---

Page 69

1  He gave a polygraph that did not indicate deception.  And 3
2  days later police were given a confe- -- heard a confession
3  from another man who accounted for all parts of the crime and
4  did not include Mr. Legace in any way.
5             In that circumstance, is it reasonable to
6  expect a police officer to believe that the information about
7  Legace going out to look for Cathy Trunko is impertinent
8  information at that point?
9         MS. DONNELL:  Objection.  Form.  Calls for speculation.
10  Incomplete hypothetical.
11        THE WITNESS:  The premises upon which you based your
12  question, from the materials that I read, are not consistent
13  with what happened.  You know, that's what I'm saying.
14             I personally think that, despite the fact that
15  they didn't report it, the police knew that Legace went out to
16  look for Cathy Trunko; but that's not memorialized in any of
17  their reports, as I recall.  That's number one.
18             Your second premise was that Legace was
19  polygraphed.  And in reading Stout's reports, Legace was not
20  polygraphed.  Stout determined that while Legace was not trying
21  to defeat or undermine the purpose of a polygraph exam, he
22  identified him as a subject who is not fit to be given a
23  polygraph exam.
24             So if he's not fit to be given a polygraph

---

RICHARD BRZECZEK                                    December 20, 2018

Page 70

1  exam, no matter what Stout may have tried do by strapping him
2  up with the machine, he did not submit to a polygraph exam
3  because there was no polygraph exam.  They couldn't examine
4  him.  Okay?
5           Just like if somebody is a double-amputee of
6  the lower limbs, you can't check the fingerprints on their feet
7  or their toes, because they're not there.  It's the same thing.
8  So those two premises that you just gave me are premises that
9  are not consistent with what information I read in the
10 documents.
11          But knowing that, for me to answer the
12 question, can I just have the part that's the interrogatory of
13 your question without the premises?  I can try to answer it.
14 BY MS. BENJAMIN:
15     Q   What I'm trying to get at -- and I can rephrase the
16 question because it's taking you on a longer answer.  And I'm
17 not trying to trip you up or anything.  Let me start again.
18          So my question to you is, pertinent
19 information in investigation -- in a detective investigation is
20 a subjective assessment by the detectives working the case at
21 any specific period of time, correct, whether something is
22 pertinent or not?
23     A   That's correct.  I mean, at some point that
24 determination is a subjective determination based upon the

Page 71

1  detective's training and experience.
2      Q   And as an investigation proceeds, evidence that may
3  have been thought to be pertinent at one time can become
4  impertinent, as you described earlier?
5      A   That's correct.
6      Q   And it's true that impertinent information is not
7  required to be included in detective reports?
8      A   That's correct.
9      Q   I just want to clarify something in your answer
10 before.
11          Is it your belief, based on your review of the
12 record, that Mr. Legace did not actually submit to a polygraph
13 examination?
14 MS. DONNELL:  Objection.  Misstates his testimony.
15 THE WITNESS:  No.  It's my belief that he agreed to take
16 a polygraph examination.  Your premise to me was that he was
17 polygraphed.  That, to me, means that someone has undergone a
18 polygraph examination.
19          Mr. Legace did not undergo a polygraph
20 examination because, in the professional opinion of the
21 polygraph examiner, Mr. Stout, Mr. Legace was not a fit subject
22 to be examined by polygraph.
23 BY MS. BENJAMIN:
24     Q   So despite the fact that Mr. Legace was hooked up

Page 72

1  to the machines, we have tapes of that examination, because the
2  result of that examination was that he was unfit, it's your
3  belief that the polygraph doesn't count, that that just didn't
4  exist then?  I'm confused.
5  MS. DONNELL:  Objection.  Form.  Argumentative.
6  THE WITNESS:  The way you described it, factually, as to
7  what happened, is accurate.  And I'm not claiming to be any
8  expert on those scraggly lines on a piece of paper that are the
9  measurements of what the polygraph examiner measures from the
10 physiological standpoint.  Okay?
11          I am saying that the fact that somebody goes
12 through the process and the result is he is an unfit subject
13 for a polygraph exam does not square that he submitted to a
14 polygraph exam which was concluded by the examiner to be able
15 to render an opinion as to the truthfulness, untruthfulness, or
16 inclusivity (sic) -- that's not the right word -- the
17 inconclusiveness of his responses.
18          Stout rendered no opinion on any response
19 because there was no response to measure in accordance with the
20 standards set by the polygraphy industry.
21 BY MS. BENJAMIN:
22     Q   Are you speaking on behalf of your own personal
23 understanding of polygraphs and what the results in this
24 particular case meant or didn't mean, or are you speaking on

Page 73

1  the way the Chicago Police Department assessed the polygraph
2  evidence -- or should have assessed the polygraph evidence in
3  this case in 1980?
4      A   I'm speaking --
5  MS. DONNELL:  Objection.  Form.
6  THE WITNESS:  I'm speaking on the basis of the way
7  Mr. Stout regarded the results -- or put it this way: how
8  Mr. Stout regarded the attempt to get polygraph results from
9  Mr. Legace.
10 BY MS. BENJAMIN:
11     Q   Okay.  So just so we're clear, you were not
12 speaking on behalf of the Police Department's understanding of
13 the results of the polygraph in this case, of how it should
14 have been interpreted by the Chicago Police Department and
15 thereby the detectives in this case?
16     A   Well, to answer your question, I don't know what
17 anybody in the police department could have or should have done
18 other than embrace what Stout told them.  Because in that cast
19 of characters the people who are named as employees of the
20 police department in all of these reports, the only one who
21 knows what he's talking about with the polygraph is Mr. Stout.
22          I don't think Rochowicz, Bedran, Higgins,
23 anybody else you -- McWeeny or anybody else you want to
24 mention, okay -- I don't think they have any idea what Stout

RICHARD BRZECZEK                                December 20, 2018

Page 74

1  really does.  I mean, they have an idea overall; but I'm
2  talking about they are, in my opinion, as incapable in
3  interpreting any of those squiggly lines on those papers as I
4  am because I have no idea what they mean.  So that's what I'm
5  saying there.
6        So when you say interpreted by the Police
7  Department, you know, the Police Department, as said in my
8  earlier -- in my report, the Police Department only knows he's
9  an unfit subject.  Okay?  I don't know if there's any
10 opportunity where he can become a fit subject.  I don't know
11 that.  But I do know that there was information obtained from
12 Legace during the pre-polygraph interview.  There was
13 information given to Stout by Bedran and Rochowicz prior to the
14 polygraph exam.  That information is important with or without
15 the machine operating, with or without Legace being a qualified
16 or a fit subject for a polygraph.  That's conversation.  That's
17 verbal.
18       Q    And what information about that interview was
19 pertinent to the investigation of Cathy Trunko's homicide at
20 the time it was supposedly given to Rochowicz and Bedran?
21       A    Well, let's back up.
22            There was information given by Bedran and
23 Rochowicz to Stout.  Let's start with that information.  There
24 were suspicions, in their minds at least, to get them to take

Page 75

1  him down for a polygraph.  Whether he was being taken down as a
2  witness to see if they can verify what they have may have
3  thought was question credibility or to see if they can get any
4  responses from him that would assist them in determining
5  whether or not he's a suspect; so that's where we have to
6  start, there.
7        So they knew certain things that they told
8  Stout, as was recorded in Stout's notes.  And Stout told them
9  certain things, as was recorded in Stout's notes.
10       Q    Are police officers trained to include suspicions
11 in their reports?
12       MS. DONNELL:  Objection.  Form.
13       THE WITNESS:  Include suspicions?
14 BY MS. BENJAMIN:
15       Q    Yes, as you just used it in your previous answer.
16       A    I think that -- I think that it's a matter of
17 routine when you talk about a possible suspect and identify
18 that person.  They talk about suspicions, in terms of if they
19 need to do additional follow-up because they feel that someone
20 may not be telling them the truth or the whole truth.  They may
21 include suspicions where they think that some information given
22 to them by an individual is a canard.
23            There's nothing wrong with putting down these
24 suspicions.  And you can always explain the suspicions later by

Page 76

1  additional information.  I thought that this person was not
2  telling me the truth about the situation, but I found out later
3  that the reason why he said the guy had a gray tie on is
4  because he's color blind.  Those kinds of things.
5        Q    In Exhibit 9, the General Reporting Instructions
6  for the Field Reporting Manual, there is nowhere in this
7  instruction manual that instructs police officers, or any
8  Chicago Police Officer preparing a report, to include
9  suspicions in their reports.
10       A    Well, look at Roman Numeral I, Capital A, Arabic 2,
11 the second paragraph from the top, "A field case report
12 provides a record of a completed investigation or establishes
13 the basis for a follow-up investigation by criminal
14 investigation either through vice control division or
15 personnel".
16            Now, if you have some suspicions as a
17 uniformed officer and you put those in the report, it's
18 something that the detectives could follow up on right there.
19       Q    Okay.  So why don't you turn to Page 6 of this
20 document?
21       A    Of this same document?
22       Q    Yes.  Letter P, the narrative section.
23       MS. DONNELL:  Just so you know, you have about 5 minutes.
24 BY MS. BENJAMIN:

Page 77

1        Q    The narrative section of reports, in general, is
2  where the substantive information is provided, correct,
3  generally?
4        A    Yes.  Yes, the narrative section.
5        Q    All right.  So look at No. 2.
6        A    Okay.
7        Q    "Reporting officers are to eliminate their
8  conclusions, opinions, feelings, and evaluations of witnesses
9  from the narrative portion of their original case report.
10 Conclusions on the part of the writer, whether based on
11 deduction or personal feelings, should not be made."
12       MS. DONNELL:  I'd just object to the extent that you
13 excluded the word "report writer".
14 BY MS. BENJAMIN:
15       Q    I'm sorry.  "Conclusions on the part of the report
16 writer, whether based on deduction or personal feelings, should
17 not be made."
18       A    Okay.
19       Q    Wouldn't that include suspicions?
20       A    If that's a personal feeling not supported by
21 anything, then you don't put it in there.  But if --
22       Q    "Suspicion" and "opinion" are --
23       MS. DONNELL:  I'm sorry.  I think you interrupted him.
24 BY MS. BENJAMIN:

