# WALLER & ASSOCIATES, LLC

15850 W. Bluemound Road, Suite 308
Brookfield, Wisconsin 53005
(262) 782-5515 • Fax (262) 641-0508
www.wallerassociates.com

**Dennis Waller, CLI**
denny1@gdinet.com

October 1, 2018

Attorney Roshna Bala Keen
Loevy & Loevy
311 North Aberdeen
3rd Floor
Chicago, IL 60607

Re:   **Daniel Andersen v. City of Chicago, et al.**
       USDC, Northern District, IL, Eastern Division; Case No.: 16-cv-1963

Ms. Keen

The following report was presented per your request for my opinions on various issues related to this litigation.

**Background and Qualifications:**

I have served as a consultant/expert witness in more than 700 cases involving issues related to police policy, procedure, and practice. I have been retained in thirty-six states including Illinois plus the District of Columbia. I have served as an expert witness in federal courts, state courts, and before administrative hearings. I have been retained by counsel for both plaintiff and defense.

I have a Bachelor of Science degree in Police Administration from Michigan State University. I have a Master of Science degree in Public Administration from Florida International University. I have received over 3,700 hours of law enforcement training including hundreds of hours from Michigan State University, the University of North Florida, Northwestern University, University of Wisconsin, International Association of Chiefs of Police; Metropolitan Police Institute; Public Agency Training Council, and Milwaukee Area Technical College.

I have served as a police officer, field training officer, detective, sergeant, lieutenant, department training officer, and chief. I have been certified as a police training instructor in Michigan, Florida, North Carolina, and Wisconsin. I have served as the director of a regional

1



EXHIBIT
5
Waller 12-19-18

police training academy in Raleigh, North Carolina. I have been certified as an Internal Affairs Investigator/Supervisor. I am a Certified Legal Investigator, one of approximately 100 in the country. I have been trained as an Assessor for the Commission on Accreditation for Law Enforcement Agencies. I have earned the status of Fellow of the American College of Forensic Examiners and Diplomate of the American Board of Law Enforcement Experts.

Throughout my years as a police instructor and supervisor, I have trained hundreds of officers in numerous subject areas including properly handling criminal investigations, crime scene investigation, report writing, court procedures, interviewing and interrogation, and police ethics. I have taught in a variety of law enforcement and related subject areas at the college and university level including the police function, police administration, criminal investigation, crime scene investigation, criminalistics, and policy development seminars in high liability areas.

Please refer to the attached curriculum vitae.

### Methodology:

The methodology I use to examine police-related issues involved in litigation is explained below. This methodology is the same, or similar to, that utilized by experienced and respected expert witnesses in the field of police practice. The basic methodology I use has been accepted in over 700 cases I have reviewed for matters before federal courts, state courts, and administrative hearings.

A.  Develop an Understanding of the Facts   Following a review of the information provided, develop and state an understanding of the facts. The facts and circumstances are specific for each case. If you change the understanding of the facts, the opinions may change or no longer be applicable.

B.  Analyze the Actions of the Officers   The second step involves analysis of the actions of the involved law enforcement officers based on documentation by the officers, relevant testimony, departmental and/or external investigations, physical evidence, and any other relevant information. Determine what the officers did and their stated justification for what they did.

C.  Compare with Standards of Training and Practice   The third step involves comparing what and why the involved officers did with various standards of training and practice. Standards of training and practice include relevant Supreme Court cases; departmental policies and procedures; applicable statewide police training programs/systems; model policies, training, and research from such institutions as the International Association of Chiefs of Police, Police Executive Research Forum, National Criminal Justice Reference Service, Commission on Accreditation for Law Enforcement Agencies, Public Agency Training Council, and the Northwestern University Center for Public Safety.

D.    <u>Define and Explain Consistencies and/or Inconsistencies</u>  The fourth step involves explaining how what the officers did, or did not do, was consistent or inconsistent with the applicable standards of training, practice, and professional ethics.  The purpose is to assist the triers of fact in understanding the sometimes complex terminology, procedures, and the scope of acceptable practices in law enforcement which may otherwise be presented in a confusing and/or misleading manner.

**Materials Reviewed:**

Complaint;
Order Granting Certificate of Innocence – Daniel Andersen;
Plaintiff's Responses to Defendants' Pleadings:
    Defendant Higgins x4;
    Defendant Olson x8;
    Defendant Pawlowski x4;
    Defendant Riley;
    Defendant McWeeny x4;
Defendants' Responses to Plaintiff's Pleadings:
    Defendant City:
        Request for Production x2;
        Request for Admissions x2;
        Answers to Interrogatories x5;
    All Officers:
        Request for Production;
        Answers to Interrogatories;
    Defendant Bednarkiewicz – Answers to Interrogatories x5;
    Defendant Cegielski – Answers to Interrogatories;
    Defendant Higgins – Answers to Interrogatories x2;
    Defendant McWeeny – Answers to Interrogatories x4;
    Defendant Nielsen – Answers to Interrogatories x5;
    Defendant Olson – Answers to Interrogatories x4;
    Defendant Pawlowski – Answers to Interrogatories x5;
    Defendant Rajewski – Answers to Interrogatories x4;
    Defendant Riley – Answers to Interrogatories x5;
Chicago PD Reports – Cathy Trunko Homicide;
Hon. Sheila Murphy's Case File for <u>State v. Andersen</u>;
Depositions/Exhibits:
    Honorable Sheila Murphy;
    Daniel Andersen – I & II;
    Detective Craig Ciegelski;
    Evidence Tech Norbert Rajewski – I & II;
    Frank LaGace;
    Officer Jim Bednarkiewicz I & II;
    Officer Larry Pawlowski;

Officer Paul Nielsen;
Mary Andersen – I & II;
SAO Investigator Gerard Carroll;
Daniel Manobianco;
John Stout;
Det. James Higgins – I & II;
ASA Glenn Sechen;
ASA Neil Cohen – I & II;
ASA David Erickson;
Chief Microanalyst Bernadette Hogan;
Detective Daniel McWeeny – I & II;
Officer Michael Riley;
Diane Grabowski;
Detective John Olson;
Transcript – <u>State v. Daniel Andersen</u> Criminal Trial, Motion Hearings.

