**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DANIEL ANDERSEN,

    *Plaintiff,*

    v.

THE CITY OF CHICAGO, *et al.*,

    *Defendants.*

No. 16 C 1963

Judge Virginia M. Kendall

## MEMORANDUM OPINION AND ORDER

In January 1980, Plaintiff Daniel Andersen was arrested for the murder and attempted rape of Cathy Trunko. He was later convicted and spent over twenty-five years in prison. In 2015, Andersen's conviction was reversed, and he was declared innocent. Andersen proceeded to sue the City of Chicago and various members of Chicago law enforcement involved in the case. (Dkt. 1). Andersen alleges in a multi-count complaint violations of his constitutional rights, pursuant to 42. U.S.C. § 1983, and several state-law claims. In December 2016, this Court ordered the case bifurcated, staying Andersen's claim against the City pursuant to *Monell v. New York Department of Social Services*, 436 U.S. 658 (1978), pending resolution of the claims against the individual defendants ("Defendants"). (Dkt. 90).

Defendants now move for summary judgment on the claims against them. Defendants move for summary judgment on all of Andersen's claims on statute of

limitations grounds. They also move for summary judgment on Andersen's claim made pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), (which makes up part of Count II), and his destruction of evidence claim (Count III). Finally, defendants move for summary judgment on all claims asserted against certain individual defendants.

## BACKGROUND

On January 19, 1980, Cathy Trunko was found lying on a sidewalk outside of 4936 S. Paulina Street in Chicago. (Dkt. 356 ¶ 1; Dkt. 330-1). Police responded to the scene and Trunko was taken to the hospital, where she was pronounced dead on arrival, having been stabbed. (Dkt. 356 ¶ 1; Dkt. 330-1).

The day after Trunko's death, Detective Richard Bedran spoke with Diane Diaz (now Grabowski), a close friend of Trunko's. (Dkt. 356 ¶ 16). Diaz told Detective Bedran that, on the night of Trunko's death, Diaz and Robert "Bob" LaGace had been at Dot's Tavern together. (*Id*.). At about 10 p.m. on the night of Trunko's death, Diaz called Trunko on Trunko's home phone and asked her to come to Dot's. (*Id*.). Diaz did not speak to Trunko again after that call. (*Id*.).

On January 21, 1980, Detective Bedran and his partner, Detective Richard Rochowicz,[1] had LaGace undergo a polygraph examination, performed by Officer John Stout. (*Id*. at ¶ 18). Stout spoke to the detectives about why LaGace was submitting to a polygraph, and documented the information they provided him; that LaGace was in a tavern with his girlfriend, she called the victim and asked her to

---

[1] Rochowicz was named as a Defendant in this case but is deceased. (Dkt. 60).

come to the tavern, the victim said no. (*Id.* at ¶¶ 19; Dkt 330-8 at 29). Stout further documented that LaGace took a friend's car and drove by where the victim lived but did not see her. (Dkt. 356 ¶¶ 19; Dkt 330-8 at 29). The parties dispute whether Stout's notes also stated that LaGace was "known to have pulled knives on the victim." (Dkt. 356 ¶¶ 21; Dkt 330-8 at 29, 82–86; Dkt. 357-15). The results of Officer Stout's polygraph of LaGace were "erratic" so as to prevent Stout "from rendering a decision regarding his status in this investigation." (Dkt. 356 ¶¶ 20; Dkt 330-8 at 30, 82–86; Dkt. 357-15). Stout documented his suggestion that LaGace "be reexamined on a future time and date if the investigators deem it advisable." (Dkt. 356 ¶ 20; Dkt 330-8 at 30, 82–86; Dkt. 357-15).

The same day as the polygraph, January 21, 1980, Officer Larry Pawlowski responded to a report of a knife found in the yard of a property one block south and one block west of where Trunko was found. (Dkt. 356 ¶¶ 24, 28). He saw that the knife had blood stains on it, and at that point he or someone else radioed evidence technicians. (*Id.* at ¶ 24). Officer Pawlowski drafted a report of this event, noting that it pertained to Trunko's death. (Dkt. 330-13). Beyond viewing the knife and drafting the report, Officer Pawloski had no further involvement in the Trunko homicide investigation. (Dkt. 356 ¶ 26).

Evidence Technicians Thaddeus Melko[2] and Norbert Rajewski responded to the scene and collected the knife. (*Id.* at ¶ 27). No fingerprints were found on the knife, but the blood samples from the knife tested positive for type A blood, the same

---

[2] Melko was named as a defendant in this case but is deceased. (Dkt. 60).

as Trunko's. (*Id.* at ¶ 29). Investigators on the scene, who may have been Detectives James Higgins, Craig Ciegelski, and Daniel McWeeny, also gave the evidence technicians a seven-ounce Old Style beer bottle. (*Id.* at ¶ 30; Dkt. 366 ¶¶ 38–39). The bottle was later dusted for fingerprints and two negatives were taken of print impressions. (Dkt. 356 ¶ 31). After the prints were found not to be suitable for comparison, Melko and at least one other person, who may have been Rajewski, disposed of the bottle. (Dkt. 356 ¶ 32; Dkt. 366 ¶ 40). Although photographs of the knife were taken at the scene, no photographs of the bottle were taken nor was the bottle inventoried. (Dkt. 366 ¶¶ 41–42).

