IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DANIEL ANDERSEN, | ) |
| *Plaintiff,* | ) |
| v. | ) No. 16 C 1963 |
| THE CITY OF CHICAGO, *et al.*, | ) Judge Virginia M. Kendall |
| *Defendants.* | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Daniel Andersen was convicted of the murder and attempted rape of Cathy Trunko and spent over twenty-five years in prison. In 2015, Andersen's conviction was reversed, and he received a Certificate of Innocence. Andersen proceeded to sue the City of Chicago and various members of Chicago law enforcement involved in the case. (Dkt. 1). Andersen alleges violations of his constitutional rights, pursuant to 42. U.S.C. § 1983, and several state-law claims.

The Court assumes familiarity with the facts of this case, as the Court recently provided a detailed background in *Andersen v. City of Chicago*, No. 16 C 1963, 2019 WL 6327226 (N.D. Ill. Nov. 26, 2019). In summary, in January 1980, Trunko died after being stabbed. A few days after her death, Chicago Police recovered a knife near the scene that they believed to be the murder weapon. In the week following Trunko's death, Andersen was arrested on a disorderly conduct charge and was questioned about Trunko. Andersen eventually confessed to killing Trunko—a confession that

he says was coerced. Andersen proceeded to a jury trial, where he was convicted of the murder and attempted rape of Trunko. Andersen remained in custody from the time of his arrest in 1980 through trial, and up until his release from prison in April 2007. In August 2015, Andersen's conviction was reversed, and in December 2015, he was granted a Certificate of Innocence by the Circuit Court of Cook County.

Andersen has moved to exclude the proposed testimony of Joseph Warren, one of Defendants' DNA experts. (Dkt. 392). The Court held a hearing on the motion on December 5, 2019. (Dkt. 441). For the following reasons, the motion is denied, with a few limited exceptions described herein.

Andersen also moved post-hearing to exclude previously undisclosed opinions Dr. Warren offered at the hearing. (Dkt. 449). For the reasons described herein, that motion is granted in part and denied in part.

## **LEGAL STANDARD**

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Trial judges act as gatekeepers to screen expert evidence for relevance and reliability. *Daubert*, 509 U.S. at 589; *see also C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015). Under Rule 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the following conditions are satisfied:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In other words, "the key to the gate is not the ultimate correctness of the expert's conclusions. . . , it is the soundness and care with which the expert arrived at her opinion." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013). In evaluating the expert's proposed testimony, the Court should "scrutinize proposed expert witness testimony to determine if it has the same level of intellectual rigor that characterizes the practice of an expert in the relevant field so as to be deemed reliable enough to present to a jury." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (internal quotation marks omitted).

The Court utilizes a three-part analysis when applying the *Daubert* framework to proposed Rule 702 evidence. The Court determines (1) "whether the witness is qualified"; (2) "whether the expert's methodology is scientifically reliable"; and (3) "whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (internal quotation marks omitted); *see also Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017). The expert's proponent bears the burden of demonstrating that the testimony would satisfy the *Daubert* standard by a

preponderance of the evidence. *See Gopalratnam*, 877 F.3d at 782; *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

**DISCUSSION**

Dr. Warren was retained by Defendants to explain the risks of DNA contamination and degradation and to discuss how such factors may have impacted the evidence in this case.[1] Andersen moved to bar Dr. Warren's opinions because they are not based on a proper scientific methodology and would not aid the jury.

**I.    Qualifications**

Andersen does not challenge Dr. Warren's qualifications to testify as an expert in DNA contamination and degradation. Dr. Warren's qualifications are provided in his report, and his experience spans decades. (Dkt. 393-1 at 3–4). Dr. Warren holds multiple degrees in biology from reputable institutions. He has been on the faculty of the University of North Texas Health Science Center since 2002, where he teaches courses in forensic genetics. Prior to that, he worked at multiple law enforcement and private laboratories. He is a member of multiple organizations in the field and also conducts workshops in the field. The Court finds him qualified to offer testimony as a DNA expert.

**II.    Reliability & Application of Methodology**

Andersen challenges the reliability of Dr. Warren's methodology and opinions. Dr. Warren's report begins by providing a background of trace DNA and the fact that

---

[1] Defendants describe Dr. Warren as opining that the DNA samples examined here were rendered unreliable and explaining why Andersen's and Trunko's DNA profiles are not found on some of the evidence. (Dkt. 409 at 2). This is an overstatement of the opinions Dr. Warren actually rendered.

