IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DANIEL ANDERSEN, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| | ) No. 16 C 1963 |
| v. | ) |
| | ) Judge Virginia M. Kendall |
| THE CITY OF CHICAGO, *et al.,* | ) |
| | ) |
| *Defendants.* | ) |
| | ) |
| | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Daniel Andersen was convicted of the murder and attempted rape of Cathy Trunko and spent over twenty-five years in prison. In 2015, Andersen's conviction was reversed, and he received a Certificate of Innocence. Andersen proceeded to sue the City of Chicago and various members of Chicago law enforcement involved in the case. (Dkt. 1). Andersen alleges violations of his constitutional rights, pursuant to 42. U.S.C. § 1983, and several state-law claims.

The Court assumes familiarity with the facts of this case, as the Court recently provided a detailed background in *Andersen v. City of Chicago*, No. 16 C 1963, 2019 WL 6327226 (N.D. Ill. Nov. 26, 2019). In summary, in January 1980, Trunko died after being stabbed. A few days after her death, Chicago Police recovered a knife near the scene that they believed to be the murder weapon. In the week following Trunko's death, Andersen was arrested on a disorderly conduct charge and was questioned about Trunko. Andersen eventually confessed to killing Trunko—a confession that

he says was coerced. Andersen proceeded to a jury trial, where he was convicted of the murder and attempted rape of Trunko. Andersen remained in custody from the time of his arrest in 1980 through trial, and up until his release from prison in April 2007. In August 2015, Andersen's conviction was reversed, and in December 2015, he was granted a Certificate of Innocence by the Circuit Court of Cook County.

Defendants have moved to bar the testimony of Dennis Waller, one of Andersen's police-practices experts. (Dkt. 395). The Court held a hearing on the motion on January 29, 2020. (Dkt. 473). For the following reasons, the motion is granted in part and denied in part.

## LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals*, Inc., 509 U.S. 579 (1993)." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Trial judges act as gatekeepers to screen expert evidence for relevance and reliability. *Daubert*, 509 U.S. at 589; *see also C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015). Under Rule 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the following conditions are satisfied:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In other words, "the key to the gate is not the ultimate correctness of the expert's conclusions. . . , it is the soundness and care with which the expert arrived at her opinion." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013). In evaluating the expert's proposed testimony, the Court should "scrutinize proposed expert witness testimony to determine if it has the same level of intellectual rigor that characterizes the practice of an expert in the relevant field so as to be deemed reliable enough to present to a jury." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (internal quotation marks omitted).

The Court utilizes a three-part analysis when applying the *Daubert* framework to proposed Rule 702 evidence. The Court determines (1) "whether the witness is qualified"; (2) "whether the expert's methodology is scientifically reliable"; and (3) "whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (internal quotation marks omitted); *see also Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017). The expert's proponent bears the burden of demonstrating that the testimony would satisfy the *Daubert* standard by a preponderance of the evidence. *See Gopalratnam*, 877 F.3d at 782; *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

## DISCUSSION

Andersen retained Waller to opine on the propriety of certain actions taken by law enforcement in Andersen's criminal case. Waller opined that, in investigating

Andersen, officers' documentation and interrogation practices were not in line with accepted police practices. (*See generally*, Dkt. 395-1). Defendants seek to bar Waller's testimony on the grounds that he is not qualified to render opinions in this case, he failed to apply a reliable methodology, and his opinions would not be helpful to the jury.

## I.   Qualifications

Defendants argue that Waller is not qualified to opine on the police practices in this case because he has very little experience investigating homicides. They also say that he has opined on false confessions, DNA evidence, polygraphs, and legal standards without sufficient experience to do so.

The Court concludes that Waller is qualified to opine on police practices generally. Waller has degrees in police administration and public administration, in addition to over 3,600 hours of additional law enforcement training from various institutions. (Dkt. 395-1 at 1; Dkt. 411-2 at 3). He spent nearly two decades as a law enforcement officer, in roles spanning police officer, to Sergeant, to Chief of Police. (Dkt. 395-1 at 1; Dkt. 411-2 at 1). He also has experience training officers; he spent several years as the director of a police training academy. (Dkt. 395-1 at 1–2; Dkt. 411-2 at 1). He has been trained as an assessor for the Commission on Accreditation for Law Enforcement Agencies and is a certified police instructor in several states. (Dkt. 395-1 at 1; Dkt. 411-2 at 2–3). He has trained "hundreds of officers" on topics including investigations, report writing, interrogation, and more. (Dkt. 395-1 at 2).

