## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| DANIEL ANDERSEN, ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | No.  16 C 1963 |
| ) | |
| v. ) | Judge Virginia M. Kendall |
| ) | |
| THE CITY OF CHICAGO, *et al.,* ) | |
| ) | |
| *Defendants.* ) | |
| ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Daniel Andersen was convicted of the murder and attempted rape of Cathy Trunko and spent over twenty-five years in prison. In 2015, Andersen's conviction was reversed, and he received a Certificate of Innocence. Andersen proceeded to sue the City of Chicago and various members of Chicago law enforcement involved in the case. (Dkt. 1). Andersen alleges violations of his constitutional rights, pursuant to 42. U.S.C. § 1983, and several state-law claims.

The Court assumes familiarity with the facts of this case, as the Court recently provided a detailed background in *Andersen v. City of Chicago*, No. 16 C 1963, 2019 WL 6327226 (N.D. Ill. Nov. 26, 2019).  In summary, in January 1980, Trunko died after being stabbed.  A few days after her death, Chicago Police recovered a knife near the scene that they believed to be the murder weapon.  In the week following Trunko's death, Andersen was arrested on a disorderly conduct charge and was questioned about Trunko.  Andersen eventually confessed to killing Trunko—a confession that

he says was coerced. Andersen proceeded to a jury trial, where he was convicted of the murder and attempted rape of Trunko. Andersen remained in custody from the time of his arrest in 1980 through trial, and up until his release from prison in April 2007. In August 2015, Andersen's conviction was reversed, and in December 2015, he was granted a Certificate of Innocence by the Circuit Court of Cook County.

Defendants have moved to exclude the proposed testimony of Andersen's DNA-related expert witnesses, Barbara McCarty, Jennifer Myler, Karl Reich, and Charlotte Word. (Dkt. 396). For the following reasons, Defendants' motion to exclude the opinions of these witnesses is denied, with one limited exception as to Dr. Word.

## LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Trial judges act as gatekeepers to screen expert evidence for relevance and reliability. *Daubert*, 509 U.S. at 589; *see also C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015). Under Rule 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the following conditions are satisfied:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In other words, "the key to the gate is not the ultimate correctness of the expert's conclusions. . . , it is the soundness and care with which the expert arrived at her opinion." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013). In evaluating the expert's proposed testimony, the Court should "scrutinize proposed expert witness testimony to determine if it has the same level of intellectual rigor that characterizes the practice of an expert in the relevant field so as to be deemed reliable enough to present to a jury." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (internal quotation marks omitted).

The Court utilizes a three-part analysis when applying the *Daubert* framework to proposed Rule 702 evidence. The Court determines (1) "whether the witness is qualified"; (2) "whether the expert's methodology is scientifically reliable"; and (3) "whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (internal quotation marks omitted); *see also Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017). The expert's proponent bears the burden of demonstrating that the testimony would satisfy the *Daubert* standard by a preponderance of the evidence. *See Gopalratnam*, 877 F.3d at 782; *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

## DISCUSSION

The DNA-testing results at issue in this case come from two pieces of evidence: (1) the knife, which is alleged to be the murder weapon; and (2) fingernail clippings taken from both of Trunko's hands.

Barbara McCarty and Jennifer Myler worked as analysts at Cellmark Forensics, the lab where the evidence was tested, when the testing was conducted. They performed the testing and analysis of the evidence. Their results were detailed in four reports dated between February 2014 and January 2015. (Dkts. 386-45, 386-46, 386-47, 386-48). They concluded, in part, that based on the DNA profiles derived from their testing:

- Andersen and Trunko were excluded as possible contributors of DNA to the sample taken from the sharp edge of the knife;

- Andersen was excluded as a possible contributor of DNA to the sample taken from the groove on the side of the knife blade, but no conclusions could be reached as to Trunko;

- No conclusions could be reached as to whether Andersen or Trunko were contributors of DNA to the sample taken from the knife handle;

- Andersen and Trunko were excluded as possible contributors of DNA to the sample taken from the knife hilt;

- Testing of the left-hand fingernail clippings revealed a major profile consistent with Trunko, but no conclusions could be made regarding the minor types present in the sample; and

- Andersen was excluded as a possible contributor of DNA to the sample taken from the right-hand fingernail clippings.

(Dkts. 386-45, 386-46, 386-47, 386-48).