RICHARD BRZECZEK                                    December 20, 2018

Page 78

1    Q    I'm sorry.  Go ahead.
2    A    Well, if you -- if you have some basis for a
3    suspicion other than your personal feelings, then you put it
4    in.  But if we just say, "It's my gut reaction because of the
5    way she wears her hair that she's not telling the truth",
6    that's a personal opinion.
7    Q    Well, evaluations of witnesses, that's a suspicion?
8    A    Not necessarily.  Evaluations of witnesses could
9    be, "I was speaking with John Doe, and he wouldn't look me in
10   the eye.  He was looking all over.  He seemed very nervous."
11        Is that an observation of mine, it's
12   suspicious that he may not be wanting to talk to me?  That
13   wouldn't be important to put in my report?  I would put it in
14   the report.
15   Q    Did you, in your career, ever conduct any homicide
16   investigations?
17   A    Yes.
18   Q    How many?
19   A    I don't recall.
20   Q    Is it more than 10?
21   A    If I say, "I don't recall", I couldn't tell you if
22   it was 10, 20, 15.  I don't know.
23   Q    Can you tell me if it was less than a hundred?
24   A    Yes.

Page 79

1    Q    Can you tell me if it was more than 10?
2    A    Yes.
3    Q    And you can't narrow it down anywhere in between
4    there?
5    A    Despite the fact that I think I can remember fairly
6    well, I don't remember specific numbers.
7    Q    And in those investigations that you investigated
8    that were homicide investigations were you the assigned
9    detective?
10   A    No.
11   Q    Were you ever the assigned detective at a
12   homicide --
13   A    No, I never was a detective in the Detective
14   Division.  I was a sergeant.  I was a youth officer assigned to
15   murder investigations also.  As I testified, we investigated
16   crimes by and against children, minors; but if the case
17   assignment slip for a murder investigation was, or had, or
18   contained a homicide detective's name on it.
19   Q    Okay.  So based on your answer, is it correct that
20   you never had the responsibility of an assigned detective for
21   any homicide investigation in your career?
22   A    That's correct.  That's correct, because I never
23   was a detective.
24   Q    Have you ever had the responsibility of training

Page 80

1    officers to conduct homicide investigations?
2    A    Of treating officers?
3    Q    Training.
4    A    Training?
5    Q    Yes.
6    A    I know that I lectured at the Academy on subjects
7    like interviews and interrogations.  I sometimes gave law
8    lectures there primarily on procedure.  Those classes would
9    have included people who were going to be homicide detectives;
10   or, in in-service training, people who are homicide detectives.
11   Q    Did you train on report writing?
12   A    I'm sorry?
13   Q    Did you train detectives on report writing?
14   A    Not that I recall.
15   Q    Did you train detectives on determining what
16   information was pertinent to an investigation?
17   A    I think that, in the training that I did, in terms
18   of the word "including pertinent information", I'm sure that
19   that dimension of the investigation came up in one or more of
20   my presentations.
21   Q    And how did it come up?
22   A    Well, many times when you're making a class
23   presentation like that, especially with people who are
24   pre-service detectives and in-service detectives, you have

Page 81

1    people that have demonstrated an ability by passing a written
2    examination.  And, therefore, they have an ability to think for
3    themselves and they ask questions, and the questions could be a
4    myriad of questions.
5        And depending upon the particular position
6    that I was holding at the time, many of them thought that they
7    would seek out an answer from me because of the position that I
8    was holding.
9    Q    So --
10   MS. BENJAMIN:  If you could read back my question,
11   please.
12        (Whereupon, the record was read as
13        requested.)
14   BY MS. BENJAMIN:
15   Q    Okay.  So how is it that you were training
16   detectives on how to determine what evidence an investigation
17   was pertinent or not, or have I misunderstood you and that was
18   not part of your training?
19   A    No.  No.  If we were doing a class on some updates
20   in the law or changes in the law, we'd always get into matters
21   involving pertinent evidence, pertinent facts, pertinent
22   matters.
23        For example, when we did the -- when the
24   Supreme Court decided a case on the procedure to conduct a

RICHARD BRZECZEK                                December 20, 2018

Page 82

1  constitutional line-up, we got into pertinent facts over there,
2  in terms of similarity of appearance, what they had to do to
3  get the line-up properly conducted, you know, being able to
4  have each person in the line-up, repeat the words of the
5  offender, photographing the line-up.
6      MS. BENJAMIN:  I will leave the last few minutes to Misha
7  if she has any.
8      MS. DONNELL:  Do we have a minute?
9      THE VIDEOGRAPHER:  No.  We're at 2:08.
10     MS. DONNELL:  At 2:08. You're done.
11     MS. ITCHHAPORIA:  Do you have any questions?
12     MS. DONNELL:  No, I'm not going to have any questions.
13     THE VIDEOGRAPHER:  Off the record at 5:23 p.m.
14     THE REPORTER:  Signature?
15     MS. DONNELL:  We'll waive signature.
16         FURTHER DEPONENT SAITH NAUGHT...
17
18
19
20
21
22
23
24

Page 83

1  STATE OF ILLINOIS        )
                            )  SS:
2  COUNTY OF COOK           )
3
4          Devan J. Moore, being first duly sworn on
5  oath, says that she is a Certified Shorthand Reporter, that she
6  reported in shorthand the testimony given at the taking of said
7  deposition and that the foregoing is a true and correct
8  transcript of her shorthand notes so taken as aforesaid and
9  contains all the testimony given by the deponent at said
10 deposition.
11
12          And further, that she is not connected by
13 blood or marriage with any of the parties to this action, nor
14 is she a relative or employee or attorney or counsel of any of
15 the parties, or financially interested directly or indirectly
16 in the matter in controversy.
17
18         _____
           Certified Shorthand Reporter
19         License No. 084 004589
20         This 21st day of January
           2019.
21
22
23
24

U.S. Legal Support, Inc.
(312) 236-8352

RICHARD BRZECZEK

December 20, 2018
Index: 1..area

**1**

**1** 18:16,21 23:16 24:13 36:10 43:9

**10** 28:2 57:1 58:20 78:20,22 79:1

**13** 56:11

**15** 78:22

**16** 4:3

**1963** 4:3 17:15

**1964** 20:16 49:14 50:8 53:8

**1970** 15:22 25:5

**1970/1971** 16:13

**1970s** 14:18,19

**1975** 20:9

**1980** 9:21 10:17 11:2 13:2,13 14:5 15:1,9,13,17,22 18:18,23 25:21 26:14 27:19 28:17 44:17 48:19 49:12, 13,15 55:23 57:7 73:3