### Understanding of the Facts:

On January 19, 1980, at approximately 10:15 p.m. Cathy Trunko [Ms. Trunko] was discovered by passersby on the sidewalk by the gangway of 4936 South Paulina, Chicago, Illinois. Ms. Trunko was lying face down in a pool of blood. She had been stabbed three times in the chest. Ms. Trunko died within a short time of receiving the stab wounds. The original CPD report indicated she had been stabbed twice in the left breast and once in the right breast.

The Chicago Police Department [CPD] was contacted. Uniform, investigators, and evidence technicians responded to the scene and initiated a homicide investigation under RD#B-025267. On January 20, 1980, Detective Bedran of Area 3 Homicide made contact with Cathy's best friend, Diane Diaz [now known as Diane Grabowski]. A CPD report dated 1/20/80 documented that Ms. Diaz informed Det. Bedran that she [Diaz] was a very close friend of Ms. Trunko. During the evening of January 19, 1980, Ms. Diaz was in the company of Robert LaGace at Dot's Lounge at 5300 S. Ashland. Ms. Diaz called Ms. Trunko at about 10:00 p.m. and asked Ms. Trunko to join them and offered to pick her up. Ms. Trunko refused. The report indicated that Robert LaGace provided the same story as Ms. Diaz.

Although not included as a report in the homicide file nor made available to the Assistant State's Attorneys [ASA] subsequently prosecuting the criminal case against Daniel Andersen [Daniel], according to Ms. Diaz CPD detectives came by to speak with her a second time on January 21, 1980, while LaGace was at her house. Ms. Diaz indicated she told the detectives about calling Ms. Trunko about 10:00 p.m. to come out, LaGace leaving the bar to get Ms. Trunko, and LaGace coming back without Ms. Trunko but missing a knife. After first speaking to Ms. Diaz, the detectives asked LaGace to speak with them in their vehicle. The vehicle drove off with LaGace and was gone for a couple hours.

4

We know now from a separate report completed by CPD Polygraph Examiner John Stout that Detectives Bedran and Rochowicz brought LaGace to him to be polygraphed on January 21, 1980. Although not otherwise included in any other CPD reports, Det. Stout determined that LaGace had been in close proximity by both time and location to Cathy at the time she was killed. Det. Stout was also advised by the detectives that LaGace had reportedly pulled knives on Cathy previously. This was information provided by the detectives that Det. Stout thought to be significant in a homicide investigation. Stout conducted four polygraph tests on LaGace which focused on his involvement in, or knowledge of, the Trunko homicide. The responses were consistently erratic so as to be unreadable. Det. Stout felt LaGace should be re-examined at another time. The only CPD report documenting the information known to Detectives Bedran and Rochowicz was the polygraph report completed by Det. Stout and maintained in a separate file in the Crime Lab.

On January 21, 1980, a knife was discovered on the front lawn of 5036 S. Hermitage. CPD Officer Pawlowksi responded to the call. Detectives Higgins and Cegielski along with Evidence Technicians [ET] Rajewski and Melko responded to the scene. The knife was photographed and brought to the crime lab where a blood standard was obtained from the knife and it was fingerprinted. The report from the evidence technicians stated: "Request by beat 8304 [Det. Higgins] to take photo,s [sic] and dust for prints recovered knife and 1 Old Stlyle beer bottle...beer bottle received from investigators at scene. Knife and bottle taken to lab for print examination..." No particulars including a chain of custody were established for the bottle. The report lists the RD# as B025267 thereby relating it to the Trunko homicide. In a subsequent court appearance ET Melko testified he could not recall which investigator handed him the beer bottle.

At approximately 2:00 a.m. on January 24, 1980, Daniel was arrested outside his residence by CPD Officers Bednarkiewicz and Nielsen. Daniel's mother, Mary Andersen, signed a complaint for disorderly conduct because Daniel had been drinking heavily and was in an agitated state. Daniel admitted he was swearing, yelling, fighting with the officers, confused, and was so drunk he had trouble standing. Daniel stated the officers kicked him until he became compliant. According to Daniel on the way to the 9th District station where Mrs. Andersen expected that Daniel would be held overnight, one of the arresting officers said, "I bet you're the guy that killed that girl." Daniel felt the officers were talking "shit" to him and because he was drunk, rowdy and upset he responded by making a nebulous comment about killing them all.

Officers Bednarkiewicz and Nielsen drafted two reports regarding the arrest of Daniel. The original arrest report for disorderly conduct indicated "Above taken to A/3...by RO's for inv of homicide." In a subsequent report drafted by these officers documenting Daniel's arrest for homicide/murder their report stated, "Investigation disclosed that the subject may be involved or have information concerning a homicide which was under investigation."

Daniel was secured to a locker in the 9th District for approximately one hour before being booked for the disorderly conduct charge and transported to Area 3 Homicide. At Area 3, Daniel was met by Detectives Olson, Fitzgerald, and Herman. According to Daniel, he was

handcuffed to a wall and told to tell the detectives what he knew. The detectives then kicked, punched, and beat Daniel with a club on three separate occasions. He was then left alone until after shift change.

Detective Olson was aware the arresting officers were bringing Daniel to Area 3. Although not reflected in the reports completed by Officers Bednarkiewicz and Nielsen, according to a report drafted by Det. Olson, the arresting officers told him that on the way to the 9th District, Daniel "...related that he was the one who had stabbed the Trunko girl. He stated that he had stabbed her 3 times and that he had thrown the knife in the area of 50th and Hermitage. He informed the officers that he had stabbed Cathy once in the right side of the chest and twice on the left side of the chest."

Detective Olson testified that before speaking with Daniel, he reviewed the Trunko homicide file. Det. Olson advised Daniel of his "Constitutional Rights" before talking to him. Daniel stated he did not kill Cathy, a person named Bob had killed her. Daniel told the beat officers that he had killed Cathy so they would take him to someone who knew about the murder. Daniel further stated that he knew Cathy very well and had sex with her on two previous occasions. Daniel stated on the evening Cathy was murdered he was at the Red Mist Tavern from after 9:00 p.m. until it closed. Daniel then went to a Barbara Mags house where he was told by Andy Gladkowski that Cathy had been killed. When asked why he threw the knife where he did, Daniel responded, "...you'll never find the knife."