It was not until several days after Trunko's death that Andersen, 19 years old at the time, was drawn into the investigation. (*Id.* at ¶ 2). On January 23, 1980, Andersen was drinking with friends at a local tavern. (Dkt. 356 ¶ 39). Unable to find her son, Andersen's mother called an officer-friend, Officer Michael Riley, and asked him to bring Andersen home. (*Id.* at ¶ 34–37). Officer Riley advised the officers on patrol in the area that evening, Officers James Bednarkiewcz and Paul Nielsen, to be on the lookout for Andersen and provided a vehicle description. (*Id.* at ¶ 38). Officers Bednarkiewcz and Nielsen pulled over Andersen's car, but he was not driving it. (*Id.* at ¶ 41). They drove the car to Andersen's home, where Andersen later pulled up as a passenger in another vehicle. (*Id.* at ¶¶ 41–42). Officers Bednarkiewcz and Nielsen then arrested Andersen, and after his mother signed a disorderly conduct charge against him, the officers took Andersen to the Ninth District police station. (*Id.* at ¶¶ 42–43). At the station, Officer Riley encountered Andersen and observed that he

was "highly intoxicated, and emotionally upset." (*Id.* at ¶ 46; Dkt. 330-28 at P001018).

After Officer Bednarkiewcz spoke to Area 3 Detective John Olson, Officers Bednarkiewcz and Nielsen transported Andersen to Area 3 to be interrogated about Trunko's death. (Dkt. 356 ¶ 47). While being questioned, Andersen told Detective Olson that he heard that someone named "Bob" killed Trunko. (*Id.* at ¶ 48).

At some later point, Andersen was questioned by Detective Higgins. Andersen alleges that Higgins showed Andersen a photo of a knife, which Higgins said was the murder weapon. (*Id.* at ¶ 49). Next to the knife in the photo was a pair of Andersen's gloves—though, notably, the police did not report seeing gloves near the knife when it was recovered. (*Id.* at ¶ 49; Dkt. 366 ¶¶ 35–36). Although Andersen had previously denied killing Trunko, he began to question himself and whether he could have killed her. (Dkt. 356 ¶ 50; Dkt 357-1 at 334–335 (". . . when I seen that, it was like, oh my goodness. Did I do this?")). Andersen then confessed to Trunko's murder and also gave a court-transcribed confession.[3] (Dkt. 356 ¶¶ 52–53). On January 24, 1980, following his interrogation and confession, Andersen was arrested and charged with the murder and attempted rape of Trunko. (*Id.* at ¶ 54).

Sheila Murphy (now the Hon. Sheila Murphy) served as Andersen's defense counsel. (*Id.* at ¶ 55). In investigating the case, Murphy spoke with Trunko's friend Diaz, and on August 11, 1981, Murphy questioned Diaz in a sworn, court-reported

---

[3] The parties disagree about whether the confession was fed, "coerced" "false[]" and/or "fabricat[ed]," but there is no dispute that Andersen confessed to the murder, regardless of whether that confession was true. (Dkt. 356 ¶ 52-53).

interview. (*Id.* at ¶ 56). In the interview, Diaz recounted the events surrounding the night of Trunko's death. Diaz told Murphy that, the night before Trunko's death, Trunko, Diaz, LaGace, an unknown person named Danny (not Andersen), and others were hanging out. (Dkt. 356 ¶ 64; 330-6 at BS-Andersen 000327). LaGace yelled at Danny, who was dating LaGace's sister, and told Cathy to keep away from Danny. (Dkt. 356 ¶ 65; 330-6 at BS-Andersen 000329–30). Later on in the night before Trunko's death, LaGace asked Diaz out and congratulated her for having Trunko, a good-looking girl, as a friend. (Dkt. 356 ¶ 66; 330-6 at BS-Andersen 000332).

Diaz told Murphy that, on the night of Trunko's death, she had been at Dot's with LaGace and that she had invited Trunko to Dot's but Trunko declined. (Dkt. 356 ¶ 57; 330-6 at BS-Andersen 000334–35). LaGace then took the phone and told Trunko he was coming to pick her up, and left Dot's in a car. (Dkt. 356 ¶ 57; 330-6 at BS-Andersen 000336). Diaz told Murphy that LaGace returned about half an hour later, sweaty and "out of breath," and that "he was nervous." (Dkt. 356 ¶ 58; 330-6 at BS-Andersen 000337). He also had more money on him when he returned than he did prior to leaving Dot's. (Dkt. 356 ¶ 58; 330-6 at BS-Andersen 000340). He told Diaz he did not see Trunko. (Dkt. 356 ¶¶ 58–59; 330-6 at BS-Andersen 000337). Diaz told Murphy that LaGace had a switchblade on him both the night of Trunko's death and the night before, and that Diaz had seen it both nights. (Dkt. 356 ¶ 60; 330-6 at BS-Andersen 000339).