it is possible to contaminate crime-scene evidence with extraneous DNA that is unrelated to the crime. He points to multiple papers detailing this possibility, going back to 2002, including studies on the incidence of law enforcement contaminating evidence. (*See*. Dkt. 393-1 at 6–7 (citing published works on the topic)). He also explains how DNA degradation occurs, and again points to published works discussing how the failure to properly store evidence can increase the risk of degradation. (*See id*. at 8 (citing published works on the topic)). As Andersen notes, that DNA degradation can and does occur is undisputed in this case. (*See* Dkt. 393 at 10 (noting no dispute that "the relevant DNA was degraded")). Dr. Warren's experience in the field lends further credence to his explanations of contamination and degradation. *See Trustees of Chicago Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Tr. Funds v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 787 (7th Cir. 2007) (noting that "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience"). That he cites to published works and studies to support his explanations further suggests that the concepts of contamination and degradation are established and generally accepted within the field of DNA testing and analysis. *See United States v. Truitt*, 938 F.3d 885, 890 (7th Cir. 2019) ("*Daubert* identifies a number of factors a court might consider, including whether the methods have been tested or subjected to peer review and whether they are generally accepted in the field."); *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011) (noting that publication of a theory and its acceptance within the relevant community are factors to be considered under

*Daubert*.). The Court finds that the science behind DNA contamination and degradation is reliable and Dr. Warren is permitted to testify regarding it.

Dr. Warren goes on to discuss the ways in which the evidence in this case may have been exposed to the potential for contamination and degradation. He reviewed a significant amount of material to do so, including the depositions of multiple members of law enforcement involved in the original case, photographs depicting the evidence and how it was stored, and more. (Dkt. 393-1 at 2–3). In proceeding in his analysis in this manner, Dr. Warren appropriately tied the science behind contamination and degradation to the facts of this case, walking through how the facts here could lead to DNA contamination and degradation. *See Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013) ("The critical inquiry is whether there is a connection between the data employed and the opinion offered. . . ."). In this way, his testimony is not unlike that of Andersen's own expert, Dr. Kassin, whose testimony this Court has also found admissible. (Dkt. 391). Like Dr. Kassin, Dr. Warren first walks through the risk factors for contamination and degradation, and then points out what risks may be present in this case given the underlying facts. The Court finds that Dr. Warren has reliably connected the concepts of contamination and degradation to his assessment of the facts here.

## III. Relevance

Andersen also challenges the relevance of Dr. Warren's testimony, arguing that it will not assist the jury. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("When analyzing the relevance of proposed testimony, the district court

must consider whether the testimony will assist the trier of fact with its analysis of any of the issues involved in the case.").

Andersen argues that one of the reasons Dr. Warren's testimony is inadmissible is because it is speculative, particularly regarding contamination.[2] While there is no direct proof of contamination here, there is certainly circumstantial evidence that could support the proposition that the evidence was contaminated. (*See* Dkt. 393-1 at 9–27 (discussing how the evidence was handled, including that law enforcement may not have used masks or gloves when handling evidence, that prosecutors and witnesses handled the evidence, and more)). Dr. Warren is permitted to opine on the risk of contamination based on "the different possible factual scenarios that might have taken place." *United States v. Hall*, 93 F.3d 1337, 1345–46 (7th Cir. 1996). What might be speculative would be for Dr. Warren to conclude that contamination did, in fact, occur here. He declined to do so. (*See, e.g.*, Dkt. 441 at 186:16–186:24).

Moreover, that Dr. Warren does not come to an ultimate conclusion about whether the DNA samples were actually contaminated is irrelevant. To satisfy the relevance requirement, the "expert need not have an opinion on the ultimate question to be resolved by the trier of fact." *Smith*, 215 F.3d at 718. One of the defense theories in this case is that the DNA test results should be given little weight because they

---

[2] Andersen repeatedly quotes Dr. Warren's deposition statement: "all I'm saying is that there is still the possibility of contamination. What that possibility is, I don't know. It may be 99 percent. It might be one percent." (Dkt. 393-2 at 179:22–179:25). It is clear that what Dr. Warren was saying was that a risk of contamination exists, although he cannot quantify it. This does not automatically make his testimony speculative. Had Dr. Warren attempted to quantify the risk, surely Andersen would be pointing out that no science supports such a quantification.

were degraded and could possibly have been contaminated. Dr. Warren's testimony will aid the jury in assessing that theory and determining what weight to give the DNA evidence. The concepts of DNA contamination and degradation are not something that the average juror would understand, except possibly at a very high level of generality. *See United States v. King-Vassel*, 728 F.3d 707, 712 (7th Cir. 2013) ("Expert testimony may be required for matters that are beyond the common understanding of a lay juror."); *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) ("Expert testimony is permitted to assist the trier of fact with technical issues that laypeople would have difficulty resolving on their own."). The Court believes that Dr. Warren's testimony will aid the jurors in understanding these scientific concepts and applying them to the facts here. And that it is not disputed that degradation occurred here does not make the concept any more understandable to the jury. Defendants are still entitled to have Dr. Warren provide background on what degradation is and why it occurs as the Court believes that this is not within the ken of the average juror.