He also serves as a member of a number of professional associations in the field of law enforcement. (Dkt. 411-2 at 2).

Waller is qualified by nature of his academic training, his experience in law enforcement, and his experience in law enforcement training. *See Trustees of Chicago Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Tr. Funds v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 787 (7th Cir. 2007) ("This court has recognized that while extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." (internal quotation marks omitted)). Waller's opinions primarily go to report writing and interrogation practices, two areas in which he has experience. (*See, e.g.*, Dkt. 395-1 at 2; Dkt. 473 at 20:19–20:21); *cf. United States v. Truitt*, 938 F.3d 885, 889–90 (7th Cir. 2019) (noting that a generalist can speak to specialized subjects he has experience with, but not those he does not). To the extent that Defendants want to highlight the lack of experience Waller may have, for example in personally investigating homicides or in taking subjects to be polygraphed, they may do so through cross-examination. *See Sheldon v. Munford, Inc.*, 950 F.2d 403, 410 (7th Cir. 1991) ("Once the district court has found a sufficient foundation for an expert's testimony, it properly leaves questions concerning his methodology, findings, and expertise to cross-examination.").

Waller will not, however, be permitted to opine that the knife was not the murder weapon. (*See, e.g.*, Dkt. 395-1 at 13 ("Subsequent DNA analysis of the knife

established that the blood on the suspect knife was not linked to either Cathy Trunko or Daniel Andersen.")). Although there is factual support for the premise that the knife may not be the murder weapon, that support comes from DNA testing. Waller is not qualified to discuss or opine on this testing as he is not a DNA expert. *See, e.g., Harris v. City of Chicago*, No. 14 C 4391, 2017 WL 2436316, at *15 (N.D. Ill. June 5, 2017) (noting that, although there was factual support for an opinion that a victim's death was accidental, false-confessions expert was not permitted to opine on the subject because it was not within his expertise).

Waller will likewise not be permitted to testify that Andersen's confession was, in fact, false, that the officers "concocted" his confession, or that the tactics used in this case were likely to result in a false confession. (*See, e.g.*, Dkt. 395-1 at 18, 25). Nothing in Waller's experience qualifies him as an expert on false confessions and he will not be permitted to opine on the subject. Further, whether Andersen is innocent and whether his confession was false are disputes at the heart of this case and must be left to the jury. *See, e.g., Harris*, No. 14 C 4391, 2017 WL 2436316, at *16 (noting that whether a confession was false, even where a Certificate of Innocence was obtained, was a question for the jury); *Caine*, No. 11 C 8996, 2013 WL 1966381, at *3 ("However, Dr. Leo will not be allowed to testify as to his opinion that Caine's and Patterson's confession statements were false. In particular, he will not be allowed to testify as to his comparison of the witnesses' confessions and the physical evidence of the crime. That is decidedly a jury question and allowing Dr. Leo to opine on that subject would invade the province of the jury.").

## II. Reliability & Relevance of Opinions

Waller described his methodology in his report. He first reviews the information provided to him to gain an understanding of the facts. Here, that information included files from the criminal case, the criminal trial transcripts, deposition transcripts and answers to interrogatories in the present case, and more. (Dkt. 395-1 at 2–4). He then analyzes the actions of the involved officers and compares those actions with "various standards of training and practice." (*Id.* at 2). Finally, he explains how the officers' actions were consistent or inconsistent with those standards. (*Id.* at 3).

This is a reliable methodology for an expert such as Waller. *See Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013) (noting that it was appropriate for police-practices expert to "describe[e] sound professional standards and identify[] departures from them" (internal quotation marks omitted)). Waller must, however, explain how he reaches his conclusions—either by linking them to generally accepted standards in the field or by citing information within his own practical experience. *See Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013) ("The critical inquiry is whether there is a connection between the data employed and the opinion offered. . . ."); *Potts v. Manos*, No. 11 C 3952, 2017 WL 4365948, at *5 (N.D. Ill. Sept. 29, 2017) ("A witness who offers expert testimony based on his experience must connect his experience to the facts of the case in order to meet the standard for reliability under *Daubert* and the Federal Rules of Evidence."); *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("If the witness is

relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."). He may rely on disputed facts to reach his opinions, as long as there is evidence to support such facts. *See United States v. Hall*, 93 F.3d 1337, 1345–46 (7th Cir. 1996) ("It is enough if the expert makes clear what his opinion is, based on the different possible factual scenarios that might have taken place."); *Harris*, No. 14 C 4391, 2017 WL 2436316, at *12 ("It is well-settled that experts can base their opinions on disputed facts because the 'soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.'" (quoting *Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.*, 782 F.3d 353, 360 (7th Cir. 2015))); *Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 1730608, at *6 (N.D. Ill. May 2, 2016) ("Moreover, although an expert cannot rely on facts that are clearly contradicted by undisputed evidence, an expert may rely on his client's version of the facts when forming his opinions.").