Andersen retained Dr. Word to review the evidence and DNA testing results. She concluded, in part, that "a) there is no indication of DNA from Cathy Trunko or Daniel Andersen on any part of the knife blade or handle tested, including areas that tested positive for the presence of blood; b) there is no indication of DNA from Daniel Andersen on the fingernail clippings from Cathy Trunko; and c) DNA from several other unidentified males were detected on the knife and fingernails." (Dkt. 386-53 at 3).

Andersen also retained Dr. Reich as a rebuttal witness, to rebut testimony from Defendants' DNA experts. Dr. Reich opined that: (1) there is little or no foundation for calculating the weight of an exclusion; (2) partial profiles can be reliably interpreted and can be interpreted to come from a single source; (3) the amount of DNA recovered from a sample does not, by itself, inform the quality of the DNA profile that is obtained; (4) DNA degradation cannot be responsible for the exclusions of Trunko and/or Andersen; (5) Defendants' experts inaccurately describe the risks and effects of contamination; and (6) Andersen's DNA is not present in the DNA profile derived from the right-hand fingernail clippings. (Dkt. 386-54).

For the most part, Defendants make blanket arguments in their motion rather than attacking specific experts' opinions. The Court therefore performs its evaluation of the four experts collectively, addressing these arguments as they apply to all the

experts. The Court held hearings on this motion in December 2019 and January 2020. (Dkts. 441, 442, 466, 467).

## I. Qualifications

### A. Barbara McCarty

Defendants do not challenge McCarty's qualifications to testify as an expert in DNA testing and analysis. McCarty's CV, which was introduced as Plaintiff's Exhibit 52 in the hearings, shows that she has worked in the field of forensics and DNA testing for approximately fifteen years and has obtained multiple qualifications in that time. The Court finds her qualified to offer testimony as a DNA expert.

### B. Jennifer Myler

Defendants do not challenge Myler's qualifications to testify as an expert in DNA testing and analysis. Myler's CV, which was introduced as Plaintiff's Exhibit 39 in the hearings, shows that she has worked in the field of forensics and DNA testing for over twenty years. She has obtained multiple qualifications and has also conducted trainings in the field throughout Virginia. The Court finds her qualified to offer testimony as a DNA expert.

### C. Karl Reich

Defendants do not challenge Dr. Reich's qualifications to testify as an expert in DNA testing and analysis. Dr. Reich's CV, which was introduced as Plaintiff's Exhibit 1 in the hearings, shows that Dr. Reich was educated at highly reputable institutions and then spent years as a research fellow. His CV reflects decades of experience in the field of DNA testing, including nearly twenty years as the managing

partner of a DNA forensic laboratory. He has also published extensively in the field and has led trainings across the nation. The Court finds him qualified to offer testimony as a DNA expert.

### D.    Charlotte Word

Defendants do not challenge Dr. Word's qualifications to testify as an expert in DNA testing and analysis. Dr. Word's CV, which was introduced as Plaintiff's Exhibit 8 in the hearings, shows that she was educated at highly reputable institutions. She has published extensively and led multiple workshops and presentations in the field. She serves as a member of multiple organizations in the field, including on the Editorial Board of the Journal of Forensic Sciences. The Court finds her qualified to offer testimony as a DNA expert.

## II.   Relevance

Defendants make the same relevance arguments as to all of Andersen's DNA experts. They argue that the experts' opinions will not assist the jury in understanding the evidence or determining a fact in issue because the results of the recent DNA testing have no bearing on what DNA might have been on the evidence in 1980, when Trunko was killed. Specifically, Defendants cite several issues with the handling of the evidence in the decades between the crime and the DNA testing at issue here.

Defendants point to law enforcement's original testing and handling of the knife. Because DNA testing was not in use at the time the knife was recovered, Defendants say, methods of testing may have contaminated the evidence. They argue

that, at the time, evidence technicians and lab analysts did not properly handle the evidence when recovering and testing it, including by not wearing face masks or possibly even gloves, swabbing with pieces of cotton that could have been contaminated, possibly leaving evidence out before and after testing, and more . (*See* Dkt. 396 at 12–13; Dkt. 386-10 at 299:18–300:6, 329:11–329:15; Dkt 386-37 at 123:15–126:15).