**1980/'81** 15:3

**1981** 15:17 27:14

**1982** 46:19,24 51:17,19 53:6 54:2, 4,19 56:22 57:20 59:22,23,24 61:23

**1983** 25:6

**19th** 15:14 27:19

**2**

**2** 8:22 9:6 76:10 77:5

**20** 4:4 78:22

**200** 4:7

**2015** 37:15 38:12

**2018** 4:4 5:9

**20th** 4:4 9:21

**29th** 5:9

**2:08** 82:9,10

**3**

**3** 8:15,18,22,23 18:6 28:2 31:3 33:2, 21 35:5 41:8 63:13 66:2 68:17 69:1

**35** 17:3,6

**35-plus** 16:18

**352** 5:18 6:14,20

**38** 46:5

**3:07** 4:5

**3:34** 23:11

**3:36** 23:13

**4**

**4** 36:10 63:12 68:17

**47** 62:7

**48** 62:8

**4:11** 44:4

**4:19** 44:6

**4th** 50:9

**5**

**5** 10:3 11:13 44:8 46:15 51:15 76:23

**5:23** 82:13

**5C** 44:8

**5D** 46:14 48:3,13 50:18 51:16,22

**6**

**6** 31:2 51:8 76:19

**63.450** 20:12

**64** 50:9

**7**

**7** 18:6

**7/75** 20:12

**70** 62:8

**71** 25:5 62:8

**8**

**8** 15:14,17 28:1 31:2 33:18,21

**82** 47:3,15

**83** 48:2

**8th** 50:8

**9**

**9** 18:8 19:20,22 20:2,4 22:23 23:14 66:15 76:5

**9th** 37:16

**A**

**A1** 24:6

**ability** 81:1,2

**absence** 10:5

**absolute** 15:16

**absolutely** 22:12

**Academy** 11:11 21:1,12 24:16 49:7, 19 50:10 53:7,13

54:12 80:6

**acceptable** 13:2,13

**access** 46:9

**accomplishing** 58:11

**accordance** 72:19

**accounted** 69:3

**accurate** 72:7

**acquire** 64:3

**acquittal** 57:18

**act** 36:22

**activity** 60:7

**actual** 32:14

**addition** 14:14 51:24

**additional** 44:10 75:19 76:1

**address** 56:4 57:3,4

**addressed** 21:14 52:6 62:20

**addressing** 19:13

**adequately** 53:23

**administrative** 16:15

**age** 56:4

**agree** 10:5,17 12:5 13:2 27:6 32:16 42:22 63:2,3 66:23 67:20

**agreed** 4:10 71:15

**ahead** 78:1

**air** 48:23

**all-inclusive** 51:11

**alleged** 35:15

**allowed** 22:7

**American** 43:10

**and/or** 28:4

**Andersen** 4:2,18 7:21,24 8:11 18:13 19:4 29:10,17,19 66:1

**Andersen's** 8:9 35:11 52:14

**annotate** 21:16, 17

**answering** 22:11

**anticipated** 60:1

**anyplace** 18:1

**anytime** 62:20

**appearance** 26:6,16 82:2

**appears** 34:1

**applicable** 53:22

**applied** 15:18

**applies** 47:22 55:13

**apply** 51:20

**applying** 33:13

**appointment** 41:22

**April** 25:6 46:19, 24 47:3,15 48:2 50:15 51:17,19 53:6 54:1,4,19 56:22

**Arabic** 23:16 24:13 76:10

**archives** 14:16 54:15

**area** 35:15,21,24 41:8 47:3 55:5,22 58:20

**Argumentative**
72:5

**arrest** 66:2

**article** 37:10,14, 19 38:2,3,4,9,11,12

**assault** 30:7

**assaulted** 30:11

**assessed** 66:20 68:2 73:1,2

**assessment** 65:3 70:20

**assigned** 28:9 40:24 42:7,9,13 79:8,11,14,20

**assignment** 35:1 38:18,19,22 42:11,12 79:17

**assignments** 42:6

**assist** 75:4

**Assumes** 54:21

**assuming** 68:22

**assumption** 29:10,13

**attempt** 26:24 73:8

**attention** 8:21 23:20 38:15 46:20

**attorney** 37:8 58:9 59:2

**audio** 4:9

**authoritative** 37:2

**authorized** 51:12

**auto** 16:22

**aware** 31:11 37:2 40:17 41:16 42:23 57:20 59:20,24

**B**

**B-R-A-D-Y** 17:15

**back** 10:12 12:23 15:2 19:18 23:13 24:18 28:17 31:6 33:17 39:3 43:4 44:6 53:7 55:23 74:21 81:10

**background** 35:14,20,23 36:9

**baseball** 30:9

**based** 5:13,15 12:20 14:3,4 33:2 58:5 67:22 69:11 70:24 71:11 77:10, 16 79:19

**bases** 67:15

**basically** 47:10

**basis** 14:12 28:16 31:8 36:14 40:6,8 58:18 59:18 73:6 76:13 78:2

**bat** 30:9

**bathroom** 44:1

**battery** 30:7

**beat** 19:2 53:4

**Bedran** 9:9,20 11:23 28:14,20 29:5 34:12 39:8,18 40:11,18 41:11,16 42:20 44:14 73:22 74:13,20,22

**began** 33:22

**begin** 32:23

**beginning** 5:19 6:4 47:1 67:12

**behalf** 4:17 72:22 73:12

**behaving** 62:23

**behavior** 62:24

**belief** 71:11,15 72:3

**believed** 25:18 52:1

**bench** 57:17

**Benjamin** 4:15 52:20 55:7 62:16 65:14,17,21 68:8,11 70:14 71:23 72:21 73:10 75:14 76:24 77:14,24 81:10,14 82:6

**Bernarkiewicz** 7:9,10

**bit** 64:10 67:2

**bits** 12:17,20

**black** 30:10

**blind** 76:4

**board** 34:24

**Bob** 26:23 27:7 28:23 29:10,17,19, 21

**body** 45:5,6,18,22 46:2 60:10 64:7 65:10

**bolster** 58:14,17

**book** 50:3

**bottom** 51:23

**Boulevard** 4:8

**Brady** 17:14,15

**break** 44:2

**Brezeczek** 5:8

**broad** 46:1

**broader** 22:17

**brought** 23:19

**Brown** 56:14

**Brzeczek** 4:2 5:2 8:15,17 19:21 20:1 21:19 22:14

**bulletin** 50:7 62:22

**bulletins** 21:14, 17 24:16 43:21 45:21 49:18 54:13

**bureau** 51:5,6

**burglary** 16:23

**C**

**call** 14:20 19:9

**called** 5:3 18:23 21:14 24:20,22 25:9 55:18

**calls** 9:12 10:9 12:9 23:19 34:13 42:24 65:5 69:9

**cameras** 60:10

**cams** 60:10

**canard** 75:22

**canvass** 57:1 58:19

**Capital** 76:10

**care** 26:12

**career** 20:15 25:6 78:15 79:21

**carries** 47:20

**carry** 15:23,24 16:1

**case** 4:3 5:9 6:21 7:20 8:7 9:4,5 13:23 14:9 17:5 19:11,14 20:22 21:6 22:15,19 23:15 28:9 30:19 33:14 38:18,19,20 39:13,19 40:10,24 41:1 42:6,7,9,10,11, 12,19 46:18,23 48:4 49:4,5 52:11 57:10, 13,15,16,17 59:20, 23,24 67:8 70:20 72:24 73:3,13,15 76:11 77:9 79:16 81:24

**cases** 43:7

**cast** 73:18

**categories** 64:24

**Cathy** 19:8 26:24 27:18,19 28:12 31:9,12,24 32:6 38:24 68:1,6,24 69:7,16 74:19

**Cathy's** 27:14

**caught** 38:14

**caused** 65:10

**causing** 31:24

**Cegielski** 7:14

**certainty** 15:16 60:20

**chain** 56:20

**change** 15:16 24:24

**changed** 15:1,8

**chapter** 15:21 16:3,4,6

**chapters** 15:19, 20 16:24

**characteristics** 26:2,3

**characters** 73:19

**charged** 43:11, 16

**check** 70:6

**Chicago** 4:3,8,16 20:4 22:16,20 43:3 46:10 53:3,17 54:4, 9 56:23 59:21 60:23 73:1,14 76:8

**children** 79:16

**Circuit** 37:16

**circumstance** 69:5

RICHARD BRZECZEK

December 20, 2018
Index: circumstances..department

**circumstances** 68:20

**citing** 46:7

**City** 4:3,15 14:9,15 45:7 46:10

**claiming** 72:7

**clarify** 71:9

**Clark** 4:4

**class** 49:8 80:22 81:19

**classes** 80:8

**classifications** 67:3

**classroom** 53:13

**clear** 53:1 62:13, 18 67:17 73:11

**client** 54:15

**collection** 45:17 48:21

**colloquially** 55:19

**color** 76:4

**commit** 43:24

**committed** 6:7 31:20 64:20

**common** 60:13

**communications** 39:24 41:7

**complainant** 23:21

**complete** 5:17 6:17

**completed** 76:12

**comprehensive** 38:5

**concealed** 38:21 39:13,16,19

**concealing** 36:11 37:3,20 38:13

**concealment** 36:17

**concerned** 37:6 38:9 64:2

**concluded** 72:14

**conclusion** 58:14

**conclusions** 77:8,10,15

**conducive** 39:24

**conduct** 44:10, 21 45:14 63:1 78:15 80:1 81:24

**conducted** 11:15 82:3

**conducting** 16:3,4 63:23

**confe-** 69:2

**confess** 36:7

**confessed** 68:3

**confession** 8:12 67:21,23 68:17,21,22 69:2

**confessions** 16:20 35:15,21,24 36:5

**confirmed** 9:24

**confused** 8:2 72:4

**confusing** 35:7

**connect** 29:8

**connection** 15:5 19:7 22:20 45:15,23 49:9 55:15

**connects** 31:12

**consensus** 62:24

**considered** 37:1 48:6,16

**consistent** 32:20 41:20,23 69:12 70:9

**constitutional** 60:2,5,8,11 82:1

**contained** 14:7 19:16 20:10 21:10 79:18

**contrary** 42:6

**control** 18:1 76:14

**conversation** 9:24 74:16

**convey** 13:3,14

**convict** 43:19

**conviction** 57:11,18

**copy** 6:11,12 21:3

**corner** 20:11

**correct** 7:3,6,9, 17,24 8:10 9:11 11:2,24 17:5 18:9, 15,20 19:1 20:19 21:1,2 22:21 28:6 30:2 34:12 35:12, 15,21 38:21 41:13 44:18 46:4,8,16,17 47:6,7 50:21 51:17, 18,20 52:11,12,14, 15 53:9 54:6 61:7,9, 20 64:7,22 66:3 70:21,23 71:5,8 77:2 79:19,22

**counsel** 4:11 6:11 46:11

**count** 72:3

**couple** 6:7 63:11

**court** 4:8,19 46:22 47:9 48:7,17 49:6 57:10 81:24

**court-reported** 8:10,12,13 35:12

**covered** 53:23

**CPD** 20:11 33:2,3, 6,8 34:11 35:6,9

**Craig** 7:14

**create** 57:5

**created** 59:15

**creation** 55:18

**credibility** 40:22 56:9,19 58:9,15,17 59:8 60:7,14 75:3

**crime** 26:3 43:24 45:15,24 49:10 60:9 63:18 64:20 66:2 68:3 69:3

**crimes** 22:20 79:16

**criminal** 7:20,24 14:20 15:1 24:22,23 25:9,15 26:13 43:10,11,12 52:14 57:21,24 58:4,14 60:16,24 61:13,18 62:12,14 63:4 76:13