After shift change, Detective Higgins approached Daniel showing him kindness. Det. Higgins took Daniel into an interview room and told him that he [Daniel] had said he had killed someone. According to Daniel, Det. Higgins told him he did not need a lawyer. Daniel stated he only said that out of anger; that he had never killed anyone. When asked to tell Det. Higgins what he knew, Daniel advised the detective that Cathy Trunko was killed in the neighborhood on Paulina, there were a lot of rumors, and there was a rumor that a guy named Bob may have killed her. Detective Higgins told Daniel they had already checked on Bob and it was not Bob. Det. Higgins asked Daniel if he had ever experienced blackouts during which he could have committed a murder and not even know it. Det. Higgins also had Daniel draw a map of the neighborhood and told him what to put on the map. Daniel told Det. Higgins that he was with Betsy and Mary procuring marijuana on the night of the murder. After leaving Betsy and Mary Daniel he went to the Red Mist Tavern.

Det. Higgins advised Daniel that Det. McWeeny had checked with Betsy and Mary and they denied being with him on that date. Det. Higgins started talking about blackouts again and showed Daniel pictures of a knife. Daniel had never seen that knife before; however, Det. Higgins showed him another photo that has never been provided to the prosecution. That photo showed the knife with a pair of gloves next to it. The gloves were of a distinctive type that Daniel used for work and were frequently left in his car or at home. The gloves made Daniel think that he may have blacked out and committed the murder.

During the interrogation, Det. Higgins suggested a lot of things to Daniel. According to Daniel, Det. Higgins said Daniel needed to convince his [Higgins'] boss that he did the murder but did not mean to do it. With input from Det. Higgins, Daniel came up with a story. Det. Higgins referred to it as a script. Det. Higgins told Daniel that a knife was used and to change the reason for the murder from robbery to sex. According to Daniel whenever he [Daniel] became reluctant about developing the "script" for his confession, Det. Higgins would threaten to leave him for the midnight shift detectives who had previously beaten him. After going through the story a couple times Det. Higgins told Daniel that he had to convince his boss that he [Daniel] had done it. ASA Sechen from the Felony Review Unit then obtained a recorded confession from Daniel. After signing the confession Daniel was also asked to sign the map he had prepared.

Based primarily on Daniel's signed confession, the map Daniel made in response to Det. Higgins' direction and input, and circumstantial evidence that the blood on the recovered knife was the same type [type A] as Cathy Trunko's, Daniel was found guilty of the murder of Cathy Trunko and sentenced to fifty-five years in prison.

Subsequent DNA testing of the blood from the knife, which was not available at the time of the investigation, determined that the blood on the knife was not from Cathy Trunko or Daniel Andersen. On December 18, 2015, after serving over thirty years in custody and/or close supervision Daniel was granted a Certificate of Innocence based upon a preponderance of evidence indicating Daniel is innocent of the offences charged.

**Opinions:**

Based on the totality of my training, education, and experience in law enforcement; as a law enforcement trainer; as a police science/criminal justice educator; and, as a police practices consultant, I have developed the following opinions to a reasonable degree of professional certainty in the field of law enforcement practice.

A     The purpose of an investigation is to determine the truth about what happened. False arrests and malicious prosecutions occur when officers deliberately and improperly slant an investigation, as opposed to their true purpose or mission, which is to determine the truth. If false, slanted, incomplete, or manufactured evidence is introduced by the police, it creates an extremely difficult, sometimes insurmountable, task for an innocent person to overcome.

    1    On December 18, 2015, Daniel was granted a Certificate of Innocence based upon a preponderance of evidence indicating Daniel is innocent of the offences charged.

    2    All law enforcement personnel, including Chicago Police officers, are trained ethically, morally, and procedurally to determine through an investigation the truth about what happened. The actions of the CPD personnel involved in the

arrest, interrogation, and prosecution of Daniel were not consistent with this nationally accepted standard of ethical law enforcement practice.

3    "The Law Enforcement Code of Ethics" is incorporated into the Chicago Police Department Rules and Regulations as a moral guideline of acceptable and appropriate conduct. As a nationally accepted standard of police practice, it was promulgated by the International Association of Chiefs of Police [IACP]. It, or something similar, is recommended by the Commission on Accreditation for Law Enforcement Agencies [CALEA] for adoption by all agencies. It states in part:

    a    "As a law enforcement officer, my fundamental duty is to......protect the innocent against deception......"

    b    "......to respect the Constitutional rights of all men......."

    c    "Honest in thought and deed......I will be exemplary in obeying the laws of the land and the regulations of my department."

    d    "I will never act officiously......I will enforce the law courteously and appropriately....without....malice or ill will, never employing unnecessary force or violence...."

4    "The criminal investigation process plays an important and special role in countries governed by the rule of law. Its function is to seek the truth...." D. Kim Rossmo, "Failures in Criminal Investigation," <u>The Police Chief</u>, October 2009, p. 64.

5    "For serious crimes, criminal investigators are the gatekeepers for the rest of the criminal justice system. The information that they collect and their interpretations of this information can have a profound impact on downstream criminal justice outcomes....At their best, investigators can protect us from some of society's most dangerous predators. At their worst, they can create and perpetuate egregious injustices." [Criminal Investigative Failures, by D. Kim Rossmo, CRC Press, 2009, p. xi]

6    ".....when investigations fail, the offenders remain free and the public is at risk of further harm. Even worse is when police arrest, and courts convict, an innocent person; not only is a terrible injustice done and the reputation of the justice system harmed, but the real offender remains free to hurt or kill again." [Deputy Chief Doug A. LePard, Preface, <u>Criminal Investigative Failures</u>, CRC Press, 2009.

B    The actions of CPD personnel in documenting what Daniel allegedly said in the police vehicle after his initial arrest are inconsistent with nationally accepted standards of police training and practice.

1    Within a short time of reading the Cathy Trunko homicide file, Detective Olson
     wrote a supplementary report indicating the following: "The officers
     [Bednarkiewicz and Nielsen] related that on the way to the 9th District Station
     that Daniel Andersen related that he was the one who had stabbed the Trunko
     girl. He stated that he had stabbed her 3 times and that he had thrown the knife
     in the area of 50th and Hermitage. He informed the officers that he had stabbed
     Cathy once in the right side of the chest and twice on the left side of the chest.
     Upon the Officers arrival at the 9th District Officer Nielsen call [sic] the Office of
     Area 3 Homicide and informed us what Andersen had said."

     a    The reports drafted by Officers Bednarkiewicz and Nielsen do not support
          Det. Olson's contention that these officers provided him with the specific
          information that Det. Olson included in his report.

     b    There is an adage used by police instructors training law enforcement
          officers about police report writing. It states, "If it's not in your report,
          the assumption is going to be it did not happen."