Diaz also told Murphy that, sometime after Trunko's death, detectives came to speak with her while she was with LaGace. The detectives told LaGace they wanted

to speak with him, and he left with them. (Dkt. 356 ¶ 62; 330-6 at BS-Andersen 000342). About three hours later, the detectives called Diaz and asked her if she believed that LaGace killed Trunko, and Diaz told Murphy that she responded "no, I can't believe that he killed Cathy." (Dkt. 356 ¶ 63; 330-6 at BS-Andersen 000342). After interviewing Diaz, Murphy did not speak to LaGace, though the parties dispute what efforts Murphy made to find LaGace. (Dkt. 356 ¶¶ 67–69; Dkt. 366 ¶ 20).

In March 1982, Andersen was tried before a jury. (Dkt. 356 ¶ 2). In her opening statement, Murphy previewed for the jury Diaz's testimony; that Diaz would testify that LaGace left Dot's to pick up Trunko, that he was gone a long time, that he came back sweaty and out of breath, and that she knew he carried a knife. (*Id.* at ¶¶ 71–72). The trial court, however, ruled that Diaz could not testify about LaGace and Trunko's dispute the night before Trunko's death on hearsay grounds, despite defense counsel's argument that it could provide a motive for LaGace to have killed Trunko. (*Id.* at ¶¶ 76–77). Diaz did testify that LaGace left Dot's around 10 p.m. and came back sweating and out of breath. (*Id.* at ¶¶ 73–74). Murphy, however, failed to question Diaz about several relevant topics—whether she knew if LaGace carried a knife, whether she saw him with one, and whether LaGace left the bar carrying a seven-ounce Old Style beer bottle—and the judge did not allow Murphy to recall Diaz to ask such questions. (*Id.* at ¶ 75).

Andersen also testified at trial, recounting that he was shown a photograph with the knife and his gloves, and his subsequent confession. (*Id.* at ¶¶ 78–80, 82).

The jury convicted Andersen of the murder and attempted rape of Trunko. (*Id.* at ¶ 2; Dkt 357-2). Andersen remained in custody from the time of his arrest, through trial, and up until his release from prison on April 24, 2007. (Dkt. 356 ¶ 2; Dkt. 357-3). Andersen remained on supervised release until April 24, 2010. (Dkt. 356 ¶ 2).

On August 13, 2015, Andersen's conviction was reversed, and on December 18, 2015, he was granted a Certificate of Innocence by the Circuit Court of Cook County. (Dkt. 356 ¶ 3; Dkt. 357-4).

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). The parties genuinely dispute a material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether a genuine issue of fact exists, the Court must take the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson,* 477 U.S. at 255; *see also Zander v. Orlich*, 907 F.3d 956, 959 (7th Cir. 2018).

## DISCUSSION

### A. Statute of Limitations

Defendants argue that all of Andersen's claims are barred by the statute of limitations. This is so, they say, because Andersen's supervised release ended on

April 24, 2010, and the statute of limitations began running on that date, but Andersen did not file the present case until February 4, 2016—long past the relevant statutes of limitations periods. *See* 745 ILCS 10/8-101; *Lewis v. City of Chicago*, 914 F.3d 472, 478 (7th Cir. 2019) ("A § 1983 claim borrows the statute of limitations for analogous personal-injury claims in the forum state; in Illinois that period is two years."). Defendants ask this Court to follow *Savory v. Cannon* in holding as much. 338 F. Supp. 3d 860, 863–64 (N.D. Ill. 2017), *rev'd and remanded*, 912 F.3d 1030 (7th Cir. 2019), *reh'g en banc granted, opinion vacated* (Mar. 6, 2019) (holding that the statute of limitations period begins to run on such claims when custody, including parole, terminates).

The district court's opinion in *Savory* is not binding on this Court, but Seventh Circuit and Supreme Court precedent are. And that precedent leads to the opposite conclusion. Claims analogous to the common-law tort of malicious prosecution, like Andersen's claims, accrue "only once the underlying criminal proceedings have resolved in the plaintiff's favor." *McDonough v. Smith*, 139 S. Ct. 2149, 2156 (2019). As the Supreme Court explained in *Heck v. Humphrey*, 512 U.S. 477 (1994), this "favorable-termination requirement is rooted in pragmatic concerns with avoiding parallel criminal and civil litigation over the same subject matter and the related possibility of conflicting civil and criminal judgments." *McDonough*, 139 S. Ct. at 2157. To show favorable termination, a plaintiff must show "that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into

question by a federal court's issuance of a writ of habeas corpus." *Heck*, 512 U.S. at 487. This favorable termination requirement "is not rendered inapplicable by the fortuity that a convicted criminal is no longer incarcerated." *Id.* at 490 n. 10.

Andersen's conviction was not reversed until August 13, 2015. Any attack prior to that date "would necessarily imply the invalidity" of an intact conviction, in contravention of the principles of *Heck*, and Andersen would have had no valid cause of action. *Id.* at 487–89; *see also, e.g., Moore v. Burge*, 771 F.3d 444, 446 (7th Cir. 2014) ("*Heck* holds that a claim that implies the invalidity of a criminal conviction does not accrue, and the statute of limitations does not begin to run, until the conviction is set aside by the judiciary or the defendant receives a pardon."); *Lewis v. Mills*, 677 F.3d 324, 333 (7th Cir. 2012) ("[I]t is well-settled that *Heck v. Humphrey*. . . bars a plaintiff from maintaining a § 1983 action where a judgment in favor of the plaintiff would necessarily imply that his conviction was invalid. (citations omitted)); *Am. Safety Cas. Ins. Co. v. City of Waukegan, Ill.*, 678 F.3d 475, 477 (7th Cir. 2012) (noting that "claims related to wrongful conviction do not accrue until the conviction has been invalidated"). The same is true of Andersen's state-law claims sounding in malicious prosecution, although the parties' briefing focuses on the § 1983 claims. *See Ferguson v. City of Chicago*, 213 Ill. 2d 94, 99, 820 N.E.2d 455, 459 (Ill. 2004) ("A cause of action for malicious prosecution does not accrue until the criminal proceeding on which it is based has been terminated in the plaintiff's favor."); *see also Simon v. Nw. Univ.*, 183 F. Supp. 3d 908, 920 (N.D. Ill. 2016) (same accrual rules apply to claims premised on malicious prosecution). Andersen's conviction was not favorably