Andersen's arguments regarding Dr. Warren's testimony go to the weight it should be given, not its admissibility. This includes the argument that the likelihood of contamination was low here because at least some evidence appears to have come from blood, as well as the argument that degraded and contaminated DNA can still be reliably interpreted. Andersen will have the opportunity to vigorously cross-examine Dr. Warren on the opportunities for contamination and degradation and to

present evidence which undermines his opinions. *See Schultz*, 721 F.3d at 431. These methods, rather than exclusion, are the appropriate solution here.

## IV. Specific Limitations

Andersen argues for some specific limitations on Dr. Warren's testimony. Andersen argues that Dr. Warren may not testify generally regarding how evidence was stored prior to the rise of DNA testing in the 1980s. Such a limitation is appropriate, as Dr. Warren's expertise is not in the standards for evidence collection pre-DNA testing. Dr. Warren will, however, be permitted to discuss any practices for which there is factual support, including information about how the evidence was stored in this case and his own laboratory experiences.

Andersen also argues that Dr. Warren should be barred from testifying about the interpretations of the DNA testing results. Dr. Warren has made clear that he was not retained to interpret the DNA testing results here, nor has he attempted to do so. (*See, e.g.*, Dkt. 441 at 157:3–157:4, 177:20–177:23). He did, however, opine on the general fact that the DNA samples obtained from the knife and bra were low-level samples and were degraded and generated results that could be consistent with contamination. (Dkt. 393-1 at 20–21, 28). He further noted that given the degradation on the bra, it could be assumed that other evidence was similarly degraded. (*Id.* at 28). This is within his expertise and he will be permitted to discuss these opinions. Further, as Andersen notes, it is not disputed that the relevant DNA samples in this case were degraded. (*See* Dkt. 393 at 10 (noting no dispute that "the relevant DNA was degraded")).

Andersen moved to exclude any opinion Dr. Warren may give on guilt or innocence. Dr. Warren has not given any such opinion and Defendants represent that he will not do so. (Dkt. 409 at 2 n.1). This argument is therefore moot.

In post-hearing briefing, Andersen moved to exclude previously undisclosed opinions that Dr. Warren offered for the first time at the hearing. (Dkt. 449). The first is any reliance on guidelines published by the Scientific Working Group on DNA Analysis Methods ("SWGDAM"). Andersen notes that Dr. Warren did not reference the SWGDAM guidelines in his report and stated in his deposition testimony that he did not rely on them. (Dkt. 449-4 at 116:4–117:15). Federal Rule of Civil Procedure 26(a)(2)(B) requires an expert witness to provide "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them." "Rule 37(c)(1) states that if a party fails to comply with Rule 26(a), the evidence is excluded 'unless the failure was substantially justified or is harmless.'" *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 417 (7th Cir. 2019) (quoting Fed. R. Civ. P. 37(c)(1)). Defendants did not respond to Andersen's motion to exclude this testimony or explain why it was justified or harmless. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument. . . results in waiver."). The Court will therefore bar Dr. Warren from relying on SWGDAM guidelines to support his opinions.

Andersen also moved to bar Dr. Warren's previously undisclosed opinion regarding the significance of the absence of DNA on a piece of evidence generally, and the significance of the absence of Trunko's DNA on the knife specifically. (Dkt. 441

at 173:1–174:23). The former part of this opinion is not undisclosed—it falls within Dr. Warren's original opinions about degradation (*Compare* Dkt. 393-1 at 5 ("Also, handling of the evidence, such as removal of the source of DNA, not wearing gloves when handling the evidence, improper packing and storage of evidence, can sometimes exasperate DNA degradation") *with* Dkt. 441 at 173:1–173:24 ("Well, were there opportunities for DNA to be removed? Were there opportunities, again, for -- mainly, again, for DNA to be removed or DNA to degrade beyond the point where it's usable?")). The latter opinion about Trunko, however, is undisclosed. As previously noted, Dr. Warren stated that he would not address the interpretation of the DNA profiles here. Again, Defendants did not respond to Andersen's motion to exclude this testimony or explain why it was justified or harmless. The Court will therefore bar Dr. Warren from referencing the absence of Trunko's DNA profile on the knife.

## CONCLUSION

For the foregoing reasons, Andersen's motion to exclude the testimony of Dr. Warren is granted in part and denied in part. (Dkt. 392). Andersen's motion to exclude Dr. Warren's undisclosed opinions is also granted in part and denied in part. (Dkt. 449). His testimony is generally admissible but will be limited consistent with this Opinion.

_____
Virginia M. Kendall
United States District Judge

Date: April 13, 2020