In addition to being reliable, Waller's opinions must be relevant. This means that they must assist the jury in "understand[ing] the evidence" or "determin[ing] a fact in issue." *Myers*, 629 F.3d at 644 (internal quotation marks omitted).

This Court's role is to address each of Waller's opinions and assess whether they properly apply a reliable methodology and whether they are relevant. The Court addresses each opinion in turn.

### A. Purpose of Investigations

Waller begins the opinions section of his report by stating that the purpose of an investigation is to uncover the truth and that officers should protect the innocent and respect the constitution. (Dkt. 395-1 at 7–8). This is not the kind of testimony that an expert is needed for—jurors are perfectly capable of understanding what the goal of a criminal investigation is. *See Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) ("Expert testimony is permitted to assist the trier of fact with technical issues that laypeople would have difficulty resolving on their own."); *Florek v. Vill. of Mundelein, Ill.*, 649 F.3d 594, 602–03 (7th Cir. 2011) ("And when the testimony is about a matter of everyday experience, expert testimony is less likely to be admissible."). Waller's testimony will therefore not aid the jury, and he will not be permitted to opine on this very simple principle. *See, e.g., Wells v. City of Chicago*, No. 09 C 1198, 2012 WL 116040, at *12 (N.D. Ill. Jan. 16, 2012) ("In particular, [Waller] contends [police officers] violated obligations to safeguard lives, be mindful of the welfare of others, respect constitutional rights, and so on. The opinion is far too general to be helpful to the jury in determining whether plaintiff has proved her claims.").

### B. Andersen's Statements to Law Enforcement Upon His Arrest

Waller opines that "the actions of CPD personnel in documenting what Daniel allegedly said in the police vehicle after his initial arrest are inconsistent with nationally accepted standards of police training and practice." (Dkt. 395-1 at 8). Specifically, Waller points out that Detective Olson documented in a report that

Andersen had told Officers Bednarkiewicz and Nielsen that he had stabbed Trunko and how he did it. Yet Officers Bednarkiewicz and Nielsen in their reports documented only that, upon arresting Andersen, "investigation disclosed that the subject may be involved or have information concerning a homicide which was under investigation." (*Id.* at 9). Waller goes on to point out that published and nationally accepted standards for police writing, specifically International Association of Chiefs of Police ("IACP") Training Keys, provide that reports should detail all relevant facts and information derived from interviews and officers must create a complete report. (Dkt. 395-1 at 9–10). *See Truitt*, 938 F.3d at 890 ("*Daubert* identifies a number of factors a court might consider, including whether the methods. . . are generally accepted in the field."); *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011) (noting that publication of a theory and its acceptance within the relevant community are factors to be considered under *Daubert*.). He ties these standards back to the reports of Officers Bednarkiewicz and Nielsen, opining that had they obtained a confession from Andersen, as detailed by Detective Olson and as described by them in later testimony, they would have been expected to document that in their reports. (Dkt. 395-1 at 11–12). This opinion reflects the reliable application of an appropriate methodology and is admissible.

This opinion is also relevant. Andersen's theory of the case is that Andersen did not independently or spontaneously confess to killing Trunko, rather law enforcement developed and fed him a story to confess to. That officers' documentation of Andersen's confession is inconsistent with a spontaneous confession is relevant to

assessing this theory of the case. Waller's testimony on this subject does not, as Defendants suggest, invade the province of the jury in assessing Andersen's claim brought pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). Waller does not opine that the officers violated *Brady* or state that they left material information out of their reports, he merely highlights what the professional standards are and identifies departures from them, which is entirely appropriate. *See Jimenez*, 732 F.3d at 721 ("When an expert offers an opinion relevant to applying a legal standard. . . the expert's role is limited to describing sound professional standards and identifying departures from them." (internal quotation marks omitted)).