Defendants also point to the prosecutors' handling of the evidence. The Cook County Assistant State's Attorneys who prosecuted the case took the knife to be used at the trial and did not recall using or typically did not use gloves when handling it— again, at the time DNA testing was not on their radar. (Dkt. 386-17 at 183:5–183:23; Dkt. 386-18 at 97:12–98:13). Many witnesses at trial may have also handled the knife without gloves and the jury was also given access to the knife during deliberation. (Dkt. 386-23; Dkt. 396 at 11). After trial, the Cook County Clerk of Court may have also touched the evidence without gloves when impounding evidence. (*See* Dkt. 386-28 at 31:15–33:8). For decades, the evidence was kept in a non-temperature-controlled warehouse where multiple boxes of evidence may have been stacked on top of each other. (*See* Dkt. 386-30 at 36:2–38:3).

By the time Andersen's post-conviction attorneys came on the scene and inspected the evidence, the knife was inside an evidence box in a torn manila envelope with the handle sticking out. (Dkt. 386-31 at 105:22–107:10). Defendants argue that the knife may have been loose in an evidence box and touching other pieces of evidence. In June 2013, an employee at the courthouse retrieved the evidence,

possibly without wearing a face mask. (*Id.* at 122:11–128:6). This evidence was ultimately sent to Cellmark, and when it was received, the handle of the knife, if it had been covered, was possibly exposed and touching other envelopes filled with evidence. (Dkt. 386-33 at 66:1–81:12).

Defendants additionally point to the fact that it is unknown whether the DNA found on the evidence came from blood—it could have come from sweat, saliva, or skin cells. If it did come from the latter sources, it could be likelier to be the result of contamination after the crime.

Defendants argue that, as a result of these multiple possible avenues of contamination and degradation and the fact that the source of the DNA is unknown, the DNA testing results could not possibly provide information about what DNA may have been on the knife at the time of the crime. And because the testing does not provide information about the DNA at the time of the crime, it is irrelevant and unhelpful to a jury. Further, Defendants contend that allowing the experts to discuss the recent DNA results will lead jurors to speculate that the current testing results would be the same as any test results that could have been done in 1980.

The Court will not exclude the experts' testimony on these grounds. Law enforcement proceeded against Andersen on the theory that the knife was the murder weapon, and he confessed to having used it. That the knife may not have been the weapon would be a crucial piece of information that would aid the jury in assessing Andersen's claims. The same goes for Trunko's fingernail clippings, that Andersen's DNA may not have been on them goes a long way towards establishing that he was

not the killer. The results of the DNA testing on these key pieces of evidence would certainly assist the jury in "understand[ing] the evidence" or "determin[ing] a fact in issue," namely whether Andersen's confession was false and whether he was the perpetrator. *Myers*, 629 F.3d at 644 (internal quotation marks omitted); *see also Walker v. Soo Line R. Co.*, 208 F.3d 581, 587 (7th Cir. 2000) (noting that an expert's testimony can still assist the trier of fact even if the expert cannot reach a conclusion with "complete certainty").

Defendants will be permitted to thoroughly cross-examine the experts about the potential for contamination and degradation and the possible impact on the results, as well as the fact that the source of the DNA is unknown. Defendants will have ample opportunity to argue to the jurors that the DNA on the evidence in 2014 does not reflect the DNA that may have been on the evidence in 1980, and that the jurors should therefore give little weight to the DNA testing results. *Cf. United States v. Tatum*, 548 F.3d 584, 587 (7th Cir. 2008) (noting that, in determining the admissibility of evidence, gaps in the chain of custody go to weight of the evidence, not admissibility); *see also, e.g., United States v. Goodrich*, 739 F.3d 1091, 1098 (8th Cir. 2014) (per curiam) ("The contamination of the DNA evidence in the collection process and the weight to give it are questions for the jury to decide."). Cross-examination, rather than exclusion, is the appropriate course.

## III. Reliability & Application of Methodology

Defendants challenge the reliability of the methodology and opinions of the experts. Their arguments boil down to the proposition that low-level and degraded

DNA samples, like the samples here, generate unreliable results and should not be interpreted. These arguments, and their multitude of tributaries that Defendants explored in their 59-page motion, go to the weight to be given to the experts' testimony, not its admissibility.