**criminally** 64:18

**criminology** 64:17

**cross** 59:6

**cross-examination** 56:19 58:10

**cross-examined** 56:10

**current** 14:9

**cut** 6:15,16

**CV** 4:3

**D**

**d'etre** 45:13

**Daniel** 4:18 7:20 66:1

**Danny** 27:22,24 28:23 30:20

**Danny's** 27:19, 21

**Dash** 60:10

**date** 5:10 6:22 15:13 41:22,23 46:19,21 47:15 50:6,8,12

**dates** 57:20 66:4

**day** 59:17,18

**days** 9:6 15:14,17 66:2 68:17 69:2

**dealing** 45:23

**dealt** 17:11,12

**death** 32:1,7 65:9

**December** 4:4

**deception** 69:1

**decided** 81:24

**deduction** 77:11,16

**defeat** 69:21

**defendant** 4:14, 15 14:9,15 38:20 39:18 45:7 46:10

**defense** 37:8 58:8 59:2

**defined** 11:1,3 22:1

**degree** 38:16 60:20

**demonstrated** 81:1

**demonstrates** 38:6

**denial** 32:21

**denies** 32:3,15

**deny** 32:13

**department** 11:4 13:21 14:8 21:6 22:16,21 23:20

RICHARD BRZECZEK

December 20, 2018
Index: Department's..establishing

36:24 41:22 43:4,21
45:13 46:12 47:10,
13,16,19,21 48:5,
15,22 50:14,19,20,
23,24 51:1,2,3,4,8,
14,16,19 52:6,23
53:18 54:4,10,19,24
56:24 58:12,21
60:23 73:1,14,17,20
74:7,8

**Department's**
73:12

**department-
level** 47:19

**Department-
wide** 55:13

**depending** 81:5

**DEPONENT**
82:16

**deposition** 4:1,
3 5:10,16,18,24 6:3,
5,10,12,17,20,22
7:2,5,8,11,14,16
8:3,16,17 10:3 11:8
18:16,22 19:21
20:2,7 26:21,22
27:4,13,16 40:17
41:16 42:5

**describe** 34:24

**detective** 5:16
9:9,13,14,17,20
11:11 13:3,7,9,13
14:1 15:2,10 17:1,8,
18 18:2 19:19 24:19
25:3,4,9,15 26:5
28:9 30:2 32:17
34:12,18,19,20
39:13,16 40:11,18,
23 41:10 42:2,4,13,
15 43:4 44:14 45:9
53:21 54:1 55:21
56:24 57:8,19 58:4
59:8 62:14 63:17,
19,23 64:1,16 70:19
71:7 79:9,11,13,20,
23

**detective's** 26:5
27:9 52:6 71:1

79:18

**detectives** 8:24
10:1,18 11:11,17,23
12:2,4,6,10,12,13
14:5 15:5,19,24
16:1,7 17:9,20,22,
24 25:1,2,11,17,21
26:10,15 27:7,11
28:4,7,8,11 33:4,9
35:6,9 36:16,22
38:23 39:12,17,21
40:24 41:8 42:2,14,
20 43:5 44:17 45:12
48:20 49:2 51:24
53:4 55:4,15,23
59:4 60:18,23 63:14
64:9 65:2 66:10,21
67:1 70:20 73:15
76:18 80:9,10,13,
15,24 81:16

**detectives'**
32:12

**determination**
40:22 67:10,12
70:24

**determine** 38:19
63:19 67:6 81:16

**determined**
65:12 68:14 69:20

**determining**
75:4 80:15

**Devan** 4:9

**Diane** 5:14

**Diaz** 5:14 6:6 9:24
27:6 29:14,22 34:4,
11

**Diaz's** 6:9,19
26:22 27:12,16

**difference** 55:2,
6

**differently** 67:22

**dimension** 59:1
80:19

**directed** 47:22
48:15

**directing** 54:19

**directive** 11:4
44:19,20 46:8
47:20,22 48:5
50:12,14,16,19,24
51:1,3,10,14 52:8,
23 54:8,19 55:9,13
62:21

**directives** 14:8
45:5,6,8,18,19,22
46:2,9,12 48:22
49:20 51:10 54:14

**disagree** 22:4

**disclose** 33:5,10,
12

**discovery**
36:12,19 37:5,21
58:1,4

**discretion**
10:18,20,21

**disregard** 44:11

**disregarding**
41:17,19

**distinction** 22:2
34:17 35:6,8 53:21

**distinguishing**
25:22 26:16

**District** 46:22
47:9

**division** 14:20
15:2,10 17:2,8,19,
24 18:1,2 19:12
24:19,23 25:10,15
26:13 43:4 45:9
51:6 53:14 57:19
60:17,24 61:13,18
62:12,14 76:14
79:14

**divisions** 49:20

**document** 13:4,
15,19 14:2 17:4,6
18:18 20:3,8,16
23:1 24:3 25:8,11,
14,17,21,22 26:1,5,
12,15 29:22 30:2,3,
4,10,15,16,18,22,24

38:15 40:14 41:8
54:9 56:20 60:18
61:19 76:20,21

**documented**
9:5 52:4

**documenting**
12:8

**documents** 8:6
14:10,11,13,16 26:9
33:22 37:13 49:11,
13,14,16 52:13
70:10

**Doe** 78:9

**domestic** 30:6

**Donnell** 4:17
9:12 10:8 12:9 13:6
14:23 21:23 22:5,7
34:13 35:16,22
42:24 44:1 54:21
58:16 62:15 65:5,16
68:4,10 69:9 71:14
72:5 73:5 75:12
76:23 77:12,23
82:8,10,12,15

**door** 27:20,22

**double-
amputee** 70:5

**draft** 16:14

**drafted** 16:15,16,
19 29:4,5 62:1,3

**drafts** 16:21

**drastically** 41:7

**drilled** 11:10

**drive** 6:1

**duly** 5:3

**duties** 15:6

───────

**E**

**earlier** 66:16
67:21 71:4 74:8

**early** 14:18,19
15:17 33:17 64:13

**eat** 21:22

**edited** 62:1,2,4

**editing** 16:24
62:5

**effect** 11:2 18:18,
23 44:17 49:12,13,
14,15

**effective** 20:9
47:14

**effects** 47:18

**eliminate** 77:7

**embrace** 73:18

**emphasis** 23:22
35:9

**employees**
73:19

**end** 5:19 6:4,15
25:5 47:1 63:4
67:10,11,16

**enforceability**
47:20

**enforcement**
10:24

**entered** 46:22
47:8

**entirety** 6:20

**entitled** 20:4

**environments**
39:23

**equate** 38:12

**essence** 40:13

**essentially** 10:2

**establish** 58:18
59:8 60:14

**established**
56:8,18

**establishes**
76:12

**establishing**
60:6

RICHARD BRZECZEK

December 20, 2018
Index: et al..hand

**et al** 4:3

**evaluations**
77:8 78:7,8

**eventually** 56:9
64:23

**everybody's**
56:4

**evidence** 30:12
31:11 37:17 43:23,
24 54:22 63:17,20
64:11 65:3 66:5,11,
20,21 71:2 73:2
81:16,21

**evidentiary**
67:7

**exact** 37:23 38:1
46:19

**exam** 40:4 41:21
69:21,23 70:1,2,3
72:13,14 74:14

**examination**
5:5 41:6 52:18 66:6
71:13,16,18,20
72:1,2 81:2

**examine** 38:22
70:3

**examined** 5:4
71:22

**examiner** 11:16
13:22,24 44:13 52:4
71:21 72:9,14

**excluded** 77:13

**exculpatory**
17:17 36:11,12,17,
18,19 37:1,4,5,17,
20,21 38:5,21
39:14,16,19 63:16,
20 64:3,11,14,24
65:4,13 66:6,9,11,
18 67:6