2    Officers Bednarkiewicz and Nielsen wrote two reports with regard to the arrest
     of Daniel Andersen on January 24, 1980.

     a    The first report documenting the arrest for disorderly conduct said,
          "Above taken to A/3...by RO's for inv of homicide."

     b    The second report documenting the arrest for homicide/murder said,
          "Investigation disclosed that the subject may be involved or have
          information concerning a homicide which was under investigation.

     c    All law enforcement officers, especially officers who receive five to six
          months of academy training such as was provided to CPD officers, are
          trained to document with specificity key points which comprise, or
          support establishment of, the elements of a crime. Specific information
          such as that allegedly related to Det. Olson was conspicuously absent in
          the officers' reports.

     d    Nationally accepted standards for police writing are exemplified in such
          things as IACP Training Keys, textbooks, and law enforcement academy
          handouts.

          1)   For many decades the International Association of Chiefs of Police
               [IACP] has produced Training Keys for use by law enforcement
               agencies as a source for law enforcement best practices. As such,

they have served as an informational source for nationally accepted standards of law enforcement practice and as training aids.

a) IACP Training Key #434 (1993) – "Principles of Report Writing" states in part:

"The objective of police reports...is...to develop a system that yields the most complete and accurate information for police use."

"To make a complete report, an officer must understand the elements of a particular crime..."

"Officers must stick to the facts while including sufficient detail."

b) IACP Training Key #288 (1979) – "The Offense Report" states in part:

"The offense report must contain all relevant facts pertaining to the case..."

"Information derived from interviews with parties involved in the case."

"...completeness is a requirement because persons unfamiliar with the subject of the report will need to know all relevant facts."

"...completeness basically refers to the inclusion of all relevant facts of an investigation."

"To report objectively, the officer must...be able to convey exactly a factual accounting..."

2) Among the qualities of an effective report are clarity, objectivity, accuracy, completeness and "...include negative as well as positive findings in order to remove unwarranted and misleading suspicion." [Fundamentals of Criminal Investigation, 3rd ed. by Charles E. O'Hara, Charles C. Thomas Publisher, pp. 35-6]

3) An article on PoliceOne.com News, June 24, 2013, "How to write organized and concise police reports" states all facts need to be contained in the report including statements of the suspect.

4) An article on yourpolicewrite.com entitled "A Criminal Justice Report Writing Checklist" includes caveats about clearly stating who did what and avoiding generalizations which can later be challenged in court.

3    The descriptions of Daniel's statements that Officers Bednarkiewicz and Nielsen memorialized in their reports were vague and nebulous. The officers' reports describing Daniel's statement to them is more consistent with Daniel's version of what happened. If Officers Bednarkiewicz and Nielsen had actually obtained a "confession" from Daniel during the arrest and transport to the 9th District, you would expect trained officers to document that with more specific language.

   a    Daniel [deposition, p. 255] testified he was manhandled by the officers when he approached his residence.

   b    Daniel [pp. 269-70] indicated he was drunk, confused, and had problems standing.

   c    On the way to the 9th District [pp. 275-6] the officers were saying "shut the fuck up you little punk." One of the officers said, "I bet you're the guy that killed that girl."

   d    Daniel indicated the police were talking shit to him. He [p. 277] said to them, "...yeah, fuck, I kill them all around here."

   e    Daniel [p. 287] testified nobody asked him about the Trunko homicide while he was handcuffed in the locker room of the 9th District for approximately one hour.

4    Det. Olson's supplemental report contains specific information which was contained in CPD reports available to him at the time namely, the location and number of stab wounds and the specific location of the knife. Daniel allegedly told Officers Bednarkiewicz and Nielsen that he had stabbed Cathy once in the right side of the chest and twice on the left side of the chest and that the knife had been discovered in the area of 50th and Hermitage. This was not substantiated by Officers Bednarkiewicz and Nielsen's reports or subsequent sworn testimony from Officer Bednarkiewicz. It should also be noted that Officer Bednarkiewicz has testified that he reviewed a case report containing facts about the Trunko homicide before allegedly questioning Daniel at the 9th District.

   a    Det. Olson stated in his report that the beat officers [Bednarkiewicz and Nielsen related to him that on the way to the 9th District Daniel stated he stabbed Cathy Trunko three times, twice in the left side of the chest and once in the right side and then threw the knife away in the area of 50th and Hermitage.

b    Officer Nielsen [deposition, p. 87] only recalled Daniel blurting out on the way to the 9th District that he had stabbed Cathy.

c    Officer Bednarkiewicz has testified three times about these events.

    1)  In a motion to suppress proceeding on July 7, 1981, Officer Bednarkiewicz testified:

        a)  On the way to the 9th District Daniel [Bates P000016] stated "I stabbed her." When asked who, he said Cathy.

        b)  After advising Daniel of his Miranda rights from the card [Bates P000020-23], Daniel said he stabbed her in the chest area once on one side and twice on the other. Officer Bednarkiewicz could not recall exactly which side he indicated. Also, when asked what he did with the knife, Daniel said he threw it on Hermitage.

    2)  At Daniel's criminal trial on March 1, 1882, Officer Bednarkiewicz [Bates P000669] testified at the 9th District he advised Daniel of his Miranda rights from a printed card. Daniel [Bates P000676-9] spoke first saying "I stabbed her." When asked who, Daniel said Cathy. When asked where he stabbed her, Daniel indicated he stabbed her in the chest area twice on one side and once on the other side. Officer Bednarkiewicz did not recall which side of the chest received two stab wounds. Also, when asked what he did with the knife, Daniel said he threw it on Hermitage.

    3)  In his sworn deposition taken on July 13, 2017, Officer Bednarkiewicz [p. 151] once again recalled Daniel saying loudly he stabbed Cathy as they arrived at the 9th District. After going into the station Officer Bednarkiewicz [p. 152] found a case report of the stabbing of Cathy Trunko. Daniel was then advised of his Miranda rights from a printed card. In response to a question about where he stabbed her [p. 175] Daniel indicated he stabbed her twice on one side and once on the other side. Officer Bednarkiewicz did not recall which side was which. When asked what he did with the knife [pp. 200-1] Daniel said "I threw it on Hermitage."