terminated until August 13, 2015, and his claims alleging causes of action akin to malicious prosecution did not accrue until that date. Those claims are therefore timely.

## B. Federal Malicious Prosecution Claim

Count VI alleges a claim for federal malicious prosecution, citing the Fourth and Fourteenth Amendments.[4] Andersen refers in the count to the initiation and continuation of proceedings without probable cause and refers to this as a claim for "unlawful pretrial detention" in his response to Defendants' motion for summary judgment. (Dkt. 354 at 29.) Thus, this count appears to address the time Andersen spent detained prior to trial, pursuant to the Fourth Amendment (applicable through the Fourteenth Amendment). *See Bailey v. United States*, 568 U.S. 186, 192 (2013). In this circuit, malicious prosecution is the wrong label for such a claim—it is instead a Fourth Amendment claim for wrongful detention. *Camm v. Faith*, 937 F.3d 1096, 1100, 1105 (7th Cir. 2019).

The Seventh Circuit has said that "a Fourth Amendment claim for wrongful detention accrues when the detention ends." *Id.* at 1107. Defendants argue, based on this premise, that Andersen's pretrial detention ended in 1982, when he was convicted, and he should have brought his claim within two years of that date. Further, Defendants note, Andersen was released from any detention in 2007 (when he was released from prison), which is also more than two years before he brought

---

[4] The complaint includes two counts titled Count VI. The other is the *Monell* claim, which is not relevant for the purposes of this Opinion. Any references to Count VI are to the claim for federal malicious prosecution.

suit. (Dkt. 328 at 3–4). In response, Andersen argues that *Heck* applies to his Fourth Amendment claim—to challenge his pretrial detention would impugn his conviction because it would challenge his confession and other evidence withheld and destroyed. Therefore, he asserts, he could not have brought his Fourth Amendment claim until favorable termination of his conviction. (Dkt. 354 at 29).

Defendants' argument that this claim accrued when Andersen was convicted is unsupported. Andersen's detention did not end when he was convicted. In *Camm*, the Seventh Circuit discussed, without deciding, a similar statute of limitations issue. 937 F.3d at 1107. In that case, the plaintiff had been held pretrial, convicted, then retried twice ending in an acquittal. The Court allowed the plaintiff's Fourth Amendment claim to move forward based on the initial probable-cause affidavit issued in the case. Though the defendant had been convicted (twice) after the submission of that affidavit, at no point did the Court suggest that the claim accrued at the time of conviction. *Id.* Although not binding for that purpose, *Camm* indicates that the Seventh Circuit's understanding is not that all Fourth Amendment claims accrue at the time of conviction.

But that would only get Andersen to 2007, still too late to bring his claim. Even if a court were to determine that his detention ended at the end of his supervised release in 2010, he would still come up short. That is where *Heck* comes in. Although Defendants argue that *Heck* has no place in the pre-conviction context, in certain situations, *Heck* applies to ongoing prosecutions. *See McDonough*, 139 S. Ct. at 2160. In some cases, the harm is distinct and accrues without regard to *Heck*, because at

that point whether a prosecution will be brought is merely speculative. *See Wallace v. Kato*, 549 U.S. 384, 390–91 (2007) (claim for arrest without a warrant accrues once detention is pursuant to legal process); *see also McDonough*, 139 S. Ct. at 2159 ("A false-arrest claim, *Wallace* explained, has a life independent of an ongoing trial or putative future conviction—it attacks the arrest only to the extent it was without legal process, even if legal process later commences.").[5]

A claim, however, that "centers on evidence used to secure an indictment and at a criminal trial. . . does not require speculation about whether a prosecution will be brought. . . . It directly challenges—and thus necessarily threatens to impugn— the prosecution itself," thereby implicating the concerns addressed in *Heck*. *McDonough*, 139 S. Ct. at 2159 (citations and internal quotation marks omitted).[6] Andersen's Fourth Amendment claim centers on the argument that he was wrongfully detained based on a coerced confession that implicated withheld and/or destroyed evidence. That confession was used to secure the charges against him, proceed with his prosecution, and convict him at trial. As such, *Heck* applies to his Fourth Amendment claim. To bring the claim earlier would have impermissibly

---

[5] Cases that discuss the end of detention as the sole accrual date can be distinguished. In *Manuel v. City of Joliet, Illinois*, 903 F.3d 667, 669 (7th Cir. 2018), *cert. denied sub nom. City of Joliet, Ill. v. Manuel*, 139 S. Ct. 2777 (2019), for example, the plaintiff was never convicted. There was no conviction to be impugned, and therefore the plaintiff's claim accrued as soon as detention ended.