A portion of Waller's opinion on this subject, however, is inadmissible as irrelevant. Waller states that Andersen's version of his statement to the officers is more consistent with the officers' reports than Detective Olson's report of Andersen's alleged confession. To reach this conclusion, Waller merely compares Andersen's testimony to the reports by the officers and Detective Olson. (Dkt. 395-1 at 11). Waller is no more capable of making this comparison than the jury. His testimony on the subject will not aid the jury in any overly complicated analysis and will usurp a credibility determination appropriately left to the jury. *Goodwin v. MTD Prod., Inc.*, 232 F.3d 600, 609 (7th Cir. 2000) ("[A]n expert cannot testify as to credibility issues. Rather, credibility questions are within the province of the trier of fact, in this case a jury."). Waller will not be permitted to opine on the consistency of Andersen's version of events with the various law enforcement reports. *Cf. Wells*, No. 09 C 1198, 2012 WL 116040, at *13 ("Waller is not using his expertise and knowledge

of police practices. . . . The jury is equally qualified to assess the evidence and determine whether draw this inference.").

Last, Defendants argue that Waller admitted that it is appropriate for a fellow officer to document events, and that Detective Olson did so here. Therefore, any discussion about improper documentation should not be allowed. Defendants twist Waller's testimony; he made clear that his beliefs about sharing documentation duties relates to two officers who both experience events firsthand. (*See, e.g.*, Dkt. 473 at 79:5–79:24). Further, whether it was appropriate for Detective Olson to be the sole documenter here and whether there are standards to support any such conclusion are appropriate fodder for cross-examination. *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) ("Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination."). The Court will not exclude Waller's testimony on this basis; as previously noted, he sufficiently supported his opinion and it is relevant.

### C. Collection of Physical Evidence

Waller also opines on the collection of physical evidence in the case, namely the knife, a beer bottle, and a pair of Andersen's gloves. Andersen's theory of the case includes arguments that law enforcement failed to consider alternative scenarios or suspects, fabricated evidence to induce Andersen to confess, and generally failed to sufficiently investigate the case. Waller's testimony about failures in collecting and

documenting evidence is relevant because it will assist the jury in assessing these theories.

Although Waller's opinions on the physical evidence are relevant, not all exhibit sufficient reliability. First, regarding the knife, Waller states that "[a]lthough there was no objective indication between the two events, the knife was immediately and improperly associated with the Trunko homicide." (Dkt. 395-1 at 12–13). Waller, however, does not explain what general standards or what in his experience led him to believe that the knife's association with the crime was improper. He merely jumps to the conclusion without explanation. In fact, he testified that standards about how the knife should have been assessed would "probably" be in Chicago Police Department ("CPD") training documents, but that he did not review these. (Dkt. 473 at 89:12–89:25). He simply stated, without elaborating, that based on his experience, that was how the knife should have been handled. (*Id.* at 90:2–90:4). This is not a reliable methodology to reach such a conclusion, and therefore Waller's opinions about improper association of the knife will be excluded. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.").

Waller also comments on the recovery of an Old Style beer bottle. To the extent that documentation about finding the bottle was incomplete, *i.e.* the report did not detail where it was found or by whom, that falls within Waller's earlier description of

the standards for complete reporting. (Dkt. 395-1 at 9–10). He will be permitted to testify about this documentation failure.

Waller also noted, however, that the bottle was not photographed nor was a chain of custody maintained for the bottle, it was discarded. He opines that the evidence technicians failed to consider the "theory of transfer" that the offender could have left the bottle at the scene. (Dkt. 395-1 at 13–14). As with the knife, Waller reaches these conclusions without appropriately linking them to standards or his experience. Waller states without any support that "[p]hotographing evidence prior to its collection is a nationally accepted standard of law enforcement practice." He also cites the "theory of transfer" but offers no explanation as to whether this is a theory commonly taught to or known by law enforcement. He otherwise cites nothing about standards for evidence technicians' conduct or report writing, nor anything else supporting his conclusions. Waller's opinions about improper handling of the bottle will be excluded.

Finally, Waller references a pair of Andersen's gloves. Detective Higgins allegedly showed Andersen a photograph of his gloves with the bloody knife, which was thought to be the murder weapon. Waller points out that collection of the gloves and the photograph were not documented. Documentation regarding the gloves falls within Waller's earlier description of the standards for complete reporting. (Dkt. 395-1 at 9–10). He will be permitted to testify about this documentation failure.