As an initial matter, this Court takes into consideration the fact that Cellmark was accredited by the American Society of Crime Laboratory Directors, Laboratory Accreditation Board and was accredited under the FBI Quality Assurance Standards and the International ISO Standards. (Dkt. 466 at 15:22–16:10). As described by Myler, the accreditation process included "a full review of our policies and procedures as well as a case review to ensure that we were being accurate in our results and to ensure the validity of our results." (*Id.*). This lends credence to the fact that Cellmark was performing its tests and analyses in accordance with generally accepted standards in the field. Additionally, accreditation included review of Cellmark's Standard Operating Procedures, ("SOPs"). (*Id.* at 19:4–19:7). The SOPs were developed based on validation studies of equipment used in the laboratory. (*Id.* at 23:19–24:2). The SOPs provided guidelines and protocols for the testing and analysis McCarty and Myler performed here. (*See, e.g.*, *id.* at 28:20–29:1; Dkt. 467 at 13:5–14:1). That Cellmark's methods were developed based on validation studies and were reviewed by an accrediting body within the field strongly supports their reliability. *See United States v. Truitt*, 938 F.3d 885, 890 (7th Cir. 2019) ("*Daubert* identifies a number of factors a court might consider, including whether the methods have been

tested or subjected to peer review and whether they are generally accepted in the field.").

In their argument that it was improper to interpret the low-level DNA samples here, Defendants point generally to the proposition that low-level DNA can be "challenging to interpret" and that the "forensic DNA community needs to be vigilant" in interpreting such samples. (Dkt. 396 at 44 (quoting John M. Butler, Advanced Topics in Forensic DNA Typing: Interpretation 177 (2015))). But their arguments and the bases for them do not persuade the Court that such samples can *never* be reliably interpreted or that analysts should *never* attempt to do so.

Specifically, Defendants point to the fact that only partial DNA profiles were derived from the samples, including the sample taken from Trunko's bra which was used to develop her profile for comparison purposes. Andersen, on the other hand, points to the 2017 Interpretation Guidelines published by the Scientific Working Group on DNA Analysis Methods ("SWGDAM"), which is "a group of scientists representing federal, state, and local forensic DNA laboratories in the United States and Canada." (Dkt. 415-16 at 2). These guidelines support the reliability of the methods used by the experts. As explained in the 2017 SWGDAM guidelines, "DNA typing results may not be obtained at all loci for a given evidentiary sample (e.g., due to DNA degradation, inhibition of amplification and/or low-template quantity); a partial profile thus results." (*Id.* at 38). Yet the guidelines still anticipate that laboratories will analyze such partial profiles. (*Id.* at 38). Dr. Reich, who has himself performed, supervised, and reviewed hundreds of forensic DNA analyses (Dkt. 386-

54 at 2–3), stated that "every forensic DNA laboratory constantly encounters and then interprets, partial profiles" and that the "wholesale dismissal of a partial profile because it is a partial profile is not part of forensic practice, is not warranted on analytical grounds, and would infer that autosomal STR loci are not genetically and analytically independent (which of course they are)." (*Id.* at 4). Cellmark's SOPs allowed for interpretation of partial profiles and allowed for exclusions to be made based off of partial profiles. (Dkt. 466 at 36:4-36:15; Dkt. 467 at 30:9–30:18). All of this points to the reliability of the methodology used here.

Defendants also point repeatedly to evidence of stochastic effects present in the testing results here, arguing that when present, such effects make interpretation and analysis unreliable. The 2017 SWGDAM guidelines define stochastic effects as "the observation of intra-locus peak imbalance and/or allele drop-out resulting from random, disproportionate amplification of alleles in low-quantity template samples." (Dkt. 415-16 at 88). Yet, again, the 2017 SWGDAM guidelines anticipate that results may still be interpreted where stochastic effects are present. (*See, e.g., id.* at 13–15, 21). Cellmark SOPs provide that for low-level DNA, the possibility of stochastic effects must be considered, and the data must be interpreted with caution, and Myler testified that when interpreting the samples, she followed this guidance. (Dkt. 466 at 177:18–178:5).