**excuse** 15:22
23:17

**Exhibit** 8:18 10:3
19:22 20:2,4 22:23
23:14 33:21 66:15

76:5

**exist** 72:4

**existed** 50:12
54:15,16

**existence** 45:6,
18

**existing** 25:4
33:2

**exonerate**
43:12,23

**expand** 21:21

**expect** 12:7,11
60:24 61:2,11,22
69:6

**expectation**
63:1

**expected** 66:22

**experience**
12:16,22 21:9 37:9
40:8 57:19 71:1

**expert** 17:5 38:19
72:8

**explain** 75:24

**explanation**
63:8

**explicit** 54:10

**explicitly** 18:4
24:2,6 25:10,16
26:14

**exposure** 37:7

**extent** 34:13 65:5
77:12

**eye** 30:8,10 78:10

## F

**face** 28:4,23
29:11,14,20 30:1,21

**facet** 36:2

**fact** 9:10 19:13
29:11,14 39:8 40:3

49:3,22 60:22 65:2,
18 69:14 71:24
72:11 79:5

**facts** 17:13 33:14
54:21 63:14,20
64:4,7,12 68:20
81:21 82:1

**factual** 31:8 40:6,
8

**factually** 72:6

**failed** 39:9 41:8

**failing** 38:13

**failure** 36:12,18,
24 37:4,21 38:5

**fairly** 79:5

**false** 35:15,21,24
36:4

**falsely** 36:7

**falsity** 35:11

**FBI** 64:17

**features** 25:23
26:16 29:4

**feel** 75:19

**feeling** 77:20

**feelings** 77:8,11,
16 78:3

**feet** 70:6

**field** 18:24 19:5,6
20:4,6,8,18,20,21,
24 21:3,5,9 22:14,
23 23:15 45:21
66:15 76:6,11

**fight** 30:7

**file** 11:18 34:8
52:10 55:5,22

**fillers** 49:24

**find** 57:3 59:2
60:24 61:3,12 63:23
68:7,15,16,19

**fingerprints**
70:6

**finish** 65:16 68:12

**fit** 64:24 69:22,24
71:21 74:10,16

**flash** 6:1

**flow** 56:20

**focus** 32:24 36:15
55:20

**focused** 55:14
67:16

**follow** 44:10 45:2
76:18

**follow-up** 44:17,
22 45:14 75:19
76:13

**foregoing** 34:1

**forget** 57:20

**form** 20:11 22:6
35:16,22 54:21
58:16 62:15 65:5
68:4 69:9 72:5 73:5
75:12

**forward** 59:10

**found** 11:17 21:8
37:18 64:7 65:10
68:1,13 76:2

**Frank** 7:3

**function** 43:17

**functions** 55:20

**fundamental**
43:10,14,16

## G

**gathering** 56:3

**gave** 11:22 20:9
32:8 49:22 54:7
69:1 70:8 80:7

**general** 10:24
20:5 45:20 46:3,7,
12 47:17 51:4 52:5
55:18 62:22 76:5
77:1

**generally** 30:4
32:22 58:3 77:3

**generic** 34:19
51:11

**Georgetown**
37:14,19 38:11

**gestae** 59:15

**gist** 38:1,3

**give** 26:18 46:2
50:6,11 52:8

**giving** 46:1

**governed** 55:14

**GPR** 55:19

**grab** 30:20

**Grabowski** 5:14
34:4,15

**graduated** 50:9

**gray** 76:3

**great** 59:5

**greater** 67:18

**guarantee** 65:1

**guideline** 21:7
52:6

**guidelines**
20:22 21:17 48:22

**guilty** 43:13,23
57:17

**gullible** 38:4

**gun** 18:14 19:4,10,
17

**gut** 78:4

**guy** 28:23 30:23
76:3

## H

**hair** 78:5

**hand** 8:14

RICHARD BRZECZEK

December 20, 2018

**handcuffs** 15:21,23,24 16:1

**handed** 54:11

**handing** 20:1

**happened** 15:17 25:6 28:10 60:14 69:13 72:7

**happening** 59:11,12

**headquarters** 39:23

**heads** 11:10

**hear** 35:17

**heard** 57:3 69:2

**hearing** 7:20

**Heather** 4:17 22:3

**helpful** 5:20

**Higgins** 5:16,21, 24 6:12 19:19 28:15,16,20,22 29:1,2 40:5,6,11,16 41:12,15 42:21,22 43:1 73:22

**Higgins'** 6:3,20 11:7

**historical** 14:11, 12

**hit** 30:8

**hold** 12:23 14:23

**holding** 81:6,8

**homes** 57:1

**homicide** 11:18 28:12,18 40:17 64:5 74:19 78:15 79:8, 12,18,21 80:1,9,10

**honest** 26:18

**hooked** 71:24

**house** 27:22,24

**hundred** 78:23

**hundreds** 37:7

**hypothetical** 10:8 13:6 63:22 68:23 69:10

**I**

**idea** 11:21 25:7 29:1 73:24 74:1,4

**identical** 59:13

**identification** 16:4 19:23

**identifications** 16:17

**identified** 14:14 69:22

**identify** 20:2 75:17

**identifying** 39:15

**Illinois** 4:8 46:23

**imagine** 43:3

**impeachment** 59:5

**impertinent** 66:24 67:4,6,15,17, 22 68:2,19 69:7 71:4,6

**implement** 47:11,18

**implemented** 49:9

**important** 74:14 78:13

**impressed** 37:13 38:8,10

**impresses** 38:14

**impressive** 37:18

**in-service** 80:10,24

**incapable** 74:2

**incident** 19:9

**incidents** 23:19

**include** 10:19 11:5 37:1 61:5 69:4 75:10,13,21 76:8 77:19

**included** 8:5 15:6 27:9 28:22 38:24 39:1 57:4 61:24 63:5,9,15 71:7 80:9

**includes** 36:12, 16,18 37:4,20

**including** 37:17 53:4 80:18

**inclusivity** 72:16

**incomplete** 6:15 10:8 13:6 54:23 69:10

**inconclusiven ess** 72:17

**inconsistency** 32:22

**incorporate** 13:9 48:8

**incorporated** 54:2

**inculpatory** 63:17,20 64:3,11, 14,24 65:4,12,15,18 66:6,9,11,17 67:5

**indication** 34:10

**individual** 4:13 21:2 67:10 75:22

**industry** 72:20

**information** 9:11 10:5,18,21,22 11:1,6,16,22 12:2,6, 8,18,23 13:3,5,8,14, 15,19,24 14:1 17:17 18:12,19 19:4,16,17 20:10 23:1,22 24:4,

11 27:7,9 31:16 33:4,10,12,15,16,21 34:1,2,5,6,7,8,9,16, 17 35:2 36:11,13, 17,18,19 37:1,4,5, 20,21 38:6,21 39:14,16,20 44:12, 22 45:2,14,23 51:24 52:2,3 54:8 56:3 61:12 63:14 64:2 67:18,21 68:2,3 69:6,8 70:19 71:6 74:11,13,14,18,22, 23 75:21 76:1 77:2 80:16,18

**informed** 41:11

**initial** 5:18 64:1

**initially** 66:23 67:2

**injuries** 65:11

**injury** 30:10,12, 13,14

**innocence** 32:11

**innocent** 43:13

**instance** 44:10 56:22 67:24

**instruction** 22:1,17 24:12 50:4 76:7

**instructional** 20:18,21 21:8,11 24:17

**instructions** 20:5 21:5,9,15 22:10,15 45:12 49:22 76:5

**instructor** 53:14 54:7

**instructs** 76:7

**instrument** 65:19

**Intelligence** 17:24

**intentional** 36:22

**interacted** 28:12,17

**interactions** 34:11

**interpersonal** 39:24 41:7

**interpreted** 73:14 74:6

**interpreting** 74:3

**interrogations** 80:7

**interrogatory** 70:12

**interrupt** 22:8

**interrupted** 68:10 77:23

**interrupting** 22:7

**interview** 11:14 23:20 32:17 59:16 74:12,18

**interviewed** 9:20 25:23 56:11 58:23

**interviews** 58:20 80:7

**Introduction** 23:16

**investigated** 53:5 79:7,15

**investigating** 63:17 64:9

**investigation** 14:20 15:1 17:13 24:23 25:9,15 26:13 28:12,18 31:17 38:23 40:18 41:3 43:18 44:11,18,22 45:24 49:10 53:24 60:4,16,19,24 61:13,18,23 62:12

RICHARD BRZECZEK

December 20, 2018
Index: investigations..measures

63:24 66:22 67:21
70:19 71:2 74:19
76:12,13,14 79:17,
21 80:16,19 81:16

**investigations**
43:12 45:14 55:16
78:16 79:7,8,15
80:1

**investigative**
11:18 41:1 55:4
62:14

**investigatory**
67:7

**involved** 16:9
28:11 32:16 60:7

**involvement**
32:18

**involving** 7:20
81:21

**irrelevant** 44:11

**issuance** 20:13
25:5 48:4,14 50:18,
23

**issue** 36:1 47:9,
13,17 51:13 54:18,
24 68:13

**issued** 20:15
47:10 48:2 50:15,24
51:17 52:23 55:10

**Itchhaporia**
4:13 5:7 8:20 9:18
10:11,16 12:15
13:11,12 15:7
19:20,24 22:3,6,13
23:9,24 35:4,19
36:3 39:3,11 43:8
44:3,7 52:16 82:11

**item** 24:11

**iteration** 25:14

**J**

**Jackson** 4:8

**James** 7:9

**January** 9:20
15:14 27:19

**John** 56:14 78:9

**Johnson** 4:6

**journal** 37:10

**judges** 37:15,16

**judgment** 64:14

**July** 20:9

**June** 50:8

**juris** 43:10

**jury** 57:17

**justice** 43:22

**K**

**kill** 32:6,10

**killed** 31:9

**kind** 5:19 30:15,17
35:24 64:19

**kindergarten**
24:9

**kinds** 31:1 49:9
51:11 59:11 76:4

**knew** 9:1,10 40:5,
7 50:12 61:4 69:15
75:7

**knife** 65:10

**knowing** 12:1
36:22 68:15 70:11

**knowledge**
60:2,13 64:7

**L**

**language** 25:20

**late** 15:17

**law** 10:24 17:16
33:3,9 37:14,19
38:11 59:20,23,24
80:7 81:20

**lawyers'** 21:16

**lead** 40:23 42:2,4,
15

**leads** 32:23

**leaf** 49:24

**learn** 13:23

**learned** 12:14
13:3,14 68:23

**learning** 14:1

**leave** 82:6

**lectured** 80:6

**lectures** 80:8

**left** 26:23 27:8

**left-hand** 20:10

**Legace** 7:3 9:1,6,
10,20,23 11:15,16,
21 12:1,5,10,13
26:23 27:8 28:4,10,
13,17 29:2,8,12,18,
21,23,24 31:3,9,12,
14,18,20,23 32:2,5,
8 39:8 40:4,12,19
41:5,12,17 42:21
44:13 65:23 66:7
67:24 68:6,23 69:4,
7,15,18,19,20
71:12,19,21,24 73:9
74:12,15

**Legace's** 29:4

**Legal** 4:7

**Letter** 76:22

**Lewis** 4:17

**lifted** 33:21

**likewise** 17:17

**limbs** 70:6

**limiting** 35:1

**line-up** 82:1,3,4,5

**line-ups** 16:4,5,
16

**lines** 72:8 74:3

**list** 8:5

**listed** 56:11

**literally** 37:7

**litigation** 46:16
48:14 57:21,24

**lives** 56:14

**located** 4:7

**long** 57:9

**longer** 70:16

**looked** 5:16,22,
23 6:23 9:4,19
24:12 67:22

**loose** 49:24

**lost** 61:14

**lot** 60:6 62:19
63:16

**low** 32:11

**lower** 20:10 70:6

**M**

**machine** 70:2
74:15

**machines** 72:1

**made** 15:24 29:13
34:17 42:23 48:9,
19,22 54:10 62:18
67:21 77:11,17

**maintain** 54:20,
24 59:21 60:3,18
64:16

**maintained**
53:20 55:1,5 61:23

**maintaining**
49:20 55:21

**majority** 6:18

**make** 22:8 29:10
34:8 35:5,7 49:3,5
53:1 62:13 64:14
65:3 67:15

**making** 40:22
53:24 55:15 80:22

**man** 69:3

**mandates** 26:5

**manual** 14:15,17
15:4,18 16:10,18
17:2,9,19 18:24
19:5,6 20:5,6,8,18,
19,20,21,24 21:3,5,
6,8,10 22:1,14,15,
24 24:15,18,20,23
25:1,3,10,16 26:4,8,
11 43:20 45:9,21
60:17 62:5,21 63:5
66:15 76:6,7