C    Physical evidence

    1    During the investigation of the Trunko homicide which occurred on January 19, 1980, a knife was discovered in the neighborhood on January 21, 1980. The knife was believed to have blood on it. Although there was no objective

indication of a connection between the two events, the knife was immediately and improperly associated with the Trunko homicide and listed under that RD# B025267.

a    CPD detectives investigating the homicide made an unsupported assumption that the knife was linked to the homicide and subsequently created a scenario to support that conclusion.

    1) The story or "script" that Detective Higgins created to link Daniel to the knife and the homicide relied on the unsubstantiated belief that the knife was linked to the Trunko homicide.

    2) Subsequent DNA analysis of the knife established that the blood on the suspect knife was not linked to either Cathy Trunko or Daniel Andersen.

    3) The knife was photographed as found before it was recovered by Evidence Technicians Norbert Rajewski and Ted Melko. ET Rajewski [deposition, p. 80] does not believe that the knife they recovered was used to kill Cathy Trunko.

b    The knife should have received a separate RD number as found property. It would have been acceptable to cross reference the reports until additional information was developed linking the two events.

2    The report documenting the recovery of the knife also indicated, "Request by beat 8304 to take photo,s [sic] and dust for prints recovered knife and 1 Old Style beer bottle...beer bottle received from investigators at scene."

a    No reports were made indicating where the beer bottle was recovered or by whom. When asked at Daniel's trial about the beer bottle, Evidence Technician Ted Melko testified:

    1) [Bates P000636] He believed the beer bottle was a seven ounce Old Style bottle, but was not sure.

    2) [Bates P000638] He could not recall the name of the person who gave him the beer bottle.

    3) [Bates P000640] The beer bottle was not inventoried. They threw the bottle in the garbage.

b    No photographs were taken, or if taken not maintained, of the beer bottle.

13

1) Evidence Technician Norbert Rajewski [p. 37] testified that it was their practice to photograph evidence before it was recovered.

2) Photographing evidence prior to its collection is a nationally accepted standard of law enforcement practice.

c    No chain of custody was maintained, which indicated that even if the bottle was subsequently determined to have some significance to the case it could not be used as evidence.

d    The beer bottle was thrown in the garbage after a determination was made that it did not contain enough ridge surfaces for comparison purposes.

e    Neither the evidence technicians handling the bottle nor the detectives on scene properly considered the theory of transfer, sometimes referred to as Locard's exchange principle.

1) The theory of transfer suggests that a criminal always leaves something at a crime scene and/or takes something away from a crime scene. The objective is to link the two.

2) If properly maintained as it should have been, it was possible that the bottle could have had some value as circumstantial evidence.

D    The maintenance by investigative personnel of "running files" or "street files" in which some information is maintained during the conduct of an investigation and then destroyed or concealed is the antithesis of an "open file" system required by Brady v. Maryland and its progeny. Det. Higgins [deposition, p. 134] referred to the use of running files by Area 3 Homicide detectives. The purpose of the running file [p. 139] was to keep the detectives up to date on any developments in the case. He [p. 140] acknowledged a running file was maintained in a spot in the sergeant's office. Det. Higgins [p. 142] testified that whenever he was in the field he would take the running file with him.

1    During the Trunko homicide investigation and through the time of Daniel's criminal trial, the Chicago PD was found to have a practice of keeping street files or running files. Although the Chicago PD's official policy and Supreme Court rulings obligated each detective to record and disclose exculpatory and impeachment evidence, there is evidence that the practice among some detectives was to keep parallel, personal notes that allowed them to withhold that type of information.

14

a     Notes regarding the information received about Robert LaGace, which should have been, but were not, converted to a supplementary report may provide information to detectives; but, then disappear when that information discredits the "accepted theory" proposed by the detectives clearing the case.

b     Officers are trained to include material information about alternative suspects in their official reports, even if documented elsewhere such as in an obscure Crime Lab file.

c     All the important investigatory steps taken, i.e., the second interview and polygraph examinations of Robert LaGace, the information learned, and the sources of that information should have been contained within the official police reports.

2     According to <u>Brady v. Maryland</u>, a failure by the prosecuting attorney to disclose exculpatory evidence is a violation of due process. Subsequent cases have extended that obligation to law enforcement personnel. A trained, experienced police officer would know and understand his/her duty to disclose exculpatory evidence and information related to credibility. [IACP Model Policy – <u>Brady</u> Disclosure Requirements]

a     Detectives have an "affirmative constitutional duty" to disclose to the prosecutor for provision to defense counsel all inconsistent statements made orally or in writing by a proposed witness [IACP Model Policy – <u>Brady</u> Disclosure Requirements]. For <u>Brady</u> disclosure purposes, there is no distinction between impeachment evidence and exculpatory evidence.

b     "Law Enforcement has what is called an 'affirmative duty' to report information that may impact the determination of a court or jury as to a defendant's guilt or sentencing. This means simply that a department must take positive steps or demonstrable measures to uncover and reveal <u>Brady</u> material." [IACP Concepts and Issues Paper – <u>Brady</u> Disclosure Requirements, p. 2]

1)     "...it is the responsibility of involved law enforcement agencies to provide such material to the prosecutor as soon as reasonably possible so that he...can determine whether it falls within Brady disclosure requirements. This requirement continues to be in effect from the point of indictment through trial...." [Ibid]

2)     Withholding exculpatory evidence serves to cover up faulty investigations.

15

      3) Exculpatory or exonerating evidence should be reviewed and considered to ensure focus on the "actual suspects." Failure to focus on, and apprehend, actual suspects may unnecessarily result in additional victims.

3      The Fraternal Order of Police [FOP], a rank and file labor organization for law enforcement officers, has made available a "Case Law Update – <u>Brady v. Maryland</u>, 373 U.S. 83 (1963)" for its members. Among the many points provided:

    a    <u>Brady</u> and its progeny require the disclosure of material "...that, if suppressed, would deprive the Defendant of a fair trial."

    b    "...a defendant is deprived of a fair trial...where there is a reasonable probability that the government's suppression effected the outcome of the case...or where the suppressed evidence 'could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict.'"

    c    "...the Supreme Court stated that <u>Brady</u> is violated when the government fails to turn over evidence that is 'known only to police investigators and not to the prosecutor.'"

    d    Police investigators have no immunity if it is demonstrated there was..."deliberate indifference or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors."

    e    "Always disclose information to the Prosecutor which may be exculpatory."