[6] *McDonough* can be viewed as being in tension with the Seventh Circuit's holding in *Johnson v. Winstead*, 900 F.3d 428, 439 (7th Cir. 2018), *cert. denied*, 139 S. Ct. 2776 (2019), and *cert. denied*, 139 S. Ct. 2777 (2019). *Johnson* applies a categorical approach to *Heck*; holding that *Heck* applies to "constitutional wrongs that occur *within* a criminal proceeding. . . —i.e., those that occur at trial." 900 F.3d at 436. This Court reads *McDonough* as expanding the definition of what falls within the Seventh Circuit's categorical approach. In other words, the use of improper evidence to secure charges from which detention stems falls inside the meaning of constitutional wrongs occurring within a criminal proceeding.

challenged an extant conviction. Andersen's Fourth Amendment claim, therefore, accrued with the favorable termination of his case and is timely.

## C. Intentional Infliction of Emotional Distress Claim

Defendants argue that Andersen's state-law claim for intentional infliction of emotional distress ("IIED"), Count VIII, is barred by the one-year statute of limitations for such a claim. Defendants point to *Bridewell v. Eberle*, 730 F.3d 672, 678 (7th Cir. 2013), which provides that "a claim of intentional infliction of emotional distress in the course of arrest and prosecution accrues on the date of the arrest." In response, Andersen argues that any claim of IIED based on the misconduct of Defendants would be subject to a *Heck* bar—such a claim would attack and undermine an extant conviction.

As other courts in this district have recognized, "the *Bridewell* decision did not discuss the accrual of an Illinois IIED claim in relation to the *Heck* rule, namely, that if a claim impugns the validity of a criminal conviction, that claim does not accrue— and the statute of limitations does not begin to run—until the plaintiff's conviction is overturned or otherwise set aside." *Smith v. Burge*, 222 F. Supp. 3d 669, 693 (N.D. Ill. 2016); *see also Brown v. City of Chicago*, No. 18 C 7064, 2019 WL 4694685, at *7 (N.D. Ill. Sept. 26, 2019). And in *Parish. v. City of Elkhart*, 614 F.3d 677, 684 (7th Cir. 2010), although under Indiana law, the Seventh Circuit recognized that a claim of IIED resting on facts that directly attack the validity of a conviction is barred until favorable termination of the conviction, pursuant to *Heck*. Illinois, like Indiana, has adopted *Heck*. *Lieberman v. Liberty Healthcare Corp.*, 948 N.E.2d 1100, 1108 (Ill.

App. Ct. 2011).  While some IIED claims of this nature might not directly attack an extant conviction, Andersen's would have.  As such, Andersen's claim did not accrue until the favorable termination of his conviction and is therefore timely.

### D. *Brady* Claim

In Count II, Andersen alleges a violation of his right to due process.  This count is based, in part, on the withholding of exculpatory evidence, a claim made pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).  (Dkt. 1 at ¶¶ 111–12).  Defendants argue that summary judgment should be granted for them on any *Brady* claim included in Count II.

To establish a violation under *Brady*, "a plaintiff must demonstrate (1) that the evidence in question was favorable to his defense, either because it had exculpatory or impeachment value; (2) that the state suppressed the favorable evidence either will-fully or inadvertently; and (3) prejudice ensued, which occurs if the evidence was material." *Goudy v. Cummings*, 922 F.3d 834, 838 (7th Cir. 2019) (internal quotation marks omitted).  The materiality of suppressed evidence is evaluated cumulatively.  *Camm*, 937 F.3d at 1109.

Andersen alleges that Defendants suppressed:

- the photo, which Andersen alleges was staged, showing the blood-stained knife next to what appeared to be a pair of Andersen's gloves;

- the fact that the police questioned and polygraphed LaGace in connection with Trunko's murder; and

- the fact that LaGace was "known to have pulled knives on the victim," and how the police learned that information.

(Dkt 354 at 3).

Turning first to the allegations relating to LaGace, as a general matter, these allegations are favorable to Andersen in that they point to an alternative suspect. *See Beaman v. Freesmeyer*, 776 F.3d 500, 509–10 (7th Cir. 2015) (noting that it "is true as a general matter" that "evidence inculpating another suspect [i]s Brady material."). Defense Counsel Murphy, however, was already aware that the police had questioned LaGace and that police had considered whether he was a suspect; Diaz told Murphy that she saw police tell LaGace that they wanted to question him, saw LaGace go with police, and that police later called Diaz to ask whether she believed LaGace had killed Trunko. (Dkt. 330-6 at BS-Andersen 000342). That information, therefore, could have been, and was, available to defense counsel through reasonable diligence and therefore was not suppressed under *Brady*. *See Anderson v. City of Rockford*, 932 F.3d 494, 504–05 (7th Cir. 2019) ("Evidence is suppressed for *Brady* purposes if the. . . 'evidence was not otherwise available to the defendant through the exercise of reasonable diligence.'" (quoting *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001))).