Waller also points out that Detective Higgins later testified that he did not recall showing Andersen any such picture and did not know if such a picture existed.

He opines that these are "waffle" responses that are embarrassing and revealing for Detective Higgins. His citations do not support his opinion. He cites propositions about interrogations and exposing witness inconsistencies that do not have to do with a detective's inability to remember case facts when testifying. He also implies that Detective Higgins could have been lying under oath. Waller failed to connect his opinions about Detective Higgins' testimony regarding the gloves to either his expertise or recognized standards. Additionally, it is not clear that any police-practices expertise is needed to evaluate the credibility of Higgins' testimony. *See Goodwin*, 232 F.3d at 609; *Wells*, No. 09 C 1198, 2012 WL 116040, at *13. Waller will therefore not be permitted to opine on this subject.

### D. Failure to Document Alternative Suspect Information

Waller discusses the failure of law enforcement to document information about a possible alternative suspect, Robert LaGace. Specifically, he observes that law enforcement failed to document that LaGace was near the scene of the crime when it happened, was looking for Trunko at the time, had been known to pull knives on Trunko, and was taken for a polygraph. (Dkt. 395-1 at 16–17). Although this information was discussed as background in a law enforcement polygraph report, nowhere did Detectives Bedran and Rochowicz document where or how they learned information about LaGace, and the prosecutor allegedly was unaware of this information. The relevance of this testimony is hard to dispute—it will aid the jury in assessing Andersen's theory that law enforcement focused in on him to the exclusion of other viable suspects and suppressed evidence in doing so.

Waller ties this documentation failure to standards regarding the duty to disclose information pursuant to *Brady*, namely IACP and Fraternal Order of Police materials regarding *Brady*. These standards, Waller says, tell officers that they should disclose exculpatory material to the prosecutor. (Dkt. 395-1 at 15–16). This failure also falls within Waller's earlier description of the standards for complete reporting. (*Id.* at 9–10). By linking his conclusions about this documentation and disclosure failure to the standards he cites, Waller engages in a reliable application of his methodology. Waller's opinions regarding documentation about LaGace are therefore admissible.

Although Waller will be permitted to discuss standards developed after *Brady*, he will not be permitted to describe to the jury the legal holding in that case or the elements of a *Brady* claim. That will be for the Court to do. *See Jimenez*, 732 F.3d at 721 ("It is the role of the judge, not an expert witness, to instruct the jury on the applicable principles of law. . . ."). His general use of terms such as "relevance," however, do not usurp the Court's role in instructing the jury. Documentation of relevant evidence goes to professional standards and requirements, and it is appropriate for Waller to discuss and apply such standards here. *See id.* ("When an expert offers an opinion relevant to applying a legal standard. . . the expert's role is limited to describing sound professional standards and identifying departures from them." (internal quotation marks omitted)).

Waller also opines that any leads about LaGace should have been investigated and documented. He supports this conclusion with information from IACP training

materials which provide that "a polygraph is not a substitute for a comprehensive field investigation." (Dkt. 395-1 at 20). He bridged this opinion to published standards, reliably applying his methodology, and will be permitted to discuss it.

Defendants argue that Waller's opinions regarding the failure to document information about LaGace are not relevant because this information *was* documented, it was just done in a polygraph report, and the failure to turn over that report cannot be the basis of Andersen's *Brady* claim. The Court thoroughly addressed this proposition in summary judgment opinion. *See Andersen*, No. 16 C 1963, 2019 WL 6327226, at *7–9. As detailed in that opinion, the information that the polygraph examiner documented as background information could have come from Detectives Bedran and Rochowicz, and their failure to record and report the source of this information and the general fact that LaGace was polygraphed could support a *Brady* claim. As such, Waller's opinions regarding whether the detectives acted inconsistently with national standards in failing to document such information is clearly relevant to Andersen's *Brady* claim. *See Jimenez*, 732 F.3d at 721 ("In constitutional tort cases, expert testimony regarding sound professional standards governing a defendant's actions can be relevant and helpful."). To the extent that Defendants want to highlight the appropriateness of relying on another officer to draft a report, here the polygraph examiner, "vigorous cross-examination" and "presentation of contrary evidence" are the appropriate means to show as much. *Schultz*, 721 F.3d at 431 (quoting *Daubert*, 509 U.S. at 596).