Defendants additionally point to the fact that at least some of the evidence samples reflected "low copy number" ("LCN") DNA, which again, they say, cannot be reliably interpreted. Andersen points to John Butler's text, Forensic DNA Typing,

which Defendants repeatedly cite. Andersen notes that Butler discusses that, although there can be difficulties in reliably interpreting LCN profiles, LCN results may still be reliable and have "enabled recovery of DNA profiles" in "situations where only a few cells from the perpetrator were present and have thereby extended the power of DNA testing." John M. Butler, Forensic DNA Typing 170 (2005). Other district courts have concluded that interpreting LCN data is a generally accepted and reliable methodology. *See, e.g., United States v. Wilbern*, No. 17-CR-6017 CJS, 2019 WL 5204829, at *16 (W.D.N.Y. Oct. 16, 2019) ("In short, here, the Court finds that results obtained from LCN DNA testing do not amount to 'junk science,' to which the courtroom should remain closed."); *United States v. Morgan*, 53 F. Supp. 3d 732, 734 (S.D.N.Y. 2014), *aff'd*, 675 F. App'x 53 (2d Cir. 2017) (concluding "that the methods of LCN DNA testing that the New York City Office of the Chief Medical Examiner ('OCME') employed are sufficiently reliable to satisfy the *Daubert* standard").

In sum, the Court determines that it is a reliable science and generally accepted practice to interpret low-level and degraded DNA samples, as the experts did here. And, as evidenced in the reports and through testimony, the conclusions that the experts reached in their interpretations are supported by the profiles obtained from the DNA samples. (*See, e.g.*, Dkt. 386-54 at 10–11; Dkt. 442 at 53:14–54:2 Dkt. 466 at 84:10–84:22; Dkt. 467 at 33:25–34:7). In seeking to discount these conclusions, Defendants appear to forget that the Court's gatekeeping function is to determine whether the methods used by an expert in reaching a conclusion are sound, not to judge whether the conclusion is correct. *Schultz*, 721 F.3d at 431; *see also*

*Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) ("It is not the trial court's role to decide whether an expert's opinion is correct."). Nothing this Court has seen in the briefing or that it heard in the many hours of hearings leads to the belief that any of these experts applied a methodology that was anything but sound, reliable, and generally accepted. If Defendants believe that the experts' methods and conclusions are questionable, "vigorous cross-examination" and "presentation of contrary evidence" are the appropriate means to show as much. *Schultz*, 721 F.3d at 431 (quoting *Daubert*, 509 U.S. at 596).

Defendants again raise the argument about contamination, similar to their relevance argument. They say that it is possible that the evidence was contaminated, and that the contaminating DNA could have been "preferentially amplified" over low levels of the original DNA on the evidence. (Dkt. 396 at 56). This is speculative. Defendants are free to make this argument to the jury, but it does not render the experts' testimony inadmissible—like Defendants' other arguments, it goes to weight over admissibility.

Aside from their arguments about reliable interpretation of the DNA profiles, Defendants also argue that the testing itself was not appropriately conducted. Defendants point to the fact that the low-level DNA samples were tested only once but that replicate amplifications are recommended within the forensic community. The failure to replicate testing, Defendants say, means that the results are not reliable. Defendants also argue that Myler and McCarty "deviated from standard practice by failing to test the negative controls from post-amplification purification

(post-Amicon) samples." (Dkt. 396 at 55). This, they say, means that there was the possibility of laboratory contamination in the samples.

This argument is contradicted by the opinion of Dr. Word, who opined that "[t]he notes and reports provided indicate that testing was performed according to standard practices." (Dkt. 386-53 at 5). Regarding the failure to test negative controls, Dr. Word stated: "It is my preference that the Cellmark Forensics Laboratory would have also tested the amplification negative controls when doing the post-amplification purification step for the samples from the bra of Kathy Trunko and the knife blade edge; however, the apparent consistency between the results pre- and post-purification suggest that contamination is not an issue for these samples." (*Id.*). These opinions were based, in part, on Dr. Word's "over 38 years of molecular biology experience and over 28 years of experience applying molecular genetics techniques to forensic testing." (*Id.* at 11). While Defendants point to some evidence that could support the argument that it would be more reliable to replicate testing and test amplification negative controls when doing the post-amplification purification, that does not mean that the tests were unreliable as conducted. The Court relies on Dr. Word's considerable experience in determining that the testing here was done in accordance with generally accepted standards and methods, along with the fact that Cellmark was an accredited laboratory and McCarty and Myler applied its SOPs.