**manuals** 45:21

**March** 47:2

**mark** 19:20

**marked** 8:15 10:2
19:22 20:1

**marks** 25:23
26:16

**material** 49:19
51:7

**materials** 5:8
21:11 24:17 54:2,11
69:12

**matter** 4:2 53:5
58:14 63:4 70:1
75:16

**matters** 61:17
81:20,22

**Mcweeny** 73:23

**meaning** 39:24
57:11

**means** 50:24
51:1,2 57:13 71:17

**meant** 45:1 72:24

**measure** 72:19

**measurements**
72:9

**measures** 72:9

RICHARD BRZECZEK

December 20, 2018
Index: mechanism..paragraph

**mechanism**
47:11

**memorialized**
59:4 69:16

**memory** 6:8
17:18 18:3,5 27:13

**mention** 28:3
73:24

**mentioned** 9:14
29:11,17,19 39:17
53:15 60:16

**mic** 52:17

**Michael** 7:6

**middle** 8:23
18:11

**mind** 15:13 17:14
64:10 66:4

**minds** 74:24

**mine** 16:22 78:11

**minors** 79:16

**minute** 82:8

**minutes** 76:23
82:6

**misconduct**
37:17

**Misha** 4:13 14:23
21:23 44:1 82:6

**Misstates** 71:14

**misunderstoo
d** 28:20 81:17

**month** 20:12 47:1

**Moore** 4:9

**motion** 57:16

**move** 18:6 46:14

**multifaceted**
36:1

**murder** 19:8
27:14,18 31:4,12,
15,18,20 32:5,13,
14,16 38:23 79:15,
17

**murdered** 68:24

**Murphy** 5:14
7:17

**Murphy's** 52:10

**mustache** 30:23

**mustaches**
30:24

**myriad** 81:4

**N**

**name-change**
14:24 15:3

**named** 73:19

**names** 4:11 56:5
57:2

**narrative** 76:22
77:1,4,9

**narrow** 79:3

**NAUGHT** 82:16

**necessarily**
38:9 62:18 78:8

**necessitated**
19:10

**necessity** 17:12

**neck** 28:4,24
29:11,20,23 30:1,21

**negative** 30:15,
17

**negatives** 30:4

**nervous** 78:10

**Nielsen** 7:12

**night** 27:14,18
68:24

**non-pertinent**
10:22

**non-subjective**
67:15

**normal** 41:2

**Northern** 46:22

**not-guilty** 57:12

**note** 28:1 42:17
63:3

**note-taking**
49:8 55:17,21

**notebook** 49:23
50:1,4 53:15

**notes** 6:5 48:6,7,
8,16,17 49:1,4,6,20,
21 50:1,3 52:17,22
53:6,14,16,18,19,24
54:2,3,5,13,20 55:1,
3,8,15,21,24 56:1,2,
12,16,17,18 57:4,
21,23 58:5,6,13,23
59:13,14,15,21
60:3,18 61:22 63:4
75:8,9

**notice** 47:10,13,
16,19 50:20,24
51:1,2,3,5,6,7,16,19
54:24 55:11,12

**notices** 45:20

**November** 5:9

**number** 19:12
20:11 46:2 50:6,11
58:21 69:17

**numbered** 18:7
28:2

**numbers** 79:6

**Numeral** 23:15
76:10

**O**

**object** 21:23 22:6
77:12

**objection** 9:12
10:8 12:9 13:6 22:4,
5 34:13 35:16,22
42:24 54:21 58:16
62:15 65:5 68:4
69:9 71:14 72:5
73:5 75:12

**obligation** 33:12
43:21

**observation**
78:11

**observed** 66:21

**obtain** 23:21

**obtained** 74:11

**obviate** 59:9

**occurred** 63:18

**occurrence**
59:10

**offender** 32:14
63:19 64:6,10 82:5

**offering** 35:10

**office** 43:20

**officer** 12:17,23
13:20 20:17 21:2
23:17,18 24:2 34:6,
11,16,18,19,20,21,
22,23 37:8 39:19
53:20 54:1 58:4,19
59:9 67:10 69:6
76:8,17 79:14

**officer's** 36:16

**officers** 4:14
15:22,23 17:23
18:17,18,23 19:2
20:22 21:1,11 22:24
25:16 33:3,6,9 35:6,
9 38:20 48:6,15,16
49:3 53:4 55:3,8
58:13 59:21 60:3
75:10 76:7 77:7
80:1,2

**officers'** 11:10
18:12 48:5

**official** 15:6 34:7
48:8

**oftentimes**
12:17

**opened** 49:23

**operate** 39:21

**operated** 43:4

**operating** 14:7,
15,17,20 15:11,18
16:10 17:2,8,19
24:19 25:10,15,24
26:13 45:9,20 60:17
61:1,13,19 62:1,12
63:5 74:15

**operator** 39:9

**opinion** 29:9
36:10,15,21 37:3,11
38:12,19 42:11 43:9
44:8 71:20 72:15,18
74:2 77:22 78:6

**opinions** 8:7
35:10 77:8

**opportunity**
65:3 74:10

**oral** 51:10

**order** 10:24 23:6
46:3,7 47:12 50:23
51:4,5,6,10 52:5
54:8 58:14 62:22

**orders** 45:20
46:12 47:9,17 51:12

**organized**
15:19,20

**original** 19:11
77:9

**overview** 46:1

**P**

**p.m.** 4:5 23:11,13
44:4,6 82:13

**pages** 5:18 6:14,
21

**Palmer** 46:16,18,
23 48:4,14

**paper** 40:2,3 72:8

**papers** 74:3

**paragraph** 8:21,
22,23 11:13 18:6,8,
11 24:6 28:1 31:2

RICHARD BRZECZEK

December 20, 2018
Index: parentheses..procedures

33:1,7,18,21 37:11
43:9 46:14 48:3,13
50:18 51:15,22
63:13 66:16 76:11

**parentheses**
20:12

**part** 5:10 6:10,22
8:15 18:16,21 20:7
26:20 27:5 31:15
33:17 34:8 35:17
38:7 42:5 54:12
55:9,24 56:2 62:1
70:12 77:10,15
81:18

**parties** 4:10

**parts** 62:3,4 69:3

**pass** 13:24 52:17

**passing** 81:1

**patrol** 17:23
23:18 24:2

**Paul** 7:12

**pause** 23:12
33:19

**pay** 46:20

**peers** 16:22

**people** 32:12
36:7 43:16 47:22
51:12 54:19 55:13
58:20,22 62:4 73:19
80:9,10,23 81:1

**people's** 56:5

**Peoples** 7:24

**perceptions**
12:21

**period** 70:21

**person** 13:4,8,15,
17,18,20 29:18
32:17 57:2 61:8
64:19 65:19 68:18
75:18 76:1 82:4

**personal** 48:6,16
53:20 57:23 58:13
72:22 77:11,16,20
78:3,6

**personally** 12:1
25:18 54:17 69:14

**personnel** 76:15

**persons** 43:11

**pertinent** 10:21
11:1,6 23:21 24:7,
11 66:12,14,17,18,
24 67:1,4,5,9,13,14,
17 70:18,22 71:3
74:19 80:16,18
81:17,21 82:1

**pertinentence**
66:19

**phenomena**
35:15,21

**phone** 27:17

**photo** 16:4

**photographing**
82:5

**physical** 25:22
26:3,6,16 30:12,13,
14 31:11

**physiological**
72:10

**pick** 26:24 27:8

**pictures** 60:9

**piece** 72:8

**pieces** 12:17,20

**place** 4:4,10 41:9
47:23

**plaintiff** 4:18

**plaintiff's** 46:11

**plea** 57:16

**point** 14:1 26:19
29:15 54:8,11
63:19,21 64:12
65:12 66:1 69:8
70:23

**poles** 32:12

**police** 10:6 11:10
12:17,18,23,24
13:5,16,19 18:17,

18,22,23 20:4,16,22
21:1 22:16,20,24
23:19 24:3 25:11,
16,17 26:6,15,23
33:23,24 34:3,5,6,8,
16 36:13,19,24
37:5,8,22 38:6
41:22 43:3,18,21
45:13 48:5,6,15
49:3 51:8 53:3,13,
18,20 54:1,4,10
55:8 56:24 58:12
59:9,21 60:3,7,8,23
68:23 69:2,6,15
73:1,12,14,17,20
74:6,7,8 75:10 76:7,
8

**policies** 33:3,8

**policy** 21:7,17
44:16 60:22

**polygraph** 9:4,5
13:22,24 25:12 39:9
40:4 41:6,21 42:21
44:13 52:2,4,9
65:23 66:5 69:1,21,
23,24 70:2,3 71:12,
16,18,19,21,22
72:3,9,13,14 73:1,2,
8,13,21 74:14,16
75:1