4      Polygraph case reports and laboratory reports were maintained separately in the CPD Crime Lab. Unless a supplementary report was placed in the investigative file or notes placed in the running file indicating same, no one at that time or in the future would be aware of potentially important investigative leads and/or <u>Brady</u> material.

    a    The polygraph report completed by Det. Stout on January 22, 1980, is one such example. Det. Stout was provided information about Robert LaGace from Detectives Bedran and Rochowicz. This included:

        1) Robert LaGace was near the location of the murder about the time Cathy Trunko was murdered.

2) Robert LaGace was looking for Ms. Trunko around the time of her death.

3) Robert LaGace was known to have pulled knives on Ms. Trunko previously.

b    Four polygraph tests were conducted. However, the recordings were so erratic as to be unusable in forming opinions regarding deception. Det. Stout recommended that Robert LaGace be re-examined.

c    Det. Stout [deposition, p. 103] agreed that information that a subject had recently been known to pull knives on the victim of a stabbing death is significant information in a homicide investigation.

d    Det. McWeeny [deposition, p. 139] testified he was unaware that Detectives Bedran and Rochowicz had obtained information that LaGace was known to have pulled knives on Ms. Trunko. He [p. 141] acknowledged that Ms. Trunko was stabbed to death so information on anyone with a knife would be important.

e    Although information significant to a homicide investigation would be expected to be included in official reports, no mention was made of Robert LaGace being polygraphed; the fact that Robert LaGace was interviewed by CPD detectives on two separate occasions; or, the source of the inculpatory information about Robert LaGace provided to the detectives.

f    Although both the polygraph case report and the laboratory report documenting the polygraph of Robert LaGace contained a reference to RD#B025267, i.e., the Trunko homicide investigation, neither report was made available to, or discovered by, the assistant state attorneys involved in the prosecution of this matter; and by extension, not provided to the defense.

g    Diane Diaz [deposition, pp. 78-85] testified that she told detectives that LaGace left to get Cathy Trunko on the evening of her murder. Despite Ms. Trunko's house being only minutes away, LaGace was gone for approximately thirty minutes. LaGace came back panting and sweating like he had been running despite the fact that he had driven there. Ms. Diaz also testified that she told the police that when LaGace came back he was missing a knife that he had when he left. None of this information was documented in the police reports.

17

5      Daniel [p. 321] acknowledged telling Det. Higgins that a guy named Bob killed Cathy Trunko.

      a      According to Daniel, Det. Higgins stated they checked into that and it was not Bob.

      b      Assuming that both Daniel and Det. Higgins were both speaking truthfully, Det. Higgins' response is consistent with him being aware of information from either a discussion with Detectives Bedran and/or Rochowicz, or the polygraph reports or notes from the "street file" reflecting important facts about LaGace and the results of LaGace being polygraphed.

      c      Neither the polygraph reports nor the running file, which should have contained information about LaGace being polygraphed and relevant information about his [LaGace] actions on the night of the murder, was provided to the ASA's or defense counsel for consideration as potentially exculpatory information.

6      Assuming as true when Daniel [pp. 334-42] testified that Det. Higgins showed him three pictures of the knife suspected to have been used in the stabbing death of Cathy. One of the photographs of the knife included a pair of gloves Daniel thought were his. Daniel testified the photo made him feel that he may have blacked out and committed the crime as suggested to him by Det. Higgins.

      a      The gloves were incorporated into the script that Det. Higgins helped Daniel concoct.

      b      Assuming Daniel's recollection of the photograph is accurate, the photograph containing the knife and gloves was not documented or included with the other physical evidence. Daniel [p. 376] testified that after he and Det. Higgins put the story together, he [Daniel] never saw the photo again.

      c      Interestingly, at a Motions Hearing [Bates P001997-8] on September 9, 1981, Det. Higgins was asked about showing Daniel a photograph containing the knife and a pair of gloves, he testified:

            1)  He did not recall if they showed Daniel a photograph containing gloves.

            2)  He also did not know if they had a photograph of the gloves.

3) There were no reports of any CPD personnel being sent to search for the gloves that were allegedly used by Daniel as would be expected. If the confession was legitimate, finding the gloves would have served to help corroborate the confession as being truthful.

    d    Det. Higgins' answers to these simple, but potentially embarrassing and revealing questions constituted uncontroverted "waffle" responses.

1) It should be noted that lying under oath is punishable as perjury; whereas, not recalling something that should be obvious only makes a lead detective appear incompetent.

2) Detectives who have some or all of the responsibility for presenting a case to the prosecution are expected to have a command of the investigation including a strong working knowledge of the evidence obtained to support the charge and how that evidence was obtained.

    e    "One of the clearest indications of faulty interview procedures and poor investigation is the ability of the defense attorney to expose the inability of a witness to observe and remember." [IACP Training Key #268 (1979) – "Fundamentals of Interviewing"]

    f    "...the interrogator should be acquainted with every significant detail of the case so that he is aware of what evidence is available..." [Fundamentals, O'Hara, p. 116]

7    ASA's Erickson and Cohen, who prosecuted this case indicated they had an open file policy – whatever records were in their file were also made available to the defense [Erickson deposition, p. 79, 292; Cohen deposition, 150].

    a    ASA Erickson [pp. 57-58] testified it was the duty of the prosecution to pass information/documents to the defense. If something was missing from the CPD records, they would go looking for it.

    b    ASA Cohen [p. 90] indicated the prosecution team would look for continuity between the reports to make sure they had a full set. However [p. 123], it did not mean the prosecution had everything.

8    All investigative leads in a homicide investigation should be followed up and documented.

    a    ASA Cohen [p. 128] stated, "In a murder case nothing is frivolous."

      b    All investigative leads, such as those documented in the LaGrace polygraph reports should have been investigated and documented.