That leaves, for *Brady* purposes, the fact that LaGace was polygraphed and that detectives knew that he had previously pulled a knife on Trunko. Regarding the polygraph, Andersen's argument cannot be that it was a violation of *Brady* not to turn over the results of LaGace's polygraph test—Defendants are entitled to qualified

immunity on such a claim.  *See Beaman*, 776 F.3d at 510 ("Beaman points to no pre–1995 case from Illinois or the Supreme Court, and we are unable to find one, establishing that inadmissible evidence inculpating another suspect (to frame it broadly) or polygraph tests (to frame it narrowly) is *Brady* material.").  So, the claim must be framed as being that Defendants failed to disclose that LaGace was polygraphed, regardless of the results.  Defendants suggest that Murphy could have interviewed LaGace and found this information out.  But there is a genuine dispute as to whether Murphy could have located LaGace with reasonable diligence—she testified that she made every effort to find him but could not.  (Dkt. 366 ¶ 20).  Defendants also argue that this evidence would have been cumulative and not material, and that is the better argument.  Murphy already knew that LaGace was questioned and that police considered that he could have killed Trunko (they asked Diaz as much directly).  Murphy could have introduced some, if not all of this information at trial, but failed to do so.  That LaGace was *also* given a polygraph test, without more, might not have been sufficient to "undermine[] confidence in the verdict."  *Beaman*, 776 F.3d at 506 (internal quotation marks omitted); *see also, e.g., Socha v. Richardson*, 874 F.3d 983, 989 (7th Cir. 2017) (stating that evidence that is "merely cumulative" is not material) (internal quotation marks omitted)).

But materiality is to be considered cumulatively, and there is also the fact that detectives knew that LaGace had previously pulled a knife on Trunko.  This argument is nuanced.  Andersen argues not that Stout's polygraph report (with the "known to have pulled knives" statement) must have been turned over.  Instead, he argues that

that information came from detectives, and, apart from the polygraph, if the detectives knew that LaGace had previously pulled a knife on Trunko they had a duty to make that fact known to the defense.

True, Stout's polygraph report might not have said "known to pull knives," or he might have misunderstood what the detectives were saying. But Stout testified that his report stated that LaGace was "known to have pulled knives on the victim," and that this is information he would have obtained from the detectives. (Dkt 330-8 at 29). At the summary judgment stage, reasonable inferences are drawn in favor of the non-movant, and here, a reasonable juror could find that the detectives told Stout that LaGace was known to have pulled knives on Trunko. If so, the next inference is that the detectives learned somehow that LaGace had pulled a knife on Trunko, probably through a conversation with a witness, yet failed to disclose that to the defense. Defendants argue in response that there is no proof that a report of any such conversation exists, that officers are not required to create exculpatory evidence, and that the failure to draft a report is not a *Brady* violation. This is a misstatement of the law. The failure to "record and report the substance" of an exculpatory conversation is "a serious violation of the government's duty to turn over all evidence favorable to the accused." *United States v. Mota*, 685 F.3d 644, 648 (7th Cir. 2012). And as to any argument that pulling a knife on someone could be harmless (maybe, for instance, he just showed her a knife), reasonable inferences must be made in favor of Andersen and there is certainly a reasonable inference to be had that pulling a knife on someone is not inherently innocuous.

Further, it is not clear how Murphy could have obtained this information through reasonable diligence. She could not interview a witness unknown to her, and we cannot assume that LaGace would have revealed this information, even if she had located him. *See, e.g., Boss*, 263 F.3d at 741 ("In cases like the present one, the question is whether defense counsel had access to *Brady* material contained in a witness's head. Because mind-reading is beyond the abilities of even the most diligent attorney, such material simply cannot be considered available in the same way as a document." (citations omitted)). And as to materiality, a reasonable factfinder, if he accepted these inferences, could certainly find this evidence to be material. It goes beyond the general proposition that LaGace might have been the murderer and suggests that a viable suspect—who disappeared around the time of the crime and returned appearing sweaty and out of breath—was known to have threatened the victim in the same manner of her killing prior to her death. Although not conclusively exculpatory, this would have been much stronger evidence that LaGace, and not Andersen, was the culprit than anything else the jury heard at trial. *See, e.g., Goudy v. Basinger*, 604 F.3d 394, 400–01 (7th Cir. 2010) (noting that suppressed evidence inculpating another suspect may be material, even when that evidence did not necessarily point to the defendant's innocence).

Defendants also argue that any conversation the detectives had with a witness who told them LaGace had pulled a knife on Trunko would have been inadmissible hearsay. That is not necessarily true. For one, Murphy might have learned who told the detectives that and called that person as a witness. Additionally, the information

could have been admitted to for its effect on the detectives—whether true or not, Murphy could have asked why the detectives declined to pursue LaGace in light of knowledge that he pulled a knife on Trunko. *See Kyles v. Whitley*, 514 U.S. 419, 447 (1995) ("By demonstrating the detectives' knowledge. . . the defense could have laid the foundation for a vigorous argument that the police had been guilty of negligence."). Even viewing solely the evidence suggesting that the detectives were aware that LaGace had previously pulled a knife on Trunko, Andersen has stated a claim under *Brady* sufficient to survive summary judgment. Viewing the facts in the light most favorable to Andersen, a reasonable factfinder could conclude that Defendants suppressed information that was favorable, unavailable to him, and, material.