Within his opinion regarding the failure to appropriately document information about LaGace, Waller discusses CPD's "practice" of keeping street files or running files. (Dkt. 395-1 at 14, 20). The *Monell* claim in this case was bifurcated (*see* Dkt. 90), and therefore references to "practices" beyond the evidence of what was actually done in this case are unnecessary, confusing, and unduly prejudicial, and will not be permitted. *See* Fed. R. Evid. 403.

### E. Andersen's Interrogation

Waller opines on Andersen's interrogation. He discusses the legal standards for a voluntary confession through the guise of a CPD General Order. Waller walks through the definition of an interrogation, how a subject must be warned of his constitutional rights, and what might invalidate a confession. (Dkt. 395-1 at 21–22). He then goes on to point out the facts relevant to each piece of the legal standard for a voluntary confession, for example, he notes that Andersen was intoxicated upon arriving at the station, he was beaten by officers, and was questioned for approximately seventeen straight hours. (*Id.* at 21–22, 25–26). He even went so far as to say that, based on the facts, Andersen's alleged waiver of his Miranda rights was "not a knowing and certainly isn't an intelligent waiver." (Dkt. 473 at 45).

"It is the role of the judge, not an expert witness, to instruct the jury on the applicable principles of law, and it is the role of the jury to apply those principles of law to the facts in evidence. As a general rule, accordingly, an expert may not offer legal opinions." *Jimenez*, 732 F.3d at 721. While an expert may "describe[e] sound professional standards and identify[] departures from them," Waller's opinion goes

beyond that. *Id.* (internal quotation marks omitted). The bulk of Waller's opinion on Andersen's confession amounts to an instruction on the law and application of the law to the facts. This invades the province of both the jury and this Court and Waller will not be permitted to testify to this piece of his opinion. *See also Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (noting that "expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible").

Further, Waller primarily relies on CPD's own policies to assess whether the interrogation was appropriate. (Dkt. 395-1 at 21–22). But "[e]vidence of purely localized police procedure is less likely to be helpful than nationally or widely used policy." *United States v. Brown*, 871 F.3d 532, 538 (7th Cir. 2017). Waller does not explain whether this policy reflected widely accepted standards or the standards he used when training officers about interrogations.

Waller also comments on the "[w]idespread physical abuse perpetrated by CPD personnel" during this timeframe and states that this led to multiple false confessions, invoking Jon Burge. (Dkt. 395-1 at 24). As previously noted, Andersen's *Monell* claim was bifurcated. CPD's general practices are not at issue in this case. Further, any reference to widespread police abuses would be far more prejudicial than probative. *See* Fed. R. Evid. 403; *see also, e.g., Patterson v. City of Chicago*, No. 15-CV-4139, 2017 WL 770991, at *12 (N.D. Ill. Feb. 28, 2017) (noting that plaintiff "may not, however, introduce evidence of unrelated collateral matters—such as *United*

*States v. Burge*. . .—because such evidence is irrelevant, unduly prejudicial, distracting to the jury, and would result in unwarranted time-waste.").

One limited area that Waller will be able to opine on regarding the interrogation is the failure to document any *Miranda* warnings Andersen was given. As described above, Waller explained that accepted standards require complete reporting. (Dkt. 395-1 at 9–10). Waller further opined that for decades the best practice for advising individuals of these rights is either by having them sign a waiver or recording their waiver. (*Id.* at 22–23). This is within his expertise and he reliably connects this testimony to facts indicating that Andersen's waiver of his rights was not appropriately documented. Further, it is relevant. Whether officers adequately documented Andersen's waiver could aid the jury in assessing whether he really did make such a waiver, and in turn, whether his confession was voluntary.

## F. Failure to Intervene

Waller's final statement in his report is that "[s]omething as egregious as what occurred to Daniel. . . could only occur with the tacit understanding, cooperation, and approval of other members of the Chicago PD." (Dkt. 395-1 at 26). Without any elaboration, he states that other officers "had an obligation and opportunity to intervene to prevent Constitutional violations from occurring," but did not. (*Id.*). He cites nothing to support this sweeping opinion, which teeters into being an impermissible legal conclusion on Andersen's failure-to-intervene claim. This opinion is unsupported and unreliable, and therefore will be excluded.

## CONCLUSION

For the foregoing reasons, Defendants' motion to exclude Waller's testimony is granted in part and denied in part. (Dkt. 395). His testimony will be limited consistent with this Opinion.

Virginia M. Kendall
United States District Judge

Date: April 14, 2020