## IV.    Additional Challenges

### A.    Dr. Word

Defendants raise some specific challenges to testimony provided by Dr. Word. The Court concludes that Dr. Word will not be permitted to testify about the depth of Trunko's wounds.  While there may be factual support for the proposition that knife did not penetrate to its hilt, Dr. Word is not a medical examiner and opinions on this subject would go beyond her expertise.  *See, e.g., Harris v. City of Chicago*, No. 14 C 4391, 2017 WL 2436316, at *15 (N.D. Ill. June 5, 2017) (noting that, although there was factual support for an opinion that a victim's death was accidental, false-confessions expert was not permitted to opine on the subject because it was not within his expertise).

The Court will, however, permit Dr. Word make certain assumptions in reaching conclusions, namely regarding the number of contributors to the DNA profiles and  whether the blood found on the knife in 1980 is the same as that of the contributor to the DNA found on the knife blade edge.  These are within her expertise. Further, there is support for her opinions through the DNA test results, even though the meaning of those results may be disputed.  *See United States v. Hall*, 93 F.3d 1337, 1345–46 (7th Cir. 1996) ("It is enough if the expert makes clear what his opinion is, based on the different possible factual scenarios that might have taken place."); *Harris*, No. 14 C 4391, 2017 WL 2436316, at *12 ("It is well-settled that experts can base their opinions on disputed facts because the 'soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions

based on that analysis are factual matters to be determined by the trier of fact.'" (quoting *Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.*, 782 F.3d 353, 360 (7th Cir. 2015))). Further, Dr. Word does not simply state that only one conclusion is possible, she renders conclusions based on certain possible assumptions. (*See* Dkt. 385-53 at 4 ("If one assumes that this DNA profile originated from the individual whose type A blood was found on the knife in 1980, then this raises some questions regarding the theory that this knife is the weapon used to stab Cathy Trunko"); *id.* at 5 ("If one considers the alternative possibility and assumes this is the knife used to stab Cathy Trunko, then the presumptive presence of blood on the knife in multiple locations even in 2013 in the absence of DNA from Cathy Trunko suggests that the blood is either not from Cathy Trunko or not human and needs an additional explanation for its presence.")). The Court declines to limit Dr. Word's testimony as to these issues.

### B.    Dr. Reich

Defendants argue that Dr. Reich should not be permitted to testify that: "(1) the DNA from the sharp edge of the knife must be derived from blood and not other biological sources"; and "(2) the DNA profiles are not the result of contamination." (Dkt. 396 at 62). Defendants' summary of these arguments overstate what Dr. Reich opined on. In actuality, Dr. Reich stated that any DNA coming from blood would dwarf the DNA coming from touch. (Dkt. 386-54 at 9–10). This is within his expertise and he will be permitted to testify about this. If Defendants want to undermine Dr.

Reich's premise that the DNA from the knife likely came from blood, the appropriate way to do so is through cross-examination.

Likewise, Dr. Reich did not opine that there was no contamination in this case. What he stated was that it had not been proven that the derived DNA profiles were the result of contamination and that consequences of contamination here would be minimal. (*Id.* at 8–9). As to his former point, it is not a controversial statement; neither side has yet proven whether contamination occurred. Dr. Reich does not need to have reviewed the facts surrounding the handling of the evidence to make such an observation. As to the latter point, the risk of contamination for purposes of DNA testing is squarely within Dr. Reich's expertise, and he pointed to specific facts, which although disputed, support his proposition (*e.g.*, that the knife tested positive for blood, that DNA from blood would dwarf that from touch). *See Hall*, 93 F.3d at 1345–46; *Harris*, No. 14 C 4391, 2017 WL 2436316, at *12. His opinions are couched to scientific reasoning related to contamination, rather than relying on facts specific to this case, therefore it is again irrelevant that he did not review evidence surrounding the handling of the evidence. (Moreover, he did review Dr. Warren's report, which walked through the handling of the evidence in great detail.) Dr. Reich will be permitted to testify that, from a scientific perspective, the risk of contamination impacting the derived DNA profile is low, and, again, Defendants will be able to challenge this opinion on cross-examination.

Finally, Defendants argue that Dr. Reich made additional, previously undisclosed opinions, particularly about: (1) whether he agreed with Cellmark's

analysis of the DNA profile derived from the sharp edge of the knife; and (2) his own lab's practices. (Dkt. 454). These arguments are now moot. These opinions were offered in rebuttal to Dr. Krane's testimony, and this Court has excluded Dr. Krane's testimony. (Dkt. 656). There will therefore be no reason for Dr. Reich to reach these opinions.