**polygraphed**
11:24 40:12,19
41:12,17 52:2
69:19,20 71:17

**polygraphs**
52:7 72:23

**polygraphy**
72:20

**portion** 16:14
18:4 26:21 27:12,16
77:9

**portions** 6:3
16:16,17

**posing** 21:21

**posited** 68:5

**position** 33:23
81:5,7

**possess** 33:4,9

**possession**
14:9 45:7 46:10
52:1

**possibilities**
64:2

**possibility**
10:15

**possibles** 31:21

**possibly** 56:3

**potential** 32:23

**practiced** 61:4

**pre-polygraph**
74:12

**pre-service**
11:10,11 80:24

**pre-test** 11:14
12:7

**pre-trial** 7:20

**predecessor**
20:16

**preliminary**
64:22

**premise** 69:18
71:16

**premises** 69:11
70:8,13

**preparation** 7:1
19:11 21:6 22:15
49:4

**prepare** 17:4
21:10

**prepared** 19:14,
16 20:23 22:19
56:9,15 58:5 59:16,
19 61:8

**preparing** 11:5
17:12 66:12 76:8

**present** 50:2
64:6

**presentation**
80:23

**presentations**
80:20

**preservation**
52:22

**preserve** 48:7,17
49:1 53:5

**preserved** 14:12
53:17 54:5

**preserving**
49:21 53:15 55:14

**presumption**
68:18

**pretest** 11:22

**pretrial** 57:16

**pretty** 17:16

**previous** 75:15

**previously** 6:13
8:15 24:20

**primarily** 80:8

**principle** 43:10,
14,16

**prior** 31:7 45:17
48:4,14 50:18,22
54:1 55:1 56:22
57:19 59:21,23
61:23 74:13

**problem** 38:7,16
40:13

**procedural**
14:15 15:4 45:21

**procedurally**
47:11

**procedure** 14:8,
17 26:14 60:17
61:1,4,6,17,19,24
62:12,23 63:5 80:8
81:24

**procedures**
14:21 15:5,11
18:17,22 26:1 33:3,
8 49:9 60:6 61:13,
20 62:1,13,19

RICHARD BRZECZEK

December 20, 2018
Index: proceed..reports

**proceed** 22:11

**proceeds** 71:2

**process** 55:18 59:15,16 72:12

**proclamation** 32:11

**produce** 56:17

**produced** 52:11 57:21,24 58:1,3

**professional** 71:20

**professionals** 36:23

**profile** 64:18

**profiling** 64:17, 20

**Progress** 55:19

**prohibits** 51:9

**promulgated** 54:9

**properly** 82:3

**prosector** 59:6

**prosecute** 43:13,18,22

**prosecution** 43:17

**prosecutions** 43:12

**prosecutor's** 43:20

**prosecutorial** 37:16

**provided** 6:1,10 11:16 17:17 20:24 21:11 41:15 44:13 77:2

**provisions** 17:22 47:12

**prudence** 43:10

**published** 14:19 37:14 54:9

**pulled** 48:23

**punched** 30:8

**purchase** 50:5

**pure** 31:15

**purest** 43:2

**purpose** 49:6 56:21 61:18 69:21

**purposes** 36:23

**pursue** 43:13

**put** 9:11,14 14:18 15:24 19:3 26:2 40:2,3 46:6 73:7 76:17 77:21 78:3,13

**putting** 37:9 75:23

**Q**

**qualified** 74:15

**qualitative** 17:12

**quantum** 67:18

**question** 10:6,10 15:14 21:20,24 22:12 23:6 25:13 26:2 28:20 32:18,19 35:18 39:3,7 53:22 54:23 56:12,19 59:5 60:1 64:10 68:5 69:12 70:12,13,16, 18 73:16 75:3 81:10

**questions** 5:13, 15,21 11:8 19:19 22:11 24:10 44:9 52:21 63:11 64:19 81:3,4 82:11,12

**quick** 44:1

**quote** 23:17 27:19

**R**

**raison** 45:13

**rank** 35:1

**re-read** 6:4

**reaching** 29:9

**reaction** 78:4

**read** 6:13 10:12,13 11:7 23:3 24:1 27:3, 4,12,16 29:22 33:17 34:11 39:3,5 40:10 41:10 60:13 69:12 70:9 81:10,12

**reading** 42:16 69:19

**reason** 28:22 30:1,3 44:11 56:8 76:3

**reasonable** 69:5

**reasons** 25:12, 18 59:7,12 60:12

**rec-** 8:1

**recall** 9:8 19:19 26:19 27:1,2,3 29:15 47:15 48:1 58:3 69:17 78:19,21 80:14

**receive** 23:1 45:3

**received** 18:12 21:2 45:12,14

**receiving** 34:7, 17

**recent** 37:13

**recess** 44:5

**recitation** 33:20

**recite** 24:8,9 45:19

**recollection** 8:3 17:11 28:24 53:12 55:11

**record** 4:10,12 10:13 22:8 23:9,11, 13 33:10 34:7 35:3 39:5 44:4,6 51:24 71:12 76:12 81:12

82:13

**recorded** 12:3,4 75:8,9

**recording** 4:9 14:4,6

**Records** 19:12

**recruit** 20:24

**reference** 18:11

**referred** 50:21

**referring** 18:13 20:7 28:8 31:6 33:6 43:14 49:17 50:14, 16,17 51:15,16 57:23

**regarded** 14:10 73:7,8

**regulation** 44:16,20

**Regulations** 51:9

**relate** 13:8

**related** 6:21 17:21 52:3 66:5

**relates** 17:9,20, 22 52:7,8

**relating** 5:9

**relation** 66:6

**relative** 31:16

**relay** 12:20

**relayed** 11:21 12:6 44:14

**relays** 12:17

**relevant** 31:17 63:14

**relying** 9:17

**remember** 6:2 8:2 9:7,21 10:4 16:17 27:21 28:15 29:21 40:20 46:19, 21 54:17 56:3 58:22 79:5,6

**removable** 30:24

**render** 8:7 68:18 72:15

**rendered** 72:18

**repeat** 10:10 82:4

**repeatedly** 11:5, 9

**rephrase** 70:15

**report** 6:2,23 8:5, 16,22,24 9:4,6,11, 19,21,23 10:6 11:13,15 12:7,12 13:5,10,16,19 16:6 17:5,9,19,21,23 18:4,12 19:3,7,9,11, 14,15 23:1 24:3 25:11,18,22 26:6,15 27:9 28:2 29:3,4,9 30:2 33:4 34:2,8 36:12,16,18 37:4,21 38:5,13 39:2,9 40:14 42:17 45:15 46:6,14 49:5,8 50:17 53:19 54:13 55:2,19 56:9,11,15, 16 57:5 58:5,10,15, 18 59:13,16,18 61:6 63:12 69:15 74:8 76:8,11,17 77:9,13, 15 78:13,14 80:11, 13

**reported** 22:20 39:1

**reporter** 4:8,19 82:14

**reporting** 15:6 17:13 18:17,22,24 19:5 20:5,6,8,18,20, 21,24 21:3,5,9,15 22:14,23 26:10 45:21,22,23 66:15 76:5,6 77:7

**reports** 9:15,17 10:19 11:5,17 17:12 20:22 21:6,10 22:15,19 23:15 29:21 33:24 36:13,

RICHARD BRZECZEK

December 20, 2018
Index: requested..standardized

19 37:5,22 38:6
48:8 54:3 63:15
66:13 69:17,19 71:7
73:20 75:11 76:9
77:1

**requested** 10:14
39:6 81:13

**require** 19:6
25:21 33:9

**required** 14:2,3
15:23 18:18 23:1
24:3 25:11,16,17
26:15 33:4 35:3
44:17 48:7,9,16
49:5 51:24 53:5
55:24 56:1 58:13
59:21 61:22 71:7