          1) "The polygraph is not a substitute for a comprehensive field investigation." IACP Training Key #286 (1979) – "The Polygraph in Criminal Investigations"]

          2) When the results of a polygraph are inconclusive the polygraph examiner should decide if a re-examination is feasible. The suspect who yields inconclusive results should be treated as if the examination had never been given. [Ibid]

9    As was mentioned in ASA Erickson's deposition [pp. 342-3], an injunction prohibiting the "street file" practice by the Chicago Police Department was issued on April 20, 1982.

      a    Det. Higgins [deposition, p. 134] confirmed the existence of "running files" at Area 3 Homicide.

      b    The theory of the "running file" [ibid, p. 137] is that detectives from each watch would put all supplementary reports and notes that had not yet been memorialized into reports so detectives could look at the file and [p. 139] theoretically know everything that had transpired in the case.

      c    On September 15, 1982, [Erickson, p. 343] the defense filed a motion to obtain the street file for the Trunko case. Such a file has never been provided to Daniel's attorneys.

      d    Despite the injunction dated April 20, 1982 prohibiting the CPD practice of maintaining "street files," the Opinion and Order from Judge Lefkow in James Kluppelberg v. Jon Burge, et al. [USDC, Northern District, IL, Eastern Division; Case No.: 13 CV 3963 (2017)] suggests that the practice of utilizing street files and withholding street files from discovery was continued after the injunction was issued prohibiting that practice. This is indicative that the practice was deeply entrenched within the rank and file of the Chicago PD.

E    Statements and confessions must be given freely and voluntarily to be acceptable for use within our criminal justice system. The U.S. Supreme Court case Miranda v. Arizona [1966] provided guidance for a procedure that, if followed, would enable a law enforcement officer to obtain a proper statement and/or confession which would diminish or eliminate chances of that statement or confession facing subsequent exclusion by the courts. It would also help considerably to ensure that an innocent person was not inappropriately subjected to judicial sanctions.

1      CPD personnel indicated that the individual subjected to multiples interrogations in this matter was repeatedly advised of his rights per <u>Miranda</u>. Those advisements and alleged waivers, assuming they were actually given, were not properly documented and therefore subject to question. CPD General Order 87-07 – Interrogations: Field and Custodial states in part:

    a    "Interrogation encompasses not only questioning, but also any remarks, psychological tactics or patient maneuvering designed to elicit a response or to undermine a suspect's will to resist further questioning."

        1) Daniel [deposition, p. 255] testified under oath that he was manhandled at the time of his arrest. Daniel stated the officer grabbed him around his chest and twisted his arm behind his back. Daniel [p. 256] was slammed against the van. Daniel [p. 257] was kicked in the legs by the officer.

        2) The officers in the squad [p. 275] told Daniel to "Shut the fuck up you little punk....one of them said, 'I bet you're the guy that killed that girl."

        3) Daniel [p. 277] indicated he was drunk, rowdy, and upset as the officers "...were talking shit..." to him. He replied to the officers, "...yeah, fuck, I kill them all around here."

    b    "Before the interrogation of an individual who is in custody anywhere or who is in any way being deprived of his freedom of movement and action, the person must be expressly warned of his constitutional rights in clear and unequivocal words...."

        1) Daniel [p. 287] testified that nobody asked him anything about Cathy Trunko's murder at the 9th District.

        2) Officer Bednarkiewicz [deposition, p. 152] testified that when they arrived at the 9th District he looked up a report on the Cathy Trunko homicide. It should be noted that the original offense report contained details about the stabbing.

        3) Daniel was kept at the 9th District handcuffed to a locker for approximately one hour before being taken to Area 3 Homicide.

    c    "It is not enough that the person to be questioned is warned and decides nonetheless to answer questions. Any circumstances of lengthy incommunicado custody, deception, promises or suggestions of benefits,

or other forms of psychological pressure will invalidate the acceptability of anything the person questioned states or writes."

1) Daniel [p. 240] indicated he was arrested about 2:00 a.m. after drinking more than usual. Daniel [p. 269] admitted he was drunk. Officer Bednarkiewicz [p. 108] testified that Daniel appeared to be drunk and [p. 167] checked the box on the arrest report indicating Daniel was intoxicated.

   a) Daniel had been awake since approximately 10:00 a.m. [January 23, 1980] the previous day through at least 7:00 p.m. the following day [January 24, 1980, a total of about thirty-three hours.

   b) According to statements by Daniel, statements by CPD personnel, and CPD reports, Daniel was repeatedly interrogated on January 24, 1980 from about 2:00 a.m. until about 7:00 p.m., a total of approximately seventeen straight hours.

2) Although Det. Olson testified he read Daniel his Miranda rights off a card, there was no indication that Daniel made a voluntary, knowing, and intelligent waiver of those rights.

3) Daniel [pp. 288-306] testified he was taken to Area 3 Homicide and handcuffed to the wall where he was punched, kicked, and beaten with a club on three separate occasions before being told, "Fucking punk, you are going to tell us what you know."

4) Beatings of this sort by CPD personnel to elicit confessions were not uncommon during this time period. In a Chicago Tribune article dated August 26, 2013, Governor Quinn was talking about a bill he signed expanding the recording of police interrogations to prevent false confessions and wrongful convictions. The article indicated "Illinois has carved out an unwanted reputation as a leader in wrongful convictions..."

2    For many decades the "best" practice for advising individuals of their rights per Miranda involved reading the information to them, determining they understood those rights through discussion, and having a form or printed card signed and witnessed. The alternative was to record the advisement by audio and/or video thereby establishing the circumstances in which the individual made a knowing and voluntary waiver of their rights, should that be the case.

a    Failure to provide a knowing and voluntary waiver of rights per <u>Miranda</u> should require an immediate cessation of an interrogation and the prompt release or booking of the individual in question.

b    Required documentation that individuals in custody have been properly advised of their rights per Miranda is a sound practice which promotes and facilitates effective supervision and oversight. The failure by the Chicago Police Department during the time period in question to require same is illustrative of a failure to supervise and serves to encourage and condone misconduct.

3    To provide accuracy and to assist in establishing that a confession was freely and voluntarily given, whenever possible any admission or confession by a suspect should be memorialized, signed, and/or recorded in some manner. If not possible, police reports documenting the statement should provide an explanation why the admission or confession was not properly memorialized.

a    Just as there was an established protocol to document a knowing and intelligent waiver of rights per <u>Miranda</u>, there has long been established protocols for documenting how an admission or confession was obtained and documenting the content of that admission or confession in a thorough manner.

b    "....the test for voluntariness of a statement is whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he or she confessed." [<u>People v. Gilliam</u>, 172 Ill.2d 484 (1996)]

c    According to trial testimony by Daniel [Bates P001313], Det. Higgins promised that if Daniel helped him he would go home. On the other hand, if Daniel did not help Det. Higgins, he threatened to let the other detectives, who had been beating Daniel in the early morning hours, come back in.