At this stage, the Court declines to grant Defendants summary judgment on the grounds that they would have qualified immunity on this claim. "A state official is protected by qualified immunity unless the plaintiff shows: (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018) (internal quotation marks omitted). "A plaintiff can show that a right is 'clearly established' by statute or constitution in at least two ways: (1) he can point to a clearly analogous case establishing the right to be free from the conduct at issue; or (2) he can show that the conduct was 'so egregious that no reasonable person could have believed that it would not violate established rights.'" *Beaman*, 776 F.3d at 508 (quoting *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001)). "Even if factual

circumstances are novel, a right can still be clearly established so long as the state of the law at the time gave the defendants fair warning that their conduct was unconstitutional." *Id.* at 509.

The Seventh Circuit has said that "[i]t was already clearly established as early as 1981 that police could not withhold exculpatory information from prosecutors." *Goudy v. Cummings*, 922 F.3d at 844; *see also Beaman*, 776 F.3d at 509 (noting that "the idea that police officers must turn over materially exculpatory evidence has been on the books since 1963"); *Manning v. Miller*, 355 F.3d 1028, 1034 (7th Cir. 2004) (noting that for qualified immunity purposes, the question of immunity need not be tailored, "it is enough that, prior to the actions that gave rise to this case, it was well established that investigators who withhold exculpatory evidence from defendants violate the defendant's constitutional due process right."). Viewing the evidence in the light most favorable to Andersen, a reasonable factfinder could conclude that Defendants suppressed exculpatory evidence. By the time of Andersen's trial, Defendants had clear warning under existing case law that such evidence must be disclosed.[7]

Finally, there is the purported picture of Andersen's gloves beside the bloody knife. The picture, on its face, is not exculpatory. In fact, it would have inculpated Andersen by showing what appeared to be his gloves with what was thought to be the

---

[7] Defendants do not seriously contest this, instead stating that "Plaintiff cannot identify any case law that clearly establishes Defendants were required to disclose their opinions of LaGace to Plaintiff." (Dkt. 328 at 20). Evidence, if it existed, that LaGace had pulled a knife on Trunko was not merely the detectives' "opinions" of LaGace.

murder weapon. Andersen argues, however, that, had the photograph been produced at trial, it would have supported the theory that the police did not adequately investigate the case and instead framed an innocent person, and therefore was exculpatory. To get to the premise that the photograph was exculpatory requires too many leaps—that officers falsified it to coerce Andersen to confess, then hid it so that defense counsel could never find out that it was actually staged. "Brady does not require that police officers or prosecutors explore multiple potential inferences to discern whether evidence that is not favorable to a defendant could become favorable." *Harris v. Kuba*, 486 F.3d 1010, 1016 (7th Cir. 2007); *see also Carvajal v. Dominguez*, 542 F.3d 561, 568 (7th Cir. 2008) (concluding that evidence was not exculpatory because "too many inferences have to be made to reach that conclusion").

This is better brought as a fabrication of evidence claim—officers fabricated the evidence to obtain Andersen's confession, which they then used to wrongfully convict him. *See Saunders-El v. Rohde*, 778 F.3d 556, 560 (7th Cir. 2015) (noting that there can be a fabrication of evidence claim in violation of a defendant's due process rights when law enforcement "'fabricates evidence that is used to obtain a wrongful conviction'" (quoting *Alexander v. McKinney*, 692 F.3d 553, 557 (7th Cir. 2012))).[8]  As

---

[8] A comparison to *Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015), is helpful, though not directly analogous. *Saunders-El* explains that suppression of the fact that police fabricated evidence is not a *Brady* violation, i.e., police do not violate *Brady* by "keeping quiet about their wrongdoing." *Id.* at 562. Although in *Saunders-El* there was no piece of evidence suppressed akin to the photograph here, the argument is very similar—by not producing the photo, Defendants were keeping quiet about their wrongdoing. Such a claim, while actionable, is more appropriately characterized as a claim outside of the *Brady* framework.

such, Andersen may use this argument to support his fabrication of evidence claim, but not his *Brady* claim.

**E. Destruction of Evidence**

In Count III, Andersen brings a destruction of evidence claim based on the fact that Defendants destroyed the seven-ounce Old Style beer bottle they found. Destruction of potentially exculpatory evidence, if done in bad faith, is a violation of due process. *Armstrong v. Daily*, 786 F.3d 529, 547 (7th Cir. 2015). The "exculpatory nature" of the evidence must have been "apparent," and the evidence must have not been able to be obtained elsewhere. *Tabb v. Christianson*, 855 F.3d 757, 768 (7th Cir. 2017); *see also McCarthy v. Pollard*, 656 F.3d 478, 485 (7th Cir. 2011) ("[T]the destruction of potentially exculpatory evidence violates the defendant's right to due process if (1) the State acted in bad faith; (2) the exculpatory value of the evidence was apparent before it was destroyed; and (3) the evidence was of such a nature that the petitioner was unable to obtain comparable evidence by other reasonably available means.").