Even if not moot, the Court would find Defendants' arguments unpersuasive. Dr. Reich's report specifically addresses Dr. Krane's opinions on the sharp edge of the knife by referring back to Cellmark's data. (Dkt. 386-54 at 5 ("The Cellmark processing of the DNA obtained from the sharp edge of the knife includes post-PCR purification and re-analysis by capillary electrophoresis. The resulting electropherogram was declared single source by Cellmark and is indeed best explained by this hypothesis.")). This is within his province as a rebuttal expert. His discussion on the topic at the hearing is not a new opinion nor does it contradict the premise that he was hired to rebut Defendants' experts rather than to review Cellmark's work generally. As to the practices of his own lab, Dr. Reich's report notes that his expertise comes, in part, from performing and supervising DNA analyses himself. (*Id.* at 2–3). Consistent with this premise, it is permissible for Dr. Reich to elaborate on how exactly his own practices and experience informed his opinion—that he did not elaborate on this in his report does not mean it is a new opinion. *Cf. Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009) (noting that the purpose of expert "reports is not to replicate every word that the expert might say on the stand"). The testimony he offered falls within his discussion of labs regularly interpreting partial profiles

(Dkt. 386-54 at 4) ("The loss of some data from a profile does not, *a priori*, inhibit, negate or destroy the potential probative value of that profile. Only by examining the DNA profile itself and its possible flaws or data loss can a determination of its probative value be made.").

### C.  Myler

Defendants argue that Myler should not be permitted to testify as an expert because she was disclosed as a fact witness. "Rule 37(c)(1) states that if a party fails to comply with Rule 26(a), the evidence is excluded 'unless the failure was substantially justified or is harmless.'" *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 417 (7th Cir. 2019) (quoting Fed. R. Civ. P. 37(c)(1)). In assessing such a motion, this Court considers "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Id.* (quoting *Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012)).

Defendants' argument is unpersuasive. They were able to depose Myler, obtain rebuttal experts, and to challenge her testimony through briefing and a lengthy hearing. Her "reports" are Cellmark's reports, and this Court has no reason to doubt that they were turned over in discovery—Defendants relied on them in making their *Daubert* motion. Myler will be permitted to testify as an expert.

Nor does the Court find that Myler made any previously undisclosed opinions at the hearing. These purported undisclosed opinions are that: "(1) the sharp edge of

the blade is single source, (2) the hilt of the knife is single source, and (3) an analyst can definitively state the number of contributors to a sample from unknown origins without making any assumptions." (Dkt. 476 at 6). Regarding the sharp edge, Myler's statement at the hearing was merely an elaboration of what she wrote in the initial Cellmark report. She stated that because the sample was low-level and degraded, she interpreted it with caution, which meant making the more conservative statement that the sample came from at least one source, but it could just as easily be interpreted as a single source. (Dkt. 466 at 119:12–120:24). The Court concludes that this was not a new, undisclosed opinion but rather a further explanation of her conclusions and the Court will not exclude it. *Cf. Walsh*, 583 F.3d at 994. Moreover, any failure to previously disclose this opinion would be harmless. Dr. Word opined that the sample taken from the sharp edge of the blade was from a single source, so Defendants would have been prepared to address this proposition regardless. (Dkt. 386-53 at 4). Regarding the hilt, the Cellmark report clearly states that the profile from the hilt "originated from an unknown male." (Dkt. 386-46). As Myler explained at the hearing, "that is synonymous with saying single source." (Dkt. 466 at 111:11–111:16). As to the third purported undisclosed opinion, Myler gave this in response to questioning by the Defendants. Again, she was not expected to anticipate any possible statement she might make while testifying and put it in her report or risk giving an "undisclosed opinion"—especially because her role in this case was as a forensic analyst, not a reviewing expert. *Cf. Walsh*, 583 F.3d at 994. Further, her statement is consistent with the fact that she described the sample taken from the

hilt as originating from a single male, thereby making a determination as to the number of contributors. Moreover, any failure to previously disclose these opinions is harmless; the Court does not believe that they will result in any prejudice or delay or were the result of bad faith.

## **CONCLUSION**

Dr. Word will not be permitted to opine on the depth of Trunko's wounds. Other than this exception, Defendants' Motion to Bar Plaintiffs' DNA Experts is denied. (Dkt. 396).

Virginia M. Kendall
United States District Judge

Date: June 16, 2020