**requirement**
14:6 16:1 17:14,15
26:10 44:21,24
45:1,2,4,5 48:10,11,
20,23 54:10 56:23
60:3,5,8,11,18

**requirements**
14:4 52:7

**res** 59:15

**research** 36:6

**respond** 23:18

**responding**
64:1

**response** 72:18,
19

**responses** 32:6,
8,9 72:17 75:4

**responsibilities** 52:7

**responsibility**
32:12 36:16 43:11
62:5 79:20,24

**responsible**
16:21,23 31:24
42:10

**responsive**
22:12

**result** 52:23 72:2,
12

**resulting** 57:18

**results** 23:20
52:2 72:23 73:7,8,
13

**retain** 54:20

**retained** 57:5

**retention** 63:3

**retired** 41:23

**retraining** 47:12
50:23

**retroactively**
51:20

**review** 5:12 6:21
7:2,5,8,11,14,16,19,
23 8:9 17:4 26:21
37:14,19 38:11
71:11

**reviewed** 5:8,15
8:6,7,11 33:22,24
46:15

**reviewing** 6:20

**Richard** 4:2 5:2

**Riley** 7:6

**Robert** 29:12,18,
24 31:8,12 42:21

**Rochowicz**
11:23 28:14,21 29:5
34:12 39:8,18
40:12,18 41:11,16
42:20 44:14 73:22
74:13,20,23

**Roman** 23:15
76:10

**room** 32:17

**rooms** 41:4

**routine** 36:13,19
38:6 61:3,6,7,17,20,
24 62:13,19 75:17

**rule** 35:2 44:16,19,
20,23,24 45:1 51:8,
9 54:3

**Rules** 51:9

**run-of-the-mill**
41:2

**running** 55:4,22

――――――

**S**

――――――

**safe** 67:14

**SAITH** 82:16

**sanctions** 47:21

**satisfy** 39:7

**scar** 28:23 29:11,
14,20,23,24 30:20

**scars** 28:3 30:22

**scene** 49:4 60:9
63:18,24 64:1,18

**scheme** 36:24

**school** 25:2

**science** 39:22

**sciences** 36:4

**scope** 38:17,18

**Scott** 4:6

**scraggly** 72:8

**search** 54:14

**section** 18:4
24:1,12 76:22 77:1,
4

**Sections** 15:19

**seek** 81:7

**selective** 6:3

**sense** 22:17 43:2

**sentence** 8:23
18:10 28:3 31:7
33:2 36:11 44:9
51:23 63:13

**separate** 19:11

**September** 50:9

**sergeant** 34:20,
22 79:14

**service** 23:19

**set** 72:20

**Sheila** 5:14 7:17
52:10

**shorthand** 56:6

**shown** 58:8

**shows** 43:23,24

**sic** 15:18 66:19
67:7 72:16

**side** 65:12,13

**signature** 82:14,
15

**signatures**
61:12

**significance**
59:14

**Signing** 61:6

**similarity** 82:2

**simple** 56:12

**simply** 24:11,24
43:18

**sitting** 53:13

**situation** 30:7
32:15 63:2 64:15
66:8 67:20 76:2

**situations** 37:7
63:23 65:8

**skimmed** 5:19

**slip** 42:11,12
79:17

**social** 36:4 39:22

**somebody's**
42:10

**someone's**
32:13

**sophistication**
38:16

**sort** 47:9,17 67:2

**source** 18:19

**South** 4:4

**speak** 43:5

**speaking** 22:4,5
72:22,24 73:4,6,12
78:9

**special** 10:24
45:20 46:3,12 47:17
51:5,6 52:5

**specific** 17:18
18:3,5 26:11 46:7
50:4 52:5,8 54:8
64:4 70:21 79:6

**specifically**
11:3 17:10 21:21
26:4 42:8 49:16
51:15 54:17

**speculation**
9:12,16 10:9 12:9
31:15,16 34:14
42:24 65:6 69:9

**speculative**
62:10

**spoke** 40:11 56:4
57:3 59:4

**squad** 41:3

**square** 72:13

**squiggly** 74:3

**stabbed** 31:23
65:9

**Stacy** 4:15 52:17

**stage** 64:13

**stand** 56:10

**standard** 10:24
14:7,15,17,20
15:10,18 16:9 17:2,
8,19 18:17,22 24:19
25:10,15,24 26:13
45:9 60:17 61:1,13,
19,24 62:12,19 63:5

**standardize**
62:23

**standardized**
55:17

RICHARD BRZECZEK

December 20, 2018
Index: standards..Trunko

**standards** 72:20

**standpoint** 72:10

**start** 49:18,19 70:17 74:23 75:6

**started** 67:19

**state** 4:11 8:24 25:10,16 26:14 31:3 33:1 36:10 37:19 43:9 44:8 48:3 51:23

**stated** 46:3

**statement** 5:14 6:6,9,11,19 8:10,12 35:12 36:14 53:11 68:14,15

**statements** 8:13 16:19 32:9,20, 22

**states** 18:11 24:2, 6

**station** 59:17

**Stop** 48:18

**Stout** 11:14,22 12:2,3,6,14 31:23 32:6,10 69:20 70:1 71:21 72:18 73:7,8, 18,21,24 74:13,23 75:8

**Stout's** 9:4,5 69:19 75:8,9

**strapping** 70:1

**street** 4:4 55:5,22 57:1

**strictly** 18:2

**strike** 7:1

**strongest** 53:12

**studies** 37:2,6

**subject** 69:22 71:21 72:12 74:9, 10,16

**subjective** 67:10,12 70:20,24

**subjects** 80:6

**submit** 19:7 70:2 71:12

**submitted** 16:22,23 62:4 72:13

**subsequent** 8:12 48:2

**substantial** 6:17

**substantiate** 37:3

**substantiates** 37:11

**substantive** 77:2

**suggests** 31:17

**superintenden t** 15:15 34:21,22 47:5,24

**superintenden t-** 15:15

**supplementary** 10:19 19:3,7,15

**support** 4:7 38:12

**supported** 77:20

**supposedly** 29:20 74:20

**Supreme** 81:24

**suspect** 13:4,15 25:19,23 26:3,7,17 30:19,23 31:4,19 32:3,23 65:4,8 66:2 75:5,17

**suspicion** 77:22 78:3,7

**suspicions** 74:24 75:10,13,18, 21,24 76:9,16 77:19

**suspicious** 78:12

**swear** 4:19

**sworn** 5:1,3 13:20 50:9

**syllabus** 54:12

_____

**T**

**taking** 4:4,9 16:21 33:22 40:12 53:14 54:13 70:16

**talk** 11:14 12:19 34:15 39:22 40:1 41:3 42:2 43:5 64:4 75:17,18 78:12

**talked** 9:24 10:23 18:7 38:17 40:9 63:16

**talking** 14:14 19:15 24:19 25:8 26:11,12 33:8 34:9 35:2 36:1,6 44:12 48:11 58:1 62:7,8 65:20 73:21 74:2

**tapes** 72:1

**taught** 63:14

**tavern** 26:23 27:8

**teach** 53:14

**telephone** 9:24 58:21

**telling** 21:24 33:22 41:1 64:17 75:20 76:2 78:5

**temporary** 47:12 50:23

**tendered** 8:18

**term** 11:1,3 22:1 34:19 51:11

**terms** 17:16 21:16 49:8 66:11,12 75:18 80:17 82:2

**test** 25:12

**testified** 5:4 15:10 18:16,21

24:16 26:20,22 27:13,17 40:16 42:5 46:15 48:4,12,14 50:18,22 66:16 79:15

**testify** 46:18 52:13 59:3

**testifying** 19:19 24:7 27:2,3 40:20 58:5 59:10

**testimony** 6:2 26:22 27:13,17 40:10 41:15,18,19, 20,23 42:7 46:16 48:7,17 49:6 53:3 54:3 56:23 71:14

**testing** 58:10

**text** 37:9

**texts** 37:2

**theft** 16:22

**theoretical** 43:2

**thereof** 47:21

**thin** 48:23

**thing** 6:4 9:13 23:4,6 70:7

**things** 6:7 16:20 31:1 36:24 39:22 42:14 54:16 59:11 62:20 67:2 75:7,9 76:4

**thought** 28:24 71:3 75:3 76:1 81:6

**tie** 76:3

**tied** 29:13 65:19

**time** 4:5 5:18 6:23 9:5,19 10:3,23 14:1 17:1 18:1,7 19:9 21:13,19,22 23:3 24:8 25:4 26:21 29:15 38:17 42:6 45:7,18 46:15 50:13 52:14,16 54:16 55:14 61:4 63:21 64:6 66:20 68:2 70:21 71:3 74:20

81:6

**times** 56:5 80:22

**tired** 6:16

**title** 46:2

**today** 4:8

**today's** 5:10 6:22

**toes** 70:7

**told** 12:1,2,6 26:23 27:19 28:24 31:23 33:23 34:3,6 40:9 73:18 75:7,8

**top** 31:2 76:11

**totality** 68:21

**totem** 32:12

**train** 80:11,13,15

**trained** 30:11 36:23 66:10,12 67:1 75:10

**training** 11:12 21:14,16 24:16 35:14,20,23 43:21 45:21 49:18,19 50:7 51:7 53:14 54:7,12 62:22 71:1 79:24 80:3,4,10,17 81:15, 18

**transcript** 5:24 7:2,5,8,11 46:20

**transcripts** 7:16,19,23 8:2,4

**treating** 80:2

**trial** 7:24 8:3,4 35:11 50:2 52:14 53:16 57:17

**trip** 70:17

**TRO** 46:21 47:8,18 48:5,15 50:19 51:19 52:23 55:1

**true** 12:16,19,22 40:16 68:9 71:6

**Trunko** 9:1,6,10 11:18 19:8 26:24

RICHARD BRZECZEK

December 20, 2018
Index: Trunko's..youth

27:8,18 28:12,17
31:9,12,24 32:6
38:24 40:17 64:5
65:9 68:1,6,24 69:7,
16

**Trunko's** 27:18
74:19

**truth** 75:20 76:2
78:5

**truthfulness**
35:11 72:15

**turn** 8:21 76:19

**type** 50:4 51:3
53:15

---

## U

**U.S.** 4:7

**unbridled** 10:20

**undergo** 71:19

**undergone**
14:24 15:2 71:17

**undermine**
69:21

**understand**
12:13 13:7 39:21

**understanding**
38:22 53:2 72:23
73:12

**unfit** 72:2,12 74:9

**uniformed**
15:22 23:17,18 24:2
76:17

**unit** 41:8 42:15

**units** 16:22

**unknown** 64:11

**untruthfulness**
72:15

**updates** 81:19

**urged** 56:2

---

## V

**variability** 60:6

**variety** 60:12

**verbal** 74:17

**verbally** 13:9

**verify** 75:2

**vernacular**
34:24

**version** 56:6

**versus** 4:2 7:24
10:21

**vice** 18:1 76:14

**victim** 9:10

**video** 4:9 60:9

**violation** 51:9

**violations** 47:21

**violence** 30:6

**virtually** 43:20

**visible** 28:3 29:24

**volunteered**
32:9

---

## W

**waive** 82:15

**wanted** 56:19

**wanting** 78:12

**wears** 78:5

**well-
established**
17:16

**West** 4:7

**whatever's**
64:23

**whoever's** 50:2
53:23

**whomever**
65:18

**willful** 36:17,22
37:1

**willfully** 36:11
37:3,20 38:12,20
39:13,19

**withholding**
37:17

**witnesses** 12:20
52:1 56:11 77:8
78:7,8

**wondering** 35:7

**word** 11:4 21:8
22:17 24:7 34:23
45:1 66:20 72:16
77:13 80:18

**words** 21:15
37:23 38:1 82:4

**work** 39:23 41:1
55:24 56:2

**working** 70:20

**write** 42:17

**writer** 77:10,13,16

**writes** 57:2

**writing** 16:6,9
17:9,19,21,23 18:4
49:8 54:13 80:11,13

**written** 14:18
37:15 38:15 51:10,
12 59:9 81:1

**wrong** 41:7 75:23

**wrote** 55:2 56:5
58:23

---

## Y

**yard** 27:23

**year** 16:12 20:12
46:18 47:23 48:1
62:7

**years** 16:18 17:3,

7 46:5 62:7,8

**youth** 79:14