1)    Daniel [Bates P001317] indicated that the midnight shift detectives [Olson, Fitzgerald, Herman] hurt him. He was scared of them.

2)    Daniel [ibid] testified that Det. Higgins told him if he [Daniel] would tell his boss [referring to ASA Sechen] the story, Det. Higgins would get him out right away. If Daniel did not cooperate the alternative was the midnight shift detectives would be allowed to continue beating him.

4    Widespread physical abuse perpetrated by CPD personnel in the late '70's and early '80's in Area 2 and Area 3 Violent Crimes against suspects resulted in an unusually high volume of false confessions which in turn led to many wrongful convictions. [Refer to the history of Lt. Burge]

    a    A City of Chicago ordinance has since been enacted providing for reparations to Burge torture victims.

    b    Special State's Attorneys Edward J. Egan and Robert D. Boyle [Report of the Special State's Attorney, p. 16] concluded that "….it is our judgment that the commander of the Violent Crimes section of Detective Areas 2 and 3, Jon Burge, was guilty of such abuse. It necessarily follows that a number of those serving under his command recognized that, if their commander could abuse persons with impunity, so could they."

    c    In a 60 Minutes interview Attorney Peter Neufeld, one of the founders of the Innocence Project, referred to the City of Chicago as the "Cooperstown" of false confessions.

5    Following acknowledgement of these widespread abuses, two significant events occurred in Illinois in 2003.

    a    Illinois enacted a law requiring that police must record all interrogations in homicide cases.

    b    Then Governor George Ryan granted a blanket commutation of all those in Illinois who had received the death penalty.

6    To stress the importance and necessity of confessions being made voluntarily, 725 ILCS 5/103-2.1(b) [*circa* 2005, also reflected in CPD General Order 05-01] requires that for certain crimes, i.e. homicide, the interrogation be recorded. If not recorded there is a presumption that the statement of an accused is inadmissible.

7    The Supreme Court of Illinois [ISC] stated in the opinion [State of IL, Appellant v. Stanley Wrice, Appellee, 2012, p. 23]: "….use of a defendant's physically coerced confession as substantive evidence of his guilt is never harmless error."

F    Assume *arguendo* that the primary basis for Daniel's conviction was his confession carefully crafted by Det. Higgins. Then based upon the subsequent determination by the court that Daniel was actually innocent of the charges in which he was convicted, it is imperative to look at how the interrogation of Daniel was conducted. Was it consistent with nationally accepted standards of police practice and training?

1    The purpose of an interrogation is to obtain facts or information concerning the offense under investigation.

    a    "An interrogation is a questioning of a person suspected of having committed an offense...to make a full disclosure of information in his possession which is pertinent to the investigation." [Fundamentals, O'Hara, p. 109]

    b    "The interrogator is not seeking to convict or punish. He is endeavoring to establish the facts of the case; to discover the truth..." [Ibid, p. 113]

    c    "Physical coercion, torture, duress, denial of rights, threats, and promises of leniency are the poison pills of legally admissible, reliable, and voluntary confessions." ["Investigator Tip" from John E. Reid & Associates; Policetraining.net Newsletter, September 2018]

2    If one accepts Daniel's description of his interrogation by Det. Higgins as generally accurate, Det. Higgins committed a number of egregious actions which were far more likely to result in a false confession than the truth.

    a    Assuming that Det. Higgins was aware that Daniel had been soundly beaten and was afraid to be put back into the hands of the midnight shift detectives, the threat to do so was likely to get Daniel to say something, perhaps anything, to prevent that from happening again. The days of beating, or threatening to beat, a confession out of someone has long since passed, even in 1980. It would/should cause the exclusion of the resulting confession from consideration by the courts.

    b    Assuming Det. Higgins advised Daniel that he did not need an attorney because he [Higgins] would help him and Daniel in his weakened condition actually believed that, it would preclude Daniel from making a knowing and "intelligent" waiver of his Miranda rights and thereby exclude any subsequent confession from being considered.

        1)    Daniel [deposition, pp. 367-8] testified that he believed Det. Higgins was his friend and he could trust him.

        2)    Daniel also testified at his trial.

            a)    [Bates P001308] Detective Higgins promised Daniel that if he [Daniel] agreed to help out on this case he [Daniel] would be going home soon. Det. Higgins also talked to Daniel about getting him a job on the police department and/or getting Daniel his job back at the Ford dealer.

    b) [Bates P001317] Det. Higgins told Daniel that all he had to do was to convince his boss [referring to ASA Sechen] and Daniel would be home free.

    c) [Bates P001318] In the interrogation room Daniel wrote on a blackboard, "Need a friend, call a cop."

    d) [Bates P001387] Daniel testified he did not need an attorney because, "...Higgins was my lawyer."

c    Assume Det. Higgins provided information to Daniel [i.e., location of the knife, where the knife was discovered, the number and location of the stab wounds, etc.] and assisted Daniel in developing a story so he could go home. If Detective Higgins did so, he violated his ethical obligations and acceptable practices for interrogating suspects.

    1) Detectives should not feed facts to a suspect or make false promises of leniency to induce a confession.

    2) These practices frequently lead to false confessions rather than the truth.

d    Forgotten in the manner in which Daniel was interrogated is the original purpose of an investigation, determine the truth about what happened.

    1) DNA analysis of the suspected murder weapon has conclusively established that the knife in question did not contain Cathy Trunko's blood.

    2) Daniel received a Certificate of Innocence because he was innocent of the charges.

    3) Supreme Court rulings and nationally accepted standards of law enforcement training and practice preclude the interrogation practices that Detective Higgins utilized on Daniel because of the inherent likelihood and danger of inducing false confessions.

3    Something as egregious as what occurred to Daniel, i.e., over thirty years of the prime of his life arbitrarily taken away, could only occur with the tacit understanding, cooperation, and approval of other members of the Chicago PD. Detectives working on this case had an obligation and opportunity to intervene to prevent Constitutional violations from occurring. Unfortunately, they did not intervene.

My opinions may be amended, or added to, upon review of additional information.

Respectfully submitted,

Dennis Waller

Encl.
 CV
 FS
 Testimony List