Andersen sets forth two reasons the bottle is exculpatory. The first is that it was "an odd-sized beer bottle uniquely sold" at Dot's, where LaGace was drinking beer before disappearing for thirty minutes. (Dkt. 354 at 22). Showing the bottle to the jury would corroborate any testimony that Diaz saw LaGace drinking such a bottle and would tend to inculpate him. This argument fails. By the time of trial, Murphy knew the type of bottle that was found. (Dkt. 356 ¶ 5; Dkt. 330-34 at P001256–57). She did not need the bottle itself to make the argument that this was

a special-sized bottle sold at Dot's or to ask Diaz about it—which she forgot to do. *See, e.g., California v. Trombetta*, 467 U.S. 479, 490 (1984) (holding there was no due process violation because defendants were "perfectly capable of raising" defense arguments "without resort to preserved" evidence).

Andersen's second argument is that the bottle was potentially and apparently exculpatory because defense counsel could have performed additional testing for fingerprints that might have led to a different conclusion about whether any fingerprints on the bottle were suitable for testing. At this stage, Andersen has pointed to evidence sufficient to suggest that the potentially exculpatory nature of the bottle was or should have been apparent to Defendants. It was discovered at what was believed to be part of the crime scene, strongly suggesting its relevance. And evidence technicians knew it was possible to lift fingerprints from the bottle; they had done as much. There is a viable argument that the technicians should have known that the bottle may need to be retested or reexamined for fingerprints at a future date or that defense counsel might want to do their own testing. *Cf. Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (holding that there was no due process violation because the state made physical evidence available to the defense for testing); *Armstrong*, 786 F.3d at 549 (noting that evidence is potentially exculpatory if it might reveal fingerprints, although in that case, evidence was never tested).

It is not enough, however, that evidence be potentially and apparently exculpatory, there must also be bad faith. And Andersen points to no evidence suggesting that Evidence Technician Rajewski, who Andersen alleges destroyed the

evidence, acted in bad faith.  Instead, Andersen cites only the general proposition that a party's state of mind is a question for the factfinder.  True, but there must be some dispute of fact supporting an inference in Andersen's favor. Andersen argues that Rajewski should have known not to destroy the bottle because of the "unusual circumstances" in which he got it and because it was not the typical practice to destroy evidence.  Without more, and if true, this supports only that Rajewski was negligent, and negligence is not sufficient for a destruction of evidence claim.  *See Armstrong*, 786 F.3d at 547 (observing that, in *Youngblood*, "the Court found no constitutional violation where the police were merely negligent."); *see also United States v. Bell*, 819 F.3d 310, 318 (7th Cir. 2016) (noting that a showing of bad faith requires "proof of an official animus or a conscious effort to suppress exculpatory evidence") (internal quotation marks omitted)).  Andersen has failed to point to a genuine dispute of material fact regarding bad faith, and Defendants are entitled to summary judgment on Count III.

### F. Individual Defendants

Finally, Defendants seek dismissal of certain individual defendants: Detective Bedran; Officer Pawlowski; Evidence Technician Rajewski; and Officer Riley. Andersen concedes dismissal of Officer Pawlowski.  (Dkt. 354 at 30 n.9).

A genuine dispute of material fact prevents Detective Bedran from being dismissed at this stage.  Detective Bedran took LaGace to be polygraphed.  If Stout did document that LaGace was known to pull knives on Trunko, Stout testified that this is information he would have obtained from the detectives he spoke to prior to

the polygraph—which includes Detective Bedran.  As previously stated, Andersen's claim that Defendants suppressed the fact that LaGace had previously pulled a knife on Trunko can go forward.  Detective Bedran plays a central role in this claim.

Andersen argues that Evidence Technician Rajewski cannot be dismissed because of his alleged involvement in destroying the beer bottle.  Because the Court dismisses Andersen's destruction of evidence claim, Rajewski can be dismissed as a defendant.

Last is Officer Riley.  Defendants argue that Officer Riley should be dismissed because he was not involved in the Trunko investigation and there is no evidence that he was a part of a conspiracy against Andersen.  In response, Andersen argues that Officer Riley knew how intoxicated and incoherent Andersen was when he was arrested, yet he failed to question or intervene in Andersen's interrogation which ultimately led to his false confession.  Both parties spend only a few sentences on their arguments pertaining to Officer Riley, and neither cites any case law supporting their position.  Courts are not obligated "to research and construct the legal arguments open to parties, especially when they are represented by counsel."[9] *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) (internal quotation marks omitted).  As a result, the Court declines to address this argument at this time, considering it waived for the purposes of summary judgment.  *See, e.g.*, *Crespo v. Colvin*, 824 F.3d

---

[9] It is not clear from the parties' submissions what claims Officer Riley is implicated in.  The relevant claims appear to be at least Counts IV and V, for conspiracy and failure to intervene, yet neither party sets out the elements of these claims or explains when an officer may be found liable.

667, 674 (7th Cir. 2016) (noting that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived").

## **CONCLUSION**

Defendants' motion for summary judgment is granted in part and denied in part. The Court grants summary judgment for Defendants on Count III because Andersen has failed to establish a genuine dispute of material fact as to whether evidence was destroyed in bad faith. Summary judgment is otherwise denied. Andersen's claims were timely brought, and genuine disputes of fact remain that prevent this Court from granting summary judgment on Count II, nor have Defendants shown that they are entitled to qualified immunity on this count. Defendants Rajewski and Pawlowski are dismissed as defendants in this case. Trial will proceed against all other Defendants on the counts that remain.

Virginia M. Kendall
United States District Judge

Date: November 26, 2019